1

1          UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,    )
                                 )
5              Plaintiff,        )    Case No. 21-cr-1289-TWR
                                 )
6   VS.                          )    San Diego, California
                                 )
7   NAMEER MOHAMMAD ATTA,        )    Monday,
                                 )    September 26, 2022
8              Defendant.        )    8:34 a.m.
    _____)

9

10

            REPORTER'S TRANSCRIPT OF PROCEEDINGS

11
            JURY TRIAL - DAY ONE (Pages 1 - 195)

12
          BEFORE THE HONORABLE TODD W. ROBINSON

13              UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   For the Government:   RANDY S. GROSSMAN, U.S. ATTORNEY
                           BY:  OWEN ROTH, Esq.
17                              J'ME FORREST, Esq.
                           Assistant U.S. Attorneys
18                         880 Front Street
                           San Diego, California  92101
19
     For the Defendant:    EZEKIEL E. CORTEZ
20                         Attorney at Law
                           55O West C Street
21                         Suite 790
                           San Diego, California  92101
22

23   Reported by:  Cameron P. Kircher
                    CSR NO. 9427, RPR, CRR, RMR
24                  333 W. Broadway, Suite 420
                    San Diego, California  92101
25                  e-mail:  cpkirchercsr@gmail.com

COMPUTER-AIDED TRANSCRIPTION

2

1                                INDEX

2                             EXAMINATION

3    WITNESS NAME                                              PAGE

4    AARON BALDERSON

5        Direct By Ms. Forrest................................... 53
         Cross By Mr. Cortez ................................... 75
6

7    KEITH NAYLOR

8        Direct By Ms. Forrest................................... 89
         Cross By Mr. Cortez ................................... 109
9        Re-Direct By Ms. Forrest ............................. 116

10

11   BRYAN PLATT, MD

12       Direct By Ms. Forrest................................... 117
         Cross By Mr. Cortez ................................... 138
13       Re-Direct By Ms. Forrest ............................. 153

14   STEPHEN LOGAN

15       Direct By Mr. Roth ................................... 156

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

3

EXHIBITS

1

2 <u>EXHIBIT</u>                                                    <u>PAGE</u>

3 <u>GOVERNMENT'S:</u>

4 Exhibit 2 Entered into Evidence                        68
  Exhibit 9 Entered into Evidence                        174
5 Exhibit 10 Entered into Evidence                       174
  Exhibit 11 Entered into Evidence                       174
6 Exhibit 12 Entered into Evidence                       174
  Exhibit 13 Entered into Evidence                       178
7 Exhibit 14 Entered into Evidence                       186
  Exhibit 15 Entered into Evidence                       180
8 Exhibit 16 Entered into Evidence                       190
  Exhibit 83 Entered into Evidence                       61
9 Exhibit 84 Entered into Evidence                       61
  Exhibit 88 Entered into Evidence                       73

10

11 <u>DEFENDANT'S:</u>

12 Exhibit 1 Entered into Evidence                        141

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

4

1          San Diego, California - Monday, September 26, 2022

2                              8:34 a.m.

3          THE CLERK:  Calling case 21-cr-1289, U.S.A. vs.

4     Nameer Atta for jury trial.

5          Counsel.

6          MS. FORREST:  Good morning, Your Honor.  J'me

7     Forrest and Owen Roth -- who stepped out for a moment but

8     will be right back -- for the United States.

9          THE COURT:  Okay.  Good morning.

10         MR. CORTEZ:  Good morning.  Ezekiel Cortez on behalf

11    of Mr. Atta, who is present in custody.

12         At counsel table, we have Ralph Cordova.  He's not

13    going to do anything.  He's going to be an inanimate object.

14    Keeping me in line.

15         THE COURT:  Are you going to introduce him to the

16    jurors?

17         MR. CORTEZ:  Yes.  In case they know him.

18         THE COURT:  Okay.

19         MS. FORREST:  Your Honor, we have some non-inanimate

20    objects at our table, people who will be doing some things.

21    We have Lina Douglas, as well as the case agent, Stephen

22    Logan.

23         THE COURT:  Okay.  Good morning to you, both.

24         Okay.  First things first, Mr. Cortez.

25         MR. CORTEZ:  Yes.

COMPUTER-AIDED TRANSCRIPTION

5

1          THE COURT:  It's my intention to discuss some of the

2    in-limine rulings and some of the pending motions.

3          MR. CORTEZ:  Yes, please.

4          THE COURT:  Do you waive the presence of Mr. Atta to

5    to discuss those legal matters?

6          MR. CORTEZ:  I do.

7          THE COURT:  Okay.  And for the record, Mr. Roth has

8    joined us now.

9          Okay.  Going through the in-limine motions, I read

10   the transcript, I've read the parties' motions.  I've also

11   gone back and read some of the other transcripts, so I think

12   I'm fully up to speed on the issues that are still pending.

13         And in that regard, I'm going to go through the

14   in-limine motions and just tell you what my understanding is

15   and clarify anything that was left open for my consideration

16   by Judge Sammartino.

17         The first one is to the -- admit the expert

18   testimony.  And there was a grant with respect to Dr. Platt,

19   Special Agent, is it Klinge?

20         MR. ROTH:  Klinge, yes, your Honor.

21         THE COURT:  Okay.  And the analysts, Lim and Evans.

22   And there is a reserved ruling on the motion with respect to

23   Criminalist Christopher Vance.  And I would also reserve on

24   that pending the evidence coming in.

25         The evidence that Mr. Vance would testify to, as I

6

1    understand it, are sales to other individuals involving pills

2    dissimilar to the ones allegedly sold to the decedent in this

3    case.

4              Is that a correct understanding?

5              MR. ROTH:  In part, Your Honor.  However, if

6    helpful, we're not going to call him; so we can moot this

7    particular expert.

8              THE COURT:  Okay.

9              MR. ROTH:  I'm sorry -- I apologize to the Court for

10   not updating you as to the particulars over the weekend.

11             THE COURT:  Okay.

12             MR. ROTH:  But we're not going to call Christopher

13   Vance, and we're not going to introduce evidence of those

14   sales of those pills.

15             MR. CORTEZ:  And counsel updated me over the

16   weekend.

17             THE COURT:  Terrific.  I appreciate the parties

18   working with one another.

19             MR. CORTEZ:  Your Honor, for the record, we just

20   received the exhibits with numbers.  We've had them over the

21   weekend, but not with numbers; so that's why I'm going

22   through the numbers right now.

23             THE COURT:  Okay.  In-limine No. 2 was a grant, and

24   I would adopt that.

25             The third was admit the text messages between

1    Mr. Atta and third parties highlighting his understanding of

2    fentanyl-laced pills.  I agree with Judge Sammartino's

3    tentative on that.  The conversations actually have to go to

4    the defendant's knowledge of fentanyl-laced pills.  So with

5    that in mind, I will rule on any objections as they come.

6         The geolocation data was No. 4.  I would adopt Judge

7    Sammartino's ruling on that.  That was a grant.

8         The social media, No. 5, I would adopt Judge

9    Sammartino's ruling on that.  That was a grant in part.  I

10   agree with Judge Sammartino that general evidence about

11   Mr. Atta being a prolific drug dealer is something that is

12   properly excluded, but I fully intend to allow the government

13   to present evidence with respect to fentanyl-laced pills and

14   other individuals.

15        So that would be -- yes.

16        MR. ROTH:  Let me -- if I may, Your Honor.  I can

17   give the Court some more precise explanation of what the

18   evidence will be as to that, that way at least the Court is

19   prepared for when objections come, if they do.

20        There are, I think the best way to describe it, sort

21   of like rings on a dart board, concentric circles of evidence

22   here.  Tapped at center, evidence of sales of the pills to

23   the defendant that led directly to his death, sales of

24   pills --

25        THE COURT:  To the decedent.

8

1          MR. ROTH:  The decedent.  I'm sorry.  I'm sorry.

2          Just outside it, sales of pills to the victim over

3     the course of about a five-week period that culminated in his

4     death.  Outside of that, sales of pills to other people.  And

5     then outside of that, sales of other drugs to other people.

6          THE COURT:  Okay.  You've lost me on the last

7     ring.

8          MR. ROTH:  Sales of other drugs to other people.

9     Sales of mushrooms and marijuana to people who are not the

10    victim.

11         As to the most outermost ring, Judge, we really have

12    made our very best effort to get rid of all of it.  There are

13    a few items of evidence in the form of Snapchat posts of

14    menus that refer to a variety of drugs.  We intend to offer a

15    variety of them.  Some list Percocet; some don't.  But that's

16    really the extent of the evidence that could reveal, in any

17    direct fashion, sales of other drugs to other people.

18         With respect to sales of Percocet in general, we do

19    have evidence.  We have text messages discussing Percocet

20    sales.  We have video posted to Snapchat that doesn't refer

21    to any drug in particular, but talks about the trap being

22    open for business, things like that.

23         And then with respect to sales of pills to the

24    victim, both in the general sense and precisely, we're

25    putting in everything we have that's admissible.  So we've

9

1    tried to really pare this down.  It's not perfect because we

2    kind of can't do it, as Your Honor will see.  But that's the

3    gist of the case.

4              THE COURT:  Okay.  With that clarification,

5    Mr. Cortez, do you still lodge an objection to the messages

6    or the postings that reference other drugs?

7              MR. CORTEZ:  I do.

8              THE COURT:  Okay.  I'm going to have to take a look

9    at those.  Can those be redacted?

10             MR. ROTH:  If Your Honor wants to see them, they are

11   Exhibit 42 of the Court's binder.  It's A through G.

12             THE COURT:  Okay.

13             MR. ROTH:  And yes, we can redact them.  I would ask

14   for the Court's guidance, and I would just ask for a little

15   bit of latitude on redacting ones that have Percocet in them.

16   Perhaps a more precise way to do it would be to only

17   introduce the posts that reference Percocet.

18             MR. CORTEZ:  Mr. Atta is now before the Court in

19   custody.

20             THE COURT:  Okay.

21             MR. ROTH:  It's also worthy of note, Judge, on one

22   instance the defendant bought a drug that was not Percocet.

23   It's a single instance.  It's otherwise relevant, and it is

24   in the evidence -- I'm sorry.  The defendant sold to the

25   decedent.

10

1          THE COURT:  Okay.

2          MR. CORTEZ:  I'm sorry.

3          THE COURT:  Mr. Cortez, with respect to the menu

4    items, that is, Government's Exhibit 42A, B, C, D, E, F and

5    G, I leave it up to you whether or not your request is that

6    they redact it.  The jurors could, if they are redacted, draw

7    an inference from the redacted versions.  I can give a

8    limiting instruction that they are only to consider the

9    evidence with respect to the Percocet and any fentanyl, and

10   any other drug dealing is not relevant for their

11   consideration.  So I leave it up to you as a tactical matter.

12         I believe the government is entitled to show that

13   Mr. Atta had for sale the Percocet and those items that

14   pertain directly and are tethered to this particular case.

15   But do you have a request with regard to redacting those

16   exhibits that I just referenced?

17         MR. CORTEZ:  I will reemphasize my objection to all

18   of that material and why.  Because the charge in this case,

19   as the government even noted in its papers, doesn't require

20   them to prove intent or mental condition -- mental intent to

21   sell fentanyl or Percocet or any specific controlled

22   substances.

23         Having noted my objection, again, I would, of

24   course, given the Court's ruling, I would ask for a

25   redaction.

COMPUTER-AIDED TRANSCRIPTION

11

1          THE COURT:  So going to the intent, the government

2    must prove that Mr. Atta had the intent to sell Percocet,

3    fentanyl or some other federally controlled substance.

4          Would not the unredacted versions of these go to

5    that intent that the government must prove?

6          MR. CORTEZ:  No, Your Honor.  Our position, which is

7    is in our moving papers, based on the government's own

8    representation to the Court, to Judge Sammartino, and quoting

9    of the Ninth Circuit Jury Instruction, they don't have to

10   prove intent of the drug.

11         THE COURT:  They don't have to prove the intent as

12   it relates to the death resulting, but they do have to prove

13   intent with regard to the distribution of a controlled

14   substance.

15         MR. CORTEZ:  The way we read it -- and it's very

16   explicit in the jury instructions -- they don't have to prove

17   foreseeability that the controlled substance will cause

18   death.  And -- actually, they do.  That's exactly what they

19   have to prove, that without foreseeability, that Mr. Atta

20   sold a controlled substance --

21         THE COURT:  But knowingly and intentionally sold a

22   controlled substance --

23         MR. CORTEZ:  Oh, absolutely.  Absolutely.  To

24   Mr. Reed.  To Mr. Reed.

25         THE COURT:  So that's the intent that I'm talking

1   about at this point --

2           MR. CORTEZ:  Right.

3           THE COURT:  -- the intent to distribute a controlled

4   substance, and then the resulting in death is a separate

5   intent.

6           So focusing only on the intent to distribute a

7   controlled substance, wouldn't all of these controlled

8   substances go to his intent?

9           MR. CORTEZ:  I would argue no.  As I noted in my

10  objections.  Having heard the Court's rulings, Sammartino's

11  and your tentative, I would object; but I would invite a

12  redaction of other drugs.

13          THE COURT:  Okay.  What is the government's

14  position?

15          MR. ROTH:  Your Honor, I would propose that in lieu

16  of redactions, that the government forego introducing

17  Government's Exhibits D, E and F, which are menus that do not

18  reference Percocet.  We can make the point we wish to make

19  without those three, and I think that has the effect of,

20  frankly, narrowing 42 by basically half.

21          I share the Court's concern that redactions are

22  worse than not redactions, because it would invite the jury

23  to wonder what's under those redactions.  And Mr. Atta did

24  not sell heroin.  He did not sell crack.  He did not sell a

25  number of drugs that are known to be exceedingly dangerous

13

1   and addictive.  And if a jury is wondering, I think that

2   could be prejudicial.

3          So I think if we remove those three, and we limit it

4   to -- it's really an exhibit of three examples of menus,

5   because one of them we're showing an update to, if Your Honor

6   compares A and B.  It's three menus from the defendant's

7   phone listing products, including Percocet.  We can make the

8   point that he understood Percocet was a drug that existed in

9   the market that he could sell for profit, and that's really

10  our point.

11         THE COURT:  Okay.  What is the difference between

12  42C and 42A and B?  I understand that B is an updated version

13  of A.  What is the relationship between those two exhibits

14  and C?

15         MR. ROTH:  Your Honor, it's another version of a

16  menu.  If Your Honor looks at the bottom half where it says

17  "non-THC product list," Your Honor will see "percs" are

18  listed.

19         Our point is we intend to argue the defendant

20  marketed, advertised, promoted sales of Percocet via

21  Snapchat.  We want to show a few different examples of him

22  doing that to make the point, this was his business practice.

23  We think that goes directly to knowing distribution, as Your

24  Honor has pointed out is an element, and knowledge that it's

25  drugs, controlled substances.

1          THE COURT:  Okay.

2          MR. ROTH:  And not sugar pills.

3          THE COURT:  Mr. Cortez, the government is

4    self-limiting to Exhibits 42A, B and C at this point.

5          MR. ROTH:  I'm sorry.  Also G.

6          MR. CORTEZ:  G.

7          MR. ROTH:  Which also, as Your Honor will see, lists

8    Percocet.

9          Your Honor, there is an independent value to this

10   one.  If Your Honor looks at the symbol, or emoji for Perc

11   30s in 42G, Your Honor will see it's a blue circle with a

12   white "M" in it.  In the early menus, it's a blue diamond.

13   We have evidence in the form of a ledger that the defendant

14   kept referring to Percocet sales to the victim and others,

15   and he categorizes them by emoji.  And those are the

16   interchangeable emojis he uses.  So this goes to

17   corroboration of sales.

18          THE COURT:  Okay.

19          MR. CORTEZ:  I don't want to go back and forth.

20   Just note my objections.  That's all I have to say.

21          THE COURT:  Okay.  So with the government's

22   withdrawal of the other exhibits, my tentative with respect

23   to 42A, B, C and G is to admit those exhibits and give a

24   limiting instruction to the jury reminding them of what the

25   charge is in this case and for what purpose they can consider

15

1     those exhibits.  Okay.

2           So next up is No. 7, which was the video footage,

3     the body-worn camera video footage.  I think at our last

4     hearing, I noted that I had watched the video footage.  Judge

5     Sammartino did not have the benefit of watching that video

6     footage.  I find that the video footage is relevant under

7     Rule 401.  However, I also need to analyze that evidence

8     under Rule 403.

9           And in that regard, I am cognizant of the

10    government's argument that the comments that are being made

11    during the time period that the EMTs and the paramedics were

12    administering treatment to the decedent are relevant.  And

13    the government is not limited in its proof just to the

14    testimony of the ME.

15          However, I believe that the video footage is such

16    that its relevance is substantially outweighed by the

17    prejudice that would flow if the jury was exposed to that

18    particular very graphic and very disturbing images and video

19    footage of the decedent in the state that he was when

20    treatment was being administered.

21          With that having been said, a lot of the weighing --

22    and it is a balancing test -- will depend upon the evidence

23    that comes in at trial.  So this is subject to revision.

24          Mr. Cortez, I don't know specifically what defense

25    or defenses you will be pursuing in this case, but if you do

16

1    challenge the testimony or the government's evidence that the

2    fentanyl was the cause of death, as opposed to other

3    contributing factors, that will weigh into the 403 balancing

4    test as to the probative nature of the evidence versus the

5    prejudicial aspect of it.

6         So I'm trying to be as transparent as possible with

7    respect to my weighing of those competing concerns, but at

8    this point in time, the government's motion to introduce the

9    video footage is respectfully denied.  And, of course, that's

10   subject to revisit -- to being revisited during the course of

11   trial.

12        I will permit the government -- in addition to the

13   video footage, there were still shots.  There were two still

14   shots.  There was a still shot where the victim had the

15   machine on his chest that was doing the compressions.  That,

16   I don't find that that is particularly relevant, but I will

17   allow the government to introduce the still shot of the EMT

18   or the paramedic administering the breaths.  And I think that

19   that is -- under 403, as I said, the video itself was

20   relevant, but I think that takes care of my overriding 403

21   concerns with respect to the prejudicial nature.

22        The government is entitled to prove its case, and

23   one of the things that they have to prove is that the victim

24   in this case suffered a fatal overdose.  And the condition of

25   the victim when the paramedics and the EMT responded is

17

1    relevant.  And I find that the one picture, and I've got a

2    copy of that picture because multiple ones were submitted to

3    me, and I'll have Ms. Ortiz hand this to the parties, so that

4    we're all talking about exactly the same thing.  I find that

5    that is admissible under 403.  So that's my ruling in that

6    regard.

7              MR. CORTEZ:  Thank you.

8              MR. ROTH:  Your Honor, just to complete the record.

9    There are two images, and Your Honor has identified

10   Government's Exhibit 2.

11             THE COURT:  Okay.

12             MR. ROTH:  Thank you.  Government's Exhibit 1 is

13   similar.  We would just ask for a ruling.

14             THE COURT:  Okay.  1, I find that it's cumulative.

15   The probative value of the photograph is the condition of the

16   decedent when the paramedics and EMTs were administering

17   treatment to him, so I find that Government Exhibit 1 is

18   cumulative to Government Exhibit 2.

19             So while I will allow at this point Exhibit 2 in, 1

20   I find is not properly admitted.

21             MR. ROTH:  Okay.  Thank you, Your Honor.

22             THE COURT:  Okay.  Eight, testimony from the witness

23   identified as A.G. pertaining to the sale of fentanyl pills.

24   That was granted.  I adopt that.

25             MR. ROTH:  It's moot, Your Honor.  A.G. will not

COMPUTER-AIDED TRANSCRIPTION

1    testify.  That is the person who was the subject of the

2    supplemental motion that we withdrew late last week.

3           THE COURT:  Okay.  No. 9 was tied in with the

4    criminalist, so I believe that's denied as moot.

5           As to the excited utterances, government in-limine

6    10, I adopt Judge Sammartino's tentative on that.

7           The motion filed, the in-limine motion filed as

8    No. 11, the aspects of the medical history, Judge

9    Sammartino's ruling as I understand it was that the medical

10   history of the decedent may properly be inquired into on

11   cross-examination of the medical examiner as to the medical

12   examiner's ultimate opinion that the death resulted from

13   fentanyl, as opposed to other causes.  And I adopt that

14   tentative.  I believe that that's a proper line of

15   cross-examination.

16          No. 12, I would adopt the tentative on that with

17   respect to the Wounded Warrior Project being granted.  That

18   motion regarding the Wounded Warrior Project being granted.

19   And the A.G. is, of course, a moot point at this point, the

20   testimony regarding that.

21          13 --

22          MR. CORTEZ:  Your Honor --

23          THE COURT:  Yes.

24          MR. CORTEZ:  Although not entirely.  The government

25   wants to offer Agent Logan's report of her interview.

1          MR. ROTH:  No, we don't.

2          THE COURT:  Okay.

3          MR. CORTEZ:  Okay.  See.  We're catching up.

4          THE COURT:  We're narrowing the issues, and I

5    appreciate that.

6          MR. CORTEZ:  Yes.

7          THE COURT:  With respect to Motion in Limine No. 13,

8    the ruling by Judge Sammartino was reserved on that, and it

9    depends on the evidence at trial.  I agree.  We'll see how

10   the evidence comes in as to what other sources of fentanyl or

11   any other controlled substance the decedent might have had.

12         14 was granted.  That's the arrest of Mr. Atta for

13   selling a gram of cocaine.  I adopt that tentative.

14         Any references to punishment are impermissible, and

15   I adopt that.  That was No. 15.

16         And the motion filed as 16 was the unrelated

17   information about Mr. Atta that was granted.  And I adopt

18   that, unless some relevance is established by the defense.

19         And 17, again, I adopt that.  If there has been any

20   discovery-related incidences or alleged violations, I'll

21   address those as they go.

22         And Mr. Cortez, do you intend to call experts at

23   this point --

24         MR. CORTEZ:  No.

25         THE COURT:  -- or do you reserve on that?

20

1          MR. CORTEZ:  I'm going to reserve.

2          THE COURT:  Okay.  And the final is the government's

3     new in-limine motion to preclude evidence that the decedent

4     engaged in the use of acid in the fall of 2019.

5          I believe that ties in with No. 11, and my tentative

6     is to grant that with respect to character evidence of the

7     decedent.  But Mr. Cortez, I believe that you can properly

8     inquire of the ME whether use of acid in the fall of 2019 may

9     or may not have been a contributing factor to the death of

10    C.M.R., as opposed to the opinion, as I understand it, that

11    it was solely attributable to the fentanyl that he had

12    ingested.

13         MR. CORTEZ:  Thank you.

14         THE COURT:  Okay.  Does that take care of all the

15    in-limine motions and all pending motions?  From the

16    government's perspective?

17         MR. CORTEZ:  It does.

18         MR. ROTH:  Yes, Your Honor.  Thank you.

19         THE COURT:  Mr. Cortez?

20         MR. CORTEZ:  For the record, I will just restate my

21    objections.

22         THE COURT:  Okay.  Of course.

23         MR. CORTEZ:  And with that, we're ready.

24         THE COURT:  Okay.  That brings me next to --

25         MR. ROTH:  Your Honor, may I confer with counsel for

21

1   just a moment?

2        MR. CORTEZ:  He conferred all weekend with me.  I

3   protest.

4        (Attorney conference.)

5        MR. ROTH:  Your Honor, pursuant -- in this case, the

6   discovery includes two phones that were seized from the

7   defendant.  They are largely duplicative.  Pursuant to an

8   agreement between the parties, the United States will not be

9   introducing any evidence from one of those phones for any

10  purpose, including cross-examination.

11       For the record, that is the phone that was seized

12  from Mr. Atta in late April of 2021.  About two weeks later,

13  I think it's about May 5th, a second phone was seized from

14  him.  All government evidence concerning the defendant's

15  phone as referenced in front of the jury will be a reference

16  to the second phone.

17       THE COURT:  Okay.

18       MR. ROTH:  Thank you.

19       THE COURT:  Okay.  With regard to the preliminary

20  jury instructions, Mr. Cortez and the government also filed

21  their preliminary instructions.

22       Mr. Cortez, you made reference in your filing that

23  you were adopting all of the ones that were filed by the

24  government.  In going through and comparing and contrasting,

25  there were a couple of instances where the government

COMPUTER-AIDED TRANSCRIPTION

22

1    included something that you did not include.

2            MR. CORTEZ:  Correct.

3            THE COURT:  And I want to make sure that you're okay

4    with those aspects of it.

5            MR. CORTEZ:  Thank you for asking.  The only ones I

6    have an issue with is the ones that appear to get into

7    closing argument and the law regarding circumstantial

8    evidence and what the government's burden is.

9            THE COURT:  No, no, no.  This isn't the voir dire,

10   the submitted voir dire questions.  This is the preliminary

11   instructions to the jury.  These are the pattern.

12           MR. CORTEZ:  Oh, jury instructions.  We all agree.

13           THE COURT:  Okay.  You said that yours were the same

14   as the government, and that was not entirely true.  And I

15   just wanted to highlight the two instructions where the

16   government included language that you did not include and

17   want to make sure that you're okay with it.

18           MR. CORTEZ:  Yes.

19           THE COURT:  Jury Instruction No. 2, the government

20   amended the pattern instruction to include reference to

21   C.M.R. and the statutes that are alleged to have been

22   violated by Mr. Atta; that is, 841(a)(1) and then the penalty

23   provision of (b)(1)(C).  And then the government also

24   included a very brief recitation of the elements that they

25   must prove to put the evidence in context.

23

1          And my tentative is to grant the request to give

2     those instructions.  I believe that it's appropriate for the

3     jurors to know what the government's burden of proof is as

4     they listen to the evidence in this case.

5          MR. CORTEZ:  I agree.

6          THE COURT:  Okay.  There was also Jury Instruction

7     No. 11, and there is an italicized portion in the second

8     paragraph where I'm going through and instructing the jury as

9     to what happens during the course of trial, and when I

10    reference then if the defendant chooses to offer evidence,

11    counsel for the government may cross-examine, there is an

12    italicized portion, the defendant has no duty at all to offer

13    any evidence.

14         And Mr. Cortez, my question in that regard is if you

15    wish me to give that instruction, given your plan to present

16    or not present any evidence?

17         MR. CORTEZ:  At this point, I am going to reserve

18    commenting.

19         THE COURT:  Okay.  Do you request that I give that

20    or not give that, or do you leave that to my discretion?

21         MR. CORTEZ:  I'll just submit it to the Court.

22         THE COURT:  Okay.  The pattern instructions that the

23    jury will receive at the end of the case make reference to

24    the fact that at no time does the defendant have any

25    obligation to present any evidence or testify, and I believe

24

1    that accurately covers that particular instruction, so my

2    tentative is not to give the italicized portion.

3          MR. CORTEZ:  Thank you, Your Honor.

4          THE COURT:  Okay.  So the voir dire questions, I

5    know I gave the parties 15 minutes for voir dire.  There were

6    a number of questions that not only tracked the standard

7    questions that are posed to the jurors, but there were some

8    that were submitted that I think are fairly characterized as

9    argumentative in nature and go to the ultimate deliberative

10   process, if you will, of the jurors and somewhat asks them to

11   pre-judge some of the evidence.

12         So out of the submitted questions, I've selected

13   two -- or I've created two.  And the first one goes to the

14   nature of the charge in this case, and whether given the

15   nature of the charge, any of the jurors simply could not be

16   fair and impartial to both sides.  So it is a recitation of

17   the charge and it incorporates a comment on the distribution

18   of controlled substance as well as the evidence that they

19   will hear regarding that the use of a controlled substance is

20   alleged to have resulted in the death of C.M.R.

21         So I do intend to inquire as to that so that the

22   parties need not sort of associate themselves with those

23   particular issues.

24         MR. CORTEZ:  Thank you.

25         THE COURT:  The second was the standard questions

25

1    that I ask of all the jurors that have to do with a

2    relationship with law enforcement and whether they would give

3    a law enforcement officer's testimony greater or less

4    credibility just by virtue of their employment status.

5         The second question tailored to the specific facts

6    of this case has to deal with military personnel testifying

7    in this case and whether by virtue of their status as

8    military personnel, whether any of the jurors would give that

9    testimony greater or lesser credibility just by virtue of

10   their status as a member of the military.

11        So those are the two questions that I culled from

12   the parties' suggested questions.  This is a unique case and

13   raises issues that we don't often see.  I will allow the

14   parties 20 minutes of attorney-conducted voir dire.  I think

15   that from the questions that were submitted, there are a

16   number that are properly put to the jurors, but are not so

17   sensitive in nature that the Court needs to ask those

18   particular questions.

19        So I defer to counsel on both sides as to which of

20   the proposed questions they want to inquire during the

21   attorney-conducted voir dire, but those other two areas that

22   I previously mentioned, I think are properly addressed by the

23   Court so that the parties don't have to identify themselves

24   with those more sensitive issues.

25        MR. ROTH:  Your Honor, if the Court's view of the

26

1    argumentative proposed voir dire is that the substance is not

2    properly acquired by voir dire, would the Court mind flagging

3    for the parties which ones, so that we don't do it.  If it's

4    a matter of tone, we will just do our voir dire.

5            THE COURT:  It's not a matter of tone.  It's a

6    matter of, you know, will you vote guilty if the government

7    proves its case beyond a reasonable doubt; and there was a

8    similar submission by the defense.

9            So any questions going to the ultimate issue that

10   the jurors must decide, or their consideration of any

11   particular evidence in the case, I believe that those lines

12   of inquiry would be improper during the attorney-conducted

13   voir dire.

14           So without going through each and every one of those

15   and giving you my tentative as to each and every one of

16   those, keeping those parameter in mind.  We have very

17   experienced counsel on both sides of this case, and I'll take

18   any objections as they are lodged.

19           MR. ROTH:  Thank you, Judge.

20           MR. CORTEZ:  Thank you.

21           THE COURT:  Okay.  With regard to any other matters

22   that we need to address, is there anything else from the

23   government's perspective before we bring the jurors in?

24           MR. ROTH:  No, Your Honor.

25           THE COURT:  Okay.  From the defense?

27

1          MR. CORTEZ:  No.  I had an issue before with the

2    marshals sitting between my client and one of us, but that's

3    not going to happen.  He looks pretty good in that suit.

4    Thank you.

5          THE COURT:  Okay.  It's been my experience that the

6    marshals who are in the court are very professional and sort

7    of meld into the scene and are not independently identifiable

8    as law enforcement personnel.

9          So when we bring the jurors in, just --

10          THE MARSHAL:  I'm going to hop up to the table,

11    sir.

12          THE COURT:  That will be terrific.  So we're going

13    to put the jurors where the questionnaires are already in the

14    seats.  So I don't anticipate any issue.

15          We've got a number of people in the gallery.  I

16    would caution you not to have any interactions at any time

17    with any of the jurors.  This case will be tried in a fair

18    and impartial manner, and I don't want anyone to have contact

19    with any of the jurors; nor will there be any comment on any

20    of the evidence as it comes in.  And I hope that is clear to

21    all the people in the gallery.

22          With that in mind, we're going to bring the jurors

23    in, and we'll begin the jury selection process.

24          (Recess, 9:05 a.m. to 9:20 a.m.)

25          THE CLERK:  Calling case 21-cr-1289, U.S.A. vs.

COMPUTER-AIDED TRANSCRIPTION

1    Nameer Mohammad Atta for jury trial.

2          Counsel.

3          MR. ROTH:  Good morning, Your Honor.  Owen Roth,

4    joined by J'me Forrest and Lina Douglas on behalf of the

5    United States.

6          THE COURT:  Good morning.

7          MR. CORTEZ:  Ezekiel Cortez for Nameer Atta.  And

8    Ralph Cordova, who is going to be assisting at counsel

9    table.

10         THE COURT:  Okay.  Thank you and good morning.

11         MR. CORDOVA:  Good morning.

12         THE COURT:  Ladies and gentlemen, I want to start

13   this morning by welcoming all of you to the courthouse.  And

14   I want to thank you sincerely for your willingness to

15   participate in this incredibly important civic duty that we

16   all have as citizens of this country.

17         Our criminal justice system could not do what it

18   needs to do without the willingness of each and every one of

19   you to take time out of what I appreciate and understand are

20   very busy schedules to come here to the courthouse and

21   participate as prospective jurors in the jury selection

22   process here this morning.  So I want to thank each and every

23   one of you for your willingness to do that.

24         I also want to talk very briefly about the pandemic

25   and our current posture with regard to the pandemic.  We

1    follow all of the CDC and local health guidelines, and I am

2    pleased to let each and every one of you know that throughout

3    the pandemic, we have managed to stay open and conduct

4    business as a court over the last two years.  And we've done

5    so by changing method of operating jury trials.  We are back

6    to our normal method of operation at this point.

7            But I am pleased to let you know that despite the

8    fact that we've been open throughout the pandemic, I have

9    received no information that any of the jurors who have

10   participated in any of the trials have had negative

11   consequences as a result of performing this very important

12   duty as jurors.

13           So we do take your health and safety very seriously.

14   We clean the courtroom twice a day.  And we leave it up to

15   each and every one of you, because that's the current

16   guidance, as to whether or not you choose to wear a mask or

17   choose not to wear a mask.  You're free to do either one

18   throughout the proceedings.

19           So I did want to start with that preliminary remark

20   about your health and safety, and, again, thank you very much

21   for your willingness to participate in this process.

22           At this point, ladies and gentlemen, I would ask

23   each and every one of you to stand.  My courtroom deputy will

24   swear you in as prospective jurors.  So if you wouldn't mind

25   standing and taking the oath.

30

1        THE CLERK:  Please raise your right hand.

2        (Prospective jurors sworn, 9:22 a.m.)

3        (Jury voir dire reported; not transcribed herein.)

4        (Jury sworn, 12:07 p.m.)

5        THE CLERK:  Thank you.  You can be seated.

6        THE COURT:  Okay.  Ladies and gentlemen, I'm going

7   to read to you some preliminary instructions, and I want to

8   apologize for not maintaining eye contact with you in

9   speaking to you directly.  I am going to read them.  They are

10  written.  At the conclusion of the case, you will receive

11  written jury instructions which will govern your duties as

12  jurors and specifically the law that will apply to the facts

13  as you find them in the case.

14        So you need not take any notes.  You do have

15  notebooks, I believe, on your chair.  If you don't have them

16  on your chair now, they will be when you return from lunch.

17  These preliminary instructions will take about 10, maybe 15

18  minutes, and at the conclusion of the instructions, we will

19  break for lunch and then begin with the taking of testimony

20  after the opening statements in the afternoon.

21        So the preliminary instructions are as follows:  You

22  are now the jury in this case, and I want to take a few

23  minutes to tell you something about your duties as jurors and

24  to give you some preliminary instructions.  At the end of the

25  trial, I will give you more detailed, written instructions

COMPUTER-AIDED TRANSCRIPTION

31

1    that will control your deliberations.

2         When you deliberate, it will be your duty to weigh

3    and to evaluate all the evidence received in the case, and,

4    in that process, to decide the facts.  To the facts as you

5    find them, you will apply the law as I give it to you,

6    whether you agree with the law or not.

7         You must decide the case solely on the evidence and

8    the law before you.  Perform these duties fairly and

9    impartially.  You should not be influenced by any person's

10   race, color, religious beliefs, national ancestry, sexual

11   orientation, gender identity, gender or economic

12   circumstances.

13        Also, do not allow yourself to be influenced by

14   personal likes or dislikes, sympathy, prejudice, fear, public

15   opinion or biases, including unconscious biases.  Unconscious

16   biases are stereotypes, attitudes or preferences that people

17   may consciously reject but may be expressed without conscious

18   awareness, control or intention.  Like conscious bias,

19   unconscious bias can affect how we evaluate information and

20   make decisions.

21        This is a criminal case brought by the United States

22   Government.  The government charges the defendant with

23   distribution of fentanyl resulting in death of another; that

24   is, the individual identified by the initials C.M.R., in

25   violation of Section 841(a)(1) and (b)(1)(C) of Title 21 of

COMPUTER-AIDED TRANSCRIPTION

1    the United States Code.

2              The charge against the defendant is contained in the

3    indictment.  The indictment simply describes the charge the

4    government brings against the defendant.  The indictment is

5    not evidence and does not prove anything.  The defendant has

6    pleaded not guilty to the charge and is presumed innocent,

7    unless and until the government proves the defendant guilty

8    beyond a reasonable doubt.  In addition, the defendant has

9    the right to remain silent and never has to prove innocence

10   or present any evidence.

11             To help you follow the evidence, I will now give you

12   a brief summary of the elements of the crime that the

13   government must prove to make its case.

14             First, the defendant knowingly distributed fentanyl.

15   Second, the defendant knew it was fentanyl, or some other

16   federally controlled substance.  And, third, the use of the

17   fentanyl distributed by the defendant resulted in the death

18   of C.M.R.

19             The evidence you are to consider in deciding what

20   the facts are consists of:  First, the sworn testimony of any

21   witness.  Second, the exhibits that are received in evidence.

22   And, third, any facts to which the parties agree.

23             The following things are not evidence and you must

24   not consider them as evidence in deciding the facts of this

25   case:  First, statements and arguments of the attorneys.

33

1    Second, questions and objections of the attorneys.  Third,

2    testimony that I instruct you to disregard.  And, fourth,

3    anything you may see or hear when the Court is not in

4    session, even if what you see or hear is done or said by one

5    of the parties or one of the witnesses.

6            Evidence may be direct or circumstantial.  Direct

7    evidence is direct proof of a fact, such as testimony by a

8    witness about what that witness personally saw or heard or

9    did.  Circumstantial evidence is indirect evidence, that is,

10   it is proof of one or more facts from which you can find

11   another fact.

12           You are to consider both direct and circumstantial

13   evidence.  Either can be used to prove any fact.  The law

14   makes no distinction between the weight to be given to either

15   direct or circumstantial evidence.  It is for you to decide

16   how much weight to give to any evidence.

17           There are rules of evidence that control what can be

18   received in evidence.  When a lawyer asks a question or

19   offers an exhibit in evidence, and a lawyer on the other side

20   thinks that it is not permitted by the rules of evidence,

21   that lawyer may object.  If I overrule the objection, the

22   question may be answered or the exhibit received.

23           If I sustain the objection, the question cannot be

24   answered or the exhibit cannot be received.  Whenever I

25   sustain an objection to a question, you must ignore the

1 question and must not guess what the answer would have been.

2   Sometimes I may order that evidence be stricken from

3 the record and that you disregard or ignore the evidence.

4 That means that when you are deciding the case, you must not

5 consider the evidence that I told you to disregard.

6   In deciding the facts in this case, you may have to

7 decide which testimony to believe and which testimony not to

8 believe.  You may believe everything a witness says or part

9 of it or none of it.

10   In considering the testimony of any witness, you may

11 take into account:  First, the witness' opportunity and

12 ability to see or hear or know the things testified to;

13 second, the witness' memory; third, the witness' manner while

14 testifying; fourth, the witness' interest in the outcome of

15 the case, if any; fifth, the witness' bias or prejudice, if

16 any; sixth, whether other evidence contradicted the witness'

17 testimony; seventh, the reasonableness of the witness'

18 testimony in light of all the evidence; and, eight, any other

19 factors that bear on believability.

20   You must avoid bias, conscious or unconscious, based

21 on a witness' race, color, religious beliefs, national

22 ancestry, sexual orientation, gender identity, gender or

23 economic circumstances in your determination of credibility.

24   The weight of the evidence as to a fact does not

25 necessarily depend on the number of witnesses who testify

35

1    about it.  What is important is how believable the witnesses

2    are and how much weight you think their testimony deserves.

3         I will now say a few words about your conduct as

4    jurors.  First, keep an open mind throughout the trial and do

5    not decide what the verdict should be until you and your

6    fellow jurors have completed your deliberations at the end of

7    the case.

8         Second, because you must decide this case based only

9    on the evidence received in the case and on my instructions

10   as to the law that applies, you must not be exposed to any

11   other information about the case or to the issues it involves

12   during the course of your jury duty.

13        Thus, until the end of the case or unless I tell you

14   otherwise, do not communicate with anyone in any way and do

15   not let anyone else communicate with you in any way about the

16   merits of the case or anything to do with it.

17        This restriction includes discussing the case in

18   person, in writing, by phone, tablet, computer, or any other

19   means, via e-mail, via text messaging or any Internet chat

20   room, blog, website or application, including but not limited

21   to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat,

22   TikTok or any other forms of social media.

23        This restriction also applies to communicating with

24   your fellow jurors until I give you the case for

25   deliberation.  And it applies to communicating with everyone

1    else, including your family members, your employer, the media

2    or press and the people involved in the trial; although you

3    may notify your family and your employer that you have been

4    seated as a juror in the case and how long you expect the

5    trial to last.

6         But if you are asked or approached in any way about

7    your jury service, or anything to do with this case, you must

8    respond that you have been ordered not to discuss the matter.

9    In addition, you must report the contact to the Court.

10        Because you will receive all the evidence and legal

11   instruction you properly may consider to return a verdict, do

12   not read, watch or listen to any news or media accounts or

13   commentary, if any, about the case or anything to do with it.

14   Although I have no information that there will be any news

15   reports about this case.

16        Do not do any research, such as consulting

17   dictionaries, searching the Internet or using other reference

18   materials, and do not make any investigation or in any other

19   way try to learn about the case on your own.  Do not visit or

20   view any place discussed in this case and do not use the

21   Internet or any other resource to search for or view any

22   place discussed during the trial.

23        Also, do not do any research about the case, the law

24   or the people involved, including the parties, the witnesses

25   or the lawyers, until you have been excused as jurors.  If

37

1    you happen to read or hear anything touching on this case in

2    the media, turn away and report it to me as soon as possible.

3        These rules protect each party's right to have this

4    case decided on the evidence that has been presented here in

5    court.  Witnesses here in court take an oath to tell the

6    truth, and the accuracy of their testimony is tested through

7    the trial process.  If you do any research or investigation

8    outside the courtroom, or gain any information through

9    improper communications, then your verdict may be influenced

10   by inaccurate, incomplete or misleading information that has

11   not been tested by the trial process.

12       Each of the parties is entitled to a fair trial by

13   an impartial jury, and if you decide the case based on

14   information not presented in court, you will have denied the

15   parties a fair trial.

16       Remember, you have taken an oath to follow the

17   rules, and it is very important that you follow these rules.

18   A juror who violates these restrictions jeopardizes the

19   fairness of the proceedings and a mistrial could result that

20   would require the entire process to start over.  If any juror

21   is exposed to any outside information, please notify the

22   Court immediately.

23       At the end of trial, you will have to make your

24   decision based on what you recall of the evidence.  You will

25   not have a written transcript of the trial.  I urge you to

38

1    pay close attention to the testimony as it is given.

2              If you wish, you may take notes to help you remember

3    the evidence.  If you do take notes, please keep them to

4    yourself until you and your fellow jurors go to the jury room

5    to decide the case.  Do not let note-taking distract you from

6    being attentive.

7              When you leave the court for recesses, your notes

8    should be left in the courtroom.  No one will read your

9    notes.  Whether or not you take notes, you should rely on

10   your own memory of the evidence.  Notes are only to assist

11   your memory.  You should not be overly influenced by your

12   notes or those of your fellow jurors.

13             Following our lunch recess, the next phase of the

14   trial will begin.  First, each side may make an opening

15   statement.  An opening statement is not evidence.  It is

16   simply an outline to help you understand what the party

17   expects the evidence will show.  A party is not required to

18   make an opening statement.

19             The government will then present evidence and

20   counsel for the defendant may cross-examine.  Then if the

21   defendant chooses to offer evidence, counsel for the

22   government may cross-examine.  After the evidence has been

23   presented, I will instruct you on the law that applies to the

24   case and the attorneys will make closing arguments.  And

25   after that, you will go to the jury room to deliberate on

39

1    your verdict.

2            Ladies and gentlemen, that concludes the preliminary

3    instructions.

4            One housekeeping matter that I would like to alert

5    you to.  To your rear, there is a door right there; and that

6    is the jury room.  And you are free to use that room

7    throughout your service.  There is a refrigerator, some

8    water, some refreshments in there, and you will have access

9    to that during your breaks, the 15-minute break in the

10   morning and the 15-minute break in the afternoon.

11           If you choose to do so, you may also bring your

12   lunch tomorrow and use that room during the lunch break.  But

13   if you have any personal items that you'd rather not carry

14   around, you may leave them in the jury room, and this area

15   will be secure when you're not present in the courtroom.

16           So with that, ladies and gentlemen, it is 20 past

17   12:00.  We will reconvene at 1:20 to begin opening statements

18   of the parties and then taking the evidence in this case.

19           I wish you all a very good lunch.  And we'll see

20   back in one hour's time.  Thank you very much.

21           (Jury absent, 12:23 p.m.)

22           THE COURT:  Okay.  We are outside the presence of

23   the jury.  All counsel are present.  Mr. Atta is present.

24           Is there anything we need to take up before we break

25   for lunch?

1        MR. ROTH:  Your Honor, we don't necessarily need to

2   resolve it, but there is one exhibit that with the benefit of

3   further thought, I think it's appropriate to at least flag it

4   for the Court.

5        Exhibit 43, Your Honor, is a screen capture of a

6   portion of a newspaper article, Associated Press newspaper

7   article that is in the defendant's phone.  It's accompanied

8   by Exhibit 44, which is the newspaper article itself

9   redacted, except for the date and the same portion that's in

10  the screen capture.

11       We intend to offer 43 for its effect on the

12  observer, i.e., what it communicated to the defendant about

13  the possibility of M30 pills as a mark, as a drug to sell in

14  the market, and the possibility to him that they contained

15  fentanyl.  Not for its truth, but for notice.  Our view is

16  it's a nonhearsay piece of evidence.  It's proper.  It's

17  admissible, so on and so forth.

18       When Your Honor reads it, though, it talks about

19  things like the Sinaloa cartel and deaths and things like

20  that.  So we would seek the Court's guidance on whether or

21  not any portion of it should be redacted in the Court's view.

22       THE COURT:  Okay.  Mr. Cortez.

23       MR. CORTEZ:  We have extremely strong objections to

24  it.  I'm not even beginning with evidentiary foundations.

25  How are they going to lay a foundation that my client

41

1    actually read it, No. 1?

2           But more importantly, this is the very type of

3    sensationalist newspaper article that I could come up with

4    that says the federal government is incompetent all the time.

5    That's not permitted.  So I have really strong objections to

6    the language in it.  It's prejudicial.

7           So beyond that, Your Honor, I really believe this is

8    the type of evidence that injects error needlessly.

9           THE COURT:  Okay.  I will take a look at 43 and 44.

10   Thank you for flagging those.

11          Will that be admitted or sought to be admitted this

12   afternoon?

13          MR. ROTH:  Unlikely.

14          THE COURT:  Okay.  All right.  I will take a look at

15   those, and if necessary, we'll have a further conversation.

16   I hope you all enjoy your lunch.

17          MR. ROTH:  Thank you, Your Honor.

18          MS. FORREST:  Thank you, Your Honor.

19          MR. CORTEZ:  Thank you, sir.

20          (Recess, 12:26 p.m. to 1:22 p.m.)

21          (Jury present, 1:22 p.m.)

22          THE COURT:  Okay.  We are back on the record.  All

23   of our jurors are present.  All counsel are present.

24   Mr. Atta is also present.

25          Is the government ready to proceed with your opening

42

1    statement?

2          MS. FORREST:  Yes, Your Honor.

3          THE COURT:  Please, go ahead.

4          MS. FORREST:  Okay.  I believe I project loudly

5    enough, but you will see the price that lawyers pay if we

6    don't project.  She'll interrupt me and ask me to put on a

7    mic.

8          Now, can everyone see the screen in front of them?

9    And do you see text on that screen?  It's a blue screen?

10         Okay.  May I proceed, Your Honor?

11         THE COURT:  Yes, you may.

12         MS. FORREST:  Thank you.

13         Ladies and gentlemen, this is a photo of Christian

14   Michael Reed.  He was born on May 20th, 1994, and he died

15   just one day after his 26th birthday, May 21st, 2020.  He was

16   only 26 years old and a lance corporal in the United States

17   Marine Corps, and he died from overdosing on fentanyl-laced

18   pills that this defendant, Nameer Mohammad Atta, sold him.

19         In the early evening hours of May 21st, 2020,

20   Mr. Reed was in his barracks and he was playing X-Box video

21   games with his friend.  Now, shortly after signing off

22   playing that video game with his friend, Mr. Reed was

23   discovered unconscious by his commanding officer.

24         First responders were on the scene within minutes,

25   and they immediately determined that Mr. Reed had fallen into

COMPUTER-AIDED TRANSCRIPTION

43

1   cardiac arrest.  They will tell you that they did what they

2   are trained to do.  They gave Mr. Reed CPR.  They gave him

3   medication for cardiac arrest.  And they gave him Narcan.

4          Now, you'll hear that Narcan is a specially designed

5   medication specifically to reverse an opioid overdose.  And

6   they'll tell you that they gave him Narcan in case Mr. Reed

7   had fallen into cardiac arrest due to an opioid overdose.

8   Nothing worked.  One day after his 26th birthday, Mr. Reed

9   was dead.  May 21st, 2020, at 7:19 p.m.

10         You're going to hear that a medical examiner

11  conducted an autopsy, reviewed Mr. Reed's medical records,

12  and that the medical examiner also reviewed toxicology

13  results of everything that was in Mr. Reed's body at the time

14  of death.

15         You'll hear that this trained medical examiner, he

16  ruled out any other cause of death, and he determined that

17  fentanyl, a dangerous opioid, killed Mr. Reed.  When the

18  medical examiner determined that Mr. Reed died from a drug

19  overdose, special agents launched an investigation to figure

20  out, how did Mr. Reed get those drugs?

21         You're going to hear that special agents obtained a

22  search warrant for Mr. Reed's phone, and they reviewed

23  communications between Mr. Reed and the defendant on a social

24  media application called Snapchat.  Now, these communications

25  between the defendant and Mr. Reed on Snapchat, the numerous

44

communications, showed that the defendant was discussing

selling drugs to Mr. Reed.  You're also going to hear that

agents were able to find Venmo transactions from Mr. Reed

paying the defendant for drugs.  So naturally, after finding

this, agents got a search warrant for the defendant's phone.

Ladies and gentlemen, the evidence will show that

from reviewing Mr. Reed's phone and the defendant's phone,

agents were able to confirm that in the last month of

Mr. Reed's life, numerous times the defendant sold him drugs,

and on May 20th, 2020, Mr. Reed's 26th birthday, the

defendant sold him drugs for that last time and those drugs

would kill Mr. Reed the very next day.

You're going to hear a lot about Snapchat throughout

this trial, and the reason you're going to hear so much about

Snapchat is because that was the preferred platform that the

defendant used to market and sell drugs to his customers.

You're going to hear terms from special agents like

"trap" and "trap house."  The special agents will explain to

you that "trap" and "trap house," they commonly refer to a

place where drugs are sold.  You're also going to learn that

the defendant repeatedly referred to his apartment as a trap

or trap house.

But you're not just going to hear street terms for

where drugs are sold, you're going to hear street terms about

drugs themselves.  You're going to hear terms like Percocet,

45

1    Perc 30s, M30s, counterfeit pills, counterfeit percs.  But,

2    ladies and gentlemen, the main thing to keep in mind when you

3    listen to all the evidence, is that all of these terms refer

4    to drugs, controlled substances.

5          Now, throughout this trial, you're also going to

6    hear about some particular evidence agents were able to find

7    on the defendant's phone.  Agents are going to tell you that

8    they were able to recover a detailed ledger, a drug sales

9    ledger in the defendant's phone in the Notes application.

10         They are going to describe to you that the defendant

11   kept detailed records of his drug transactions and that this

12   document was titled "My Own Sales."  And that right after

13   that title, "My Own Sales," there is a little emoji with a

14   bag of cash and a dollar sign on the outside.

15         Ladies and gentlemen, the defendant recorded all of

16   his drug transactions.  And you're going to see that these

17   transactions are consistent with every time, every Snapchat

18   communication, every Venmo transaction, every in-person

19   pickup of the drugs that the defendant sold to Christian

20   Reed.

21         You're also going to hear that the defendant, he

22   didn't just use Snapchat to market drugs and sell drugs to

23   customers like Christian Reed.  He didn't just keep a

24   detailed sales ledger of all of his drug transactions.

25   Ladies and gentlemen, you're going to hear that the defendant

46

1    recorded his drug sales on video.

2          You're going to see a video that was retrieved from

3    the defendant's phone, recorded on May 20th, 2020, Christian

4    Reed's 26th birthday that the defendant took of Mr. Reed

5    driving away from his apartment at approximately 4 o'clock in

6    the afternoon.

7          You'll also see a still from this video that shows

8    there is a distinctive dent in the front of the car that

9    Christian Reed was driving when he went to the defendant's

10   house.  You'll be able to confirm for yourselves by seeing

11   the video that the defendant took was of Christian Reed's car

12   because a photo of that same car with that distinctive dent

13   was found on Mr. Reed's phone, and that photo had been taken

14   on May 19th, 2020.

15         The evidence is going to show that through the

16   defendant's Snapchat communications with Mr. Reed, through

17   the defendant's Venmo transactions with Mr. Reed, through the

18   defendant's detailed drug-sales ledger documenting his drug

19   sales to Mr. Reed, and the very video the defendant took on

20   Christian Reed's birthday, that all of this evidence confirms

21   that the defendant is the person who sold Christian Reed the

22   drugs that would kill him on May 20th, 2020, a little after

23   7:00 p.m.

24         At the end of this trial, we will ask that you

25   return a verdict of guilty.

47

1          Thank you.

2          THE COURT:  Thank you, Ms. Forrest.

3          Mr. Cortez, do you wish to make an opening

4     statement?

5          MR. CORTEZ:  Yes, Your Honor.  Thank you.

6          Can we put up the picture again of Mr. Reed?  Thank

7     you.

8          Members of the jury, I hope you can all hear me

9     without a microphone.  Thank you.

10         I heard something interesting in the prosecutor's

11    opening, interesting to me right now, because I know the

12    case.  I ask you to keep your mind on this fact that I'm

13    about to mention.  She said four times, the defendant,

14    meaning Mr. Atta, a 22-year-old man, sold Mr. Reed drugs.

15    She used the word "drugs."

16         This case is, indeed, a tragic trial about the death

17    of a young man.  You see his picture.  But the evidence you

18    will hear as it comes in from witnesses, from documents, from

19    scientific facts, even their witnesses will give you facts,

20    is going to show that every Snapchat, everything that has

21    nothing to do with Mr. Reed is evidence of drugs, as they

22    say, evidence that you will see at the end of this case once

23    the evidence is in, may not help you to decide what the real

24    issue here really is.

25         Because obviously there are two sides to this story.

COMPUTER-AIDED TRANSCRIPTION

48

1    And let me see if I can foresee what's going to happen here

2    with the evidence.  Yes, on May 21st, 2020, around -- no one

3    knows exactly what time.  Sometime around 5:30 in the

4    afternoon, 6 o'clock or so, Mr. Reed started having serious

5    medical problems.

6           The pathologist who will testify here, Dr. Platt,

7    Dr. Platt will testify from up there and will show you his

8    autopsy findings.  He will testify that this young man had a

9    preexisting series of health conditions, all serious.

10          He will also tell you what he found in the body

11   after they did the autopsy.  Members of the jury, please

12   listen for that evidence, keep a very close eye on the

13   science, on the facts, the undisputed facts, and look to see,

14   some of you have training, technical training, look to see

15   what was found in the autopsy.

16          Let me tell you what the prosecutor mentioned only

17   once -- actually, maybe she didn't.  You know the drugs that

18   they are going to try to prove were sold by Mr. Atta.  She

19   said fentanyl.  Their evidence is going to prove it wasn't

20   fentanyl.  It was Percocet.  Should that make a difference?

21   You bet.  You bet.

22          Because all the Snapchat with Mr. Reed, he was

23   looking for Percocet tablets, percs, M30's.  He had been

24   using them before.  This is not the first time.  And you'll

25   see he purchased several times, from their own evidence,

several times he purchased Percocets.  Not only on May 20.
Several times.  He had been taking them.

May 21, he's dying.  You have several first
responders.  You will hear them testify, good professionals.
You will see that when they got to the scene, two of them
specifically, first responders, they started trying to keep
Mr. Reed stabilized.  One of them intubated him.  That simply
means to stick a tube in his trachea to give him oxygen.
Okay.  This same officer will tell you that he smelled
alcohol reeking all over the place as he was trying to
intubate him.  At this point, Mr. Reed was still alive.

Prosecutor tells you, one of them gave him Narcan.
Let me tell you how it really happened, how the evidence will
show, when Keith Naylor, the paramedic from MCRD testifies,
he will testify that he got there with another first
responder, Aaron Balderson, Captain Aaron Balderson.

Twenty minutes elapsed.  Twenty minutes as Mr. Reed
is fighting for his life.  So there were medical people
there.  They could have given him Narcan immediately upon
seeing him.  We've all heard about fentanyl overdoses.
Everybody knows about them.

The Narcan came much later.  When Officer Naylor
calls in the hospital, because they don't know what else to
do, Mr. Reed is slipping away, tragically.  With two
attendants there to revive him, they call in and want

50

1    permission to stop resuscitating efforts.  They are going to

2    testify that way.  It's denied.

3         The first request to terminate resuscitation efforts

4    was denied by the hospital.  They keep going.  Struggling.

5    They make a second -- oh, by the way, at that point, the

6    hospital tells them, Give him Narcan.

7         More than 20 minutes later, members of the jury,

8    more than 20 minutes later, as Mr. Reed is sitting there

9    dying, look at him, nice, young man.  The evidence will prove

10   that he was struggling for a very long time with drug

11   addiction, with pain medication.  He was prescribed oxycodone

12   by the doctor themselves a month earlier.

13        I please ask you to keep an open mind when you

14   listen to the pathologist, the toxicology report that he's

15   going to talk about, and then look for one piece of evidence,

16   because I will, too.  Look for a piece of evidence you'll

17   find in the pathologist's report, the autopsy report, and the

18   toxicology report.  Look for that piece of evidence that says

19   Percocet, oxycodone.  Don't let them shade the truth.  Don't

20   let them describe something else or an exception.

21        Because along with that, you're going to find

22   another piece of evidence that will be undeniable in the case

23   and that you will hear from the medical professionals.  What

24   happens to the eye when you're having a fentanyl overdose, an

25   opioid overdose is you look in somebody's eyes as they are

1    undergoing an overdose, and the pupils of their eyes, they

2    are constricted.  They are called pinpoint pupils.  Tiny

3    little dot of the pupil you see.  That's a classic fentanyl

4    overdose symptom.

5         Keep a very close eye on the evidence to see how

6    Mr. Reed's pupils were.  That's a crucial piece of evidence

7    you will see.  And go on the facts, go on the science.  Don't

8    go on explanations.  Remember, an expert's opinion is an

9    opinion.  Look for the evidence that the results of the

10   autopsy prove beyond a reasonable doubt that Mr. Reed's

11   overdose was for fentanyl.  You will see some facts that lead

12   away from that.

13        Then you will also see and hear that only a month

14   earlier, Mr. Reed had been taken to the hospital, a month

15   earlier.  He was taken to the hospital because he was

16   suffering what everyone at the time thought was a stroke.

17        Now, you have some very good professionals, medical

18   people who knew what they were doing, very competent people.

19   They attended to Mr. Reed, and no one diagnosed that stroke

20   as a fentanyl overdose.  No one.  And medical professionals

21   are trained to recognize those things so they can administer

22   Narcan, so they can administer the proper urgent medical

23   care.

24        They thought he was going through a stroke.  In

25   fact, you will hear from their very witnesses that they did

52

1    not think that was a fentanyl overdose.  Jump forward to

2    May 21st, then I'll sit down.

3            May 21st, 2020, Mr. Reed's birthday was the day

4    before.  This is a tragedy.  There is a victim in this case

5    without a doubt.  We don't deny that.  He died after he had

6    medical professionals for 20 minutes working on him.  Don't

7    give him Narcan until the very end, but it was too late.

8            Look very closely at what they prove with their

9    evidence about something that has a technical, chemical name.

10   And please remember this word:  Metabolites.  Metabolites.

11   Metabolites.

12           Thank you for your time.

13           THE COURT:  Thank you, Mr. Cortez.

14           MS. FORREST:  Yes, your Honor.  The United States

15   calls Aaron Balderson.

16           THE CLERK:  Right up here.  Please raise your right

17   hand.

18      AARON BALDERSON, a government witness, having been duly

19        sworn, testified as follows:

20           THE WITNESS:  Yes.

21           THE CLERK:  Thank you.  If you can please state your

22   name and spell it for the record.

23           THE WITNESS:  Aaron Balderson, A-a-r-o-n

24   B-a-l-d-e-r-s-o-n.

25           MS. FORREST:  Your Honor, may I proceed?

53

1          THE COURT:  Yes, please.

2          MS. FORREST:  Thank you.

3                     DIRECT EXAMINATION

4     BY MS. FORREST:

5     Q.   Good afternoon.

6     A.   Good afternoon.

7     Q.   Can you please pull the mic a little bit closer to you.

8     We have someone taking down everything you say, and we need

9     to make sure she can hear you.

10    A.   Is that better?

11    Q.   Yes, I believe so.

12          Where do you work?

13    A.   I work at LifeCare Medical Transports in --

14          THE REPORTER:  I'm sorry.

15          THE WITNESS:  I work at LifeCare Medical Transports

16    in Fredericksburg, Virginia.

17    Q.   BY MS. FORREST:  And what does your job at LifeCare

18    Transports involve?

19    A.   I'm the Director of Operations, so I supervise all

20    ambulance crews that are staffed and make sure they get their

21    patients picked up and dropped off on time from various

22    locations.

23    Q.   Now, do the individuals you supervise go on calls; is

24    that the terminology?

25    A.   Yes.

54

1    Q.    And do you, yourself, ever go on calls?

2    A.    Yes.

3    Q.    Under what circumstances do you go on calls?

4    A.    Usually if call volume is high or too high for my staff

5    to handle, or if we're short-staffed or both.

6    Q.    Is that often the case now?

7    A.    At least a couple of days a week, yes.

8    Q.    Are you certified as an EMT?

9    A.    Yes.

10   Q.    And can you explain for the jury what is an EMT.

11   A.    So an EMT is a health-care provider that is trained to

12   provide medical care, both for medical emergencies and

13   injuries, both prior to and during transport to the

14   hospital.

15   Q.    When did you first become an EMT?

16   A.    In April of 2008.

17   Q.    And what did you do to become an EMT?

18   A.    I had to go through 110 hours of classroom instruction,

19   as well as 10 hours in the field for clinicals.

20   Q.    What types of things did you learn in the 110 hours of

21   instruction?

22   A.    We learn anything from, you know, different types of

23   medical emergencies, such as diabetic emergencies, strokes,

24   heart attacks, and how to treat those, as well as traumatic

25   injuries from car accidents, gunshot wounds, falls, how to

55

1   treat those, as well as a little bit of EMS operations.

2   Q.    What is EMS operations?

3   A.    Just when you come to a scene, one of the first things

4   you're supposed to look for when to identify and when you

5   need additional resources, how to call for those additional

6   resources.

7   Q.    Okay.  Can you briefly explain for the jury what you

8   learned.  What are the first things you look for when you

9   arrive on the scene?

10  A.    So if I was to arrive at, say, a car accident, the first

11  thing I want to assess is, is the scene safe?  Are there

12  downed power lines?  Is there fire?  Is there slow-moving

13  traffic that's going to put me and my crew at risk?

14        The second thing I want to determine is the number

15  of patients that I have and the severity of their injuries;

16  you know, which hospitals are closer to me, what are they

17  capable of?  Do I need to call for a helicopter, things like

18  that.

19  Q.    Now, is one of the things that you learn, sort of

20  triaging, learning how you prioritize what you need to do

21  when you're treating someone?

22  A.    Can you repeat your question?

23  Q.    Of course.

24        Is one of the things that you learn when you get on

25  scene is figuring out what's the most important aspect of the

1    medical emergency with an individual?

2    A.    Yes.

3    Q.    What you have to treat?

4    A.    Yes.

5    Q.    Okay.  In instances of cardiac arrest, what's the most

6    important thing for you to do?

7    A.    Starting chest compression and securing an airway.

8    Q.    And is that to hopefully bring the person out of cardiac

9    arrest?

10   A.    Yes.

11   Q.    Okay.  Can you outline for the jury your training and

12   experience as an EMT following 2008.

13   A.    Okay.  So following 2008, when I was first certified, I

14   was actually already a member of a volunteer rescue squad.  I

15   continued my service with that voluntary rescue squad from

16   2008 to 2013.  From 2009 to 2010, I was a member of a second

17   volunteer rescue squad while I was in college.

18         In 2013, I went to my first duty station as a

19   Marine, which was in California; so there wasn't really an

20   opportunity for me to volunteer as an EMT.  Shortly after

21   that, I went to Okinawa, at which point my EMT certification

22   lapsed.  I recertified in 2018 and then joined another

23   volunteer rescue squad in 2018 until 2019, when I was

24   reassigned back to California.

25   Q.    Why did your EMT certification lapse when you were in

57

1    Okinawa?

2    A.    I just -- I didn't have the opportunity to volunteer,

3    and I didn't keep up with my continuing education hours, so I

4    had to take the class again.

5    Q.    And so is it accurate to say that when this

6    certification lapsed, you were in the Marines and not working

7    as an EMT?

8    A.    That's correct.

9    Q.    Okay.  And when did you get your recertification?

10   A.    2018.

11   Q.    And have you maintained that certification since?

12   A.    Yes.

13   Q.    Did you attend college?

14   A.    Yes.

15   Q.    Where?

16   A.    Virginia Tech.

17   Q.    What did you study at Virginia --

18   A.    Biology.

19   Q.    Could you give me a moment to make sure I've finished.

20   A.    Yes.

21   Q.    For example, give me a moment to make sure I finish my

22   question, and then you can start your answer so, again, the

23   court reporter gets everything down.

24   A.    Yes.

25   Q.    So it sounds like you studied biology.  When did you

58

1    graduate?

2    A.    2012.

3    Q.    And did your biology degree that you obtained in 2012,

4    did that help you working as an EMT?

5    A.    Yes.

6    Q.    How so?

7    A.    I took a lot of medically related classes for my degree,

8    and I also had a concentration in pre-medicine; at the time,

9    I was considering going to medical school.  So an example of

10   some of those classes were anatomy and physiology,

11   microbiology.

12   Q.    Now, what does it mean to be a nationally registered

13   EMT?

14   A.    Being a nationally registered EMT means that you have

15   met certain standards and requirements set by the National

16   Registry of Emergency Medical Technicians.  It's a national

17   body that just -- it sets a federal or national standard for

18   EMTs, as opposed to differing standards across states.

19   Q.    And when did you first obtain that national

20   certification?

21   A.    2018.

22   Q.    Okay.  And you mentioned serving in the Marine Corps.

23   What time period did you serve?

24   A.    From 2012 to 2022.

25   Q.    And what was your rank when you separated?

59

1    A.   Captain.

2    Q.   And what was your rank in May of 2020?

3    A.   Captain.

4    Q.   Now, on May 21st, 2020, did you respond to a dispatch

5    call for an unconscious male in his barracks?

6    A.   Yes.

7    Q.   Approximately what time did you receive that call?

8    A.   Approximately 6:30 in the evening.

9    Q.   Now, were you working in your capacity as a Marine or as

10   an EMT when you heard that call from dispatch?

11   A.   I was working in my capacity as a Marine.

12   Q.   Did you respond to the call?

13   A.   Yes.

14   Q.   Why did you respond to the call, even though you were

15   working in your capacity as a Marine?

16   A.   It was close-by, and it was a medical issue for which

17   I'm trained at a higher level than my police officers to

18   intervene and treat.

19   Q.   What did you understand the medical issue to be when you

20   initially received the call?

21   A.   When I initially received the call, I understood it to

22   be a male unconscious in the barracks.

23   Q.   Did you later determine the identity of the unconscious

24   male?

25   A.   Yes.

60

1    Q.    And what was his name?

2    A.    Christian Reed.

3    Q.    As soon as you got the call, did you head to Mr. Reed's

4    barracks?

5    A.    Yes.

6    Q.    Okay.  Did you receive any updates while you were en

7    route?

8    A.    Yes.  Shortly after we were initially dispatched and I

9    responded, the dispatcher notified us that witnesses that had

10   found Mr. Reed were reporting that he was gurgling and

11   turning purple.

12   Q.    When you heard from dispatch that there had been reports

13   that Mr. Reed was gurgling and turning purple, given your

14   training as an EMT, what did that mean to you?

15   A.    To me, it meant that it was very likely that he was in

16   cardiac arrest.

17   Q.    Why did you think that Mr. Reed was in cardiac arrest?

18   A.    The turning purple is consistent with a lack of oxygen

19   to the body.  I mean, you know, some people call it blue;

20   that's typically what you hear.  But just the discoloration

21   overall as purple or blue indicated to me that he was starved

22   for oxygen, and the gurgling the witnesses were reporting

23   sounded to me like agonal respirations.

24   Q.    And what's "agonal respirations"?

25   A.    Agonal respirations are respirations that a person takes

61

1   shortly after they pass away, where it's not really an

2   effective breath.  It's more of a reflex than anything

3   else.

4   Q.   There should be a binder in front of you.  Do you see a

5   large binder --

6   A.   Yes.

7   Q.   -- that has multiple tabs?

8        Can you please place that in front of you and take a

9   look at Tabs 83 and 84.  Just let me know when you've had a

10   moment to review those tabs.

11   A.   I have.

12   Q.   Okay.  What do you see behind Tabs 83 and 84?

13   A.   I see photographs of Barracks 5115.  Looks like the

14   section at the barracks containing rooms 25 to 34.

15   Q.   Are these a fair and accurate representation of

16   Mr. Reed's barracks?

17   A.   Yes.

18        MS. FORREST:  Your Honor, the United States moves

19   Exhibits 83 and 84 into evidence.

20        MR. CORTEZ:  No objection.

21        THE COURT:  83 and 84 are received.

22    (Government's Exhibits 83 and 84 received in evidence.)

23        MS. FORREST:  Please pull up Exhibit 83.

24   Q.   Okay.  Now, you said that you received the call sometime

25   around 6:30.  After receiving the call, being en route,

1   getting updates, approximately how long did it take you from

2   hearing the dispatch call to getting to Mr. Reed's barracks

3   to treat him?

4   A.   It was less than five minutes.

5   Q.   Okay.  Now, can you tell us what we're looking at here

6   with Exhibit 83.

7   A.   This is a photo of Mr. Reed's barracks room.  He was on

8   the first floor, so you would go into that open doorway there

9   to the left of the photo and immediately turn right adjacent

10   to the stairwell to enter his room.

11   Q.   Okay.  We can take it down.  Thank you.

12        When you arrived to Mr. Reed's barracks, what did

13   you see?

14   A.   I saw my police officers beginning CPR.  One of them was

15   performing chest compressions, and the other one was

16   attaching the AED.

17   Q.   Now, did firefighters and paramedics ultimately arrive

18   to help with your treatment of Mr. Reed?

19   A.   Yes.

20   Q.   Approximately how long after you got on scene did

21   firefighters and paramedics arrive to assist?

22   A.   It was less than two minutes.

23   Q.   Okay.  Now, earlier you said you thought that Mr. Reed

24   was in cardiac arrest based on the updates you had received

25   from dispatch.  When you got to Mr. Reed's room, did he, in

COMPUTER-AIDED TRANSCRIPTION

1    fact, appear to be in cardiac arrest to you?

2    A.    Yes.

3    Q.    Did you know why Mr. Reed was in cardiac arrest?

4    A.    No.

5    Q.    Did you try to determine why Mr. Reed was in cardiac

6    arrest?

7    A.    Not initially, no.

8    Q.    Why not?

9    A.    When you're responding to someone that's in cardiac

10   arrest, that's not really -- that's not what you do.  You

11   immediately start chest compressions and you try to secure an

12   airway to try and start saving the person's life and get them

13   out of cardiac arrest and restore a normal rhythm to their

14   heart.

15   Q.    Is it standard in cases of cardiac arrest that your top

16   priority is doing whatever you can to get the person out of

17   cardiac arrest, rather than --

18              MR. CORTEZ:  Objection.  Leading.

19              THE COURT:  Overruled.  You may ask the question.

20              MS. FORREST:  Let me restate it.

21   Q.    Is it standard practice in cases of cardiac arrest to

22   make your top priority getting the patient out of cardiac

23   arrest rather than trying to spend time figuring out what put

24   them in cardiac arrest?

25   A.    That's correct.

64

1    Q.   Okay.  Now, did you have any guesses as to why Mr. Reed

2    was in cardiac arrest?

3              MR. CORTEZ:  Objection.  Speculative.

4              THE COURT:  Sustained.

5    Q.   BY MS. FORREST:  Okay.  Now, at some point when you

6    entered Mr. Reed's barracks, did you have a body camera on?

7    A.   Yes.

8    Q.   Did you at some point turn that body camera on to start

9    recording?

10   A.   Yes.

11   Q.   And why did you do that?

12   A.   It was our policy to activate body cameras on calls.  I

13   also believed it would be a helpful tool, both for

14   investigative purposes as well as for training purposes.  I

15   worked right next to the fire chief, and he and I had a

16   pretty good relationship, so I thought it would be beneficial

17   for him and his personnel as well.

18   Q.   And when in relation to when you entered Mr. Reed's

19   barracks did you turn your body camera on?

20   A.   It was shortly after I entered.  I believe it was once I

21   approached my officers to assist them, I turned it on at some

22   point then.

23             MS. FORREST:  Now, would you take a look in the

24   binder, I believe in the sleeve you'll see some discs.  The

25   discs are numbered 203 and 204.  They have been marked for

65

1   purposes of identification.

2           One moment, Your Honor.

3   Q.   Have you had a chance to look at them?

4   A.   I see the two discs I initialed.  I just don't see the

5   203 or 204.

6   Q.   Okay.  But do you see that your initials are on both of

7   these discs?

8   A.   Yes.

9   Q.   And for one of the discs, which we can -- we will mark

10  as 203 for purposes of identification, was that the full

11  body-camera footage from when you started recording when you

12  got in Mr. Reed's barracks to when you stopped recording?

13  A.   Yes.

14  Q.   And what we'll mark as Exhibit 204, did you have an

15  opportunity to review clips, so sections taken from that full

16  body-camera footage?

17  A.   Yes.

18          MS. FORREST:  Your Honor, the United States has

19  marked the clips as Exhibits 85, 86 and 87, and we would

20  offer them into evidence.

21          MR. CORTEZ:  May I have a moment, please?

22          We need to approach.

23          MS. FORREST:  Your Honor, I'm not sure whether the

24  defense has an objection, but I believe we may need to

25  approach based --

66

1          MR. CORTEZ:  Based on your ruling earlier.

2          THE COURT:  Okay.  85, 86 and 87 have been offered

3    into evidence.

4          Do you have an objection to those, Mr. Cortez?

5          MR. CORTEZ:  I do, sir.

6          THE COURT:  Okay.  The objection is sustained.

7    Q.   BY MS. FORREST:  Okay.  When you arrived to Mr. -- when

8    you arrived to Mr. Reed's barracks, what type of care did you

9    see being administered to him?

10   A.   When I first got there, one of my police officers was

11   performing chest compressions.  The other was attaching AED

12   pads to Mr. Reed's chest.

13   Q.   What is an AED pad?

14   A.   An AED is an automated external defibrillator, and the

15   pads are adhesive pieces that attach to a patient's chest.

16   The AED is designed to deliver electricity to a person's

17   heart in an effort to get it into a normal rhythm.

18   Q.   And is this one of the ways of treating someone who is

19   in cardiac arrest, trying to get them out of cardiac

20   arrest?

21   A.   Yes.

22   Q.   Okay.  And I believe you said that you saw chest

23   compressions being performed.  Were they being performed by

24   an individual?

25   A.   Yes.

67

1    Q.   And are chest compressions a way to -- a method of

2    treating someone in cardiac arrest?

3    A.   Yes.

4    Q.   And is the purpose of this trying to get their heart

5    going?

6    A.   The purpose of it is more to manually pump their heart

7    until a normal rhythm can be restored, in an effort to

8    continue to circulate blood throughout the body.

9    Q.   Can you take a look in your binder at tab -- it should

10   be Tab 2.  And when you've had a moment, please tell me when

11   you're done.

12   A.   Okay.

13   Q.   And what is Exhibit 2?

14   A.   2 is a clip of my body-cam footage, showing one of the

15   firefighters rendering aid to Mr. Reed.

16   Q.   And to be clear, when you use the word "clip," I just

17   want to make sure the record is clear, are you referring to a

18   still image from a clip, a photograph?

19   A.   Yes, ma'am.

20   Q.   And is that a photograph from the video footage that

21   your body camera recorded?

22   A.   Yes.

23   Q.   And is it a fair and accurate representation?

24   A.   Yes.

25              MS. FORREST:  Your Honor, the United States offers

68

1   Exhibit 2 into evidence.

2           MR. CORTEZ:  Per the Court's -- subject to the

3   Court's ruling, no objection.

4           THE COURT:  Okay.  2 is received.

5      (Government's Exhibit 2 received in evidence.)

6   Q.  BY MS. FORREST:  Now, can you orient us and tell us what

7   we're looking at here.

8   A.  I believe I was looking at a different photo.

9   Q.  Can you turn to Tab 1.  I think that may be what you're

10  referring to.

11  A.  Yes.  I'm sorry.  I was looking at Tab 1.

12          MS. FORREST:  My apologies, Your Honor.  I'll

13  correct the record.  Exhibit 1 should be admitted into

14  evidence based on Mr. Balderson's testimony.  We'll call it

15  Exhibit 2, Your Honor; but it's Tab 1 in the witness'

16  binder.

17          THE COURT:  Okay.  Mr. Cortez, do you stipulate that

18  the foundation that was laid for 1 equally applies to 2?

19          MR. CORTEZ:  I don't know.

20          THE COURT:  Okay.

21          MR. CORTEZ:  I have Tab 2, Exhibit 2.  Under -- no.

22          THE COURT:  Okay.  Ms. Forrest, will you please lay

23  the foundation.  2 is withdrawn --

24          MS. FORREST:  Of course, Your Honor.

25          THE COURT:  -- for lack of foundation.

69

1      MS. FORREST:  Of course, Your Honor.

2  Q.   Please take a look at the exhibit behind Tab 1.

3  A.   Yes, ma'am.  The exhibit behind Tab 1 is a still shot

4  from my body-worn camera that shows one of the firefighters

5  rendering aid to Mr. Reed.

6  Q.   And what is behind Tab 2, what still shot?

7  A.   Behind Tab 2 is another still shot from my body-worn

8  camera that shows me providing artificial ventilations to

9  Mr. Reed.

10 Q.   Okay.  Is that the image that was shown on screen?

11 A.   Yes, ma'am.

12 Q.   Okay.  And is that a fair and accurate representation

13 from your body-camera footage?

14 A.   Yes, ma'am.

15      MS. FORREST:  Appears there was some confusion, Your

16 Honor, but the United States offers Exhibit 2, which is

17 behind Tab 2 into evidence.

18      THE COURT:  Any objection?

19      MR. CORTEZ:  Not in the Court's ruling, but I just

20 want to make sure we're talking about the same thing.  Tab 2,

21 J'me.

22      MS. FORREST:  Yes.  My apologies.

23      MR. CORTEZ:  Thank you.

24      MS. FORREST:  And, Your Honor, for the record, as

25 Mr. Cortez has pointed out, it's time stamped 18:53:47.

1    Q.   Is that correct, Mr. Balderson --

2    A.   Yes, ma'am.

3    Q.   -- that that's the time stamp?

4              THE COURT:  Okay.  2 is received.

5              MS. FORREST:  Thank you, Your Honor.  Can we please

6    publish it.

7    Q.   Now, can you -- yeah, just orient us and tell us what

8    we're looking at here, where you're standing and what's going

9    on.

10   A.   So I'm at Mr. Reed's head.  I'm providing artificial

11   ventilations to him with a bag-valve mask.  I also see the

12   AED pad attached to his right chest, as well as the LUCAS,

13   which is a chest compression machine, for lack of a better

14   term, providing chest compressions to Mr. Reed.  I also see

15   two IV tourniquets, one on each arm, but I don't see IV

16   access established yet.

17   Q.   Okay.  Now, let's start with you.  You're trying to

18   provide artificial ventilation I believe is what you said?

19   A.   Yes, ma'am.

20   Q.   What is that?

21   A.   Artificial ventilation is essentially breathing for a

22   patient.  I'm using a bag-valve mask, which has a one-way

23   valve on it.  When I squeeze the bag that's in my right hand

24   in this photo, it delivers air through a mask, or if there is

25   an endotracheal tube present, which there isn't in this

1   photo, but it delivers oxygen to Mr. Reed artificially.

2   Q.   And is this another step in an attempt to try to get

3   Mr. Reed out of cardiac arrest, to get him breathing on his

4   own?

5   A.   Yes.

6   Q.   Okay.  You referred to the AED pad.  Is that the

7   electricity that you mentioned before being delivered to

8   Mr. Reed's chest?

9   A.   It's the pad that would deliver the electricity, yes,

10  ma'am.

11  Q.   Thank you for the clarification.

12       Earlier you said that chest compressions were

13  manually being delivered at one point when you walked into

14  the barracks to Mr. Reed.  Can you explain for the jury what

15  the LUCAS machine is.

16  A.   So the LUCAS is a device that -- it is very physically

17  taxing to deliver chest compressions for an extended period

18  of time.  The quality is also a little bit reduced.  The

19  LUCAS is a -- it's an acronym -- I don't remember what it

20  stands for.  But it's a device that we can apply to a patient

21  that essentially has a -- as you can see, a large plunger in

22  the center of their chest, and that will deliver chest

23  compressions continuously for us.

24  Q.   And is one of the purposes to deliver not only steady

25  compressions, but consistent compressions from the machine?

72

1    A.    Yes, ma'am.

2    Q.    Is this also in an effort to get Mr. Reed's heart

3    beating again?

4    A.    It's more to circulate blood throughout his body

5    artificially until we can restore his heart to a normal

6    rhythm.

7    Q.    And is that a method of addressing someone in cardiac

8    arrest?

9    A.    Yes, ma'am.

10   Q.    You referred to the IVs -- or not IVs, but I believe IV

11   tourniquets to establish some sort of vascular access.

12   What's the purpose of an IV tourniquet?

13   A.    The purpose of an IV tourniquet is to essentially reduce

14   blood flow away from, in this case the arms, so that veins

15   become easier to access so that you can put an IV in that

16   vein.

17   Q.    And what does the IV itself do?

18   A.    The IV is the path by which paramedics would deliver

19   certain drugs to assist in the treatment of the cardiac

20   arrest.

21   Q.    So cardiac arrest medication?

22   A.    Yes, ma'am.

23   Q.    What are some different cardiac arrest medications?

24   A.    Epinephrine and Atropine are two that I know of.

25   Q.    And do you remember whether cardiac arrest medication

73

1    was administered, in fact, to Mr. Reed?

2    A.   I remember, after watching my body-camera footage.

3    Q.   Okay.  When you were in Mr. Reed's room, did you see any

4    prescription medication?

5    A.   Eventually, yes.

6    Q.   Okay.  Where did you see that medication?

7    A.   I saw it on the -- I believe it was the shelf to the

8    left.  Right after you come in the door, there is a little

9    bookshelf to the left, and it was sitting on that.

10   Q.   Would you take a look at Exhibit 88.  It should be

11   behind Tab 88.  Please let me know when you've had a moment

12   to look at it.

13   A.   Behind Tab 88 is a photo of Mr. Reed's bookshelf that

14   has a prescription pill bottle, cell phone, wallet and some

15   other personal items.

16   Q.   And is the photo behind Tab 88, so Exhibit 88, is that

17   photo a fair and accurate representation of some of the

18   personal items that you observed in Mr. Reed's room?

19   A.   Yes.

20        MS. FORREST:  Your Honor, the United States offers

21   Exhibit 88 into evidence.

22        MR. CORTEZ:  No objection.

23        THE COURT:  88 is received.

24     (Government's Exhibit 88 received in evidence.)

25        MS. FORREST:  Can you please publish.  Thank you.

COMPUTER-AIDED TRANSCRIPTION

74

1    Q.   What did you do when you saw this prescription pill

2    bottle?

3    A.   I looked at the label to see what the medication was,

4    whose name was on it, when was it filled, how many are

5    left.

6    Q.   And whose name -- let's start with the name.

7         Whose name did you see on this pill bottle?

8    A.   Christian Reed.

9    Q.   And what did you observe as far as the pills within the

10   pill bottle?

11   A.   It was about a third of the way full.  And there were

12   different types of pills in there.  It was not all the same

13   pill.  Some were caplets, some were tablets and gel caps.  I

14   also noticed that it was either filled that day or the day

15   before.

16   Q.   Do you recall whether you opened the pill bottle and

17   looked inside or just observed it from the outside?

18   A.   I don't really recall.

19   Q.   Okay.  The cell phone.  How -- when you -- is that the

20   state in which you found Mr. Reed's cell phone?

21   A.   Yes, ma'am.  That's the state in which it was handed to

22   me.

23   Q.   Okay.  Can you explain that to the jury.

24   A.   Shortly after the hospital authorized EMS personnel to

25   cease resuscitative efforts, one of the firefighters on the

75

1  scene handed me this phone, telling me that it was open,

2  mentioning something about maybe there is text messages, or

3  something like that.  So I took it from him and just sat it

4  down and told him something to the effect of, We'll give that

5  to CID when they get here.

6  Q.   What is CID?

7  A.   It's the Criminal Investigative Division.

8  Q.   Did you go in the phone or do anything with it?

9  A.   No.

10  Q.   So after it was handed to you, you simply placed it on

11  the shelf?

12  A.   Yes, ma'am.

13        MS. FORREST:  Okay.  I have no further questions for

14  the witness, Your Honor.  Thank you.

15        THE COURT:  Okay.  Thank you.

16        Cross-examination.

17        MR. CORTEZ:  Yes.  Thank you.

18                    CROSS-EXAMINATION

19  BY MR. CORTEZ:

20  Q.   Captain Balderson, good afternoon, sir.

21  A.   Good afternoon.

22  Q.   Let me go back and cover a little more detail about

23  the -- just the last question right now.  There was -- you

24  were asked whether -- you mentioned the hospital.

25  A.   Yes.

76

1    Q.    As you're trying to determine what's going on, you

2    mentioned the hospital giving someone direction; right?

3    A.    Yes, sir.

4    Q.    Now, you had arrived with a colleague; correct?  You

5    were not the only one there at the scene; right?

6    A.    I was not the only one at the scene, no, sir.

7    Q.    And besides you attending to -- because I noticed in

8    that picture, one of the pictures, Mr. Reed's outstretched

9    arm and the knees of a person with olive pants; correct?

10   A.    I'm not sure.  Can I see the photo again?

11   Q.    Sure.  Can we bring it up again, please.  Tab 2.

12          Do you see those pants to the left, top left of the

13   picture?

14   A.    Yes, sir.

15   Q.    Okay.  Mr. Reed's arm stretched out?

16   A.    Yes, sir.

17   Q.    Who is that officer?

18   A.    That is a firemen, but I don't know who it is.

19   Q.    And you say it's a fireman because you see the bottom of

20   the jacket they wear, the yellowish --

21   A.    Yeah.  The bottom of the jacket and the pants, yes,

22   sir.

23   Q.    Yes, sir.  Then there is an arm right in the middle of

24   the picture, transecting the picture.  Is that your arm,

25   sir?

77

1    A.   With the black watch and the rubber glove?

2    Q.   Yes.

3    A.   Yes, sir, that's my arm.

4    Q.   And then I see another hand on the right side of the

5    picture touching Mr. Reed's other arm; right?

6    A.   Yes, sir.

7    Q.   Who would that be?

8    A.   I don't know, sir.

9    Q.   Okay.  Were there more than two other people besides you

10   at that time?

11   A.   Yes, sir.

12   Q.   And let's see if we can get this developed a little

13   better.

14        There is a time stamp and a date stamp on that

15   photograph; right?

16   A.   Yes, sir.

17   Q.   The date stamp is 5/21/2020; correct?

18   A.   Yes, sir.

19   Q.   And military time, 18:53:47; right?

20   A.   Yes, sir.

21   Q.   In civilian time, that would be 6:58 p.m.?

22   A.   6:53 p.m., yes, sir.

23   Q.   Sorry.  6:53?

24   A.   Yes, sir.

25   Q.   My mistake.  Thank you.

78

1          And you said on direct examination that you arrived

2     there at 6:30?

3     A.   It was approximately 6:30, yes, sir, is when I was

4     dispatched.

5     Q.   I understand.  And you had been there roughly, fair to

6     say, 15, 20 minutes?

7     A.   Yes, sir.

8     Q.   And on direct, you also testified that you were trained

9     to, at the time, determine what is the most important

10    approach to a patient that needs critical care; right?

11    A.   Yes, sir.

12    Q.   It is your job to determine what is going on with the

13    patient; right?

14    A.   To an extent, yes, sir.

15    Q.   Yes.  Because you have to administer the right medical

16    aid; right?

17    A.   Yes, sir.

18    Q.   Okay.  And we heard about all your training.  How many

19    fentanyl overdoses had you experienced in your career?

20    A.   Fentanyl specifically, I don't know.

21    Q.   Roughly, sir.

22    A.   Opioid in general, probably a dozen or so.

23    Q.   A dozen or so.  And in your camera -- strike that.

24          You were interviewed over the weekend by the

25    government, right, for your testimony?

79

1   A.   Yes, sir.

2   Q.   And in that interview you had, you were asked about what

3   your camera, the body camera that we're talking about that

4   took that still picture, what your camera showed about

5   Mr. Reed's eye pupils; correct?

6   A.   Yes, sir.

7   Q.   And those eye pupils that the camera taped were dilated;

8   right?

9   A.   Yes, sir.

10  Q.   Not pinpoint?  Not constricted; correct?

11  A.   That's correct, sir.

12  Q.   Now, when you arrived, because of your medical training

13  and the advanced symptoms you were told, like gurgling, you

14  concluded a cardiac arrest; right?

15  A.   Yes.

16  Q.   Did you look -- when you arrived first and see Mr. Reed,

17  did you look at his eyes?

18  A.   No, sir.

19  Q.   You didn't look at his eyes?

20  A.   Not at first, no, sir.

21  Q.   Right.  You were doing all this other stuff for maybe

22  15, 20 minutes to try to keep him alive; right?

23  A.   Yes, sir.

24  Q.   Okay.  And at some point, you got to the point where --

25  strike that.

1          Incidentally, when you got there, when you first

2     arrived in front of the barracks, actually on scene, you

3     didn't exactly know where the specific room was; correct?

4     A.    I had trouble finding the room, yes, sir.

5     Q.    You were in a hurry and you were concerned; right?

6     A.    Yes, sir.

7     Q.    And so you approached a duty officer that was sitting

8     there to help people like you; correct?

9     A.    Yes, sir.

10    Q.    And that officer appeared to be not concerned;

11    correct?

12    A.    Yes, sir.

13    Q.    To the point where it irritated you; correct?

14    A.    Yes, sir.

15    Q.    Because he wasn't taking the matter seriously;

16    correct?

17    A.    Yes, sir.

18    Q.    He had to look at a map, he told you?

19    A.    Yes, sir.

20    Q.    And you didn't have time to look at a map; right?

21    A.    No, sir.

22    Q.    So once you realize where you had to go, you rushed in

23    there, you go into the room.  Were you the first one in,

24    sir?

25    A.    No, sir.

81

1    Q.    Who was first in?

2    A.    My two police officers.

3    Q.    I'm sorry?

4    A.    Two of my police officers.

5    Q.    Their names, sir?

6    A.    Officer Holguin and Corporal Vargas.

7    Q.    And what were they doing when you got there?

8    A.    They were initiating CPR on Mr. Reed.

9    Q.    Had they looked at his pupils?

10   A.    I don't know, sir.

11   Q.    So then you begin to administer the aid that you

12   provided.  And after time elapsed, one of the people there --

13   I believe a sergeant -- suggested that you all stop your

14   efforts to keep Mr. Reed alive; right?

15   A.    Can you repeat your question, sir?

16   Q.    Yes.  At some point after you tried to restart the

17   cardiac rhythm --

18   A.    Yes.

19   Q.    -- and you were doing oxygenation on the body, one of

20   your officers, or a person there basically said, Let's stop,

21   or this is not working, something like that; correct?

22   A.    No, not really, sir.

23   Q.    Someone had to call the hospital for direction; right?

24   A.    Yes, sir.

25   Q.    Who was that?

COMPUTER-AIDED TRANSCRIPTION

1    A.   I believe that would have been EMS Chief Matt Rios.   EMS

2    Chief Matt Rios.

3    Q.   Rios.   Officer Rios.

4         What did he say, if anything?

5    A.   I don't really know.  I kind of heard it going on in the

6    background, but I wasn't really paying attention to the radio

7    traffic at the time.

8    Q.   He said something; right?

9    A.   I don't remember.

10   Q.   You don't remember specifically what he said?

11   A.   Correct.

12   Q.   Okay.  But he said something?

13   A.   Yes, sir.

14   Q.   Okay.  And then from whatever he said, someone called

15   the hospital, Sharp Hospital; right?

16   A.   I think -- I thought it was Scripps La Jolla.

17   Q.   Scripps.  I'm sorry.  I get confused between hospitals.

18   You're right.  Scripps La Jolla.

19        And please tell the jury why he had to call Scripps

20   La Jolla.

21   A.   So once -- once you work a cardiac arrest patient for a

22   certain amount of time to no avail, the senior healthcare

23   provider on scene at the time, which was Mr. Rios, has the

24   ability to call the hospital and speak to a doctor and

25   request permission to cease resuscitative efforts.

83

1    Q.   And was that the first request to cease resuscitative

2    efforts, or was it the second one?

3    A.   I'm not sure which one you're referring to, sir.  But he

4    did ask twice.

5    Q.   Thank you.  So there were two requests?

6    A.   Yes, sir.

7    Q.   The first one was denied; correct?

8    A.   Yes, sir.

9    Q.   The second one was granted after they told you to put

10   Narcan into Mr. Reed; right?

11   A.   Yes, sir.

12   Q.   That was over 20 minutes later after you arrived,

13   roughly; correct?

14   A.   Yes, sir.

15   Q.   From your training and medical background, had you

16   identified a fentanyl overdose when you arrived, and you had

17   given Mr. Reed Narcan, maybe it would have helped; correct?

18        MS. FORREST:  Objection.  Calls for speculation.

19        THE COURT:  Sustained.

20   Q.   BY MR. CORTEZ:  For about 20 minutes, no one, not one of

21   you, gave Mr. Reed Narcan; correct?

22   A.   Yes, sir.

23        MR. CORTEZ:  I have no other questions.

24        THE COURT:  Okay.

25        MS. FORREST:  Your Honor, with the Court's

COMPUTER-AIDED TRANSCRIPTION

84

1    permission, may this witness be excused?

2         THE COURT:  Yes.  Ladies and gentlemen, we are going

3    to take an early afternoon break.  There is a legal matter

4    that I must discuss with the attorneys at this time.  So we

5    are going to take our 15-minute afternoon recess at this

6    time.

7         I would admonish you -- and I will give you this

8    admonishment every time we take a recess in this case -- not

9    to form or express an opinion about anything having to do

10   with this case, and not to do any independent research,

11   whether it be on the Internet, books, if people still use

12   books, or anything along those lines.  All of the evidence

13   that you will properly consider will be introduced here in

14   court.

15        So it is 2:25.  We'll call it 2:25.  Please be back

16   ready to go at 20 till 3:00.  Thank you.

17        And you can leave your notebooks here in the

18   courtroom.  And you can go to the jury room, but if you go to

19   the jury room, you have to stay there the entire 15 minutes.

20        Can we ask someone to shut that door, please.

21        (Jury absent, 2:24 p.m.)

22        THE COURT:  Okay.  We are outside the presence of

23   the jury.  All counsel are present.  Mr. Atta is present.

24        Yes, Mr. Cortez.

25        MR. CORTEZ:  Can we have Captain Balderson not

85

1  totally excused yet?

2          THE COURT:  Well, we're going to discuss something

3  real quick.

4          You can step down, sir.

5          THE WITNESS:  Thank you, sir.

6          THE COURT:  Okay.  Government wish to be heard?

7          MR. ROTH:  No.  I'm waiting for the Court.

8          THE COURT:  Okay.  My in-limine ruling regarding the

9  video footage was based upon the state of the evidence as I

10 understood it to be.

11         Mr. Cortez, during your opening, you made repeated

12 references to the way in which the responding personnel

13 treated C.M.R.  And I now believe that based on your

14 cross-examination of this witness, when coupled with the

15 opening that was given, you have made relevant the video

16 footage that was shot by the body camera, because you called

17 into question their actions once they responded to the area,

18 in that they did not administer Narcan.

19         I think that the jury is properly entitled to see

20 what they did do and the circumstances under which they were

21 making those decisions.  So the balancing test that I

22 previously referenced, the balancing equation has shifted

23 somewhat given the opening and given the cross-examination.

24         Do you wish to be heard?

25         MR. CORTEZ:  I completely agree.

1          THE COURT:  Okay.  So the in-limine ruling as to

2     Government's in-limine Motion No. 7 is -- tentatively it was

3     denied.  I allowed Government's Exhibit No. 2 to be received

4     in evidence.  Government Exhibit 1 not to be received into

5     evidence.

6          My ruling at this point, given the state of the

7     evidence, is that the video footage shot from the body cam

8     may be introduced in its entirety or in the clips that the

9     government has proposed.

10          MR. ROTH:  Thank you, judge.

11          MS. FORREST:  Thank you, Your Honor.

12          THE COURT:  Okay.  So that's the legal -- and I

13     wanted to do that before the witness was excused.

14          MR. CORTEZ:  Absolutely.

15          THE COURT:  And I apologize for the early break.

16          MR. CORTEZ:  No, no.  I got it.  Absolutely.

17          THE COURT:  But I think --

18          MS. FORREST:  Thank you for clarification.

19          THE COURT:  I think the parties knew where I was

20     going with that.

21          MR. CORTEZ:  Totally agree.

22          THE COURT:  Is there anything else that we need to

23     address before we take a ten-minute recess?

24          MR. ROTH:  I would just observe, Your Honor, that

25     based on the opening, it's the government's position that

1    Exhibit 43, the screen shot that we referenced before the

2    lunch hour, should now be admitted without any redactions.

3          Mr. Cortez opened by arguing that there is a

4    difference between fentanyl and Percocets.  That's not true

5    as a matter of law, but he has now placed directly in issue

6    the issue of the content of M30 pills, which that screen grab

7    speaks to.

8          MR. CORTEZ:  I don't agree.  We're talking about

9    fentanyl.

10          THE COURT:  Okay.  I'm paying very close attention

11    to everything that's being said.  I'm taking very detailed

12    notes.  I did not get a chance over the lunch break to take a

13    look at 43 and 44, so I'm going to reserve ruling on those

14    particular exhibits at this time.

15          MR. ROTH:  Thank you, Judge.

16          THE COURT:  So with that in mind, I leave it up to

17    the parties, the government in particular, whether on

18    redirect you would like to go into the video footage or

19    whether you want to re-call this witness.  I know that it's a

20    shifting landscape.

21          MS. FORREST:  Yes, Your Honor.

22          MR. CORTEZ:  Yes, it is.

23          THE COURT:  Okay.  We'll be in recess until 20

24    till.

25          MR. ROTH:  Thank you, Judge.

88

1          MS. FORREST:  Thank you, Your Honor.

2          MR. CORTEZ:  Thank you.

3          (Recess, 2:27 p.m. to 3:40 p.m.)

4          THE COURT:  We are back on the record.  All jurors

5     are present.  All counsel are present.  Mr. Atta is present.

6          I remind you, sir, that you're still under oath.

7          Okay.  Ms. Forrest.

8          MS. FORREST:  Your Honor, the United States does not

9     have any further questions for this witness.  And with the

10    Court's permission, may he be excused?

11         THE COURT:  Okay.  You may step down, sir.

12         THE WITNESS:  Thank you, sir.

13         MS. FORREST:  Your Honor, the United States calls as

14    its next witness, Keith Naylor.  That's with a "Y."

15         THE CLERK:  Thank you.  Please raise your right

16    hand.

17      KEITH NAYLOR, a government witness, having been duly

18        sworn, testified as follows:

19         THE WITNESS:  I do.

20         THE CLERK:  Thank you.  If you can, when you're

21    seated, state your name and spell it for the record.

22         THE WITNESS:  Keith Naylor.  K-e-i-t-h N-a-y-l-o-r.

23         MS. FORREST:  May I proceed, Your Honor?

24         THE COURT:  Yes, you may.

25         MS. FORREST:  Thank you.

COMPUTER-AIDED TRANSCRIPTION

89

1                    <u>DIRECT EXAMINATION</u>

2    <u>BY MS. FORREST:</u>

3    Q.   So we have someone taking down everything you say, so

4    I'd ask that you keep the microphone close to you and speak

5    loudly so she can get everything.

6         Where do you work?

7    A.   Currently, I'm a firefighter/paramedic for the Lakeside

8    Fire Protection District in Lakeside.

9    Q.   What does your job involve on a daily basis?

10   A.   My job involves any manner of 911 responses,

11   primarily -- a majority of our responses are medical aids,

12   approximately 90 percent of those, and anything else that

13   people call 911 for:  Vehicle accidents, fires, rescues,

14   anything.

15   Q.   How long have you had your current job?

16   A.    I've been with the Lakeside Fire Protection District for

17   currently about two months, and prior to that, I was with

18   MCAS Fire Department for about 15 years.

19   Q.   Can you say the last part one more time.

20   A.   Yes.  I was with MCAS Miramar Fire Department for

21   approximately 15 years.

22   Q.   Now, as a general matter, can you explain to the jury

23   the difference between a paramedic and an EMT.  And I'll ask

24   you to slow down a little bit so --

25   A.   Sure.

90

1   Q.   -- she can get down everything.

2   A.   Yes.  EMT, that is -- EMT basic is generally where

3   you'll start your training at.  It's basic life support

4   skills, CPR, wound care, basic airway management.  There is

5   really not a lot of medications or anything that we'll do as

6   far as evaluating the condition of a patient's heart.

7        As a paramedic, our scope of practice, as we call

8   it, gets expanded greatly.  It's quite a bit more training.

9   We're able to do vascular access, access through -- called

10  intraosseous to the bone.

11       Then we also go through extensive cardiology

12  training, where we learn how to read EKGs, interpret

13  conditions of the heart.

14       THE REPORTER:  I'm sorry.

15       THE COURT:  If you can just slow down just a little

16  bit.

17       THE WITNESS:  No problem.  I know I can talk fast

18  sometimes.  I apologize.

19       THE COURT:  And especially with the technical terms,

20  nice and slow.

21       THE WITNESS:  Understood, sir.

22       In addition to that, we go through a lot of

23  pharmacology training, where we get trained on certain

24  medications that we can use to help treat life-threatening

25  conditions, problems with the heart, problems with the lungs,

91

1    metabolic issues.  We also are trained in advanced airways,

2    where we can place breathing tubes down people's throats,

3    into their lungs.  We have a couple different routes and

4    techniques for that procedure.

5            So generally, the foundation of an EMT is the same

6    as a paramedic.  It's just that a paramedic has extensively

7    more training to perform more invasive procedures, as we call

8    it.

9    Q.   BY MS. FORREST:  Can you describe what you had to do to

10   become a paramedic to get to where you are now.

11   A.   Sure.  To even apply for paramedic school, you have to

12   be an emergency medical technician basic.  That's a

13   relatively short course.  It's approximately one semester.

14   When you're completed with that, then you begin kind of your

15   real-world experience, as far as treating patients.

16           Generally, the paramedic schools want you to have a

17   year of experience.  In addition to that, you have to take a

18   few prerequisite classes for paramedic school:  Anatomy and

19   physiology, basic pharmacology, a few other involving -- a

20   handful of classes are in there.

21           To be a paramedic is very much like applying for a

22   job.  You have to go through an interview.  It's a written

23   interview, maybe a skills exam.  It's a whole application

24   process just to get admitted into paramedic school.  From

25   paramedic school, we go through about a one-year didactic

1    program, and that's where we learn all of the -- all the

2    literature, and that's the foundation of our skills.

3         When you're done with the didactic portion, then

4    we'll be placed into an emergency room, and generally there

5    we'll spend approximately two months.  And that's how we

6    learn to assess patients at a more advanced level, learn all

7    of our physical skills, as far as starting IVs and our

8    osseous access, inserting the breathing tubes, as I mentioned

9    before, and getting a real-world experience as far as how the

10   pharmacology we perform actually acts on a patient.

11        When that's done, then we go out to what we call a

12   field internship.  And a field internship is typically about

13   three months, and you're riding with an experienced senior

14   paramedic, and he evaluates all the skills, all the

15   techniques that you've learned over the course of your

16   experience leading up to that and makes a determination

17   whether or not you're going to be a qualified paramedic.

18        For that, there is a national exam that we take.

19   It's the National Registry of EMTs/paramedic.  And then when

20   you get hired with your respective agency, then you usually

21   spend about three months in a field training program.  So

22   you're already a paramedic, you're a licensed paramedic, but

23   it's a more technical version of your internship, and that's

24   really where your agency is going to decide if you're someone

25   they want working for you to provide care.

1  Q.   Now, among paramedics, is there what's called a lead

2  paramedic?

3  A.   There is.  It depends.  It varies from agency to agency.

4  Typically, it will be the paramedic that's assigned to the

5  ambulance that day.  It's just kind of a standard that

6  whoever is the paramedic on the ambulance will generally be

7  the lead paramedic for those incidents.

8        Frequently, we have paramedics assigned to the fire

9  engines that respond with us as well, and oftentimes there

10 can be multiple paramedics there.  But there is always a

11 lead.  There is always somebody in charge.

12 Q.   So of the people who have gone through the extensive

13 background that you've outlined to become a paramedic, is a

14 lead paramedic often someone who has significant experience

15 even compared to other paramedics?

16 A.   All paramedics are qualified to the same standard.  In

17 certain situations, if we encounter a patient that, you know,

18 is uncommon or very technical, then generally the more

19 experienced paramedic will assume patient care and control of

20 that call.

21       But as far as specifics skill sets or certain

22 advances in the paramedic field, it's -- it's not really

23 commonplace.  Every paramedic should be qualified to run

24 every incident.  But like I said, sometimes there are

25 situations that arise where you just haven't seen it before

94

1    as a new medic and you rely on your more experienced medics

2    to help you get through that.

3    Q.   In all, how many years have you worked as a paramedic?

4    A.   Twenty years.  And then two years as EMT basic prior to

5    that.

6    Q.   Now, has your training and experience as a paramedic

7    involved identifying and treating overdoses?

8    A.   Absolutely.

9    Q.   What about opioid drug overdoses?

10   A.   Yes, ma'am.

11   Q.   Can you tell the jury a little bit, a little bit about

12   your experience in identifying and treating drug overdoses.

13   A.   Sure.  It comes in all manners, anywhere from the

14   very -- the overdose was witnessed.  We can arrive on scene

15   and we have firsthand accounts from the bystanders on the

16   scene saying, yes, this individual suffered an opioid

17   overdose.  Here is what it was.  Those are very

18   straightforward.  We know this is the problem.

19         There is other instances where we come across a

20   patient who is just nonresponsive and we have to work through

21   an organized assessment program to try and determine what

22   that cause may be.  And then there is also instances where we

23   find out that an individual had suffered that overdose, and

24   it's not something that we're aware of until much, much

25   later.

95

1    Q.   I believe you used the termed "an organized assessment

2    program."  What is that?

3    A.   So one of the foundations of all paramedic training.

4    It's very easy, especially as a new paramedic, to arrive on

5    scene, it's very chaotic.  Oftentimes there is family.  There

6    is bystanders.  It can be a very hectic scene.

7         And if you don't have an organized, methodical

8    approach to your assessment -- basically there is a specific

9    line of questionings or a specific set of tasks that you

10   perform initially -- then it's easy to kind of get derailed,

11   your call will not go smooth.  Something that we always

12   train -- that I've always trained my new paramedics with is

13   just being very organized, very detailed and methodical and

14   staying to a strict pattern.

15   Q.   In your experience in treating drug overdoses, including

16   opioid overdoses, have you treated people who were in cardiac

17   arrest due to an overdose?

18   A.   Yes.

19   Q.   And in those instances, what is your top priority when

20   you're treating them, when you start treating them?

21   A.   So if we encounter a patient that's in cardiac arrest,

22   we work under guidelines set forth by the country.  It's

23   called advanced coronary life support, and it's a specific

24   set of protocols that we follow.  Generally, the initial

25   treatment is more to try and restart the heart, to put it

96

1    very plainly.

2          Until we kind of get the care going and get track of

3    them potentially breathing again, a lot of the other

4    treatments kind of fall secondary and tertiary to that.  So

5    our primary role is to try to address the cardiac issue that

6    may be secondary to the primary cause of that.

7    Q.   And why do the secondary concerns, why do they fall --

8    why do they become secondary and your focus is on treating

9    the cardiac arrest and getting the patient out of that?

10   A.   It's standard protocol.

11   Q.   What are some of the classic signs of an opioid

12   overdose?

13   A.   So with opioid overdose is typically we'll see

14   respiratory depression, so lower respiratory rates.  We'll

15   see a decrease in the patient's responsiveness.  They may not

16   be alert.  They may not be breathing.  Oftentimes, if we can

17   encounter that individual early on in the assessment, with

18   what we call pinpoint pupils, there is certain modes of

19   reactions that occur that cause that.  But as that arrest

20   continues, some of those signs may become a little more

21   vague.

22   Q.   What do you mean, some of those signs may become a

23   little more vague?

24   A.   Typically, if there is nobody on scene to tell us this

25   is what happened, then our nexus of suspicion, you know, we

1    tend to fall away from what may have caused that arrest in

2    order to just address that arrest.

3           So individuals who have been in cardiac arrest for

4    some time, regardless of the cause, those pinpoint pupils may

5    not be evident.  Sometimes the pupils become fixed and

6    dilated.  That generally occurs a little bit later after the

7    arrest.

8    Q.   So regardless of whatever the cause is of someone

9    falling into cardiac arrest, why is the focus on treating the

10   cardiac arrest?

11   A.   Well, until we get the heart restarted, none of the

12   additional pharmacological treatments are going to be

13   effective.  If there is no heart to pump that blood, create

14   that blood pressure, start perfusing the brain, start

15   perfusing those major organs.  Until we get that heart

16   restarted, a lot of the other treatments are primarily going

17   to be ineffective.

18   Q.   Can administering certain medications affect the

19   dilation of a patient's pupils?

20   A.   Um, I can't speak to that as far as in a cardiac arrest

21   situation.  There are certain medications that will cause a

22   dilation of a patient's pupils.  There is certain chemicals

23   that patients can be exposed to that are nonopioid-related

24   that can cause a dilation of pupils.

25          But during the cardiac arrest situation, I don't

98

1    believe any medications we give will cause that sort of

2    reaction.

3    Q.    On May 21st, 2020, did you respond to a call for an

4    unconscious male in his barracks?

5    A.    Uh-huh.  That's correct.

6    Q.    Do you remember approximately what time you responded to

7    that call?

8    A.    I do not.  I apologize.

9    Q.    Do you remember whether it was day or night?

10   A.    I believe it was daytime.

11   Q.    Did you later learn the identity of the unconscious

12   male, what his name was?

13   A.    We generally do patient care reporting afterwards, so

14   that would have been information I included in my patient

15   care report.  But to be honest, we run a lot of calls.

16   Q.    Did you know that the unconscious male that you

17   responded to the call for on May 21st, 2020, whether he was

18   in the Marines or not?

19   A.    I never actually was able to, say, ask anybody on scene,

20   Was this an active-duty Marine?  We talk about index of

21   suspicion.  We responded to the barracks on base.  That's

22   where active-duty Marines live, and that's where we responded

23   to.  Given his age, that's generally our assumption, but

24   that's not something we verify as far as our taking of care

25   priorities, whether or not he's active duty.

99

1   Q.   Okay.  When you arrived at the barracks, what was your

2   role relative to the other medical personnel on scene?

3   A.   Sure.  So my -- it was my day to be the lead paramedic.

4   I was assigned to -- to Medic 61, which is the ambulance that

5   Marine Corps Miramar operates.  And we responded with one of

6   the fire engines that is standard for that to respond to as

7   well.

8   Q.   And on May 21st, 2020, what were your responsibilities

9   as the lead paramedic?

10  A.   So as the lead paramedic, it's generally a little bit

11  less of a hands-on kind of role.  You will get in there as

12  much as required, but you're more there to kind of

13  quarterback the incident, if you will.

14       So you're the one that assigns the patient

15  respond -- the patient care responsibilities.  You ensure

16  that any tasks that you have assigned have been completed

17  accurately.  You are constantly reevaluating the status of

18  the call and if any sort of therapies need to be changed.

19  Q.   And when you arrived to to barracks, what did you see?

20  Can you describe that for the jury.

21  A.   Sure.  I recall an unconscious male on the ground.

22  There was law enforcement on scene.  There was one law

23  enforcement officer who, by happenstance, was also an

24  emergency medical technician.

25       He was at the head of the patient, as we call it,

1    and he was already providing effective ventilations; so I

2    actually kept him in that role.  It's very tight quarters.

3    It's really hard for us to work around.  He was qualified.

4    He was doing a fantastic job, so I kept him in that role, and

5    then we assigned out tasks as per protocol.

6    Q.   And when you arrived, was the patient in cardiac

7    arrest?

8    A.   Yes.

9    Q.   Did you know why he was in cardiac arrest?

10   A.   I did not.

11   Q.   Did you ever determine why he was in cardiac arrest

12   while you were on scene?

13   A.   No, we did not.

14   Q.   Did you ever try to determine it?

15   A.   As part of our standard assessment, we always try and

16   make that determination.  But given our limited abilities and

17   our limited diagnostic tools, it wasn't a hard-and-fast

18   situation that we were able to make.

19   Q.   What was your top priority when you entered the barracks

20   and saw that the patient was in cardiac arrest?

21   A.   Well, our top priority is always safety, to ensure that

22   the first responders are going to be safe.  Law enforcement

23   was there, so that issue was addressed.

24           Beyond that, when I was speaking to organized

25   assessments, we start with something really simple.  It's

1    called ABCs.  So airway, breathing, circulation.  A law

2    enforcement officer had already established an airway.  He

3    was helping out with that those respirations.  So our next

4    top priority is going to be compressions, so chest

5    compressions.

6    Q.   Did you ever hook the patient up to a heart monitor to

7    monitor whether the patient's heart was beating?

8    A.   Yes, ma'am.

9    Q.   Now, did you ever see that the patient's heart was

10   beating outside of any electricity or anything like that

11   being administered?

12   A.   No, it was not.

13   Q.   And did you check to see if the patient was breathing on

14   his own at any time, so independent of artificial ventilation

15   being administered to him?

16   A.   Absolutely.

17   Q.   And from the time that you were there, was the patient

18   ever breathing on his own?

19   A.   No, he was not.

20   Q.   Did you administer -- did you administer medication

21   that's used to treat cardiac arrest?

22   A.   Yes, we did.  As part of our standard protocol, we

23   administered the medication epinephrine.

24   Q.   And can you explain, how does epinephrine work?

25   A.   Epinephrine is actually, to put it simply, adrenaline.

1    It's actually another name for it.  It causes stimulation of

2    the cardiac muscle.  Any sort of blood flow that does occur

3    to that heart, any sort of electrical activity, the heart may

4    start to generate on its own.

5              THE REPORTER:  Wait.  Wait.

6              MS. FORREST:  I'm going to ask you to slow down.

7              THE COURT:  You were doing terrific.

8              THE WITNESS:  I know.  I get a little technical and

9    I get a little fast.

10             THE WITNESS:  Correct.  So any sort of electrical

11   activity, the heart may begin to generate on its own.  This

12   medication will potentiate that.  It will hopefully make it

13   more effective.

14   Q.   BY MS. FORREST:  Now, regardless of the cause of someone

15   entering cardiac arrest, in your experience, is cardiac

16   arrest something that someone is likely to be able to be

17   retrieved from, in your experience as a paramedic?

18   A.   The data and statistics generally place that probability

19   very low, generally the rate is 3 to 6 percent, is your

20   survivability rate for a possible cardiac arrest.

21   Q.   And is that 3- to 6-percent survivability rate once

22   someone goes into cardiac arrest, is that percentage

23   regardless of what puts them in cardiac arrest?

24   A.   That is correct.

25   Q.   And is that consistent with your 20 years' experience as

1    a paramedic?

2    A.    It is.

3    Q.    Now, was Narcan administered to the patient on May 21st,

4    2020?

5    A.    Yes, it was.

6    Q.    And what is Narcan?

7    A.    I'm going to try to slow down because I'll go fast

8    again.

9    Q.    Thank you.

10   A.    So Narcan is a medication that we administer to -- the

11   common conception is that it's an antidote, that it works

12   against any sort of opioid overdose.  And in reality, what it

13   is is it actually competes with the opiate that may be

14   introduced into a patient's bloodstream.  Everybody in this

15   room has opioid receptor sites that are part of their general

16   neurologic function.  Your body naturally produces its own

17   opiates.

18         Narcan more readily binds with those opiate receptor

19   sites than an opiate will.  So there has been occasions as

20   well where we're administering Narcan, Narcan will wear off,

21   that opiate will still be in that patient's bloodstream and

22   they will become symptomatic again.

23   Q.    Does Narcan save everyone that gets it, everyone who is

24   suffering from an opioid overdose, if they are administered

25   Narcan?

1    A.   No, it does not.

2    Q.   Have you had experiences where you've administered

3    Narcan to someone as fast as you could, and you still weren't

4    able to revive them out of a cardiac arrest?

5    A.   Out of a cardiac arrest, I can't speak to that.  I have

6    been on opiate overdoses where we've given all the Narcan

7    that we literally carried on that ambulance, and it still

8    wasn't enough to compete with the amount of opiates that that

9    person had taken.

10   Q.   Now, you said that you administered Narcan in this case.

11   Can -- can you explain to the jury whether that's part of the

12   standard protocol in responding to a cardiac arrest?

13   A.   No, it's not.  It's not part of standard ACLS protocol.

14   That was something that occurred later on in the incident.

15   Generally, when we find a young, healthy individual and, you

16   know, we're not really sure what the etiology of that cardiac

17   arrest event may be; so we actually asked for that

18   administration of Narcan as a physician variation.

19          So we have to get on the radio.  We speak to a nurse

20   that is at the hospital.  There will be a physician standing

21   right there with that nurse.  We'll kind of tell them the

22   situation, what we have done, that we want to try everything.

23   And that's how the Narcan order came about.

24   Q.   So is it the case that you can't just decide, hey, from

25   what I see, I need to administer Narcan?  You actually have

1    to contact a hospital and get authorization to administer

2    Narcan?

3    A.    Not in all situations.  Narcan administration is part of

4    a lot of our standing-order protocols.  In the instance where

5    we are working a cardiac arrest, it's not part of that

6    standard algorithm.  So if we do want to make that

7    administration, we have to ask for a variation from a

8    physician to make a change to that protocol.

9    Q.    So to make sure I understand.  In cases of cardiac

10   arrest, you have a standard protocol, and Narcan is not part

11   of that standard protocol.  That requires getting special

12   authorization from a physician; is that right?

13   A.    That is correct.

14   Q.    And how does the physician provide this special

15   authorization while you're on scene, in the barracks, for

16   example, in this case?

17   A.    We communicate via radio system.

18   Q.    Now, do you personally communicate via radio system?

19   A.    Very frequently, that's my primary responsibility.  On

20   this particular incident, one of our emergency medical chiefs

21   had shown up to the response, and that was a task that I

22   delegated out to him.

23   Q.    And what is that chief's name?

24   A.    Matt Rios.

25   Q.    So what did you have him do?

106

1    A.   So he's also an extremely experienced paramedic.  He was

2    one of our primary EM Chiefs.  And basically give him a

3    turnover as far as what we had done, what protocols we had

4    followed, what our current situation was and anything else

5    that we had to try.

6         So he would get on the radio.  He would contact our

7    base hospital.  And then he would give that same full report

8    to a nurse, who's on the other end of that radio, and given

9    the circumstances, she'll generally request a physician to

10   come into the radio room, and that whole sequence of events

11   occurs again.  And then treatment decisions are made after

12   that.

13   Q.   And so after you obtained authorization to provide

14   Narcan, can you explain what exactly you did?

15   A.   Yeah, it's a fairly straightforward procedure.  We

16   already had access to the patient's vasculature.  It's as

17   simple as taking the medication out of the box and hooking it

18   up to the line, the access line, and simply pushing the

19   medication into the patient's bloodstream.

20   Q.   And when you administered -- did you yourself administer

21   the Narcan?

22   A.   I believe I did.  I was -- like I say, it's been a

23   couple of years.  I believe I was the one that pushed the

24   Narcan.

25   Q.   Okay.  Do you recall what happened after the Narcan was

1   administered?

2   A.   Nothing.

3   Q.   Did it have any effect on the patient's breathing?  Did

4   it suddenly start his heart?

5   A.   No, it did not.

6   Q.   Did it have any effect on his ability to breathe on his

7   own?  Did it suddenly make him start breathing?

8   A.   No, it did not.

9   Q.   You used the term earlier "index of suspicion" with

10  respect to a determining or attempting to determine the cause

11  of someone falling into cardiac arrest.

12       Can you explain what you mean by index of suspicion.

13  A.   Sure.  Depending on the response you're going to, so,

14  for example, if we go to a patient's house that is 95 years

15  old and has a long list of preexisting medical conditions,

16  problems with their heart, problems with their lungs, our

17  index of suspicion is it's probably related to something like

18  that.

19       If we go to, you know, a middle-aged male, those

20  indexes may change.  We may be concerned about, is it

21  something that occurred secondary to high blood pressure or,

22  you know, pulmonary embolisms, traumatic events.  And it's

23  very case dependent.

24       So depending on the individual, the circumstances,

25  what we see on scene, that will kind of influence our index

108

1    of suspicion, as far as what may have caused that incident to

2    occur.

3    Q.   And so specifically focusing on opioids and your

4    experience seeing opioid -- or treating people who have

5    suffered from opioid overdoses, what are some of the factors

6    that contribute to your index of suspicion, whether it's high

7    or low?

8    A.   A lot of that -- excuse me.  A lot of that has to do

9    with what we can see on scene.  Do we see paraphernalia?  Are

10   there bystanders on the scene that witnessed the event occur?

11   Does our suspect reveal pinpoint pupils?  Does it reveal -- I

12   mean, I've been on cases where we'll go on heroin overdoses,

13   which is a similar sort of drug, and you'll still find the

14   needle hanging out of the arm, so your index of suspicion is

15   quite high for that.  But as far as, you know, making solid

16   determinations on everybody, it's pretty tough to do.

17   Q.   Did you have a high index -- or I should rephrase.

18        What was your index of suspicion as to whether the

19   patient you treated on May 21st, 2020, whether it was an

20   opioid overdose that caused him to enter cardiac arrest?

21   A.   At that time, it really wasn't high on my suspicion

22   list.

23   Q.   Why not?

24   A.   In my experience, prior to working for MCS Miramar, I

25   worked downtown San Diego, and we frequently encountered

109

1    people that were utilizing these sort of substances for

2    desired effect.  It wasn't something that we saw very often

3    in MCS Miramar.  It was a pretty rare event for us to

4    actually push Narcan on a patient.

5              MS. FORREST:  One moment, Your Honor.

6              THE COURT:  Yes.

7              MS. FORREST:  No further questions, Your Honor.

8              THE COURT:  Okay.  Thank you.

9              Mr. Cortez, cross-examination.

10             MR. CORTEZ:  Yes.

11                        CROSS-EXAMINATION

12   BY MR. CORTEZ:

13   Q.    Is it Officer Naylor or Mr. Naylor?

14   A.    Mr. Naylor is fine, sir.

15   Q.    Mr. Naylor --

16   A.    Yes.

17   Q.    -- let me pick up where my colleague left off.

18             She was going over your index of suspicion as to

19   what may be the medical urgency you have.  You did not have a

20   high degree of suspicion that this was an overdose of opioid;

21   right?

22   A.    At that time, I did not, no.

23   Q.    And you just testified just now that you had a lot of

24   experience with overdose cases, especially opioids; right?

25   A.    That is correct.

COMPUTER-AIDED TRANSCRIPTION

1     Q.    Downtown?

2     A.    Yes.

3     Q.    And you added that sometimes you even see someone with a

4     needle sticking out of their arm, and that's pretty easy to

5     determine what may be going on?

6     A.    Absolutely.

7     Q.    But curiously, you also mentioned as part of your

8     determination about what is happening here, this patient, you

9     look at their pupils; right?

10    A.    That is correct.

11    Q.    And the pupils in this case were dilated; right?

12    A.    That is correct.

13    Q.    Now, earlier you testified, also on direct examination,

14    that you gave Mr. Reed medication to try to get that pump

15    going; correct?

16    A.    That is correct.

17    Q.    And he was being oxygenated already by Captain

18    Balderson, correct, by the time you got there?

19    A.    I don't -- I don't know if he actually had oxygen with

20    him.

21    Q.    You testified on direct that when you walked in, you

22    determined it was a cardiac arrest, and that one of the

23    things to do immediately is to oxygenate the person; right?

24    A.    There is a difference between oxygenation and

25    ventilation.  So ventilation --

1   Q.   I'm sorry.  I'm sorry.

2   A.   Ventilation is actually providing that positive

3   pressure --

4   Q.   Correct.

5   A.   -- to simulate respiration.

6   Q.   Correct.

7   A.   Oxygenation is when you actually apply oxygen to that

8   device.

9   Q.   Correct.  And in this instance, when you came in, there

10  was an officer already intubating the patient; right?

11  A.   That is not correct.

12  Q.   Did you see Captain Balderson?  You said you saw an

13  officer that was doing a pretty good job already?

14  A.   Correct.  But he's not qualified to provide

15  intubation.

16  Q.   I got it.

17       What was he doing a pretty good job of?

18  A.   On providing basic ventilations, according to the

19  American Heart Association standard protocol for a basic

20  provider.

21  Q.   I got it.

22       For all of us who are not trained, what is

23  ventilation?

24  A.   Ventilation is basically simulating your natural

25  response to breathe, but you're doing it mechanically for

1    them.

2    Q.   When you say "mechanically," so that we all can

3    understand, you're pushing down on the chest area?

4    A.   That is different than ventilation.  When you're pushing

5    down on the chest, you're providing compressions.

6    Q.   I see.

7         So how do you provide ventilation to a patient?

8    A.   So you provide ventilation to a patient, from a basic

9    standpoint, we'll generally place, it's a plastic device that

10   goes into their mouth.

11   Q.   I'm sorry.  You said a what device?

12   A.   A plastic device.

13   Q.   Plastic device on the face?

14   A.   It goes inside the mouth.  It's called an oropharyngeal

15   airway.

16   Q.   Oral what?

17   A.   Oropharyngeal airway.

18   Q.   And "pharyngeal" because it's in the pharynx?

19   A.   That's correct.

20   Q.   Does it have a bag attached to that?

21   A.   It does not.

22   Q.   How does it provide ventilation?

23   A.   The device does not.  What the device does is help

24   maintain the airway in an open position, so that when we use

25   that device, that bag-valve mask, that when we go to provide

1    that ventilation, it's not occluded by the patient's

2    tongue.

3    Q.   I see.  And you were watching someone ventilating that

4    patient; right?

5    A.   Absolutely.

6    Q.   And at that time, there was no bag attached to that

7    thing he had in his mouth?

8    A.   When the first responders arrived on scene, when the

9    paramedics arrived on scene?

10   Q.   Yes.

11   A.   We absolutely utilized that device.

12   Q.   All right.  But when you arrived there?

13   A.   I don't recall.

14   Q.   Okay.  At any rate, you testified on direct that you

15   felt comfortable because who was giving ventilation was doing

16   a pretty good job; right?

17   A.   Given the proper equipment, he was doing a good job.

18   Q.   Do you know who Captain Balderson is?

19   A.   Do I know who he is?

20   Q.   Yes.

21   A.   Just from in a professional nature, responding on

22   incidents with him, and it was relayed to me on previous

23   incidents that he was an emergency medical technician.

24   Q.   Did he arrive there before you?

25   A.   He did.

1    Q.   So by the time you got there, Captain Balderson was

2    already attending to the urgency; right?

3    A.   That is correct.

4    Q.   Thank you.

5         Now, you were asked whether the administration of

6    Narcan would do any good when there is no palpitation of the

7    heart; right?

8    A.   I believe so.

9    Q.   And you said, well, no, because you've got to have

10   circulation first in the body for those medications to get

11   in; right?

12   A.   That is correct.

13   Q.   Okay.  And you had administered some medications, one of

14   them was epinephrine; right?

15   A.   That is correct.

16   Q.   Because you were focused on getting that heart going,

17   that pump going, that circulation going; right?

18   A.   That's the primary objective, yes.

19   Q.   And as you're in the middle of trying to work on this

20   patient, you're also getting feedback and back and forth with

21   the hospital; right?

22   A.   Not during the initial stages of the event.  Generally

23   we make base hospital contact when we've exhausted all of our

24   standing-order protocols and we're looking for additional

25   treatment methodologies.

115

1    Q.   And when you got to that point, the chief basically --

2    Chief Rios basically called the hospital, right, to get

3    guidance?

4    A.   That is correct.

5    Q.   Okay.  And so when the chief calls the hospital, you're

6    telling the hospital people, the nurse that you mentioned,

7    the doctor that may be consulted, everything that you're

8    encountering with that patient at that time; right?

9    A.   That is correct.

10   Q.   Because that detailed information regarding the

11   patient's health is critical to the doctor who is not on

12   scene; correct?

13   A.   That is correct.

14   Q.   And knowing all of the factors that you relayed to this

15   doctor at the hospital, even though you said that sometimes

16   Narcan doesn't do any good after you get the heart pump

17   going, the doctor told you to try Narcan anyway; right?

18   A.   I believe -- I wasn't on the radio to exactly know the

19   exchange of verbiage that occurred.  However, when Chief Rios

20   came back into the room, the determination was already made

21   to provide that Narcan.

22   Q.   Exactly.  Because the doctors off-site believed it might

23   help; right?

24   A.   We wouldn't have administered it if we didn't believe it

25   would have.

1    Q.   Exactly.

2              MR. CORTEZ:  That's all I have.  Thank you.

3              THE COURT:  Thank you.

4              Redirect Examination?

5              MS. FORREST:  Yes.

6                        REDIRECT EXAMINATION

7    BY MS. FORREST:

8    Q.   Who asked to administer Narcan to the patient on

9    May 21st, 2020?

10             MR. CORTEZ:  Asked and answered, Your Honor.

11             THE COURT:  Overruled.

12             THE WITNESS:  Can you repeat the question again?

13   Q.   BY MS. FORREST:  Who asked for permission or

14   authorization to administer Narcan to the patient on

15   May 21st, 2020?

16   A.   I believe that would have been Chief Rios.

17   Q.   And was Chief Rios a member of your team?

18   A.   Yes, ma'am.

19   Q.   Is it fair to say that your team requested permission to

20   administer Narcan to the patient?

21   A.   Yes, ma'am.

22             MS. FORREST:  Nothing further, Your Honor.

23             THE COURT:  Okay.  Thank you, sir.  You may step

24   down.

25             THE WITNESS:  Thank you very much.

COMPUTER-AIDED TRANSCRIPTION

117

1          THE COURT:  Government's next witness, please.

2          MR. ROTH:  Thank you.

3          MS. FORREST:  Yes, Your Honor.  The United States

4     calls Dr. Platt.

5          THE CLERK:  Thank you.  Please raise your right

6     hand.

7        BRYAN PLATT, MD, a government witness, having been duly

8          sworn, testified as follows:

9          THE WITNESS:  I do.

10          THE CLERK:  Thank you.  If you can please state your

11     name and spell it for the record.

12          THE WITNESS:  Bryan Platt.  Bryan, B-r-y-a-n, Platt,

13     P-l-a-t-t.

14          MS. FORREST:  May I proceed, Your Honor?

15          THE COURT:  Yes, you may.

16          MS. FORREST:  Thank you.

17                    DIRECT EXAMINATION

18     BY MS. FORREST:

19     Q.   Good afternoon, Doctor.

20     A.   Good afternoon.

21     Q.   Now, Doctor, I'll tell you what I tell all witnesses.

22     Please try to speak up, speak into the microphone; we have

23     someone taking down everything you're saying.  And please try

24     to speak slowly, which I know can be tough to do sometimes.

25          What do you do for work?

1    A.    Currently, I'm one of the deputy medical examiners at

2    the Armed Forces Medical Examiner System at Dover Air Force

3    Base in Dover, Delaware.

4    Q.    Can you explain for the jury what your responsibilities

5    are as the deputy medical examiner.

6    A.    As one of several deputy medical examiners, I am

7    responsible for performing forensic pathology investigations,

8    including autopsies, on cases that come under our

9    jurisdiction.

10   Q.    You mentioned forensic pathology investigations.

11   Besides autopsies, what do such investigations include?

12   A.    Well, the -- the phrase "forensic pathology

13   investigation" is basically the sum total of everything we're

14   doing there.  It's investigation at the scene, the

15   toxicology, the histology, the -- you know, the

16   identification process; that is the phrase that we utilize in

17   our office to encompass the whole process.

18   Q.    And so that includes autopsies and toxicology results

19   taken of an individual?

20   A.    Correct.

21   Q.    And toxicology -- can you explain what a toxicology

22   report or result -- report is or results are for the jury.

23   A.    Well, for toxicology, in our office, we utilize

24   specimens derived during the autopsy examination.  We will

25   collect -- in our office, we collect blood.  We collect

1    urine, bile from the gallbladder, the vitreous fluid from the

2    eye and gastric contents.  We will also additionally utilize

3    as something of a backup, as necessary, we utilize solid

4    organs, most commonly the liver, the spleen or the kidney.

5    Q.   Now, what is your background that you have that

6    qualified you to become a deputy medical examiner in your

7    current position?

8    A.   All the way back?

9    Q.   Well, you don't have to go back to junior high, but...

10   A.   So I have an undergrad in chemistry from Albright

11   College in Reading, Pennsylvania in 2001.  Went to medical

12   school at Temple University School of Medical, now the Katz

13   School of Medicine.  Graduated there in 2007.

14        At that point, I transitioned to Naval Hospital

15   Pensicola.  I did an internship year in family practice from

16   2007 to June of 2008.  I stayed in Pensicola for

17   approximately another eight months, going through the Navy's

18   flight surgeon billet -- or training there.  After that, I

19   was assigned to a pair of Marine CH-53 helicopter squadrons

20   at Marine Corps Air Station, New River, North Carolina.

21   That's the air station associated with Camp Lejeune.  I was

22   there from April '09 until August of 2011.

23        At that point, I was -- I started my residency in

24   anatomic and clinical pathology at Walter Reed National

25   Military Medical Central in Bethesda.  So that was from

120

1    September of 2011 until August of 2015.

2            I started my forensic pathology fellowship at the

3    Virginia Office of the Chief Medical Examiner, at their

4    Tidewater Regional Office in Norfolk in November of 2015

5    through October of 2016.  And then at that point, I trans --

6    I moved to the Armed Forces Medical Examiner system and have

7    been there ever since November of 2016.

8    Q.   And throughout your career in conducting autopsies, if

9    you had to put a number on it, approximately how many

10   autopsies have you conducted?

11   A.   Fellowship, 201.  For the -- for AFMES, I've done I

12   believe an additional 135 at this point.

13   Q.   And this might be a weird question, but how do you have

14   such a specific number of the number of autopsies you've

15   performed?

16   A.   I keep Excel spreadsheets of all the details on them.  I

17   do that to track all the pieces as they come in.  All the

18   toxicology, where it is on the review process.  So it's

19   something that I developed in fellowship and I just kind of

20   stuck with it.

21   Q.   Now, did you perform an autopsy of a male by the name of

22   Christian Reed in connection with this case?

23   A.   I did.

24   Q.   Now, before we get into the details of that autopsy, can

25   you kind of orient the jury, sort of the information that you

1    need and what you do before you begin your autopsy?

2    A.   Okay.  So before we begin our autopsy, typically -- you

3    know, our office is different in that we're the only federal

4    entity out there.  So it takes a little more time to

5    establish whether it's our appropriate jurisdiction.  The

6    phrase we use is "exclusive federal jurisdiction."  So most

7    commonly, you know, deaths on base, deaths on ships, deaths

8    overseas, things like that.

9         So initially we are presented with a death.  We

10   confirm that it's our jurisdiction.  And then we are given

11   kind of the basic synopsis of what was found.  You know,

12   found unresponsive in their barracks room, found unresponsive

13   outside, you know, found hanging, found with a gunshot wound

14   to the head.  Usually it's that kind of brief synopsis that

15   we are given initially prior to beginning the case.

16   Q.   Now, is the synopsis usually pretty general, or is it

17   very specific?  Does it vary?

18   A.   Well, it's very concise is the best word I would use.

19   So basically, you know, just basically what is the minimum

20   that is known at the time the death is presented to us to

21   make a determination, A, is it our jurisdiction; and, B, is

22   it a forensic case or not.

23   Q.   And what do you mean by "forensic case"?

24   A.   When we talk about medical examiner work and forensic

25   pathology, we're talking about the investigation of sudden,

122

1    violent, unnatural, unexpected death; so we need to hear

2    enough circumstances to fit those categories.

3             You know, so a lot of times it's from the moment --

4    from the moment the remains are discovered, maybe -- like I

5    said, a hanging, gunshot wound to the head, yes, it's obvious

6    that it's a forensic case, but sometimes if it's someone who

7    has died in a hospital, and we have to understand the

8    circumstances of why they were admitted to the hospital first

9    before we decide whether it's our case or not, whether it

10   would fit for -- you know, fit into that definition.

11   Q.   Do you recall when you performed the autopsy of

12   Christian Reed in connection with this case?  Do you remember

13   the date of your autopsy?

14   A.   The date?

15   Q.   Yes.  Do you recall --

16   A.   Can I refer to my report?

17   Q.   Of course.  You can turn to -- it looks like you may

18   have your report with you.

19   A.   Uh-huh.

20            So the date of death we were made aware of, it was

21   May 21st of 2020.

22   Q.   And what was the date that you performed the autopsy?

23   A.   May 28th of 2020.

24   Q.   Now, is that a typical time frame before you start an

25   autopsy?

1    A.   At that time, you know, in response to travel

2    restrictions placed throughout the Department of Defense, we

3    could not operate as we normally would.  For deaths that

4    occurred in the United States, typically what we will do is

5    we'll travel to the case, because it is much more difficult

6    to move someone, you know, across state lines before they are

7    embalmed and ready to be interred.

8         So because of that -- so at that time what we were

9    doing in response to the travel restrictions is we were

10   moving cases to where we were located.  Dover Air Force Base.

11   We have some regional medical examiners in Texas.  We have a

12   regional medical examiner in Washington State.  So the time

13   it takes to coordinate that contract, that -- obtain

14   permissions in the State of California, we had to -- there

15   were forms that we had to fill out specifically to get the

16   remains from California to Delaware.  So we -- that seven-day

17   time frame was not uncommon during that period.

18   Q.   Now, do you recall the date that you signed your autopsy

19   report?

20   A.   The date I signed it was August 7th of 2020.

21   Q.   And what is the reason that you perform the autopsy on,

22   I believe it was May 28th of 2020, and you signed the report

23   in August of that same year?

24   A.   Well, when -- the standard for completing our autopsy

25   reports is 90 percent of our case is finished within 90 days.

124

1   So without doing the math, I mean, I know it's within

2   standard at that point.

3          But we're also -- we're waiting on numerous things

4   to come in, toxicology results.  If I have to -- if I need to

5   engage a neuropathology expert to look at the brain with me,

6   that takes some time; a cardiovascular cardiologist expert to

7   look at the heart with me, that adds some time, in addition

8   to any other special studies that are required.  Plus, also,

9   you know, other -- you know, life also gets in the way as

10  well sometimes.

11  Q.   Do you always consult or -- I believe the word you used

12  is "engage."  Do you always engage these specialists as part

13  of your autopsies, or is it under special circumstances?

14  A.   Yes, it's under special circumstances.  It's not a

15  routine practice.  If it's a -- you know, if there are

16  circumstances that you -- you know, like I said, if you do

17  not have a good answer or a good diagnosis at the time, there

18  is nothing wrong with engaging an expert at that point; but

19  it is not done routinely.

20  Q.   Now, what were you informed as far as the circumstances

21  of Mr. Reed's death before you began your autopsy?

22  A.   So initially we understood he was found unresponsive in

23  his barracks room during a welfare check.  And kind of the

24  use of that term is, okay, well, did he not show up to a

25  formation?  Did he not show up to an appointment, what have

1   you.  In clarifying that, we also learned that he had been

2   recently admitted at the Naval Medical Center in San Diego

3   approximately a month prior to death.

4          So, you know, those two pieces of information,

5   initially before he arrived at Dover, the question was, okay,

6   are we looking at something totally separate or are we

7   looking at something that may be related to why he was

8   admitted a month earlier.

9   Q.   And was that one of your first considerations, whether

10  his hospital admission a month prior to his death in any way

11  related to his death?

12  A.   Yeah.  That was kind of the first big branch point in

13  our -- kind of in my thinking in my mind.  Okay.  What do I

14  have?  What question do I have to answer?  Okay.  Is this

15  part of the hospitalization or is it something else?

16  Q.   So how did you go about answering that question for

17  yourself?

18  A.   Well, I mean, it's also going through the autopsy and

19  looking specifically for that.  It's more of just -- you

20  know, the phrase I use is if you don't think about it, you're

21  not going to look for it.  So it's just being aware of that

22  while I'm doing the same process for an autopsy I do with my

23  other cases.

24  Q.   Is it standard for you to review an individual's medical

25  history, either before or after you conduct your autopsy?

1   A.   Either/or.  I've done both, you know, depending on the

2   circumstances.  If I have questions or something doesn't make

3   sense to me, I'll look in depth.

4        The other instance when we will go through the

5   medical records is like I talked about earlier, in

6   determining whether a case just is a medical examiner case or

7   not.  So that -- so -- so there is a variability as far as

8   how deeply we go through the medical records before versus

9   after the autopsy.

10  Q.   And so, for example, such as this case, where you're

11  informed that an individual was hospitalized a month before

12  their death, did you take the steps to review Mr. Reed's

13  medical records, to either rule out or consider whether that

14  hospitalization contributed to his death?

15  A.   I did.  The big thing I was looking for there is, well,

16  what was his admission diagnosis?  What was his discharge

17  diagnosis?  What did he show up with, what was diagnosed

18  during the hospital course and what was he discharged with?

19  Q.   Let's start with admission diagnosis.  Why did you look

20  to see what the admission diagnosis was?

21  A.   Well, honestly, just to kind of see, okay, what -- you

22  know, literally, what parts of the body do I got to spend

23  some scrutiny on.  The initial story was altered mental

24  status.  Okay.  I've got to pay attention to the brain,

25  probably something going on there.  They talked about arm

127

1    weakness or something like that; I'm going to look for

2    injuries.  Is there something to explain that as well?

3         And then along with that, you know, specifically

4    talking about mental status, okay, what did the radiology of

5    the brain show at the time?  And so that's -- so those were

6    kind of the questions I had going into that autopsy.

7    Q.   And why did you look at the -- why did you in this case

8    and why do you generally look at the diagnosis someone has

9    when they are released from a hospital?

10   A.   Mostly, just to see how things may have progressed.  You

11   know, did they resolve?  Did they -- did it resolve?  Did the

12   admission diagnosis change, you know, to a final discharge

13   diagnoses?  Did they find anything additional?  That's --

14   basically it's comparing those two points in time.

15   Q.   If you look in the binder -- there is a binder near you.

16   There should be a disc titled Exhibit 5.  It's a CD.  Can you

17   let me know when you see that?

18   A.   I see it.

19   Q.   Now, did you have an opportunity to review the contents

20   of this disc?

21   A.   I did.

22   Q.   And what is on this disc?

23   A.   What it is is a -- it's a PDF file that -- the medical

24   records system we use, we call it ALTA, in the military, that

25   it creates a medical record, mostly outpatient, but also some

1    inpatient stuff, particularly with labs and studies.  And it

2    organizes it into a nice PDF file with different sections and

3    it organizes by page number.  So a lot of times that is --

4    when we engage -- particularly medical, other military

5    medical hospitals, and we engage their patient records,

6    that's the format we get.

7    Q.   And did you have an opportunity to review Mr. Reed's

8    medical records contained on this disc?

9    A.   I did.

10   Q.   Did you have an opportunity to review the toxicology

11   results of tests that were performed on his body at the time

12   of death?

13   A.   At the time of death?

14   Q.   Or after death, I should say.

15   A.   So you're talking about my studies?

16   Q.   Yes.

17   A.   Yes.  Yes.

18   Q.   And is there any information, other than what I've

19   mentioned that we've already discussed, that you considered

20   in coming to your conclusions regarding the cause of death in

21   this case?

22   A.   Yes.  So just to backtrack a little bit.  When -- going

23   through his autopsy, I didn't find any significant injuries

24   or anything that would be considered a cause of death.

25   Particular to the brain in this case, there was concerns that

129

1     there were some findings in the brain that were possibly

2     contributing to the arm weakness that they had talked about.

3            At the -- I had seen -- I went through and I saved

4     the brain at that time to review with my neuropathologist.

5     And the brain is a unique organ.  In order to do that, in

6     order to do your best exam with it, you have to preserve it

7     first versus seeing -- you know, examining it right then and

8     there at the time of autopsy.

9            So while that was occurring, and then the damage to

10    the brain, going throughout the rest of the body, nothing

11    else that I could identify as a cause of death.  I received

12    my toxicology results then, and it was -- in those results, I

13    was able to settle on a cause of death in this case.

14    Q.   And Dr. Platt, what did you determine to be the cause of

15    Christian Reed's death?

16    A.   So I certified this death as an acute fentanyl

17    intoxication.

18    Q.   Can you explain to the jury what that is.

19    A.   Basically, in everyday language, it was an overdose.  He

20    had a fatal level of fentanyl concentration in his blood.

21    Q.   Do you recall the level of fentanyl that Mr. Reed had in

22    his blood?

23    A.   It was 99 nanograms per milliliter.

24    Q.   Can you explain for the jury what that quantity is with

25    respect to an amount of fentanyl that is necessary to end

1   someone's life.

2   A.   Yeah.   So -- well, it's -- in toxicology in general,

3   it's not just enough to say that when you're talking about

4   something is a fatal level, there is one number and

5   everything above it, everyone is dead and every number below

6   it, they are not going to be.   That's not the case.

7        With fentanyl, it does have proper -- you know, we

8   use it in the hospital all the time.   We use it primarily for

9   pain relief, analgesia.   At that range, we're talking about

10   low single digits, one, two nanograms per milliliter.

11        Fentanyl also has use in the Intensive Care Unit, in

12   the ICU, when, you know, someone is intubated and for more

13   anesthesia purposes.   And that range is in the low single

14   digits.   10, 12, 14, you know, up to 20 nanograms per mill.

15   Because you can give those higher doses because you're

16   already supporting the person's breathing.   Once you get

17   above that low, single-digit level, you start to affect the,

18   what we say, respiratory depression there.

19        So 99 nanograms per mill is well within the accepted

20   range in the medical examiner community of, yes, this is

21   consistent with a fatal overdose.

22   Q.   When you reviewed Mr. Reed's medical records and

23   performed your autopsy, did you specifically look for any

24   evidence that Mr. Reed had had a stroke a month prior to

25   dying?

1   A.    So part of the -- where that stroke comes up is with the

2   imaging, he was in the hospital a month before he died, there

3   were some findings that suggested maybe there was an area of

4   an infarct or a stroke, particularly in the right motor

5   cortex, that could be causing problems with his left arm.

6          After -- after I received my toxicology result, I

7   was very satisfied this was going to be a cause of death,

8   so -- but then for completeness' sake, knowing this history,

9   I went ahead and examined the brain myself, with the caveat

10  of, okay, if I see anything suspicious, I can still engage my

11  neuropathologist.

12         So I went through and sectioned the brain.  I didn't

13  see any lesion that corresponded to what was described on the

14  radiology.  Everything looked essentially symmetrical, and

15  that's the first thing I look for, does the right side look

16  like the left side?

17         And then I took several sections of the brain to

18  look at under the microscope, because one of the other issues

19  identified in the imaging was a concern for basically a

20  vasculitis, an inflammation around the vessels, that was

21  leading to this altered mental status, this encephalitis

22  picture that clinically they were seeing.  And I didn't

23  appreciate any inflammation on the various slides that I

24  looked at.

25         Now, that's -- you know, looking through his medical

132

1    records, he had received a course of steroids.  These would

2    basically calm down the immune system, so it's not

3    unreasonable that, okay, you know, the reason I'm not seeing

4    any of this is he was treated adequately and the issue had

5    resolved.

6    Q.    Did you find any evidence in Mr. Reed's brain or in any

7    other part of his body that he had had a stroke a month

8    before he died?

9    A.    No.

10   Q.    And you mentioned vasculitis.  Do you believe that it's

11   possible Mr. Reed did, in fact, have vasculitis a month

12   before he died?

13   A.    It's possible.  They described altered mental status

14   clinically as part of his initial presentation.  So there

15   were radiology findings suggestive of it.  But there was --

16   like I said, he was discharged.  There was an interval where,

17   by all accounts, he had returned to basically baseline

18   functioning.  So for me to not find anything, you know, it is

19   not proof of, well, that was an incorrect diagnosis coming in

20   the door.  No, that's not what I'm saying.

21   Q.    So given that it may have been the case that Mr. Reed

22   had vasculitis a month before he died, why don't you think

23   vasculitis had anything to do with the cause of his death?

24   A.    Well, I mean, it's -- I'm not sure I'm following your

25   question.

133

1   Q.   That's my fault.  Let me rephrase.

2        Given that you determined that it was possible that

3   Mr. Reed had suffered from vasculitis a month before he died,

4   why did you not conclude that that was any sort of

5   contributing factor to Mr. Reed's death, his cause of

6   death?

7   A.   Well, No. 1, it wasn't present at the time of my

8   autopsy; so that's probably the biggest factor.

9   Q.   If Mr. Reed had died from vasculitis, would you expect

10  to see evidence of that when you performed your autopsy?

11  A.   If it was a vasculitis encephalitis picture, yeah, I

12  need to see it if I'm going to call it that, yeah.

13  Q.   Is there anywhere, other than the brain, that you can

14  find evidence of a stroke in someone's body?

15  A.   Well, a stroke, yeah, the long term for a stroke is a

16  cerebral vascular accident; so by definition, yeah, it's the

17  brain or, you know, the mid-brain, basically the central

18  nervous system.

19  Q.   And what do you expect to see when you look at someone's

20  brain and they have died from a stroke?

21  A.   Well, if they had died acutely, you know, like within

22  hours, days, you know, from that, it depends on how it was --

23  what caused it.  Whether it was a hemorrhagic stroke, you

24  know, blood vessel bursting, there is a large bleed.  Well,

25  that's going to be obvious.

1          The other thing -- the other big category of strokes

2    or cerebral vascular accidents you see are more of the

3    embolic strokes.  These are ones where he had the blood clot

4    in the leg, he had a hole in his heart, or they had atrial

5    fibrillation, blood clots in the heart, and they got spread

6    up into the brain.  That, what you see there, with that blood

7    flow being cut off, you start to see basically the -- that

8    territory of the brain breaking down, starting to become

9    necrotic.  So it -- it follows the distribution of the

10   vessels, as far as what regions you see.

11         And there are a number of changes you see, depending

12   on at what time, you know, how soon or long after the stroke

13   has occurred, as far as what you can see both initially at

14   autopsy and then under a microscope.

15   Q.   Focusing on fentanyl causing someone's death.  You said

16   earlier that there are medical uses of fentanyl; is that

17   right?

18   A.   Correct.

19   Q.   Now, when you look at the results of an autopsy -- or

20   excuse me, your conclusions, when you determine that someone

21   has died as a result of fentanyl, is there anything about the

22   fentanyl that allows you to determine whether it was from a

23   medical source or it was an illicit source?

24   A.   So the easiest way, the most common way we look at it is

25   if there is anything basically that shows up in the

1  toxicology with it.  If it's a purely medical source, we're

2  going to see fentanyl and, you know, some of the metabolites,

3  norfentanyl, 4APP -- 4APPP.  That's the abbreviated version.

4       Sometimes we will see compounds that we know have no

5  human use, you know, things that are used in the veterinary

6  space, so, you know, colloquially, they are referred to as

7  cutting agents.

8  Q.   And so do -- does the presence of cutting agents tell

9  you that the fentanyl in the person's system did not come

10  from a medical professional?

11  A.   Yes.  That signals to us that most likely, if we see a

12  compound that we know has no human use, it is likely a

13  cutting agent.

14  Q.   And did you find the presence of any cutting agents in

15  the fentanyl -- or excuse me, in Mr. Reed's body in addition

16  to the fentanyl levels?

17  A.   Yeah.  The agent that we found on our toxicology screen,

18  there was one agent, and that's a metabolite.  Referring here

19  from the toxicology report, 4-Methylaminoantipyrine, and then

20  its metabolite 4-Aminoantipyrine.  Those compounds, in and of

21  themselves, have some veterinary use.  They have no use in

22  humans.  So that could be a source.

23       The other possibility of the source for specifically

24  the 4-Methylaminoantipyrine, it is the metabolite of a very

25  old, you know, old pain reliever, old fever reducer that used

136

to be on the market in the U.S. about 50 years ago.  The

generic name is Matamizole.  You can still find that drug

around the world, you know, Central America, South America,

China, Russia.  There is still some countries in Europe that

have it.  So that could be also another possible source, but,

again, it's not in the market in the U.S.

Q.   When examining someone's body, so performing an autopsy,

are there any sort of classic signs that you see in

performing autopsies that are consistent with an opioid

overdose, or any sort of drug overdose?

A.   The two big things that we look for that we note, as far

as an opioid overdose -- and this is just in general -- is

the lungs tend to be -- they tend to be more full of fluids,

pulmonary edema.

          And that's just the -- from the -- you know, as the

opioid is a narcotic, is it slows down your respiratory

drive.  You don't respond appropriately to the buildup of

carbon dioxide because you're not adequately exhaling it out.

Your body is slowly becoming more hypoxic, more deprived of

oxygen, so in that setting, you start to accumulate more

fluid in the lungs.

          The other thing we see, and there are some studies

that kind of tease this out with various opioids, between

heroin and fentanyl and some of the other pills, is there

will be some urinary retention.  But that, you know, is not

1    always the case.  It doesn't have to be there.  But it's --

2    it's things that kind of point you in that direction prior to

3    receiving your toxicology results.

4    Q.   Given Mr. Reed's height, weight, his age and size

5    generally, what would you expect -- what would have expected

6    his lungs to weigh when you performed your autopsy?

7    A.   For his height and weight, young adult male, the 300- to

8    400-gram range is what I would anticipate.

9    Q.   Did you weigh Mr. Reed's lungs?

10   A.   I did.

11   Q.   Do you recall the weight of both of his lungs, the

12   separate weight of each lung?

13   A.   So from my report, the right was 860 grams; the left was

14   900.

15   Q.   So was the weight of Mr. Reed's lungs individually

16   consistent with your expectation that there is pulmonary

17   edema or fluid retention in the lungs of someone who dies of

18   a drug overdose?

19   A.   Yes.  The weight, and then also when I looked at the

20   lungs under the microscope, you can see the fluid in there as

21   well so...

22   Q.   You mentioned some, I believe it was steroids or

23   prescription medication that Mr. Reed was taking.  Did you

24   review his medical records for all of the medication that he

25   had been prescribed?

138

1    A.   Well, I can't quote all the medications he had been

2    prescribed, but, you know, I do recall that as part of his

3    treatment course, he did receive steroids for that.

4    Q.   And looking at the medication that was in his system, in

5    addition to any other substances as far as the toxicology

6    report, did any medication that Mr. Reed took, in your

7    professional opinion, contribute in any way to his cause of

8    death?

9    A.   As far as the additional findings on the toxicology

10   screen, no, it was just the fentanyl, the fentanyl and the

11   fentanyl metabolites.

12          MS. FORREST:   One moment, Your Honor.

13          THE COURT:   Yes.

14          MS. FORREST:   No further questions, Your Honor.

15          THE COURT:   Okay.   Thank you.

16          Mr. Cortez, Cross-examination.

17          MR. CORTEZ:   Yes.   Thank you.

18                      CROSS-EXAMINATION

19   BY MR. CORTEZ:

20   Q.   Dr. Platt, let me begin a little bit where she left off.

21          You mentioned metabolites of fentanyl; correct?

22   A.   Correct.

23   Q.   And you know what metabolites of fentanyl are in a body;

24   correct?

25   A.   I -- yes.

1    Q.    In fact, you listed them in your report; right?

2    A.    Correct.

3    Q.    Do you have your report in front of you, sir?

4    A.    I do.

5    Q.    I'm going to refer you to Page 6.  Tell me when you're

6    there.

7    A.    Got it.

8              MR. CORTEZ:  If I can refer you to Roman Numeral

9    Section IV.

10             THE COURT:  Do we have a copy of this exhibit that's

11   been marked for identification?

12             MR. CORTEZ:  I do.  I can introduce it.

13             THE COURT:  Just so the record is clear, what he's

14   referring to and so we have a copy of what he's referring

15   to.

16             MS. FORREST:  Yes, Your Honor.  We do have a copy.

17   It's Exhibit 4.  I believe Dr. Platt has his own copy of the

18   exhibit, but it's the same document, Your Honor.

19             MR. CORTEZ:  Exhibit 4.

20             THE COURT:  Okay.  Thank you.

21   Q.    BY MR. CORTEZ:  Exhibit 4 in front of you, that's the

22   autopsy report you signed; correct?

23   A.    Correct.

24   Q.    And you signed it -- if I may have just a second -- on

25   August 7th, 2020; correct?

1     A.    Correct.

2     Q.    At 9:56 in the morning?

3     A.    Yes, sir.  That's the time stamp, yes.

4     Q.    That's the military stamp?

5     A.    Yes.

6     Q.    And your report consists of seven pages; correct?

7     A.    Correct.

8     Q.    And this report is the autopsy report you prepared for

9     this case; correct?

10    A.    Yes.

11          MR. CORTEZ:  At this point, I offer it as -- is it

12    in for the government?

13          MS. FORREST:  The United States did not introduce

14    the report, Your Honor.

15          MR. CORTEZ:  I offer it -- I'm sorry.  Go ahead.

16          I offer it as Defendant's 1.

17          THE COURT:  The only marked copy that I have is

18    Government's 4.  Do you want to introduce Government's 4?

19          MR. CORTEZ:  I have it in front of me, except it has

20    a government sticker and mine now.

21          THE COURT:  Okay.

22          MR. CORTEZ:  So should I identify it as

23    Defendant's 1?

24          THE COURT:  Sure.  That's fine.  You can identify it

25    however you see fit.  I just don't want two exhibit stickers

1    on a single exhibit, please.

2         MR. ROTH:  We're happy to refer to it as Defendant's

3    Exhibit 1 going forward, Your Honor.

4         THE COURT:  Okay.  Is there any objection to

5    Exhibit 1 being received in evidence?

6         MS. FORREST:  No, Your Honor.

7         THE COURT:  Okay.  Defense Exhibit 1 is received in

8    evidence.

9       (Defendant's Exhibit 1 received in evidence.)

10        MR. CORTEZ:  Thank you.

11   Q.   Let me take you now to the page I was asking about, and

12   that would be Page 6, Roman Numeral IV.

13        Doctor, are you there?

14   A.   Uh-huh.

15   Q.   This section is entitled "Toxicology and Special

16   Studies"; correct?

17   A.   Correct.

18   Q.   And you list first two categories.  A, it's volatiles;

19   correct?

20   A.   Correct.

21   Q.   And, B, drugs; correct?

22   A.   Correct.

23   Q.   And you have ten drugs listed under that section;

24   correct?

25   A.   Correct.

1    Q.    The first one is fentanyl?

2    A.    Yes.

3    Q.    The 99 nanograms per liter that you mentioned on direct;

4    correct?

5    A.    Yes.

6    Q.    The second one is norfentanyl; correct?

7    A.    Correct.

8    Q.    And please tell the jury what norfentanyl is.

9    A.    Norfentanyl is most commonly a metabolite of fentanyl.

10   Q.    And, Doctor, for those of us who are untrained.  What is

11   a metabolite?

12   A.    Basically a metabolite, it just refers to a change in

13   the apparent drug that the body does, whether it goes through

14   the stomach or it goes through the liver or it goes through

15   the kidney, the body will do things to the drug to make it

16   more soluble or also to -- you know, as far as to excrete it.

17          So if you're talking -- so from fentanyl to

18   norfentanyl, there is some chemical change somewhere, it's

19   usually very slight, but it -- but it changes -- it changes

20   the overall structure.  It changes, and, thus, there is a

21   name change.

22   Q.    And so in layperson's terms, if I may, norfentanyl is

23   how the body breaks down fentanyl; is that fair to say?

24   A.    Yes.  Yes.

25   Q.    Thank you.

143

1          Item 3 is 4-Amino-1 -- can you help me pronounce

2     that big word?

3     A.     4-Amino-1-phenethylpiperidine.

4     Q.     Also known as 4-ANPP; correct?

5     A.     Yes.

6     Q.     What is that?

7     A.     So that is, again, another metabolite of fentanyl.  Why

8     it uses the 4-ANPP name, I don't know.  But the only thing I

9     would point out, that name, is it refers to the piperidine at

10    the basic structure of fentanyl.  There is a six-member ring

11    where if you're -- if you remember any chemistry, instead of

12    six carbons, there is five carbons and a nitrogen, so it just

13    refers to the basic structure there.

14    Q.     Without getting into the chemistry, so this chemical or

15    molecule is a metabolite of fentanyl; correct?

16    A.     Yeah.  So it either came from fentanyl or the body

17    further metabolized norfentanyl to get to that.

18    Q.     Correct.

19           Would it come from another opiate?

20    A.     No.

21    Q.     Are you sure?

22    A.     Yes.

23    Q.     Absolutely sure?

24    A.     Unless you have other opioids.

25    Q.     I don't, sir.

1    A.    No.  Because the structure of fentanyl is very unique

2    compared to things such as heroin or morphine.  Morphine,

3    you're talking about a four-ring structure altogether.  These

4    are -- you know, these are three-ring structures that are

5    on -- kind of stretched out on a chain, basically is the

6    simplest way to describe it.

7            But, no, these are not going to go back and forth

8    from something like heroin or, you know, some oxycodone or

9    OxyContin or anything like that.

10   Q.    Oxycodone you said?

11   A.    Yeah.  It's not going to be crossover back and forth.

12   These are very, very different structures.

13   Q.    Oxycodone has another name, Percocet; correct?

14   A.    I believe that is, yeah, oxycodone/Percocet, but, yeah,

15   that's possible.

16   Q.    And then you list -- go ahead.  I'm sorry.

17   A.    No, I believe you're right.

18   Q.    Okay.  Thank you, Doctor.

19           Items 4 and 5 are also metabolites of fentanyl;

20   correct?

21   A.    No.

22   Q.    Huh?

23   A.    No.

24   Q.    What are they?

25   A.    They are -- you know, like I was explaining, these

145

1     are -- these are all -- these are pyrene molecules that

2     have --

3     Q.   Wait.  I'm sorry to interrupt you.  But we don't -- what

4     is the piperidine part?

5     A.   Well, it's simplest to say, no, these are not

6     metabolites of fentanyl.

7     Q.   Okay.

8     A.   These compounds, like I said, have had -- they have no

9     human use --

10    Q.   Okay.

11    A.   -- as described right then and there.

12    Q.   Thank you.

13         Item 6, 7, 8, 9 and 10 are all the medications

14    Mr. Reed was on; correct?

15    A.   Correct.

16    Q.   Gabapentin, what is that for, Doctor?

17    A.   That is used for a neuropathic-type pain.  Most

18    commonly, diabetics that have -- their diabetes has

19    progressed, and they have kind of numbness, tingling pain in

20    their fingers; they'll use Gabapentin.

21         In this instance, he had -- he had some residual

22    weakness after -- you know, again, he was found kind of in a

23    contorted position.  He complained of left arm weakness and

24    some pain related to that, so they utilized Gabapentin for

25    that upon discharge.

146

1    Q.    That was in the prior hospitalization in April,

2    April 2020; correct?

3    A.    Correct.

4    Q.    Okay.  There was also Zolpidem; right?

5    A.    Correct.

6    Q.    Is that a sleeping pill?

7    A.    That's Ambien, yes.

8    Q.    Ambien?

9    A.    Sleep aid.

10   Q.    Can it be pretty powerful?

11   A.    If you take enough of them, yes, it has detrimental

12   effects; but otherwise, taken as prescribed, it's safe.

13   Q.    Just like fentanyl, when taken in a prescribed dose, is

14   not fatal; right?

15   A.    When utilized under the care of a doctor, yes.

16   Q.    Correct.  When you use fentanyl not under the care of a

17   doctor, it can be exceedingly lethal; right?

18   A.    Correct.

19   Q.    Thank you.

20         Then there was two others.  I won't bother to go

21   into them.  So let me focus on -- if I may have a second.

22         Doctor, your opinion in this case, taking everything

23   into account, was that this individual died from a lethal

24   intake of fentanyl; correct?

25   A.    Correct.

1    Q.    And that nothing else contributed to that death;

2    right?

3    A.    Correct.

4    Q.    And you eliminated the possibility of a stroke a month

5    earlier because he didn't show vasculitis when you did the

6    autopsy of the brain?

7    A.    That's two separate issues there.

8    Q.    Okay.  Help us, please.

9    A.    So the -- the initial radiology described, you know, the

10   possibility of a stroke or an infarct in a particular

11   region.

12   Q.    Sorry to interrupt you again.  I'm going to keep doing

13   this.

14         The "initial radiology," please explain to us what

15   that would mean.

16   A.    So they -- he had multiple scans of his head, of his

17   brain, using CT, computed tomography or MRI.  The -- he had

18   multiple MRI examinations over the course of several days

19   when he presented.

20         And it was -- the portions of the study where they

21   look at kind of how -- you know, kind of how the contrast

22   material, you know, that they use in there, was -- would

23   diffuse out through the vasculature.  And there were some

24   findings on those particular phases of the study, MRI gets

25   really technical, but there were issues that they saw where

1    the -- there were some changes that suggested, hey, blood is

2    not flowing properly or correctly or at all to this region.

3    And -- and with vasculitis, again, similar kind of -- you

4    know, kind of delays and diffusions is how they -- they

5    describe it.

6              So based on those interpretations, they were -- they

7    said they were suggestive of is there a possible infarct, is

8    there a possible stroke, in particular in the right motor

9    cortex causes his arm symptoms to the left side, and then he

10   just kind of almost -- "multi-focal" is the phrase they use

11   as far as the vasculitis picture there.  So that was two

12   different issues I'm looking for there.  Vasculitis, I got to

13   look at under the microscope.

14             If I'm looking for an infarct in the right motor

15   cortex, I'm looking for, like I said, is the right side, is

16   there something wrong versus the left side.  Initially when

17   you slice through it, you're looking for an infarct.  One of

18   the things you notice, even after you preserve it, you know,

19   an infarcted area, it's soft.  You know, it kind -- it gives.

20   Even if the rest of the brain is nice and firm, that area

21   stays soft.  It's because necrotic tissue doesn't preserve as

22   well.

23             I didn't see anything like that.

24   Q.   Let me interrupt you.  When you say "necrotic tissue,"

25   can you explain what that is.

149

1    A.    Necrotic, basically dead, dying tissue.

2    Q.    Okay.  Thank you.

3          Please proceed.

4    A.    Okay.  So I didn't see any of that.

5          People who have had a stroke recover and it's been

6    years since they had the ultimate end point of the process of

7    the brain healing from a stroke, well, it actually forms a

8    little cavity.  Well, obviously, yeah, we're a month later, I

9    wasn't going to see that.

10         So those are the big things, looking at initially.

11   And then under the microscope, if I'm looking for areas of an

12   infarct, I'm looking for various levels of inflammation not

13   related to the vessels necessarily, but throughout the brain

14   itself.  There is kind of a -- we say spongiosis, but there

15   is kind of like a -- it's not a nice solid sheet of brain,

16   you know, the brain matter and all the cells that we see in

17   there.  There is holes in there now.  I didn't see that

18   either.

19         So I didn't see it grossly, didn't see it

20   microscopically as far as an infarct.  And then the

21   vasculitis, I looked at multiple sections throughout the

22   brain, not just, you know, the one, and surveying through all

23   the vessels, I didn't see anything.  And then when you talk

24   about vasculitis, the inflammation tends to cuff around the

25   vessels.  I didn't see that.

1    Q.    Let me ask you about that inflammation.

2    A.    Uh-huh.

3    Q.    Going back to April of 2020, with all those medical

4    professionals attending to Mr. Reed a month earlier,

5    they relied on radiology and a bunch of other tests;

6    correct?

7    A.    Yes.  So radiology combined with clinical

8    presentation.

9    Q.    Precisely.  And all these medical professionals looking

10   at Mr. Reed -- and they kept him for a few days in the

11   hospital for observation, and what have you -- concluded it

12   had been a stroke; correct?

13   A.    They -- that was part of their discharge diagnosis.

14   Like I said, I looked for what they saw.  I could not find

15   it.

16   Q.    Only what they diagnosed.

17   A.    Yes.

18   Q.    At discharge.

19          And to treat the -- a stroke, post-stroke symptoms,

20   they prescribed steroids; right?

21   A.    The steroids were primarily focused on the vasculitis,

22   but in stroke cases, they will use it because the common

23   thing there is swelling of the brain.

24   Q.    Exactly.

25   A.    So they want to help -- steroids help with that.

151

1    Q.   And so they prescribed steroids to address the

2    vasculitis, the swelling of the brain; correct?

3    A.   Correct.

4    Q.   And a month later -- or actually, more than a month

5    later, when you actually started looking at the brain tissue,

6    you saw no evidence of vasculitis; right?

7    A.   Correct.

8    Q.   Could that be due to the steroid effect?

9    A.   I think that's most likely what happened, yeah.  Versus,

10   well, that was an incorrect diagnosis at the start.

11   Q.   Did you have any reason to believe that the doctors in

12   April 2020 missed, totally missed a diagnosis?

13   A.   I have no reason to think that they missed the diagnosis

14   of vasculitis.  Without having spoken to those doctors, one

15   of the questions I had, particularly with the left arm

16   weakness, is he also had an initial diagnosis of

17   rhabdomyolysis, and that's a breakdown in the muscle.  He was

18   found kind of in a contorted position with the armed pinned

19   underneath.

20   Q.   Doctor, when you say he was found, you're talking about

21   one month later, May 21st?

22   A.   No.  I'm talking about in April when he was admitted.

23   Q.   When he had the incident?

24   A.   The incident.

25   Q.   Go ahead.

152

1    A.    So my question at the time for -- you know, related to

2    that is, if he had rhabdomyolysis, did he also have an

3    element of what we frequently see with rhabdomyolysis,

4    repeated injuries in the military.  Some call it compartment

5    syndrome.

6         And what it is is that muscle breaks down.  There is

7    fluid that builds up.  When you think about the structures of

8    the arm and everything like that, and it builds up and puts

9    pressure on things in there, puts pressure on the vessels,

10   decreases blood flow, makes thing worse with that.

11        The other thing that doesn't like pressure is the

12   nerves in your arm.  So when you're talking about left arm

13   weakness, what I would -- the question that I had for the

14   clinicians that took care of him, well, did you rule out,

15   okay, yeah, you focused on here.  It's a whole series of

16   dots, the peripheral nervous system, all the way down to the

17   muscle that could have caused weakness.  Is that why he

18   had --

19   Q.    Let me interrupt you.

20        When you say the questions you had for those

21   clinicians from April 2020, did you call them and ask them?

22   A.    Specific to that, no.

23        MR. CORTEZ:  Thank you.

24        No more questions.

25        THE COURT:  Okay.  Redirect Examination?

153

1          MS. FORREST:  Yes, Your Honor.

2                    REDIRECT EXAMINATION

3     BY MS. FORREST:

4     Q.   Dr. Platt, just to make sure we're all on the same page,

5     is a stroke something different than vasculitis?

6     A.   Yes.  We're talking about stroke, cerebral vascular

7     accident versus vasculitis, you know, is simply just

8     inflammation associated with the vessels.

9     Q.   And based on your examination of Mr. Reed's brain, you

10    did not find any evidence of a stroke; is that right?

11    A.   Correct.

12    Q.   And based on your examination of Mr. Reed's brain, you

13    determined that it is possible Mr. Reed had vasculitis, was

14    treated for that with steroids and that that resolved; is

15    that right?

16    A.   Correct.

17    Q.   And so your conclusion is that neither a stroke nor

18    vasculitis in any way contributed to Mr. Reed's death; is

19    that right?

20    A.   That's correct.

21    Q.   Defense counsel asked you questions about 6 through 10.

22    These are the substances listed on the sixth page of your

23    autopsy report.

24    A.   Correct.

25    Q.   And I believe you said that these are substances that

154

1    Mr. Reed was prescribed.  They are prescription medications;

2    is that right?

3    A.    Yes.

4    Q.    And did any of these four substances, so Substances 6

5    through 10, in your opinion, in any way contribute to

6    Mr. Reed's death?

7    A.    No.

8              MS. FORREST:  No further questions for this witness,

9    Your Honor.

10             May Dr. Platt be excused?

11             THE COURT:  Okay.

12             MR. CORTEZ:  No recross.  And he may be excused.

13   Thank you, Doctor.

14             THE COURT:  Okay.  Thank you, sir.  You may step

15   down.

16             THE WITNESS:  Thank you.

17             MR. ROTH:  Your Honor, before calling our next

18   witness, the government asks permission to read into the

19   record a stipulation as to the content of testimony that one

20   witness would have offered.  This has been agreed to by the

21   parties.

22             THE COURT:  Yes.  Please, go ahead.

23             MR. CORTEZ:  No objection.

24             MR. ROTH:  Thank you, Your Honor.

25             If called to testify at trial, Austin Ritter would

155

1    testify that in light of his friendship with C.M.R., he knew

2    that C.M.R. drove a dark-colored BMW sedan, and that the

3    sedan had a dent in the area of the front bumper on the

4    right-hand side.

5              Thank you.

6              Your Honor, the United States calls Stephen Logan.

7              THE COURT:  Okay.  While Mr. Logan is coming, ladies

8    and gentlemen, I instruct you that the parties have agreed

9    that Austin Ritter would so testify to the subject matter of

10   the stipulation.  You may consider that testimony in the same

11   way as if it had been given here in court.  So that's your

12   consideration of the stipulated testimony.

13             THE CLERK:  Please raise your right hand.

14   STEPHEN LOGAN, a Government witness, having been duly

15      sworn, testified as follows:

16             THE WITNESS:  Yes, ma'am.

17             THE CLERK:  Thank you.  If you can please state your

18   name and spell it for the record.

19             THE WITNESS:  My name is Stephen Logan.

20   S-t-e-p-h-e-n L-o-g-a-n.

21             MR. ROTH:  May I proceed, Your Honor?

22             THE COURT:  Yes.

23             MR. ROTH:  Thank you.

24

25

156

DIRECT EXAMINATION

1

2  BY MR. ROTH:

3  Q.   Good afternoon, sir.

4  A.   Good afternoon.

5  Q.   Mr. Logan, what do you do for a living?

6  A.   I'm a special agent with NCIS.

7  Q.   Is that the Naval Criminal Investigative Service?

8  A.   Yes, sir, it is.

9  Q.   How long have you been an NC -- and what is it that you

10  do for NCIS?  I'm sorry.

11  A.   Conduct criminal investigations as it relates to the

12  Department of the Navy assets, property and personnel.

13  Q.   And forgive me if you had said it, you're a special

14  agent?

15  A.   Yes, sir.  I'm a special agent.  I'm sorry.

16  Q.   No.  That's my mistake.

17       How long have you been a special agent with NCIS?

18  A.   Fourteen years.

19  Q.   Prior to joining NCIS as a special agent, what did you

20  do?

21  A.   I was in the Marine Corps Reserves and a professional

22  firefighter in Kentucky.

23  Q.   How long were you in the Marine Reserves?

24  A.   Fourteen years.

25  Q.   Did you ever deploy as a Marine?

157

1   A.   Yes, sir, I did.

2   Q.   How many times did you do that?

3   A.   Three.

4   Q.   Special Agent, what's your educational background?

5   A.   I have a Bachelor of Science degree in arson

6   investigation.

7   Q.   Would you like some water?

8   A.   No.  I'm good.  Thank you.

9   Q.   Okay.  Special Agent, what is the principal

10  investigative mandate for NCIS?

11  A.   Again, to conduct criminal and counterintelligence

12  investigations as it relates to the Department of Navy

13  assets, property and personnel.

14  Q.   And your principal responsibility as a special agent is

15  to carry out investigations in furtherance of the mandate; is

16  that fair to say?

17  A.   Yes, sir.  That's correct.

18  Q.   Okay.  What kinds of matters have you investigated as an

19  NCIS special agent?

20  A.   I've investigated crimes against children, adult sex

21  crimes, narcotics, organized crime and counterintelligence

22  matters.

23  Q.   As to narcotics, how many different kinds of

24  investigations do you estimate you've done over the course of

25  your career with NCIS?

1    A.    Approximately 20.

2    Q.    And what kinds of investigative techniques have you used

3    in the course of those 20-odd investigations?

4    A.    I've conducted both physical and electronic or technical

5    surveillance.  I've utilized search warrants, subpoenas.

6    Debrief of defendants post-conviction.  I've used

7    confidential informants and undercover agents in furtherance

8    of those investigations.

9    Q.    Do you also use subpoenas to obtain information?

10   A.    Yes, sir, we do.

11   Q.    And do you confer with other experienced law enforcement

12   officers who work in drug trafficking?

13   A.    Yes, sir.

14   Q.    Okay.  Special Agent, as part of your work, have you

15   ever conducted a search of a phone?

16   A.    Yes, sir, I have.

17   Q.    How many times do you think you've done that?

18   A.    Probably a hundred.

19   Q.    Okay.  And have you ever conducted a search of a social

20   media account?

21   A.    Yes, sir, I have.

22   Q.    How many times do you think you've done that?

23   A.    Probably 25 or so.

24   Q.    Okay.  Did you receive any formal training as part of

25   joining NCIS?

159

1    A.    Yes, sir, I did.

2    Q.    And have you received formal training throughout the

3    course of your 14 years?

4    A.    Yes, sir, I have.

5    Q.    Would you describe, in a summary way, the training

6    you've received over the past 14 years.

7    A.    So initially I was trained at the Federal Law

8    Enforcement Training Center in Brunswick, Georgia.  It's a

9    criminal investigations training program and then an

10   NCIS-specific-based special agent basic training program.

11   I've received additional specialized training in death

12   investigations, crime scene processing, proactive criminal

13   operations, like narcotics, things of that nature.

14   Q.    And is it fair to say that on-the-job training happens

15   at the agency?

16   A.    That is the primary form of training, yes, sir.

17   Q.    Special Agent, as part of your training and your

18   experience, have you become familiar with a law known as the

19   Controlled Substances Act?

20   A.    Yes, sir, I have.

21   Q.    Is it fair to say that's a law that controls certain

22   substances?

23   A.    Yes.

24   Q.    From your perspective as an investigator, how does the

25   Controlled Substances Act go about controlling substances?

COMPUTER-AIDED TRANSCRIPTION

1   A.   So the Controlled Substances Act evaluates each drug and

2   determines its value, or I guess -- lack of a better term,

3   its value on the society, and places it on the schedule.

4   Q.   So when you say "value on society," is it fair to say

5   that's the, you know, salutary effects and also the potential

6   for abuse?

7   A.   Yes, sir.

8   Q.   Okay.  And so this Act, in evaluating those substances

9   on those criteria, I think you said it schedules them;

10   right?

11   A.   Yes, sir, it schedules them.

12   Q.   How many schedules are there under the Act?

13   A.   There are five.

14   Q.   Okay.  And so are they numbered?

15   A.   Yes, sir.  I through V.

16   Q.   How do substances that are listed on Schedule I differ

17   from substances on Schedule V?

18   A.   Substances on Schedule I have no medical use and have a

19   high propensity for abuse.

20   Q.   And fair to say that Schedule V is diametrically the

21   opposite?

22   A.   Correct.

23   Q.   So it's sort of a sliding scale across the five

24   schedules; right?

25   A.   Right.  That is correct.

1    Q.    Okay.  Just for the record, let me ask and then you

2    answer.  Okay?

3    A.    Yes, sir.

4    Q.    Okay.  Great.

5          Special Agent, have you come across a drug called

6    oxycodone in the course of your career?

7    A.    Yes, sir, I have.

8    Q.    What kind of a drug is oxycodone?

9    A.    It is an opiate.

10   Q.    Okay.  And is it scheduled?

11   A.    Yes, sir, it is.

12   Q.    What schedule is oxycodone on?

13   A.    It is a Schedule II.

14   Q.    And so as a Schedule II, does that mean it can be

15   distributed, but it's got to be by a medical professional?

16   A.    Yes, sir, that's what that means.

17   Q.    All right.  Have you heard of a drug called fentanyl?

18   A.    Yes, sir, I have.

19   Q.    What kind of a drug is fentanyl?

20   A.    Fentanyl is also an opiate.

21   Q.    Okay.  Is it scheduled?

22   A.    Yes, sir.

23   Q.    And what schedule is fentanyl on?

24   A.    Fentanyl is also a Schedule II drug.

25   Q.    How does fentanyl compare to oxycodone, as you

162

1    understand it?

2    A.   Fentanyl is a more powerful pain reliever than

3    oxycodone.

4    Q.   Is it fair to say that it is dramatically more

5    powerful?

6    A.   Yes, sir.

7    Q.   Okay.  Special Agent, have you heard of M30 pills?

8    A.   Yes, sir, I have.

9    Q.   What are M30 pills in their genuine form?

10   A.   M30 pills in their genuine form are oxycodone,

11   30-milligram oxycodone tablets.

12   Q.   What do they look like?

13   A.   They are round and blue.

14   Q.   Do they have any markings on them?

15   A.   They do.

16   Q.   What markings are on M30 pills?

17   A.   They have an M imprinted on one side and the number 30

18   imprinted on the other.

19   Q.   Now, you said just now in their genuine form, it's 30

20   milligrams of oxycodone in an M30 pill; is that correct?

21   A.   Yes, sir.

22   Q.   Is it your understanding that in a genuine form, every

23   single pill that comes off the line at the pharmaceutical

24   plant is going to have 30 milligrams of oxycodone in it?

25   A.   That's correct.

1   Q.   In the course of your work as an investigator, have you

2   come across another form of an M30 pill?

3   A.   Yes, sir, I have.

4   Q.   Would you please describe that.

5   A.   The other form that I've encountered is a counterfeit

6   M30 pill.

7   Q.   And in your experience, how do the counterfeit M30 pills

8   differ from the genuine ones?

9   A.   The opiate in the counterfeit M30 pills is fentanyl.

10  Q.   Okay.  Do those M30 pills contain substances known to

11  you as bonding agents, or cutting agents?

12  A.   Yes, sir.

13  Q.   And what is, if you will, the chemistry going on with

14  the bonding agent and the fentanyl in a counterfeit M30

15  pill?

16  A.   Probably the -- I'm by no means a chemist, but probably

17  the easiest way to describe it is if you're making meatloaf,

18  you put bread crumbs or cracker crumbs in there, in with the

19  eggs to hold the meatloaf together; and the cutting agents or

20  bonding agents work very similar.

21  Q.   Special Agent, have you heard of Percocet in the course

22  of your career?

23  A.   Yes, I have.

24  Q.   What is Percocet?

25  A.   Percocet is a brand name for oxycodone.

164

1   Q.   Okay.  So all Percocet are oxycodone, but not all

2   oxycodone is Percocet; is that right?

3   A.   That is correct.

4   Q.   Just to be clear, Percocet is a Schedule II controlled

5   substance; right?

6   A.   That is correct.

7   Q.   Oxycodone is a Schedule II controlled substance;

8   right?

9   A.   That is correct.

10  Q.   Fentanyl is a Schedule II controlled substance; right?

11  A.   That is correct.

12  Q.   Thank you.

13       Special Agent, in the course of your 14 years, and

14  based on your training and experience, have you become

15  familiar with common terms used in drug trafficking?

16  A.   Yes, sir, I have.

17  Q.   I'd like to ask you a couple of questions about that

18  based on your experience, and then I'm going to stop that

19  part of your testimony and ask you to pivot, focusing on the

20  facts of this case.  Okay?

21  A.   Yes, sir.

22  Q.   In general, have you heard the term "trap" before?

23  A.   I have.

24  Q.   What does "trap" mean?

25  A.   "Trap" is usually associated -- usually in conjunction

1    with the word "trap house" or something to that effect, and a

2    trap house is a place where drugs are sold.

3    Q.   Okay.  Have you heard the term "plug" before?

4    A.   Yes, sir, I have.

5    Q.   What is a plug?

6    A.   A plug is a source of supply for drugs or a drug

7    dealer.

8    Q.   So somebody who plugs you?

9    A.   Yes.

10   Q.   Okay.

11   A.   Yes, sir.

12   Q.   Thank you.

13           Special Agent, have you heard of any shorthand for

14   Percocet?

15   A.   Yes, sir, I have.

16   Q.   What are common shorthands for Percocet that you've come

17   across?

18   A.   Percs, 30s, blues.  Those are the three that come to

19   mind right off the top of my head.

20   Q.   Okay.  Thank you.  And Special Agent, I do just want to

21   ask one thing, and I should have followed up on this point.

22           In your experience, have you seen the results of

23   drug testing of counterfeit M30 pills, the one that has the

24   fentanyl in them?

25   A.   Yes, sir, I have.

1   Q.   In your experience, are they always consistent, with

2   respect to the amount of fentanyl in the pill?

3   A.   No, sir, they are not.

4   Q.   Okay.  So it's not like when it gets manufactured at the

5   pharmaceutical company; right?

6   A.   Correct.

7   Q.   Okay.  Special Agent, I'm going to now ask you to answer

8   a series of questions not with respect to your training and

9   experience, but rather just focusing on this case.  Okay?

10  A.   Okay.

11  Q.   Thank you.

12       Special Agent, you are aware that the United States

13  has brought a case against a person by the name of Nameer M.

14  Atta; is that correct?

15  A.   Yes, sir, I am.

16  Q.   Do you know what Mr. Atta looks like?

17  A.   Yes, sir, I do.

18  Q.   How do you know that?

19  A.   Through surveillance, looked at his driver's license,

20  and also I had two occasions to speak to Mr. Atta.

21  Q.   So you've personally visited with Mr. Atta

22  face-to-face?

23  A.   Yes, sir.

24  Q.   Do you know what Mr. Atta looks like?

25  A.   Yes, sir, I do.

1   Q.   And do you see him in the courtroom today?

2   A.   Yes, I do.

3        MR. CORTEZ:  Stipulate to identity.

4        THE COURT:  Do you accept the stipulation?

5        MR. ROTH:  I'd like to do it, Your Honor.

6        THE COURT:  Okay.  Go forward.

7   Q.   BY MR. ROTH:  Special Agent, would you please point out

8   Mr. Atta and identify him by an article of clothing he's

9   wearing?

10  A.   Mr. Atta is sitting to your left at the table wearing

11  the light-colored shirt.

12       MR. ROTH:  And, Your Honor, may the record please

13  reflect that Special Agent Logan has identified the defendant

14  as Mr. Atta.

15       THE COURT:  Yes.  The record will so reflect.

16       MR. ROTH:  Thank you.

17  Q.   Special Agent, have you conducted an investigation into

18  the death of a man named Christian Reed?

19  A.   Yes, sir, I have.

20  Q.   Who was Christian?

21  A.   Christian was an active-duty Marine, assigned to Marine

22  Air Corps Station in Miramar here in San Diego County.

23  Q.   Where did Christian die?

24  A.   Christian died in his barracks room.

25  Q.   When did he die?

1    A.   On 21 May -- May 21st, 2020.

2    Q.   How old was he?

3    A.   He was 26 and a day.

4    Q.   So he died the day after his 26th birthday?

5    A.   Yes, sir.

6    Q.   Thank you.

7         Special Agent, why did NCIS commence an

8   investigation into Christian's death?

9    A.   It is NCIS policy to conduct an investigation related to

10  all noncombat deaths of active-duty service members, both in

11  the United States and abroad.

12   Q.   And as the investigation began, what initial steps did

13  NCIS take?

14   A.   NCIS agents conducted what we call a scene examination.

15  They respond to the location where the individual died and

16  memorialize that space or the area with both photographs --

17  with photographs, sketches, notes and also look for and seize

18  any evidence.

19   Q.   In that initial search, documentation process of

20  Christian's room, did the agency find any particular item of

21  evidence that shed light on how Christian came to die?

22   A.   Yes, sir, they did.

23   Q.   What did you find?

24   A.   Christian's cell phone.

25   Q.   And what was the day of that initial search?

169

1    A.    That day was on the day he died, May 21st, 2020.

2    Q.    Okay.  Now, at some point, is it fair to say that NCIS

3    was notified that the medical examiner had determined the

4    cause of death was a fentanyl overdose?

5    A.    Yes, sir.

6    Q.    When did NCIS receive that notification?

7    A.    That was in August of 2020.

8    Q.    And did the agency take any follow-on steps upon

9    receiving that notification?

10   A.    Yes, sir, we did.

11   Q.    What did you do?

12   A.    Myself and another agent went and conducted a secondary

13   search of Christian's barracks room.

14   Q.    And why did you do that?

15   A.    We were looking for any fentanyl or anything like that

16   that would have given us any indication or identified a

17   location of fentanyl.

18   Q.    Had the room been cleaned by the time you went to it in

19   August of 2020?

20   A.    Yes, sir, it had.

21   Q.    And did you find any fentanyl or fentanyl pills in the

22   room at that point?

23   A.    No, sir, we did not.

24   Q.    Okay.  Now, Special Agent, at the time of Christian's

25   death, there were prescription bottles in his room; right?

170

1    A.    Yes, sir, that's correct.

2    Q.    Okay.  A variety of prescriptions; fair enough?  Fair to

3    say?

4    A.    Yes, sir.

5    Q.    Were those pill bottles seized at the time of the

6    initial search on May 21st of 2020?

7    A.    No, sir, they were not.

8    Q.    And why not?

9    A.    Because the pills in the bottle matched what was on the

10   label.

11   Q.    So in other words, there was no evidence at the time of

12   death of any illicit drug use that the agency saw from

13   examining the pill bottles and their contents?

14   A.    Yes, sir, that's correct.

15   Q.    Okay.  Special Agent, you should have a fairly large

16   binder in front of you.  Do you see that binder?

17   A.    Yes, sir, I do.

18   Q.    Okay.  If you would, could you please turn to the tab

19   that is No. 88.

20   A.    No. 8?

21   Q.    88.  Double 8s.

22   A.    Double 8s.

23         Okay.  I'm there.

24   Q.    Okay.  And have you reviewed the exhibit marked as

25   Government's 88?

171

1    A.    Yes, sir, I have.

2    Q.    Do you recognize this image?

3    A.    Yes, sir, I do.

4    Q.    What is depicted in Government Exhibit 88?

5    A.    It's a photograph of a shelf in Christian Reed's

6    barracks room.

7    Q.    And how do you know that this is a photograph of a shelf

8    in Christian Reed's barracks room?

9    A.    Because it was included in our case file, and I've

10   reviewed the case file several times.

11   Q.    Is this, Government's Exhibit 88, a fair and accurate

12   copy of that photograph?

13   A.    Yes, sir, it is.

14        MR. ROTH:  Your Honor, the United States moves to

15   admit and publish Exhibit 88.

16        MR. CORTEZ:  No objection.

17        THE COURT:  88, it's already received in evidence.

18        MR. ROTH:  I'm sorry to everyone.  If we could bring

19   up Government's Exhibit 88.

20   Q.    Okay.  Special Agent, do you see a phone in the center

21   of the having already been admitted Government's 88?

22   A.    Yes, sir, I do.

23   Q.    Do you recognize that phone?

24   A.    Yes, sir, I do.

25   Q.    Okay.  Whose phone is that?

1    A.    That is Christian Reed's cell phone.

2    Q.    Okay.  Did you take physical possession of his phone?

3    A.    Yes, sir, we did.

4    Q.    Okay.  And did you provide this phone to any other

5    member of the law enforcement community for any reason?

6    A.    Yes, sir, I did.

7    Q.    What did you do?

8    A.    I provided this phone to one of our digital forensic

9    examiners at NCIS.

10   Q.    And what did the digital forensic examiner do with

11   Christian's phone?

12   A.    He made a digital copy of Christian's phone.

13   Q.    Okay.  And did you receive the digital copy?

14   A.    Yes, sir, I did.

15   Q.    Special Agent, can you just provide, from your

16   perspective, an explanation of what the digital copy is.

17   A.    Okay.  Sure.  So the digital copy, very simply, is they

18   plug the phone into a computer.  They use specific digital

19   tools and make a copy of the cell phone.  It's an exact

20   replica.

21   Q.    Special Agent, if you would please now turn to

22   Exhibits 9, 10, 11 and 12.  Please look up when you're ready.

23   A.    Yes, sir.

24   Q.    Okay.  Do you recognize Government's Exhibits 9, 10, 11

25   and 12?

173

1    A.   Yes, sir, I do.

2    Q.   What are these?

3    A.   Exhibit 9 is a photograph of Christian Reed in his

4    dress-blues uniform.  The second photo in Exhibit 9 is a

5    photo of Christian Reed in his Marine Corps combat utility

6    uniform.

7         Exhibit 10 is a photograph of Christian in his -- in

8    a gray T-shirt with an orange "T" on it.

9         And you asked for 8, 9 and 10; is that correct?

10   Q.   And 11 and 12.

11   A.   Sorry.  I skipped No. 8.  No. 8 --

12   Q.   No, we're not doing 8.  9, 10, 11 and 12.

13   A.   Oh, I'm sorry.  11 and 12.

14        11 and 12 are photographs of Christian's car.

15   Q.   Okay.  How do you know that 9, 10, 11 and 12 come from

16   Christian's phone?

17   A.   Because I reviewed the forensic copy of Christian's

18   phone, and I observed these photos.

19   Q.   Are 9, 10, 11 and 12 fair and accurate copies of the

20   images that you saw in your review of the download of

21   Christian's phone?

22   A.   Yes, sir.

23        MR. ROTH:  Your Honor, we would move to admit and to

24   publish 9, 10, 11 and 12.

25        THE COURT:  Okay.  To be clear, Exhibit 9 is two

1    pages; correct?

2            MR. ROTH:  It is, Your Honor.

3            THE COURT:  Okay.  Any objection to 9, 10, 11 and

4    12?

5            MR. CORTEZ:  No.

6            THE COURT:  They are received in evidence.

7         (Government's Exhibits 9, 10, 11 and 12 received in

8           evidence.)

9            MR. ROTH:  Thank you.  If we can please bring up

10   Government's Exhibit 9.

11   Q.   This is Page 1 of Government's Exhibit 9.  Special

12   Agent, who is in this picture?

13   A.   That's Christian Reed.

14   Q.   How do you know that?

15   A.   So several reasons.  According to initial death

16   examination, agents on scene were able to identify Christian

17   against his DOD ID card.  And then autopsy, they identified

18   Christian via DNA, fingerprints and dental records.

19   Q.   And have you had a chance to review the photos of the

20   body that the ME examined by DNA, dental records,

21   fingerprints?

22   A.   Yes, sir, I have.

23   Q.   And was it Christian?

24   A.   Yes, sir, it was.

25   Q.   If we can scroll to the second page.

1       Is this Christian again?

2   A.   Yes, sir, it is.

3   Q.   How does the uniform that he's wearing differ -- or the

4   clothes that he's wearing differ from the earlier page?

5   A.   This is what we call a combat utility uniform.

6   Q.   Thank you.  If we can please bring up Exhibit 10.

7       Special Agent, is this Christian?

8   A.   Yes, sir, it is.

9   Q.   Could you describe the T-shirt that he's wearing?

10  A.   It's a gray T-shirt with an orange "T" on it.

11  Q.   Do you recognize that orange T?

12  A.   Yes, sir.  It is the emblem or symbol for the University

13  of Tennessee.

14  Q.   Okay.  So that's a Tennessee Volunteers T-shirt;

15  right?

16  A.   Yes, sir.

17  Q.   Special Agent, from your review of the phone download,

18  are you aware of the date stamp that's associated with this

19  photograph?

20  A.   Yes, sir, I am.

21  Q.   On what date, per the download, was this photo taken?

22  A.   That was May 21st, 2020.

23  Q.   So that's the day that Christian died; right?

24  A.   Yes, sir, that's correct.

25  Q.   Okay.  We'll come back to that point in a bit.  If we

176

1    can turn to Government's Exhibit 11 and bring it up, please.

2           Special Agent, this is a dark blue BMW; right?

3    A.    Yes, sir, that's correct.

4    Q.    Do you know who drove this car?

5    A.    Yes, sir, I do.

6    Q.    Who was the driver of this car that's depicted in

7    Government's Exhibit 11?

8    A.    Christian Reed.

9    Q.    Okay.  And how do you know that?

10   A.    It was identified by his friend Austin Ritter, and I

11   also pulled this photo from Christian Reed's car -- phone.

12   Q.    I'm sorry?

13   A.    I'm sorry.  I pulled it from his phone.  Not his car, I

14   apologize.

15   Q.    No.  It's fine.

16          Special Agent, do you see a building in the

17   background?

18   A.    Yes, sir, I do.

19   Q.    What kind of a building is that?

20   A.    That's a barracks building on Marine Corps Air Station

21   Miramar.

22   Q.    Okay.  If we can pull up Government Exhibit 12.

23          And Special Agent, how does Government's Exhibit 12

24   differ from Government's Exhibit 11?

25   A.    11 was more -- was a photo of the driver's side.  This

177

1    is a photo of the passenger side.

2    Q.   Okay.  Anything notable or distinctive about this BMW as

3    depicted in Government's Exhibit 12?

4    A.   Yes, sir, there is.

5    Q.   What is it?

6    A.   There is damage to the bumper.

7    Q.   Okay.  Fair to say that below the headlight, there is a

8    depression on sort of the right-edge side of the bumper?

9    A.   Yes, sir, that's correct.

10   Q.   Okay.  Special Agent, do you happen to recall the

11   approximate date of this, Government's Exhibit 12?

12   A.   It was May 19th, 2020.

13   Q.   Okay.  So that's two days before the death?

14   A.   Yes, sir.

15   Q.   Okay.  Special Agent, if you would now please go to the

16   binder and look at Government's Exhibit 13.  And just look up

17   when you're ready.

18   A.   Yes, sir.

19   Q.   Okay.  Special Agent, what is Government's Exhibit 13?

20   A.   Exhibit 13 is a GPS satellite photo of 9845 Jake Lane.

21   Q.   Do you recognize this image at Government's Exhibit

22   14 -- 13, I'm sorry.  Do you recognize Government's

23   Exhibit 13?

24   A.   Yes, sir, I do.

25   Q.   How so?

COMPUTER-AIDED TRANSCRIPTION

1   A.   I reviewed Christian's cell phone, and that image was

2   pulled from Christian's cell phone.

3   Q.   Is this a fair and accurate copy of the satellite map

4   image that you found in Christian's -- in the download of

5   Christian's phone?

6   A.   Yes, sir.

7        MR. ROTH:  Your Honor, move to admit Government's

8   Exhibit 13.

9        THE COURT:  Any objection?

10        MR. CORTEZ:  No objection.

11        THE COURT:  13 is received.

12    (Government's Exhibit 13 received in evidence.)

13        MR. ROTH:  Thank you, Judge.  If we can bring up 13,

14   please.

15   Q.   So, Special Agent, we're now looking at, as you

16   described, a sort of satellite image; right?  Do you see in

17   the center of this image a large blue circle?

18   A.   Yes, sir, I do.

19   Q.   Okay.  And then within that blue circle, there is a

20   white circle that is sort of almost more hand drawn?

21   A.   Yes, sir.

22   Q.   And above that is a white arrow, correct?

23   A.   Correct.

24   Q.   Okay.  Do you see a pin drop just at the bottom edge of

25   the white circle?

1    A.    Yes, sir, I do.

2    Q.    All right.  Special Agent, what is the address

3    associated with this pin drop?

4    A.    9845 Jake Lane.

5    Q.    How do you know that?

6    A.    Because I have conducted surveillance at that location

7    and also served a search warrant at that location.

8    Q.    And Special Agent, we will come to this more fully in

9    your testimony, but who lives at 9845 Jake Lane?

10    A.    Nameer Atta.

11    Q.    All right.  Now, Special Agent, you learned upon receipt

12    of the opinion of the medical examiner that there was an

13    opinion this was a fentanyl overdose; correct?

14    A.    Yes, sir.

15    Q.    What investigative steps, if any, did you take with

16    respect to Christian's phone with that information in mind?

17    A.    I reviewed text messages and other information in that

18    phone to identify a source of supply for fentanyl.

19    Q.    And did you find communications on Christian's phone

20    tending to suggest that he had been engaged in transactions

21    that led to his death?

22    A.    Yes, sir, I did.

23    Q.    Over what kind of medium, if you will, did those

24    communications occur?

25    A.    Via Snapchat.

180

1    Q.   All right.  Special Agent, I'm going to have you jump to

2    Government's Exhibit 15.

3    A.   1-5?

4    Q.   Please.

5         Do you recognize Government's Exhibit 15?

6    A.   Yes, sir, I do.

7    Q.   And for the record, Government's Exhibit 15 is several

8    pages.  What is Government's Exhibit 15?

9    A.   Those are photographs I took of Snapchat messages on

10   Christian Reed's cell phone.

11   Q.   And can you explain -- how do I put this?  Are these

12   fair and accurate depictions of the communications you saw on

13   Christian's phone?

14   A.   Yes, sir, they are.

15        MR. ROTH:  Okay.  Your Honor, I would move to admit

16   Government's Exhibit 15.

17        MR. CORTEZ:  Subject to our earlier objections,

18   nothing else.

19        THE COURT:  Okay.  15 is a multipage exhibit.  Do

20   you have a total page number?

21        MR. ROTH:  Yes, of course, Your Honor.  Eight pages,

22   Your Honor.

23        THE COURT:  Okay.  Government's 15, which is

24   comprised of eight pages, is admitted.

25        (Government's Exhibit 15 received in evidence.)

181

1          MR. ROTH:  If we could please bring up Government's

2     Exhibit 15.  If we could please zoom in on the first photo

3     there.  Perhaps to put just the whole thing on the screen.

4     Perfect.  This is perfect.

5     Q.   Okay.  Special Agent, a couple of things.  First of all,

6     this is Christian's phone; correct?

7     A.   Yes, sir.

8          MR. CORTEZ:  Asked and answered, Your Honor.

9          THE COURT:  Overruled.  The answer will stand.

10         MR. ROTH:  I'm sorry, Your Honor.  I'm sorry.

11    Q.   Whose thumb is this?

12    A.   Whose thumb is this?  That's mine.

13    Q.   Okay.  Do you see at the top, there is a little icon of

14    a head with some hair and some texts next to it?

15    A.   Yes, sir.

16    Q.   What is written next to that little icon at the top of

17    the screen?

18    A.   Next to the avatar is the words "My G" and it has an

19    icon for an electrical plug.

20    Q.   Okay.  So "My G" with, fair to say, that's an emoji?

21    A.   Yes, sir.

22    Q.   And the emoji is of a plug; correct?

23    A.   Yes, sir.

24    Q.   I'd like to go through the first message.  Could you

25    please read the first message that's indicated here.

182

1    A.   The first message reads:  Send @ of who referred to

2    verify yourself.  And send school/area for delivery

3    reference.  Do not leave on read.  Thanks!  DLG, handshake

4    emoji.

5    Q.   Okay.  Special Agent, what do you understand the phrase

6    "verify yourself" to mean here?

7    A.   The individual that sent that message is asking for bona

8    fides.

9    Q.   Okay.  Now, in response, Christian gives -- he gives a

10   response; right?

11   A.   Yes, sir, he does.

12   Q.   And what's the response?

13   A.   Christian responds:  @tg_cloter and Miramar/San Diego

14   area.

15   Q.   Special Agent, did you conduct any follow-up

16   investigation into this @tg_cloter, which appears to be

17   provided in response to the request for verification?

18   A.   Yes, sir, I did.

19   Q.   Okay.  What did you learn?

20   A.   I learned that tg_cloter is an individual known as

21   Carson Cloter.

22   Q.   Did you conduct any investigation to assess whether

23   Carson Cloter might have provided fentanyl or oxycodone to

24   Christian Reed?

25   A.   Yes, sir, I did.

1    Q.   What did you learn in the course of your

2    investigation?

3              MR. CORTEZ:  Objection.  Hearsay.

4              THE COURT:  Sustained.  Lack of foundation.

5              MR. ROTH:  Okay.  Fair enough.

6    Q.   Did you conduct an investigation?

7    A.   Yes, sir, I did.

8    Q.   Did you conduct interviews?

9    A.   I did.

10   Q.   And did you gather information from your interviews and

11   from your review of information in general?

12   A.   Yes, sir, I did.

13   Q.   And do you have an understanding of what you believe

14   Mr. Cloter's role is here?

15   A.   Yes, sir, I do.

16   Q.   Do you believe Mr. Cloter provided any fentanyl or

17   oxycodone?

18             MR. CORTEZ:  Objection.  Speculative and hearsay.

19             THE COURT:  Sustained.

20             MR. ROTH:  Okay.  We'll move on.

21   Q.   Special Agent, "My G plug," what do you understand that

22   to be?

23   A.   That is how Christian saved this person's name in his

24   phone, or in his Snapchat.

25   Q.   Okay.  I'd like to just scroll through the eight pages

184

1    and have a look at them.  And Special Agent, if we could go

2    to the next page.

3         Special Agent, can you summarize the nature of the

4    communications between My G plug and Christian.

5         So let's stop for a second.  Do you see about three

6    quarters of the way down, there is a check mark, and below it

7    some writing?

8    A.   Yes, sir, I do.

9    Q.   What is that writing?

10   A.   Say that again?  I'm sorry.

11   Q.   What does it say?

12   A.   It says $70 - 2 Perc30's/PU at 7/11 PQ.

13   Q.   What is your understanding of that message?

14        MR. CORTEZ:  Objection.  Hearsay.  Lacks

15   foundation.

16        THE COURT:  Overruled.

17   Q.   BY MR. ROTH:  What is your understanding of that

18   message?

19   A.   That message is a drug transaction for two 30-milligram

20   Percocets for $70 to be picked up at the 7-Eleven on

21   Penasquitos Drive.

22   Q.   And specifically, 30-milligram Percocets?

23   A.   Yes, sir.

24   Q.   Okay.  Great.  If you could scroll to the next page.

25        Fair to say that it's similar?

185

1    A.   Yes, sir.

2    Q.   Keep going.

3         Continuously the same?

4    A.   Yes, sir.

5    Q.   If we can go to the last page of this one.

6         Special Agent, do you see the last entry on this set

7    of communications?

8    A.   Yes, sir, I do.

9    Q.   Could you just -- what does it say there at the

10   bottom?

11   A.   It says, !! $300- 12Perc30's/PU Casa.

12   Q.   Okay.  Special Agent -- we can take 15 down.  Thank you.

13        Did you find these communications on the download of

14   Christian's phone?

15   A.   Yes, sir, I did.

16   Q.   In other words, you found them two ways; right?

17   A.   Yes, sir.

18   Q.   If you could please have a look at Government

19   Exhibit 14.  And look up when you're ready.

20   A.   Yes, sir.

21   Q.   Do you recognize Government Exhibit 14?

22   A.   Yes, sir, I do.

23   Q.   What is it?

24   A.   It is part of the forensic download of Christian Reed's

25   cell phone.

186

1    Q.   And what specifically is it from the forensic download

2    from Christian Reed's cell phone?

3    A.   It is the Snapchat messages between Mr. -- Christian

4    Reed and My G.

5    Q.   Okay.  Are these a fair and accurate depiction of the

6    communications between Christian and My G plug found on the

7    download of Christian's phone?

8    A.   Yes, sir, they are.

9         MR. ROTH:  Your Honor, we would move to admit

10   Government's Exhibit 14.

11        MR. CORTEZ:  Subject to earlier objections.  That's

12   all I have.

13        THE COURT:  Okay.  14 is received.

14      (Government's Exhibit 14 received in evidence.)

15        MR. ROTH:  And, Your Honor, this one is one, two,

16   three, four, five pages, Your Honor.

17        THE COURT:  Okay.  Thank you.

18        MR. ROTH:  Thank you.  If we could bring up

19   Government's Exhibit 14.

20   Q.   Special Agent, the first -- in row one, do you see the

21   column that says "body"?

22   A.   Yes, sir, I do.

23   Q.   Okay.  Is the message there the message that you read,

24   the first message from Exhibit 15 that you just described?

25   A.   Yes, sir, it is.

1   Q.   Okay.  And is the response in row two, that's the same

2   response?

3   A.   Yes, sir, that's correct.

4   Q.   Okay.  Special Agent, have you compared 14 and 15?

5   A.   Yes, sir, I have.

6   Q.   In terms of content, are they the same thing?

7   A.   Yes, sir, they are.

8   Q.   But there is additional information in 14; right?

9   A.   Yes, sir, that's correct.

10  Q.   And I'd like to talk about that.  First of all, do you

11  seem columns labeled "from" and "to"?

12  A.   Yes, sir, I do.

13  Q.   And if we could start with row one.  Do you see the My G

14  plug text in that -- in the first row?

15  A.   Yes, sir, I do.

16  Q.   Is there another name associated with My G plug there?

17  A.   Yes, sir, there is.

18  Q.   What's written there?

19  A.   It is nameeratta3324.

20  Q.   What is your understanding of the association of the

21  phrase nameeratta3324 with My G plug?

22  A.   Nameeratta3324 and My G plug are the same person.

23  Q.   Okay.  So My G plug is how Christian saved the account,

24  nameeratta3324, in his Snapchat; is that right?

25  A.   Yes, sir, that's correct.

188

1    Q.    Okay.  If you look in the next column, do you see

2    "participants"?

3    A.    Yes, sir, I do.

4    Q.    And do you see, in addition to the nameeratta3324, there

5    is a second account listed; right?

6    A.    Yes, sir, there is.

7    Q.    And what's that other account?

8    A.    Chreed06 with parentheses, owner.

9    Q.    Okay.  We'll come to this more fully, but, Special

10   Agent, did you come to establish who chreed06 was?

11   A.    Yes, sir, I did.

12   Q.    Who was that?

13   A.    Christian Reed.

14   Q.    And did you come to identify evidence showing who

15   nameeratta3324 is?

16   A.    Yes, sir, I did.

17   Q.    And who is that?

18   A.    Nameer Atta.

19   Q.    Okay.  The defendant?

20   A.    Yes, sir, the defendant.

21   Q.    Special Agent, what is the date of the first message

22   exchanged between the defendant and Christian Reed here?

23   A.    April 14th, 2020.

24   Q.    And if we can please go down to the last page and the

25   final entry.

189

1        Special Agent, what's the date of the last entry or

2   the last exchanges between Christian and the defendant?

3   A.   That date is May 20th, 2020.

4   Q.   And could you remind me, when did Christian die?

5   A.   May 21st, 2020.

6   Q.   Thank you.  Special Agent -- we can take 15 down.

7   Actually, if I can go back to Page 1, please.

8        In row seven, do you see an incoming message from

9   nameeratta3324 to chreed06?

10  A.   Yes, sir, I do.

11  Q.   And what's written in the incoming message?

12  A.   It's an address.

13  Q.   What's the address?

14  A.   9835 Jake Lane, San Diego, California 92126.

15  Q.   Have we seen this Jake Lane address already in your

16  testimony today?

17  A.   We saw 9845 Jake Lane.

18  Q.   Okay.  How did 9845 Jake Lane relate to 9835 Jake

19  Lane?

20  A.   Those buildings are adjacent to one another.

21  Q.   Thank you.  We can take down Government's 14.

22        Special Agent --

23        THE COURT:  Mr. Roth, are you going move to a

24  separate line of inquiry at this point?

25        MR. ROTH:  I am.  Actually, if I may -- I'm so

COMPUTER-AIDED TRANSCRIPTION

1    sorry.  If I could put in one more exhibit, and then we can

2    stop.

3              THE COURT:  Sure.

4              MR. ROTH:  Thank you.

5    Q.    Special Agent, could you have a look at Government's

6    Exhibit 16.

7    A.    16?

8    Q.    Uh-huh.  Just look up when you're ready.

9              Do you recognize Government's Exhibit 16?

10   A.    Yes, sir, I do.

11   Q.    What is it?

12   A.    It is a banner that I observed in Christian Reed's cell

13   phone.

14   Q.    By "banner," do you mean Snapchat banner?

15   A.    Yes, sir, it is a Snapchat banner.

16   Q.    And is Government's Exhibit 16 a fair and accurate

17   depiction of the Snapchat banner that you saw in the download

18   of Christian's phone?

19   A.    Yes, sir, it is.

20             MR. ROTH:  Your Honor, we would move to admit

21   Government's Exhibit 16.

22             MR. CORTEZ:  Subject to earlier objections.

23             THE COURT:  Okay.  16 is received.

24      (Government's Exhibit 16 received in evidence.)

25             MR. ROTH:  And I would ask to just publish it

1  briefly.  If we could bring it up.

2  Q.   Special Agent, I just want to ask you to summarize the

3  content of Government's Exhibit 16, and I think with that,

4  we'll stop for the day.

5         So could you just please take us through what this

6  is.

7  A.   Sure.  It's -- at the top of it, it says, Temple is

8  Open.  Tap in with orders.  Taking off five to ten dollars

9  off all minimum orders, electrical plug icon.  Delivery and

10  pickup available.

11  Q.   Okay.  And Special Agent, that's the same icon that

12  we've seen when we were talking about My G plug when looking

13  at Christian's Snapchat exchanges with the defendant;

14  right?

15  A.   Yes, sir.  That's correct.

16         MR. ROTH:  Your Honor, I can stop there.

17         THE COURT:  Okay.  Ladies and gentlemen, we're going

18  to take our evening recess at this time.  And before you

19  leave, I remind you of the admonition not to form or express

20  an opinion about this case, not to discuss it with anyone

21  until it is submitted to you for deliberations with your

22  fellow jurors.

23         And I also repeat the admonishment not to do any

24  independent research about any facts and circumstances having

25  to do with this case, the participants in this case, the

1    locations in this case or anything at all having to do with

2    the testimony that you've heard so far in this matter.

3            So with that, ladies and gentlemen, I wish you all a

4    very good evening.  We will reconvene promptly at 9:00 a.m.

5    tomorrow morning, and we will follow the schedule I

6    previously referenced.  So thank you very much for your

7    attention, and we'll see you tomorrow morning.  And you can

8    leave your notebooks on your chair.  Again, the area will be

9    secure overnight.

10           One more thing, ladies and gentlemen.  If you have

11   car trouble, if you have child-care issues, if anything

12   unexpected comes up, please contact Ms. Ortiz.  I believe you

13   have her contact information.  If you don't, she will provide

14   it to you.  She will be your point of contact.  So please

15   telephone her in the morning if something comes up.  I don't

16   expect that it will, but if an emergency arises, she will be

17   your point of contact.

18           So good evening.

19           (Jury absent, 4:54 p.m.)

20           THE COURT:  We are outside the presence of the jury.

21   All counsel are present.  Mr. Atta is present.

22           Is there anything that we need to discuss before we

23   break for the evening?

24           MR. CORTEZ:  Not from us.

25           THE COURT:  Okay.

1           MR. ROTH:  Just a heads up, Your Honor.  After

2      Special Agent Logan, we have two more witnesses.  They will

3      be brief.  I think that at the rate we're going, the

4      government's case may end by the lunch hour tomorrow.  And I

5      have no idea what the defense plan is, but just for knowing.

6           And then, Your Honor, I do anticipate that

7      screenshot that we've raised a couple of times today is going

8      to come up tomorrow morning, so just for the Court's --

9           THE COURT:  Okay.  That's 43 and 44; correct?

10          MR. ROTH:  That is correct.

11          THE COURT:  Okay.  Why don't we reconvene tomorrow

12     morning at 8:45.  We'll discuss those exhibits, and if

13     anything comes up during your preparation tonight, we can

14     discuss it before we bring the jury in at 9:00 a.m.

15          MR. ROTH:  Okay.

16          MR. CORTEZ:  Thank you.

17          THE COURT:  Mr. Cortez, it's coming to that time in

18     the trial --

19          MR. CORTEZ:  It is.

20          THE COURT:  -- where I'd like to know if you have a

21     plan or how you see the defense case going.  Do you intend to

22     call witnesses, and how long would your presentation be if

23     you call witnesses?

24          MR. CORTEZ:  We will make that determination tonight

25     and tomorrow morning.  If we do, it will be an hour and a

194

1    half.

2          THE COURT:  Okay.  So it looks like we're going to

3    close tomorrow.

4          MR. ROTH:  Yes.

5          MR. CORTEZ:  Oh, yeah.  And counsel for the

6    government had notified me last week that we should be ready

7    to go Tuesday.  He was kind enough to do that.

8          THE COURT:  Okay.  So what I'm going to do now is go

9    back, finalize my preliminary draft jury instructions.  The

10   parties are relatively on the same page when it comes to the

11   jury instructions, so there is not going to be a lot to

12   discuss.  But I will e-mail those to you within the hour.

13         And what I'll ask the parties to do is come back

14   tomorrow at 8:30, promptly at 8:30, and we'll have our jury

15   conference then so that the parties know what the jury

16   instructions are going to be and you can formulate your

17   closing arguments accordingly.  And I'll have final packets

18   with the jury instructions for you, if you want to use the

19   Elmo, or I can give it to you in electronic format if, over

20   the lunch period, you'd like to incorporate those into a

21   PowerPoint or whatever presentation you intend to use for

22   closing.

23         So let's reconvene tomorrow morning at 8:30,

24   promptly at 8:30, because I don't want to hold the jury.  At

25   9 o'clock, they are coming in whether we are done or not.

1          MR. CORTEZ:  8:30 it is.  Thank you.

2          THE COURT:  Thank you.

3          MR. ROTH:  Thank you, Judge.

4          MR. CORTEZ:  Have a good evening.

5          THE COURT:  Thank you.  You, too.

6          (Proceedings adjourned at 4:57 p.m.)

7                         --o0o--

8                 C E R T I F I C A T I O N

9          I hereby certify that I am a duly appointed,
    qualified and acting official court reporter for the United
10   States District Court; that the foregoing is a true and
    correct transcript of the proceedings had in the
11   aforementioned cause; that said transcript is a true and
    correct transcription of my stenographic notes; and that the
12   format used herein complies with the rules and requirements
    of the United States Judicial Conference.
13          DATED:  October 25, 2022, at San Diego, California.

14                              S/CAMERON P. KIRCHER
                                CAMERON P. KIRCHER
15

16

17

18

19

20

21

22

23

24

25