196

1                   UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF CALIFORNIA

3

4   UNITED STATES OF AMERICA,   )
                           )

5              Plaintiff,   )   Case No. 21-cr-1289-TWR
                           )

6   VS.                     )   San Diego, California
                           )

7   NAMEER MOHAMMAD ATTA,    )   Tuesday,
                           )   September 27, 2022

8             Defendant.   )   8:31 a.m.
   _____)

9

10

11          REPORTER'S TRANSCRIPT OF PROCEEDINGS

          JURY TRIAL - DAY TWO (Pages 196 - 408)

12        BEFORE THE HONORABLE TODD W. ROBINSON

13          UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   For the Government:   RANDY S. GROSSMAN, U.S. ATTORNEY
                         BY:  OWEN ROTH, Esq.

17                           J'ME FORREST, Esq.
                     Assistant U.S. Attorneys

18                     880 Front Street
                     San Diego, California  92101

19

   For the Defendant:    EZEKIEL E. CORTEZ

20                     Attorney at Law
                     55O West C Street

21                     Suite 790
                     San Diego, California  92101

22

23   Reported by:  Cameron P. Kircher
                CSR NO. 9427, RPR, CRR, RMR

24               333 W. Broadway, Suite 420
               San Diego, California  92101

25               e-mail:  cpkirchercsr@gmail.com

COMPUTER-AIDED TRANSCRIPTION

197

1                              INDEX

2                           EXAMINATION

3    WITNESS NAME                                        PAGE

4    STEPHEN LOGAN

5       Cross By Mr. Cortez ...................................... 301
        Re-Direct By Mr. Roth.................................... 309
6

7    MICHAEL KLINGE

8       Direct By Mr. Roth ...................................... 312

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION

198

EXHIBITS

EXHIBIT                                                              PAGE

GOVERNMENT'S:

Exhibit 18 Entered into Evidence                                     222
Exhibit 19 Entered into Evidence                                     222
Exhibit 20 Entered into Evidence                                     222
Exhibit 21 Entered into Evidence                                     229
Exhibit 23 Entered into Evidence                                     229
Exhibit 25 Entered into Evidence                                     235
Exhibit 26 Entered into Evidence                                     235
Exhibit 33 Entered into Evidence                                     238
Exhibit 35 Entered into Evidence                                     238
Exhibit 37 Entered into Evidence                                     238
Exhibit 38 Entered into Evidence                                     238
Exhibit 39 Entered into Evidence                                     238
Exhibit 41 Entered into Evidence                                     254
Exhibit 42A Entered into Evidence                                    255
Exhibit 42B Entered into Evidence                                    255
Exhibit 42C Entered into Evidence                                    255
Exhibit 42G Entered into Evidence                                    255
Exhibit 46 Entered into Evidence                                     263
Exhibit 49 Entered into Evidence                                     268
Exhibit 50 Entered into Evidence                                     272
Exhibit 51 Entered into Evidence                                     270
Exhibit 53 Entered into Evidence                                     273
Exhibit 54 Entered into Evidence                                     273
Exhibit 61 Entered into Evidence                                     280
Exhibit 62 Entered into Evidence                                     280
Exhibit 63 Entered into Evidence                                     284
Exhibit 64 Entered into Evidence                                     280
Exhibit 66 Entered into Evidence                                     288
Exhibit 67 Entered into Evidence                                     289
Exhibit 69 Entered into Evidence                                     280
Exhibit 70 Entered into Evidence                                     291
Exhibit 71 Entered into Evidence                                     280
Exhibit 72 Entered into Evidence                                     280
Exhibit 73 Entered into Evidence                                     280
Exhibit 74 Entered into Evidence                                     280
Exhibit 76 Entered into Evidence                                     294
Exhibit 77 Entered into Evidence                                     296
Exhibit 79 Entered into Evidence                                     280
Exhibit 80 Entered into Evidence                                     280
Exhibit 90 Entered into Evidence                                     294
Exhibit 201 Entered into Evidence                                    233
Exhibit 202 Entered into Evidence                                    221

San Diego, California - Tuesday, September 27, 2022

1                        8:31 a.m.

2            THE CLERK:  Calling Case 21-cr-1289, U.S.A. vs.

3    Nameer Atta, for jury trial.

4            Counsel.

5            MR. ROTH:  Good morning, Your Honor.  Owen Roth

6    along with J'me Forrest and Lina Douglas on behalf of the

7    United States.

8            THE COURT:  Thank you.  Good morning.

9            MS. FORREST:  Good morning.

10           MR. CORTEZ:  Good morning, Your Honor.  Ezekiel

11   Cortez on behalf of Mr. Atta, who is present in custody, and

12   Ralph Cordova, who keeps me in control.

13           THE COURT:  Okay.  Good morning.  Thank you.

14           MR. CORTEZ:  Good morning.

15           THE COURT:  This matter is on calendar, and for the

16   record, we are outside the presence of the jury.  We've set

17   this matter on calendar this morning for a jury instruction

18   conference.

19           And in that regard, have the parties received copies

20   of the draft jury instructions last night?

21           MR. ROTH:  Yes, Your Honor.

22           MR. CORTEZ:  Yes, we did.

23           THE COURT:  Okay.  I am also in receipt of the

24   government's briefing, filed -- there were two filings.  The

25   second one is filed as ECF 104.  And I'll address those after

COMPUTER-AIDED TRANSCRIPTION

1    we go through the rest of the jury instructions.  And that

2    ultimately pertains to, I believe it was draft instruction

3    No. 10, which is the element of proof with regard to the

4    charge in this case and what the government must prove and

5    what the applicable defenses are to that charge.

6            So going through the instructions -- give me one

7    second.  I'm just going to go through them in sequence and

8    ask if either party has any objection to the draft

9    instructions as we go through them.  And many of them were

10   submitted by both parties, so I would anticipate there won't

11   be many objections.

12           Okay.  Instruction No. 1, any objection from the

13   defense?

14           MR. CORTEZ:  No.

15           THE COURT:  Any from the government?

16           MR. ROTH:  No.

17           THE COURT:  Instruction No. 2.  Mr. Cortez?

18           MR. CORTEZ:  No objection.

19           THE COURT:  Any objection from the government?

20           MR. ROTH:  No.

21           THE COURT:  Okay.  Instruction No. 3.  We'll wait

22   and see what Mr. Atta does with respect to his decision to

23   testify.  So --

24           MR. CORTEZ:  Yes.

25           THE COURT:  -- any objection as to either one of

1   those versions, depending on whether or not Mr. Atta

2   testifies?

3           MR. CORTEZ:  No objection.

4           MR. ROTH:  No, Your Honor.

5           THE COURT:  Okay.  Instruction No. 4, any objection

6   from the defense?

7           MR. CORTEZ:  None.

8           THE COURT:  Any objection from the government?

9           MR. ROTH:  No, Your Honor.

10          THE COURT:  Instruction No. 5?

11          MR. CORTEZ:  No objection.

12          MR. ROTH:  None, Your Honor.

13          THE COURT:  Okay.  Instruction No. 6?

14          MR. CORTEZ:  No objection.

15          MR. ROTH:  None, Your Honor.

16          THE COURT:  Instruction No. 7?

17          MR. CORTEZ:  No objection.

18          MR. ROTH:  No, Your Honor.

19          THE COURT:  Instruction No. 8?

20          MR. CORTEZ:  No objection.

21          MR. ROTH:  No, Your Honor.

22          THE COURT:  Instruction No. 9?

23          MR. CORTEZ:  No objection.

24          MR. ROTH:  No, Your Honor.

25          THE COURT:  Instruction No. 10 we'll hold off on for

COMPUTER-AIDED TRANSCRIPTION

1  the moment.

2           Instruction No. 11?

3           MR. CORTEZ:  Before we pass it, I have no objection

4  to it, just so the Court will know.

5           THE COURT:  Okay.  So draft instruction No. 10,

6  there is no objection by the defense.  Any objection by the

7  government?

8           MR. ROTH:  Not as written, Your Honor.  I do want to

9  review the briefing and --

10          THE COURT:  Okay.  I've got two other versions of

11  this that I think we need to discuss based on the briefing,

12  and, Mr. Cortez, I'm very interested in your thoughts on the

13  government's filing from last night as to the available

14  defenses.

15          MR. CORTEZ:  You might be surprised.

16          THE COURT:  Okay.  We'll take a pass on 10 --

17          MR. CORTEZ:  Okay.

18          THE COURT:  -- for the moment.

19          Instruction No. 11?

20          MR. CORTEZ:  No objection.

21          THE COURT:  So my question was whether or not we

22  need Instruction No. 11?  Because the jury will receive the

23  verdict form --

24          MR. CORTEZ:  Correct.

25          THE COURT:  -- and as they work their way through

1    the form, it would necessarily include a finding of the

2    lesser-included offense.  So they would work their way

3    through the form, and if they found that the distribution

4    resulting in death aspect had not been proven, they would, by

5    virtue of working their way through the form, make a finding

6    as to the lesser-included offense.

7           So with that in mind, do you still request Jury

8    Instruction No. 11, Mr. Cortez?

9           MR. CORTEZ:  I do.  And I had noticed the somewhat

10   duplication.  The other one -- the verdict form obviously is

11   a jury instruction.  So I would ask for that.

12          THE COURT:  Okay.

13          MR. ROTH:  Your Honor, I would join in that.

14   Because in the event the jury was unanimous on the first two

15   elements, I would hate for them to not understand that they

16   can convict on that, rather than fully acquit based on

17   failure to reach a consensus or failure of proof on the third

18   element.

19          THE COURT:  Okay.  Very well.  11 is in without

20   objection.

21          12?

22          MR. CORTEZ:  No objection.

23          MR. ROTH:  None, Your Honor.

24          THE COURT:  Okay.  13?

25          MR. CORTEZ:  No objection.

1          MR. ROTH:  No, Your Honor.

2          THE COURT:  14?

3          MR. CORTEZ:  No objection.

4          MR. ROTH:  None, Your Honor.

5          THE COURT:  We're doing great.

6     15?

7          MR. CORTEZ:  No objection.

8          MR. ROTH:  No.

9          THE COURT:  16?

10         MR. CORTEZ:  No objection.

11         MR. ROTH:  None, Your Honor.

12         THE COURT:  17?

13         MR. CORTEZ:  No objection.

14         MR. ROTH:  No, Your Honor.

15         THE COURT:  And with respect to the verdict form,

16    the government submitted a proposed verdict form.  My only

17    change to that is going to be, instead of having them circle

18    it, I'm going to have a blank and the two options underneath

19    the blank, and then they can fill it in.  I just don't want

20    crossing out and, you know, what --

21         MR. CORTEZ:  I prefer the Court's version in this.

22         THE COURT:  Okay.  And 18?

23         MR. CORTEZ:  No objection.

24         MR. ROTH:  No, Your Honor.

25         THE COURT:  Okay.  So that circles us back around to

1    Instruction No. 10 and the government's filing ECF 104, which

2    was the briefing that pertains to, Mr. Cortez, your opening

3    and your cross-examination of the two first responders.

4         What is your response to the government's filing

5    ECF 104?

6         MR. CORTEZ:  It's very straightforward.  That is not

7    going to be our defense at all.  I cannot tell the Court at

8    this point what our precise defense will be, but showing the

9    government's -- showing the unreliability of the government's

10   gathering of evidence is always at issue for every jury, and

11   that's why I used all those indications.  There is more to

12   come.

13        But I'm not going to be arguing -- I was aware of

14   another case, not the *Rodriguez* case.  I think, Counsel, I

15   put it in my brief, but I was aware of cases such as suicide

16   cases, where a person sold drugs to an individual, used the

17   drugs to commit suicide by taking an extreme amount, and the

18   Court found that's not a defense at all because you still

19   have a but-for cause.

20        I'm keenly aware that the but-for cause here is the

21   issue and our defense will be -- will be honed in at the end

22   of the government's case.

23        THE COURT:  Okay.

24        MR. CORTEZ:  I don't see this as an issue.

25        THE COURT:  Okay.  So I have two other Instructions

206

1    10.  I took a stab at drafting them in response to the

2    government's filing of ECF 104.  And I would ask the parties

3    to take a moment to look over those two versions of

4    Instruction No. 10.

5              And my concern in that regard, Mr. Cortez, I

6    appreciate the fact that that is not going to be your defense

7    that you argue, but that is an issue that was not only raised

8    during opening, but is foremost in the jury's mind, I

9    believe, based on the state of the evidence.

10             MR. CORTEZ:  Let me make it easy for the Court.  I

11   have no objection to your addition.

12             THE COURT:  Okay.  Which version?  I've got two.

13             MR. CORTEZ:  The last sentence in this instruction,

14   "additionally, whether the first responders," I have no

15   objection to that.

16             MR. ROTH:  Your Honor, we would request the other

17   one, which, for the record, the sentence is "Additionally,

18   the level of care administered to C.M.R. by the first

19   responders, whether it was medically appropriate or whether

20   it fell below an ordinary standard of care, is not a relevant

21   consideration as to whether the fentanyl distributed by the

22   defendant is the cause of C.M.R.'s death."

23             I think that is accurate.  I think it's an

24   appropriate level of generality, and I think it addresses the

25   issue.

1          MR. CORTEZ:  That's fine, too.  That is not going to

2   be our defense.

3          THE COURT:  That's fine.  I just want to accurately

4   state the law to the jury so they have full knowledge.

5          There was a change to the first sentence in that

6   last paragraph --

7          MR. CORTEZ:  I noticed that.

8          THE COURT:  -- and I want to highlight that to the

9   parties.

10          MR. CORTEZ:  Okay.

11          THE COURT:  Because there was a sentence in there

12   about a contributing factor.

13          MR. CORTEZ:  Contributing factor.

14          THE COURT:  And the law is a but-for --

15          MR. CORTEZ:  Correct.

16          THE COURT:  -- inquiry.

17          So I did take that out, and I want to make sure that

18   the parties are okay with that.

19          MR. CORTEZ:  I appreciate the Court taking it out,

20   because the case law does not consider contributing

21   factors.

22          THE COURT:  Okay.  So no objection to taking that

23   out?

24          MR. CORTEZ:  None.

25          THE COURT:  Okay.

208

1          MR. ROTH:  One moment, Your Honor?

2          THE COURT:  Sure.

3          MR. ROTH:  Thank you.

4          (Attorney conference.)

5          MR. ROTH:  We agree, Your Honor.  Thank you.

6          THE COURT:  Okay.  I also noted, going through the

7     jury instructions, and I appreciate the parties' streamlined

8     presentation of the evidence, I'm assuming that the experts

9     who testified yesterday, they were never formally offered

10    pursuant to Rule 702.  There was no objection.  I'm assuming

11    the parties were going off of the in-limine rulings.

12          Is that correct, Mr. Cortez?

13          MR. CORTEZ:  You have a good eye.  I was waiting for

14    the end of the government's case.

15          THE COURT:  Okay.

16          MR. CORTEZ:  They were never offered.  But they were

17    preliminary in-limine rulings, and we could accept them

18    offering them now.

19          THE COURT:  Okay.  So there is no objection to the

20    702 testimony that was introduced yesterday?

21          And the reason why I raise that, there is a pattern

22    instruction as to how the jurors should consider expert

23    testimony, but they haven't really been keyed into the expert

24    nature of the testimony.  There was one witness that Mr. Roth

25    distinguished between the expert portion of his testimony and

COMPUTER-AIDED TRANSCRIPTION

1   the fact-based portion of his testimony.

2          MR. CORTEZ:  Correct.

3          THE COURT:  Are you requesting an expert testimony,

4   the pattern instruction on how they should consider that

5   evidence?

6          MR. CORTEZ:  I'm not.  But if the Court wishes to

7   give it, I have no problem under either form of expertise is

8   widely accepted.

9          THE COURT:  Okay.  They are to judge it as any other

10  testimony and give it the weight they feel it deserves, so I

11  believe it's properly covered under the other, because it has

12  not been highlighted for this jury.  So if the parties are

13  not requesting it, it's clearly not error not to give it.  So

14  I'm happy to abide by the parties' request in that regard.

15         MR. CORTEZ:  Okay.  I agree.

16         THE COURT:  Okay.

17         MR. ROTH:  We agree, Your Honor.

18         And to complete the record, with our apologies for

19  not being more precise, that is what we were doing, going off

20  the in-limine rulings.

21         With respect to the witness currently on the stand,

22  I actually chose not to qualify him because I'm trying to be

23  mindful of the law on law enforcement witnesses with the dual

24  role, and I didn't want to call attention to him as a, quote,

25  unquote, expert.  I just wanted to qualify him for those

1   limited points, and then, I think the Court saw, pivot hard

2   away from it.

3          THE COURT:  No.  I think you were very careful in

4   eliciting the dual-purpose testimony in a very

5   compartmentalized way, and I appreciate that.

6          MR. CORTEZ:  I just have one separate item, if I

7   may.

8          THE COURT:  Yes.

9          MR. CORTEZ:  Each time the government offers

10  evidence, especially yesterday with Agent Logan, I have to

11  say each time, "Based on my prior objections, I have nothing

12  else."  I'd like the Court to just consider a running

13  objection to that type of evidence so I don't have to repeat

14  it all the time in front of the jury.

15         THE COURT:  Yes.  I will treat all of the previously

16  made objections as reserved regarding any of the exhibits

17  that are introduced into evidence.

18         MR. CORTEZ:  Okay.  Thank you.

19         THE COURT:  Okay.  That brings me to Exhibits 43 and

20  44.  I have had a chance to review those.

21         Mr. Cortez, do you wish to be heard with respect to

22  those exhibits?  Those are the newspaper articles.

23         MR. CORTEZ:  Right.  Again, even going back to law

24  school, I couldn't have a stronger objection to that type of

25  unreliable, argumentative, prejudicial evidence.

1          THE COURT:  Okay.  With respect to those articles,

2     my understanding is one was taken from Mr. Atta's phone; is

3     that correct?

4          MR. ROTH:  Yes, Your Honor.  And just for the

5     record, Exhibit 43 is a screenshot found in the defendant's

6     phone.  So 44 is the article, but redacted so that it only

7     reflects the content of the screenshot at 43 and the date.

8          The whole point of 44 is to show a date that can be

9     associated with the publication of the article that's in the

10    screenshot.  I'm not -- but if the Court is going to allow us

11    to put in 43, and the parties can agree that it was from

12    February of 2019, we don't need 44.  Its only probative value

13    is a point in time.

14         THE COURT:  Okay.

15         MR. ROTH:  As to 43, yes, it's on the defendant's

16    phone.

17         THE COURT:  Okay.  So with respect to 43, I find

18    that it is relevant, that is, it meets the 401 standard that

19    there is some suggestion or evidence, based on Mr. Atta's

20    phone, that he was aware that the M30 pills contained

21    fentanyl.  I mean, that's the nature of the article.  I find

22    that it's relevant on that basis.  However, the remainder of

23    the article as it pertains to the Sinaloa cartel, the deaths

24    resulting from the use of the M30 fentanyl-laced Percocet, I

25    find that that is excludable properly under Rule 403.

1          So what I will permit the government to do is elicit

2    testimony regarding what the screenshot contains and it goes

3    to the knowledge of Mr. Atta, that the M30 pills may have

4    been laced with fentanyl; and I believe that that's relevant

5    and admissible.

6          But as to the exhibit itself, even in redacted

7    format, I think that the probative value is substantially

8    outweighed by the prejudicial effect of the comment that's

9    been made by, I believe it's the sheriff in Arizona, about

10   the scourge of these, and I think we're getting far afield,

11   and I think Mr. Cortez's concern in that regard is

12   well-founded.

13         So 43 and 44, the physical exhibits, are excluded

14   under Rule 403.  The relevant portion, however, is admissible

15   under 401.  So the testimony will come in, but the physical

16   exhibits will not.

17         MR. ROTH:  And, Your Honor, the United States will

18   offer that testimony for the nonhearsay purpose of notice to

19   the defendant of the existence of these pills as a

20   possibility in the market and the possibility that they could

21   contain fentanyl.

22         We do not seek to offer it for its truth.  We will

23   not argue from this testimony that the defendant knew there

24   were fentanyl -- there was fentanyl in the pills because he

25   read it in a newspaper article.  I think that would be

213

1    hearsay.

2         MR. CORTEZ:  Without going back and forth with the

3    same issue, I have extremely strong objections, and that's

4    all I can say.

5         THE COURT:  Okay.  What is your objection to the

6    testimony regarding the M30s and the fact that there was an

7    article saying that those are laced with fentanyl, and

8    putting Mr. Atta on notice that the M30s may have been

9    tainted in that fashion?

10        MR. CORTEZ:  I have several objections.  The first

11   one is basic evidentiary foundation.  No. 1, simply because

12   something is on Mr. Atta's screenshot doesn't establish

13   notice of anything.

14        No. 2, it doesn't establish the real issues in this

15   case, the direct issues, not the argument about them, that,

16   in fact, he did sell, even Percocets to Mr. Reed.  Okay.

17   There is a lot of illusion, and that's why in voir dire, the

18   government concentrated on circumstantial evidence.  It's no

19   secret.  It's very obvious.

20        Third, that doesn't show any -- it's not probative

21   of his motive or intent or knowledge that the actual

22   substances he may be selling are, indeed, laced with

23   fentanyl.  And he may be acknowledging that.  So the third

24   issue is not very conclusive as to what it meant to the

25   defendant, and to introduce that type of evidence, I really

COMPUTER-AIDED TRANSCRIPTION

1    believe is one of those things that you cannot unring.

2          So to the extent that the government hasn't rested,

3    and I still am fine-tuning defenses, that's all I can say at

4    this point.

5          THE COURT:  Okay.  So your objection is noted,

6    Mr. Cortez.

7          MR. CORTEZ:  Thank you.

8          THE COURT:  With respect to the testimony, my

9    expectation is it will be very narrowly tailored, that there

10   was an article found on a screenshot that was found on

11   Mr. Atta's phone, and that the article pertained to the fact

12   that fentanyl-laced M30 pills were in circulation or are in

13   existence, and that will be the extent of the testimony in

14   that regard.

15         MR. ROTH:  Yes, Your Honor.

16         THE COURT:  Okay.  With that ruling, Mr. Cortez, do

17   you ask for any limiting instruction when that evidence comes

18   in?

19         MR. CORTEZ:  I don't think a limiting instruction

20   will do any good.

21         THE COURT:  Okay.

22         MR. CORTEZ:  Thank you.

23         THE COURT:  Are there any other matters that we need

24   to discuss before we break and bring the jury in at 9:00

25   a.m.?

215

1          MR. CORTEZ:  No.

2          MR. ROTH:  No, Your Honor.  Thank you.

3          THE COURT:  Okay.

4          MR. ROTH:  Oh, Your Honor.  We would ask the Court

5     to reserve on our ability to use the screenshot in cross if

6     the defendant testifies or if the defense opens the door.

7     That's all.

8          THE COURT:  Yes.

9          MR. ROTH:  Thank you.

10          THE COURT:  Okay.  Do either of the parties request

11     an electronic version of the jury instructions, or are you

12     satisfied with the version that you have?

13          MR. ROTH:  We -- if we could have it, that would be

14     great.

15          MR. CORTEZ:  Yes.  That always helps.

16          THE COURT:  Okay.  I will e-mail it to both

17     parties.

18          MR. ROTH:  Your Honor, if I may, if the Court has

19     its verdict form ready, may we have that in electronic form?

20          THE COURT:  I do not have it ready.  My plan was to

21     do it over the lunch break.

22          MR. ROTH:  Sorry.  That's fine.

23          THE COURT:  But I will give it to you before

24     closing.  If you need an electronic version, I can go do it

25     now.

COMPUTER-AIDED TRANSCRIPTION

216

1           MR. ROTH:  No.  That's fine.

2           THE COURT:  Okay.  All right.  We are in recess

3    until 9:00 a.m.  Thank you.

4           MR. CORTEZ:  Thank you.

5           MR. ROTH:  Thank you, Judge.

6           MS. FORREST:  Thank you, Your Honor.

7           (Recess, 8:49 a.m. to 9:16 a.m.)

8           THE COURT:  Okay.  We are back on the record.  The

9    jurors are not present.  All counsel are present.  Mr. Atta

10   is present.

11          I've been informed that one of our jurors is not

12   here, and Ms. Ortiz tried to call the juror, and that juror

13   did not answer the telephone.  So it is Juror No. 2, who is

14   seated in the second seat from the end.  It was the last

15   juror out of the courtroom yesterday.  And apparently she was

16   having trouble finding parking yesterday.

17          So because the case is being submitted to the jury

18   today, I'm going to solicit the parties' thoughts in going

19   forward with the alternate transitioning in as our

20   deliberating juror and excusing, if she does show up, Juror

21   No. 2.

22          So Mr. Cortez, what are your thoughts in that

23   regard?

24          MR. CORTEZ:  May I consult with my team?

25          THE COURT:  Of course.

COMPUTER-AIDED TRANSCRIPTION

217

1              (Attorney conference.)

2              MR. CORTEZ:  We agree that we should proceed

3    immediately because we don't know what's happening.

4              THE COURT:  Okay.  What is the government's

5    position?

6              MR. ROTH:  Your Honor, we take no position.

7              THE COURT:  Okay.  So what we will do is this:  We

8    will let the jurors remain in their assigned seats.  Seat

9    No. 2 will be open, but the understanding will be that the 12

10   remaining jurors will be our deliberating jurors in this

11   case.

12             Mr. Cortez, to be clear, you're okay with that

13   course of action; is that correct?

14             MR. CORTEZ:  Absolutely, yes.  Thank you.

15             THE COURT:  Okay.  And the government takes no

16   position with respect to that; is that correct?

17             MR. ROTH:  Yes, sir.

18             THE COURT:  Okay.  What we will do is we'll be in a

19   very brief recess.  We'll bring in our remaining 12 jurors,

20   and we'll go forward with the presentation of evidence.

21             MR. CORTEZ:  Thank you.

22             MR. ROTH:  Thank you, Your Honor.

23             (Recess, 9:19 a.m. to 9:20 a.m.)

24             (Jury present, 9:21 a.m.)

25             THE CLERK:  Calling case 21-cr-1289, U.S.A. vs.

1    Nameer Atta for jury trial, day two.

2          Counsel.

3          MR. ROTH:  Good morning again, Your Honor.  Owen

4    Roth, along with J'me Forrest and Lina Douglas, on behalf of

5    the United States.

6          THE COURT:  Okay.  Good morning.

7          MR. CORTEZ:  And Ezekiel Cortez on behalf of

8    Mr. Atta.  Also present is Ralph Cordova.

9          THE COURT:  Thank you.  And good morning.

10         MR. CORTEZ:  Thank you.  Good morning.

11         THE COURT:  Ladies and gentlemen, I hope you had a

12   good evening.  We are going to resume with the taking of

13   evidence in this case.  We have enough jurors to go forward.

14   I know that we were waiting for one of the jurors who

15   apparently is unable to join us this morning.  So we will go

16   forward with the taking of evidence.

17         I wanted to briefly mention a scheduling

18   consideration.  When you were here yesterday, the parties and

19   I were estimating that the case would be submitted to you no

20   later than Friday of this week.  We have very experienced

21   counsel on both sides of the case, and they have been working

22   very diligently to narrow the issues for your consideration.

23   And as a result of their efforts in this case, it is likely

24   that the case will be submitted to you for your consideration

25   this afternoon.

219

1              So for scheduling purposes -- so if you need to call

2    people and let them know -- I just wanted to alert you to

3    that change in the scheduling in this case.  Again, once the

4    case is submitted to you for your deliberations, how long and

5    how much you deliberate is a matter entirely up to you.  So I

6    can tell you when the case will be submitted to you for your

7    consideration, but as to the remainder, that is entirely

8    within your province.

9              So with that in mind, sir, I will remind you that

10   you're still under oath.  And we'll resume the examination,

11   Mr. Roth.

12             MR. ROTH:  Thank you, Your Honor.

13             THE WITNESS:  Yes, sir.

14       STEPHEN LOGAN, having been previously duly sworn,

15         testified as follows:

16                   DIRECT EXAMINATION (CONTINUED)

17   BY MR. ROTH:

18   Q.   Good morning again, Special Agent.

19   A.   Good morning, sir.  How are you?

20   Q.   Good.  Thank you.

21             Special Agent, when we left off yesterday afternoon,

22   you were offering testimony about the contents of Christian's

23   phone.  Do you recall that?

24   A.   Yes, sir, I do.

25   Q.   And I just want to close with one point.  Special Agent,

220

1    on the -- in the witness box area, do you see a phone in a

2    bag that is labeled Government's Exhibit 202?

3    A.    Yes, sir, I do.

4    Q.    Special Agent, what is Government's Exhibit 202?

5    A.    Christian Reed's cell phone.

6    Q.    And how do you know that?

7    A.    Because I have reviewed the evidence, and I have also

8    handled this item of evidence several times.

9    Q.    Is the download of Christian's phone that you've offered

10   testimony about, the download from that device?

11   A.    Yes, sir, it is.

12          MR. ROTH:  Your Honor, the government would move to

13   admit Government's Exhibit 202.

14          THE COURT:  Any objection?

15          MR. CORTEZ:  No more objections other than what I've

16   stated.

17          THE COURT:  Very well.  202 is received.

18      (Government's Exhibit 202 received in evidence.)

19          MR. ROTH:  Thank you, Your Honor.

20   Q.    Now, Special Agent, yesterday, do you recall offering

21   some testimony about communications over Snapchat that you

22   found on Christian's phone?

23   A.    Yes, sir, I do.

24   Q.    Did you follow up with Snapchat, given that you found

25   communications on Christian's phone over that application?

221

1    A.    Yes, sir, I did.  I submitted a federal search warrant

2    to Snapchat for the contents of Christian Reed's Snapchat

3    account.

4    Q.    Okay.  And if you would please have a look at

5    Government's 18, 19 and 20.

6    A.    18, 19 and 20?

7    Q.    And look up when you're ready.

8    A.    Yes, sir.

9    Q.    Do you recognize Government's 18 through 20?

10   A.    Yes, sir, I do.

11   Q.    What are they?

12   A.    They are information derived from the search warrant

13   submitted to Snapchat for Christian Reed's Snapchat.

14   Q.    How do you know that?

15   A.    Because I reviewed the information submitted by

16   Snapchat, and this information was contained in those

17   results.

18   Q.    Are Government's 18 through 20 fair and accurate copies

19   of the information that you received from Snapchat?

20   A.    Yes, sir, they are.

21         MR. ROTH:  Your Honor, we would move to admit

22   Government's Exhibit 18 through 20.

23         THE COURT:  Any objection?

24         MR. CORTEZ:  No.

25         THE COURT:  18 through 20 are received.

COMPUTER-AIDED TRANSCRIPTION

222

1        (Government's Exhibits 18, 19 and 20 received in

2          evidence.)

3              MR. ROTH:   Thank you, Your Honor.

4              If we can please pull up Government's Exhibit 18.

5    Thank you.

6              Special Agent, what is this?

7    A.   That is the subscriber information for Christian Reed's

8    Snapchat account.

9    Q.   What is the ID?

10   A.   The ID is chreed06.

11   Q.   And have we seen chreed06 in any evidence thus far?

12   A.   Yes, sir, we have.

13   Q.   Where have we seen that?

14   A.   That was recovered from -- we saw that in the evidence

15   that we recovered from messages from Christian Reed's cell

16   phone Snapchat messages.

17   Q.   Okay.  And do you see an e-mail address next to the

18   ID?

19   A.   Yes, I do.

20   Q.   What is that e-mail address?

21   A.   Chreed006@gmail.

22   Q.   In your search of Christian Reed's cell phone, did you

23   find communications to and from that e-mail address?

24   A.   Yes, sir, I did.

25   Q.   Did you see a name in the e-mails that was in the

COMPUTER-AIDED TRANSCRIPTION

1    account, as in Dear So and So or To So and So?

2    A.   Yes, sir, I did.

3    Q.   What was the name of the person receiving e-mails at

4    this address on Christian's phone?

5    A.   The names were Chris or Christian.

6    Q.   Okay.  And then do you see a column labeled phone

7    number?

8    A.   Yes, sir, I do.

9    Q.   And what is the phone number listed there?

10   A.   1 (507) 702-1867.

11   Q.   Special Agent, whose phone number is that?

12   A.   Christian Reed's cell phone.

13           MR. ROTH:  If we can please go to Government's 19.

14           THE COURT:  Mr. Roth, I believe the witness

15   misstated the phone number, just so the record is clear.

16   Q.   BY MR. ROTH:  Okay.  Special Agent, would you mind just

17   rereading carefully the phone number.  If we can bring 18

18   back up.

19   A.   1 (507) --

20   Q.   I think it might be 570.

21   A.   I'm sorry.  570.  I apologize.  1 (570) 702-1867.

22   Q.   Okay.

23   A.   Excuse me.

24   Q.   That's quite all right.

25           Is that Christian's phone number?

224

1    A.    Yes, sir, it is.

2    Q.    How do you know that's Christian's phone number?

3    A.    Because I reviewed his cell phone and that number was

4    present.

5    Q.    Okay.  And while the numbers are small on the screen,

6    you're confident that's it?

7    A.    That is it, yes, sir.

8    Q.    Okay.  Thank you.  If we can please go to Government's

9    Exhibit 19 and please pull that up.

10          Special Agent, what is Government's Exhibit 19?

11   A.    That is the friends list from Christian Reed's Snapchat

12   account.

13   Q.    Do you have an understanding of what a friends list

14   is?

15   A.    Yes, sir, I do.

16   Q.    What is it?

17   A.    A friends list is someone that you have some type of

18   contact with over the social media account.

19   Q.    Does it work the same as Facebook Friend, for

20   instance?

21   A.    Yes, sir.  Similar in nature, yes.

22          MR. ROTH:  If we can please go to -- and for the

23   record, Your Honor, Government's Exhibit 19 is one, two,

24   three, four, five, six pages long.

25   Q.    Special Agent, if we could please bring up Page 5 of

225

1    this exhibit.  And, Special Agent, as you look at Page 5 of

2    Government's 19, do any particular names on the friends list

3    jump out to you?

4    A.    Yes, sir, they do.

5    Q.    Which one is that?

6    A.    About a third of the way down, one of the friends on

7    Christian Reed's friend list is nameeratta3324.

8    Q.    What do you infer from the fact that this account is on

9    the friends list?

10              MR. CORTEZ:  Objection.  Speculation.

11              THE COURT:  Overruled.

12              THE WITNESS:  That Christian Reed and Nameer Atta

13   were Snapchat friends.

14              MR. ROTH:  If we can turn to Government's

15   Exhibit 20.

16   Q.    Special Agent, what is Government's Exhibit 20?

17   A.    I'm sorry.  I flipped a little too far.

18              That is information provided by Snapchat from

19   Christian Reed's Snapchat account.

20   Q.    Are these communications?

21   A.    Yes, sir, they are.

22   Q.    And are they communications between chreed06 and

23   nameeratta3324?

24   A.    Yes, sir, they are.

25   Q.    Special Agent, have you had a chance to review

226

1    Government's Exhibit 20 in its entirety?

2    A.   Yes, sir, I have.

3    Q.   How does Government's Exhibit 20, which comes from

4    Christian's Snapchat account, compare to Government's

5    Exhibits 14 and 15, which came from Christian's phone?

6    A.   They are identical.

7    Q.   Thank you.  We can take down Government's Exhibit 20.

8    Thank you.

9         Special Agent, in addition to gathering evidence

10   from the phone and from the Snapchat account, did you find

11   any other relevant evidence concerning Christian?

12   A.   Yes, sir, I did.

13   Q.   What else did you find?

14   A.   We found a Venmo account on Christian's phone.

15   Q.   Do you know what Venmo is?

16   A.   Yes, sir, I do.

17   Q.   What is it?

18   A.   It is a money-transfer application for mobile devices.

19   Q.   Okay.  Did you obtain any evidence from that phone?

20   A.   Yes, sir, I did.

21   Q.   What did you get?

22   A.   I got subscriber information and transaction history for

23   Christian Reed's Venmo account.

24   Q.   Okay.  Special Agent, I believe in the binder in front

25   of you, there should be, behind Government's 22, a CD

227

1  contained inside of a slip.  Do you have that?

2  A.   No, sir, I do not.

3       MR. ROTH:  If you can just give me one second.

4       I'm sorry.  I misidentified the record, Your Honor.

5  Government's 25, so just flip to the back.

6       THE WITNESS:  Yes, sir, I have it.

7  Q.   BY MR. ROTH:  Okay.  What is at Government's Exhibit

8  205?

9  A.   It is a disc containing Christian Reed's and Nameer

10  Atta's Venmo records.

11       MR. ROTH:  Okay.  So we're going to -- Your Honor,

12  just to -- we're going to lay a foundation for both right

13  now.

14       THE COURT:  Okay.

15  Q.   BY MR. ROTH:  In Government's Exhibit 205 -- first of

16  all, did you obtain Venmo -- records from Venmo for both

17  Christian Reed and for the defendant?

18  A.   Yes, sir, I did.

19  Q.   And did you receive records back?

20  A.   Yes, sir, I did.

21  Q.   Okay.  And was it your testimony that those two sets of

22  records are on the CD at Government's Exhibit 205?

23  A.   Yes, sir, that's correct.

24  Q.   How do you know Government's Exhibit 205 contains those

25  two sets of Venmo records?

1    A.   Because I reviewed the disc, and then once I reviewed

2    and saw both -- that the disc contained both records.  Once I

3    was done reviewing the disc, I signed my name to the disc.

4    Q.   And do you see and recognize your signature on the disc

5    there?

6    A.   Yes, sir, I do.

7    Q.   Are the complete Venmo records for Christian Reed and

8    the defendant on that CD fair and accurate copies of the

9    records you obtained from Venmo?

10   A.   Yes, sir, they are.

11   Q.   Okay.  With the benefit of that, if you could please

12   turn to Government's Exhibit 21.  Just let me know when

13   you've had a chance to look at that.

14   A.   Okay.

15   Q.   Okay.  And, you know what, while we're doing that, if

16   you can also please look at 21 and 23.

17   A.   Okay.

18   Q.   Special Agent, what are Government Exhibits 21 and 23?

19   A.   21 and 23 are -- 21 is Christian Reed's subscriber

20   information from his Venmo account, and 23 is some of the

21   transaction records from his Venmo account.

22   Q.   Are these fair and accurate copies of the subscriber

23   information and the transactions that you referenced?

24   A.   Yes, sir, they are.

25   Q.   And do you know that from having reviewed the Venmo

229

1   account yourself?

2   A.   Yes, sir, I do.

3        MR. ROTH:  Your Honor, the government moves to admit

4   Government Exhibit 21 and 23.

5        MR. CORTEZ:  Same as before.

6        THE COURT:  Okay.  21 and 23 are received.

7     (Government's Exhibits 21 and 23 received in evidence.)

8        MR. ROTH:  Thank you, Your Honor.

9        If we can please pull up 21.

10  Q.   Special Agent, what is the name, the first name and last

11  name --

12       MR. CORTEZ:  It disappeared.

13  Q.   BY MR. ROTH:  What is the name of the person whose

14  account this is associated with?

15  A.   The name is Christian Reed.

16  Q.   Okay.  And do you see a user name?

17  A.   Yes, sir, I do.

18  Q.   What name is that?

19  A.   ChristianReed06.

20  Q.   Do we see that user name anywhere else in this case?

21  A.   We see a similar name in his Snapchat account.

22  Q.   Okay.  And do you see a DOB?

23  A.   Yes, sir, I do.

24  Q.   What is the DOB?

25  A.   5/20/1994.

230

1    Q.   Can you remind us what Christian Reed's birthday was.

2    A.   May 20th, 1994.

3    Q.   Okay.  If we can now please bring up Government's

4    Exhibit 23.

5         Special Agent, do you see in government's -- let's

6    start with this.  Can you give us, in a sentence or two, a

7    summary of what this is.

8    A.   So this is the transaction history, or an excerpt of the

9    transaction history of Christian Reed's Venmo account.

10   Q.   Okay.  And what is -- you see in the status column,

11   there are one, two, three, four approved transactions;

12   correct?

13   A.   Yes, sir.

14   Q.   What are the four dates of the four approved

15   transactions?

16   A.   May 1st, May 3rd, May 6th and May 10th; all in 2020.

17   Q.   And I apologize.  There is one more at the very bottom.

18   A.   The one at the bottom is May 15th, also of 2020.

19   Q.   Okay.  And do you see notes associated with these

20   approved transactions?

21   A.   Yes, sir, I do.

22   Q.   What are the things written for the approved

23   transactions?

24   A.   The notes are plug walk, My G, OC, some tings and plug

25   walk.

231

1    Q.    So we have two references to a plug here; correct?

2    A.    Yes, sir.

3    Q.    Okay.  And actually, there is -- do you see in the third

4    row, a reference to OC?

5    A.    Yes, sir, I do.

6    Q.    Okay.  Do you see the counterparty?

7    A.    Yes, sir, I do.

8    Q.    What is the counterparty name?

9    A.    Mo David.

10   Q.    Special Agent, did you come to identify the person using

11   the account named Mo David?

12   A.    Yes, sir, I did.

13   Q.    Whose account is it?

14   A.    Nameer Atta's account.

15   Q.    Special Agent -- we can take this down.

16          The records you just saw, that's a portion of

17   Christian's Venmo records; correct?

18   A.    Yes, sir, that's correct.

19   Q.    Who was the other person to whom Christian sent money

20   over?

21   A.    Michael Mancini.

22   Q.    And did Christian have little notes in the payments he

23   sent to Michael Mancini?

24   A.    He did.

25   Q.    Did that prompt you to conduct any follow-up

232

1    investigation as to Mr. Mancini?

2    A.    Yes, sir, I did.

3    Q.    And from your investigation, who is Michael Mancini?

4    A.    Christian Reed's father.

5    Q.    And where does Michael Mancini live?

6    A.    Scranton, Pennsylvania.

7    Q.    Special Agent, in the course of your investigation, did

8    you try to find any indication of other people who might have

9    sold drugs to Christian?

10   A.    Yes, sir, I did.

11   Q.    Did you find any evidence of any other person who sold

12   fentanyl or oxy or percs to Christian?

13   A.    No, sir, I did not.

14   Q.    Okay.  Thank you.

15          Now, beyond the evidence pertaining to Christian,

16   did you find any other evidence in this case that bears on

17   this matter?

18   A.    Yes, sir, I did.

19   Q.    And did you, for instance, seize another phone?

20   A.    Yes, sir, I did.

21   Q.    Whose phone did you seize?

22   A.    Nameer Atta's phone.

23   Q.    Okay.  If you could please look on the bench there, I

24   think you'll see Government's Exhibit 201.

25   A.    Yes, sir.

233

1    Q.    Do you recognize Government's Exhibit 201?

2    A.    Yes, sir, I do.

3    Q.    What is it?

4    A.    Nameer Atta's cell phone.

5    Q.    How do you know that that's Nameer Atta's cell phone?

6    A.    Because I took that cell phone off of him on May 5th,

7    2021.

8    Q.    Okay.  So you had an in-person encounter with Mr. Atta

9    on May 5th of last year?

10   A.    Yes, sir, that's correct.

11   Q.    And at that time, Exhibit 201 was in his possession?

12   A.    That is correct.

13   Q.    And as part of your encounter, you seized Exhibit 201?

14   A.    Yes, sir, I did.

15   Q.    And you recognize it here today?

16   A.    Yes, sir, I do.

17        MR. ROTH:  Your Honor, the United States moves to

18   admit Government's Exhibit 201.

19        THE COURT:  Any objection?

20        MR. CORTEZ:  Same as before.

21        THE COURT:  201 is received.

22      (Government's Exhibit 201 received in evidence.)

23        MR. ROTH:  Thank you.

24   Q.    Having seized -- one second.

25        MR. CORTEZ:  Sorry.  May we have a moment.

COMPUTER-AIDED TRANSCRIPTION

234

1      (Attorney conference.)

2   Q.   BY MR. ROTH:   Okay.   Special Agent, did you execute a

3   search on Government's 201?

4   A.   Yes, sir, I did.

5   Q.   And what did you get, just as a general matter, in

6   conducting a search of that?

7   A.   I got photos, videos, text messages, social media

8   information, things of that nature.

9   Q.   Okay.   I asked a bad question.   I'm sorry.   Let me try

10   it again.

11      Did you have a forensic examiner conduct a download

12   of 201?

13   A.   Yes, sir, I did.

14   Q.   In the exact same way that Christian's phone was

15   downloaded?

16   A.   Yes, sir, exactly.

17   Q.   Did you receive a download of the defendant's phone back

18   from the examiner?

19   A.   I did.

20   Q.   Okay.   If you could please have a look at Government's

21   Exhibits 25 and 26.

22   A.   Okay.

23   Q.   Do you recognize them?

24   A.   Yes, sir, I do.

25   Q.   What are they?

1    A.    They are selfies of Nameer Atta.

2    Q.    And where did you first see those?

3    A.    I saw those in Nameer Atta's cell phone.

4    Q.    And are these fair and accurate copies of the photos

5    that you saw in the defendant's phone?

6    A.    Yes, sir.

7              MR. ROTH:  Move to admit 25 and 26, your Honor.

8              THE COURT:  Any objection?

9              MR. CORTEZ:  Same as before, in limine.

10             THE COURT:  Okay.  25 and 26 are received.  The

11   objection is overruled.

12      (Government's Exhibits 25 and 26 received in evidence.)

13             MR. ROTH:  Thank you.  If we can bring up 25.

14   Q.    Okay.  Special Agent, who is that?

15   A.    Nameer Atta.

16   Q.    Okay.  Now, it's a little bit hard to see, but can you

17   see the reflection in the sunglasses that the defendant is

18   wearing in this photo?

19   A.    Yes, sir.

20   Q.    What can you see reflected in the reflection of the

21   sunglasses?

22   A.    His cell phone.

23   Q.    Okay.  Great.  Thank you.  If we can zoom out of that.

24             In this picture, the defendant is wearing a hat;

25   correct?

236

1    A.   Yes, sir, that is correct.

2    Q.   Can you see writing on the top of the hat above the

3    brim?

4    A.   Yes, sir, I can.

5    Q.   What does it say?

6    A.   "GOAT."  G-o-a-t.

7    Q.   Thank you.  If we could please go to Government's

8    Exhibit 26.

9         And, again, who is this?

10   A.   Nameer Atta.

11   Q.   And do you believe this to be another self-taken or

12   selfie photograph?

13   A.   Yes, sir, I do.

14   Q.   And, again, this was found where?

15   A.   On Nameer Atta's cell phone.

16   Q.   Thank you.

17        Now, if we could please turn to Government's

18   Exhibits 33, 35, 37, 38 and 39.  Please review those.

19   A.   33, 35, 37, 38 and 39.

20   Q.   Please look up after you've had a chance to look at

21   those.

22        MR. ROTH:  Your Honor, if we could have a moment.

23        (Juror No. 2 enters courtroom.)

24        MR. ROTH:  Should I continue, Your Honor?

25        MR. CORTEZ:  I will go with the prior ruling.

COMPUTER-AIDED TRANSCRIPTION

1           THE COURT:  Okay.  We're going to hold on one second

2      so that Ms. Ortiz can speak to her.

3           Ladies and gentlemen, feel free to stand up and

4      stretch your legs, if you'd like to do that.  It should only

5      be a second.

6           (Brief pause in proceedings.)

7           THE COURT:  Okay.  Mr. Roth, could you please

8      continue your examination.

9           MR. ROTH:  Thank you, Your Honor.

10     Q.   Special Agent, what are the exhibits that I've

11     identified as Government's 33, 35, 37, 38 and 39?

12     A.   They are messages recovered from Nameer Atta's cell

13     phone.

14     Q.   Are they text message exchanges?

15     A.   Yes, sir, they are.

16     Q.   Is it fair to say that for the most part, these are

17     excerpted from longer text strings on the phone?

18     A.   Yes, sir, that's correct.

19     Q.   How do you know that those exhibits are from the

20     defendant's phone?

21     A.   Because I was provided with a digital copy of

22     Nameer Atta's cell phone.  I reviewed that -- I've reviewed

23     the digital copy, and I observed these text messages.

24     Q.   Are these fair and accurate copies of the text messages

25     you saw in defendant's phone?

238

1   A.   Yes, sir, they are.

2        MR. ROTH:  Your Honor, we would move to admit

3   Government's 33, 35, 37, 38 and 39.

4        MR. CORTEZ:  Same as before.

5        THE COURT:  Okay.  The objection is overruled.  33,

6   35, 37 and 39 are received.

7        MR. ROTH:  Apologies, Your Honor.  Also 38.

8        THE COURT:  And 38?

9        MR. ROTH:  Yes, sir.

10       THE COURT:  Okay.

11     (Government's Exhibits 33, 35, 37, 38 and 39 received in

12       evidence.)

13       MR. ROTH:  Thank you.  If we can please bring up

14   Government's Exhibit 33.

15   Q.   Now, first, do you see two columns, a "from" column and

16   a "to" column?

17   A.   Yes, sir, I do.

18   Q.   I'd like to focus on the "to" column for just a moment.

19        Do you see there written a phone number next to the

20   name Nameer Atta?

21   A.   Yes, sir, I do.

22   Q.   Okay.  What is the phone number that is written there?

23   A.   Let me try again.  (858) 699-6818.

24   Q.   Whose phone number is that?

25   A.   Nameer Atta's.

239

1    Q.   The defendant's?

2    A.   Yes, sir.

3    Q.   How do you know that the defendant's phone number is

4    (858) 699-6818?

5    A.   A couple of different reasons.  We conducted database

6    checks and identified that phone number as belonging to the

7    defendant.  And then on a couple of occasions in May of last

8    year, I had an opportunity to speak to the defendant on the

9    phone, and he called me on my cell phone from that phone

10   number.

11   Q.   Okay.  Now, you heard the defendant's voice on the

12   phone; right?

13   A.   Yes, sir, that is correct.

14   Q.   Have you heard the defendant's voice in any other

15   context?

16   A.   Yes, sir, I have.

17   Q.   What are the contexts in which you've heard the

18   defendant's voice?

19   A.   Well, videos on his cell phone.

20   Q.   Have you spoken to him face-to-face before?

21   A.   I also have spoken to him face-to-face, yes, sir.

22   Q.   Having listened to his voice and recordings, and having

23   spoken to him face-to-face, was the defendant the person who

24   called you when you spoke with someone that called from the

25   phone number (858) 699-6818?

240

1    A.   Yes, sir, it is.

2    Q.   Okay.  Now, here we have some text messages between the

3    defendant and another contact; right?

4    A.   Yes, sir.

5    Q.   And what is the name of the contact as it is saved in

6    this exhibit?

7    A.   Johnny Gym, LA Fitness.

8    Q.   Okay.  And for ease, I'm going to refer to him as

9    Johnny.  Okay?

10   A.   Sure.

11   Q.   If we can please scroll down to row five.

12        What is the incoming message from Johnny to the

13   defendant?

14   A.   The message is Ay, you have plug for perc?  Or any

15   strong pain killer?  Bought to put in hella hours on a tattoo

16   session this weekend.

17   Q.   What's the date stamp of this message?

18   A.   November 8th, 2019.

19   Q.   Okay.  If we can scroll down to row six.

20        How does the defendant respond there?

21   A.   The defendant responds, yea, my homie got some script

22   percs for $20 I think.

23   Q.   Fair to say "script" is short for "prescription"?

24   A.   Yes, sir.

25   Q.   Okay.  If we could scroll down to row ten.

241

1      What does Johnny ask the defendant there?

2   A.   Johnny asked the defendant, could you ask how many

3   milligram -- I'm sorry.  Could you ask how many mg they

4   are.

5   Q.   Okay.  And if you could scroll down, Row 11, how does

6   the defendant respond there?

7   A.   The defendant responds, the only prescription ones are

8   the 10's.  Anything else is pressed (fake).

9   Q.   Let's take down 33, please.

10      Special Agent, in the course of your review of the

11   defendant's phone, did you find any screenshots of any news

12   articles?

13   A.   Yes, sir, I did.

14   Q.   And were you able to ascertain the date of the news

15   article that you found on the defendant's -- the screenshot

16   that you found on the defendant's phone?

17   A.   Yes, sir, I did.

18   Q.   What was the date of the screenshot -- of the article

19   that you found screenshotted on the defendant's phone?

20   A.   February 14th, 2019.

21   Q.   Did that article say anything precisely about the nature

22   of M30 pills?

23   A.   Yes, it did.

24   Q.   In a sentence, what did it say?

25   A.   That the M30 pills were being counterfeited and laced

242

1   with fentanyl.

2   Q.   Okay.  And is it your understanding that M30 pills are

3   Percocet in their genuine form?

4   A.   Yes, sir.

5   Q.   Okay.  If we can please go to Government's 35.

6        And by the way, the messages with Johnny were in

7   November of that year; correct?

8   A.   That's correct.

9   Q.   Okay.  Let's look at Government's 35.

10       What is the name of the saved contact that the

11  defendant is speaking with here?

12  A.   The name is Alyssa Estell's friend Custy.

13  Q.   Okay.  I'll refer to this one as Alyssa.  Okay?

14  A.   Okay.

15  Q.   What are the dates of the two exchanges on April 17th

16  between the defendant and Alyssa?

17  A.   Say again.

18  Q.   What is the date of the two exchanges -- of the exchange

19  in rows one and two?

20  A.   That date is April 17th, 2020.

21  Q.   And there, we see the defendant sent Alyssa two

22  messages; right?

23  A.   That's correct.

24  Q.   Could you just read those two messages that the

25  defendant sent to Alyssa.

243

1  A.   The first one is, I also have Perc's g.  And the second

2  one is, back on the menu.

3  Q.   Let's go down now to row five, please.

4       What is the date of that message?

5  A.   May 1st, 2020.

6  Q.   And if we go to rows six and seven, what are the dates

7  of those two messages?

8  A.   May 2nd, 2020.

9  Q.   What does Alyssa say to the defendant -- or ask the

10  defendant on May 1st, as noted in row five?

11  A.   Alyssa asked the question, how much would seven perks

12  be?

13  Q.   Now, perks is spelled with a "K" there; right?

14  A.   Yes.

15  Q.   Do you believe there is any significance to the spelling

16  difference there?

17  A.   No, sir.

18  Q.   Okay.  How does the defendant respond?

19  A.   The defendant responds, Most do 45 each.  I do 3 for

20  100.  But I got you 7 for 210.

21  Q.   And then what does he say in the next line?

22  A.   The next one is, Trust me, the most trusted and most

23  potent percs in SD and OC rn.

24  Q.   The most trusted and the most potent percs in SD and

25  OC?

244

1    A.   Yes, sir.

2    Q.   Do you know -- what do you believe SD and OC is?

3    A.   SD is San Diego and OC is Orange County.

4    Q.   Okay.  Let's please go to Government's 37.

5              What is the date of Government's 37?

6    A.   The date is November 12th, 2019.

7    Q.   Okay.  And fair to say that there is -- there are two

8    exchanges -- there are two statements on November 12th;

9    correct?

10   A.   That's correct.

11   Q.   And these are all outgoing messages the defendant sent;

12   right?

13   A.   That is correct.

14   Q.   What's the name of the contact that the defendant sent

15   all these messages to?

16   A.   Ryyan Al-Orainy.  And then beside the name is the emoji

17   or icon for an electrical plug.

18   Q.   Okay.  So this is a message sent by the defendant to

19   someone named Ryyan, and in the defendant's phone Ryyan is

20   saved with a plug?

21   A.   Yes.

22   Q.   Okay.  What does the defendant write to Ryyan plug on

23   November 12th?

24   A.   The defendant writes, How many percs you got on you?

25   Bruh, I got a lot of offers now for others selling percs.

245

1    Q.    What does he write to Ryyan the plug on November 22nd?

2    A.    I got bands ready for percs.

3    Q.    And then what does he say below that?

4    A.    He says, I can take you to get the percs.

5    Q.    And then finally, on November 30th of '19.

6    A.    He says, Where the percs at.

7    Q.    Thank you.

8          MR. ROTH:  Let's please go to Government's

9    Exhibit -- one second, Your Honor.  Thank you.

10   Q.    Special Agent, in the middle -- let me follow up on

11   something.

12          In row three there --

13   A.    Yes, sir.

14   Q.    -- do you see a reference to the word "bands"?

15   A.    Yes, sir, I do.

16   Q.    Okay.  I'm going to go a little bit out of order here,

17   and I'm going to be very explicit.  Okay.  I want you to step

18   out of your role as the person describing the evidence.

19          MR. CORTEZ:  Objection.  Improper commentary.

20          MR. ROTH:  Well, I actually think it's important.

21          THE COURT:  Okay.  I'll allow you to proceed in that

22   manner, to make the distinction between the two types of

23   testimony.

24   Q.    BY MR. ROTH:  Okay.  I want to ask you one question that

25   goes back to the first part of your testimony, which is just,

COMPUTER-AIDED TRANSCRIPTION

246

1    can you give an explanation of something that you understand

2    based on your experience as an investigator.

3    A.    Yes, sir.

4    Q.    Okay.  Do you understand what "bands" is?

5    A.    Yes, sir, I do.

6    Q.    What is, in your experience, the term "bands"?

7    A.    Bands is bands around stacks of cash.

8             MR. ROTH:  Okay.  Thank you.  We're going to come

9    out of that and go back into the testimony.  And I apologize

10   to the Court for forgetting to do that earlier.  Okay.

11            MR. CORTEZ:  I move to strike, Your Honor.  No

12   proper foundation.

13            THE COURT:  Okay.  We were proceeding based on the

14   Court's prior rulings.  If you would like to lay a foundation

15   and submit this or tender this witness as a 702 expert, you

16   may do so at this time.

17   Q.    BY MR. ROTH:  Okay.  Special Agent, I'm going to back up

18   a little bit.

19            Earlier in your testimony, do you recall describing

20   your experience as an NCIS special agent?

21   A.    Yes, sir, I do.

22   Q.    Do you recall all of the testimony you gave on the

23   specialized training that you received to be an NCIS agent?

24   A.    Yes, sir, I do.

25   Q.    Do you recall describing 14 years of on-the-job

247

1   training?

2   A.   Yes, sir, I do.

3   Q.   And do you recall the 20-odd drug investigations that

4   you said you have participated in?

5   A.   Yes, sir, I do.

6   Q.   Do you recall all of the different investigative

7   techniques that you described using in the course of your 14

8   years?

9   A.   Yes, sir, I do.

10  Q.   Okay.  And do you recall offering testimony showing that

11  you have the ability to infer the meaning of vague or --

12  coded or ambiguous terms as they pertain to drug

13  trafficking?

14  A.   Yes, sir, I do.

15  Q.   That last thing, is that something that you have done

16  consistently over the course of your career as a NCIS special

17  agent?

18  A.   Yes, sir, it is.

19        MR. ROTH:  Your Honor, the United States would

20  tender Special Agent Stephen Logan as an expert witness under

21  Rule 702 for the purposes of offering testimony on the nature

22  of language used by drug traffickers.

23        MR. CORTEZ:  I still have the same objection.  He

24  didn't ask about bands.  And he did only 20 investigations.

25        THE COURT:  Okay.  We've got two different

COMPUTER-AIDED TRANSCRIPTION

1   objections going, the 702 expert, as well as the lack of

2   foundation objection now being lodged.

3          MR. CORTEZ:  Correct.

4          THE COURT:  So as to the expert testimony, I do find

5   that you have established the expertise of this witness, and

6   I will allow him to render an opinion under Rule 702.

7          As to the basis of his opinion, I sustain the

8   objection as to lack of foundation.

9   Q.   BY MR. ROTH:  Okay.  Special Agent, do you see the term

10  "bands" in row three?

11  A.   Yes, sir, I do.

12  Q.   Have you seen the term "bands" in the course of your

13  career as a special agent?

14  A.   Yes, sir, I have.

15  Q.   Have you seen "bands" used in a consistent, particular

16  way?

17  A.   Yes, sir, I have.

18  Q.   And in your experience, what is the consistent,

19  particular way that the term "bands" has been used when we're

20  talking about drug trafficking?

21  A.   "Bands" is a reference to bank bands wrapped around

22  stacks of cash.

23  Q.   Okay.  Now, having done all of that, is it fair to say

24  that the qualification you were just given as an expert

25  pertains to the testimony you gave only at the start of your

249

1    examination and the limited question about bands that you

2    just answered?

3    A.   Yes, sir.

4    Q.   And that separately, you're testifying as a fact

5    witness?

6    A.   Yes, sir.

7              MR. ROTH:  Okay.  I think I've made a record.

8              THE COURT:  Yes.

9              MR. ROTH:  Thank you.

10   Q.   If we could please turn to Government's 38.

11             Special Agent, who are the two people communicating

12   with each other in Government's Exhibit 38?

13   A.   An individual identified as Salim and the defendant,

14   Nameer Atta.

15   Q.   What is the date of these exchanges?

16   A.   March 9th, 2020.

17   Q.   Okay.  And remind us when Christian Reed died.

18   A.   Christian died on May 21st, 2020.

19   Q.   All right.  What is the -- this set of messages begins

20   with one, two, three, four, five, six, six messages that

21   Salim sent to the defendant; right?

22   A.   Correct.

23   Q.   Could you please read those.

24   A.   The first message is, Bro, ur perc plug bomedyyyy.  I

25   found a new one.  M30s.  Real script.  Swear.  No fentanyl.

250

1    Q.   Okay.  So Salim is communicating to the defendant, I

2    found a new source of M30s, these are prescription.  They

3    have no fentanyl?

4    A.   Yes, sir.

5    Q.   How does the defendant respond in the next two rows?

6    I'm sorry.  Yeah -- please.

7    A.   The defendant responds, the fact you said script 30s,

8    LOL.  You're retarded.

9    Q.   Okay.  And if we could please go down a little bit.  Do

10   you see -- in the row right above the yellow line, Salim

11   sends a message in response.

12   A.   The row above the yellow line?

13   Q.   Yes.

14   A.   Yes, sir.

15   Q.   It's dated 9:51:49 p.m.  What does Salim write to the

16   defendant there?

17   A.   Salim writes, they have script thirties.

18   Q.   If we can go to the next page of this exhibit.

19        What does the defendant say in response to that?

20   A.   The defendant responds, not perc's, LOL.  2000 percent

21   they don't, LOL.

22   Q.   So Salim says they have prescription percs, and the

23   defendant responds, LOL, 2000 percent they don't, LOL; is

24   that right?

25   A.   That's correct.

251

1    Q.    Okay.  Now, if we could go to the last message on this.

2    It's dated April 2nd.  Do you see that one?

3    A.    Yes, sir, I do.

4    Q.    And do you see that there is a gmail address that sends

5    a message to Salim?

6    A.    Yes, sir.

7    Q.    Okay.  Is that gmail address associated with any

8    particular person or phone number in general?

9    A.    Yes, sir, it is.

10   Q.    Who is it associated with?

11   A.    It's associated with the defendant, Nameer Atta.

12   Q.    And we can see that in the second column here; right?

13   A.    Yes, sir, that's correct.

14   Q.    And generally, we see it in every single chat that

15   we've -- or text exchange that we've seen; right?

16   A.    Yes, sir.

17   Q.    Okay.  And just to be clear, what does the defendant say

18   to Salim there?

19   A.    At Mr. -- @MrDLB, quote, Mo David.

20   Q.    Have we seen Mo David anywhere else?

21   A.    Yes, sir, we have.

22   Q.    Where else have we seen Mo David?

23   A.    We saw that in Christian Reed's Venmo transaction

24   history.

25   Q.    And who was Mo David in the transaction history for

COMPUTER-AIDED TRANSCRIPTION

252

1    Christian Reed?

2    A.    Nameer Atta.

3    Q.    The counterparty that Christian Reed sent money to?

4    A.    That's correct.

5    Q.    Okay.  Just to be clear on the record, Mo David as

6    written by the defendant in this message he sent to Salim is

7    the name of the counterparty that received payments from

8    Christian at that number?

9    A.    Yes, sir, that's correct.

10   Q.    Thank you.  If we could look at Government's 39.

11         Now, this is in a different format; right?

12   A.    Yes, sir, it is.

13   Q.    But this is also messages on the defendant's phone?

14   A.    Yes, sir, that's correct.

15   Q.    And who is he sending a message to here?

16   A.    He is sending the message to Salim.

17   Q.    And what is the date of this one?

18   A.    February 21st, 2020.

19   Q.    What does he say to Salim?

20   A.    I got percs.

21   Q.    If we can go to Page 2.  Do you see a photo there?

22   A.    Yes, sir, I do.

23   Q.    And can we go to Page 3.

24         Is Page 3 a blowup of the image that the defendant

25   sent to Salim?

253

1    A.   Yes, sir, it is.

2    Q.   Okay.  What is it?

3    A.   It is a prescription pill bottle with white pills in

4    it.

5    Q.   Okay.  Thank you.  We can take that down.

6         If we could please have you look at Government's

7    Exhibit 41.

8    A.   41?

9    Q.   Do you recognize it?

10   A.   Yes, sir, I do.

11   Q.   What is it?

12   A.   It is a photograph pulled from Nameer Atta's cell

13   phone.

14   Q.   What is it of?

15   A.   It is a photograph of banded dollar bills.

16   Q.   And how do you know it came from the defendant's

17   phone?

18   A.   Because I reviewed the digital download of the

19   defendant's phone and observed this image.

20   Q.   Is this a fair and accurate copy of the photo you saw on

21   defendant's phone?

22   A.   Yes, sir, it is.

23        MR. ROTH:  Your Honor, we would move to admit

24   Government's Exhibit 41.

25        MR. CORTEZ:  Same as before.

254

1        THE COURT:  Okay.  The objection is overruled.  41

2   is received.

3        (Government's Exhibit 41 received in evidence.)

4        MR. ROTH:  If we can please pull it up.

5   Q.   Special Agent, in the center of this photo, do you see a

6   note with some handwriting on it?

7   A.   Yes, sir, I do.

8   Q.   What is written there?

9   A.   G-o-a-t with a date of 10/18/2019.

10  Q.   Have we seen G-o-a-t anywhere else?

11  A.   Yes, sir, we have.

12  Q.   Where have we seen that?

13  A.   We saw it on a hat that Nameer Atta was wearing in a

14  photograph.

15  Q.   And what is surrounding the note?

16  A.   Banded dollar bills.

17  Q.   Now -- so are those bands?

18  A.   Yes, sir.  Those are bank bands.

19  Q.   Just literally speaking?

20  A.   Bank bands, yeah.

21  Q.   Okay.  Thank you.  We can take down 41.

22       Special Agent, I'm going to now ask you to please

23  look at Government's Exhibits 42A, B, C and G.  I'm going to

24  skip D, E, F.

25  A.   Okay.

255

1    Q.    What are these?

2    A.    They are menus from Snapchat.

3    Q.    Do you recognize them?

4    A.    Yes, sir, I do.

5    Q.    Where did you -- first, where did you see those?

6    A.    I found those in Nameer Atta's cell phone.

7    Q.    Okay.  And are these fair and accurate copies of the

8    banners that you saw in the defendant's phone?

9    A.    Yes, sir, they are.

10          MR. ROTH:  Your Honor, I'd move to admit 42A, B, C

11   and G.

12          MR. CORTEZ:  Same as before.

13          THE COURT:  Okay.  The objection is overruled.  42A,

14   B, C and G are received.

15     (Government's Exhibit 42A, B, C and G received in

16       evidence.)

17          MR. ROTH:  Thank you, your Honor.

18          If we can please bring up 42A.

19          THE COURT:  Mr. Cortez, do you request any specific

20   instruction as to these exhibits?

21          MR. CORTEZ:  As before, my prior position.

22          THE COURT:  Okay.

23          MR. CORTEZ:  Thank you.

24          THE COURT:  You're welcome.

25   Q.    BY MR. ROTH:  Special Agent, what is this?

COMPUTER-AIDED TRANSCRIPTION

256

1    A.    It is a menu.

2    Q.    Okay.  And fair to say, the word "menu" is at the top

3    there?

4    A.    Yes, sir, that's correct.

5    Q.    Below the word "menu," do you see a series of initials

6    that are repeated several times?

7    A.    Yes, sir, I do.

8    Q.    What initials are those?

9    A.    DLG.

10   Q.    Have we seen DLG anywhere else?

11   A.    Yes, sir, we have.

12   Q.    Where have we seen it?

13   A.    In messages on Christian Reed's cell phone and in

14   Christian Reed's Snapchat account.

15   Q.    So I'm going to beg your patience for a moment and ask

16   Ms. Douglas if she can pull up Exhibit 14 briefly.

17         Thank you.  That was pretty quick.

18         Do you see that first message that defendant sent to

19   Christian Reed on April 14th?

20   A.    Yes, sir, I do.

21   Q.    Can you just read it again quickly.  Read it again.

22   A.    It is, send at symbol of who referred to verify yourself

23   and send school/area for delivery reference.  Do not leave on

24   read.  Thanks, DLG, handshake emoji.

25   Q.    Thank you.  If we can go back to 42A.

257

1        Now, there is a list of items below the repeated DLG

2   initials; correct?

3   A.   Yes, sir.

4   Q.   I'd like to direct your attention to the one that's

5   second from the bottom.

6   A.   Second from the bottom?

7   Q.   Uh-huh.

8   A.   Yes, sir.

9   Q.   What is written there?

10  A.   It is a blue diamond emoji, and percs 30 mg, most

11  trusted out.

12  Q.   So there is a menu item percs, 30 milligrams, and the

13  text is most trusted; right?

14  A.   Yes, sir.

15  Q.   And the emoji associated with that is this blue diamond;

16  correct?

17  A.   That is correct.

18  Q.   Okay.  If we can zoom out or go back out of this.  If we

19  can bring up 42B.

20       How does 42B compare to 42A?

21  A.   They are similar in the sense that it's the same menu,

22  but the -- there are redactions or updates to that menu.

23  Q.   And with respect to the listing of percs, how is the

24  menu modified, if at all?

25  A.   It says re-up soon.

258

1    Q.   If we can please go to 42C.  What is this?

2    A.   A new menu.

3    Q.   Okay.  And do you see the menu is broken into two

4    categories?

5    A.   Yes, sir.

6    Q.   I'd like you to go to the second category.  What does

7    that read?

8    A.   The second category is labeled non-THC product list.

9    Q.   And what is the third item on the non-THC product

10   list?

11   A.   It is a pill emoji and the word "percs."

12   Q.   Now, this emoji is not a blue diamond; right?

13   A.   That is correct.

14   Q.   Can you give a description.

15   A.   It is a red and yellow pill emoji.

16   Q.   Okay.  Now, there is no reference to 30 here; correct?

17   A.   That's correct.

18   Q.   And there is no reference to most trusted here?

19        MR. CORTEZ:  Your Honor, the picture speaks for

20   itself.

21        THE COURT:  Overruled.

22   Q.   BY MR. ROTH:  Does this picture refer to 30s?

23   A.   No, sir, it does not.

24   Q.   Does this picture say anything about being most

25   trusted?

COMPUTER-AIDED TRANSCRIPTION

1    A.    No, sir, it does not.

2    Q.    Let's go to 42G, please.  What is this?

3    A.    A menu.

4    Q.    And do you see the item that is second from the bottom

5    on this third menu?

6    A.    Yes, sir, I do.

7    Q.    What is there?

8    A.    It is a round, blue emoji with a white letter M in it.

9    In the middle of it, it says Perc 30s, most trusted in SD,

10   handshake emoji.

11   Q.    So here, there is a reference to Perc 30s; is that

12   right?

13   A.    Yes, sir.

14   Q.    And I'm sorry.  What does it say next to Perc 30s?

15   A.    Most trusted in SD, with a handshake emoji.

16   Q.    Special Agent, have you personally viewed M30 pills?

17   A.    Yes, sir, I have.

18   Q.    What color are they?

19   A.    Blue.

20   Q.    Okay.  So this is a blue circle with an M in it, and the

21   other references a blue diamond; correct?

22   A.    That's correct.

23   Q.    Thank you.  We can take down 42G.  Thank you.

24        THE COURT:  Mr. Roth, if you can give me just a

25   second.

260

1          With respect to Exhibits 42A, B, C and G, ladies and

2     gentlemen, there is an instruction that you're going to be

3     given that some evidence was introduced for a limited purpose

4     and a limited purpose only.

5          With respect to those exhibits, you are to only

6     consider them as to the content of those exhibits that was

7     specifically addressed here in court today and for no other

8     reason.  So the remainder of those exhibits, there was no

9     testimony about the remainder of those exhibits, and you are

10    not to consider the remainder of those exhibits in any

11    fashion whatsoever.

12          MR. ROTH:  Thank you, Your Honor.

13          THE COURT:  Please, go ahead, Mr. Roth.

14          MR. ROTH:  Thank you, Your Honor.

15    Q.   Special Agent, in the course of your search of the

16    defendant's phone, did you find anything of note in addition

17    to photographs, text messages and menus?

18    A.   Yes, sir, I did.

19    Q.   What did you find?

20    A.   I found an item in the Note section of the cell phone.

21    Q.   Okay.  And so -- just not as an expert or anything, but

22    your common experience in life, phones have a function that

23    allows you to just take down little notes to yourself;

24    right?

25          MR. CORTEZ:  Objection.  Leading.  This has happened

261

1   a lot.

2          THE COURT:  Sustained.

3   Q.   BY MR. ROTH:  Okay.  Do you know what the Notes section

4   of a phone is?

5   A.   Yes, sir, I do.

6   Q.   Can you just give a general explanation of it.

7   A.   It's an app on your phone where you type notes.

8   Q.   Great.

9          What, in particular, did you find in the Notes

10  section?

11  A.   I found a list of Nameer Atta's sales.

12  Q.   Okay.  Did this list have a title?

13  A.   It did.

14  Q.   What was the title of it?

15  A.   It was red exclamation point, and it said, my own sales.

16  And then it had an emoji, it was a bag of money on it -- or

17  it was a bag with a green dollar bill sign on it.

18  Q.   Have you printed off this list?

19  A.   Yes, sir, I have.

20  Q.   How many pages is it?

21  A.   207.

22  Q.   And how would you describe a given page of the list?

23  A.   It's a business ledger.

24  Q.   Okay.  So what kind of things are documented on it?

25  A.   Business ledgers will have dates, times, locations,

262

1    sales, product, purchaser, seller, things of that nature.

2    Q.   Okay.  Did you get any sense of the date range that the

3    list covers?

4    A.   Yes, sir, I did.

5    Q.   What is the date range of the list?

6    A.   It's about 23 months, running from -- I'll have to work

7    backwards.  April of '21 to -- from May of 2019 to April of

8    '21.

9              MR. ROTH:  Okay.  This is for ID only, Your Honor.

10   Q.   Special Agent, if you can have a look at Government's

11   Exhibit 45.

12   A.   Yes, sir.

13   Q.   What is 45?

14   A.   That's the printed-out business ledger.

15   Q.   Okay.  Do you recognize it?

16   A.   Yes, sir, I do.

17   Q.   Is that an accurate representation or copy of the list

18   that was in the defendant's phone?

19   A.   Yes, sir, it is.

20   Q.   Special Agent, if you would then please turn to

21   Government's Exhibit 46.

22   A.   Okay.

23   Q.   What is Government's 46?

24   A.   Government's 46 an excerpt of that same business

25   ledger.

263

1    Q.   I'm going to ask you a few follow-up questions about

2    that.

3    A.   Yes, sir.

4    Q.   Is Government's Exhibit 46 a chart?

5    A.   Yes, sir, it is.

6    Q.   Who prepared that chart?

7    A.   I did.

8    Q.   What were you documenting in the chart at Government's

9    46?

10   A.   Information from defendant's -- the defendant's business

11   ledger as it related to Christian Reed.

12   Q.   Okay.  So is Government's 46 a summary chart reflecting

13   the portions of the list that concerned Christian?

14   A.   Yes, sir.

15   Q.   Is Government's 46, to the best of your knowledge and

16   ability, an accurate reflection of that excerpt of the

17   lengthy list?

18   A.   Yes, sir, it is.

19        MR. ROTH:  Your Honor, the United States moves to

20   admit Government's 46 under 1006.

21        MR. CORTEZ:  In limine and the same as before.

22        THE COURT:  Okay.  The objection is overruled.  46

23   is received.

24     (Government's Exhibit 46 received in evidence.)

25        MR. ROTH:  If we can please pull up Government's

264

1   46.

2   Q.   Special Agent, do you see at the top a label?

3   A.   Yes, sir.

4   Q.   What is that?

5   A.   That is a copy of the label from the original list.

6   Q.   Okay.  Why did you choose to put that on top of the

7   summary chart?

8   A.   Just so I knew where the information came from.

9   Q.   This is a cross-reference?

10  A.   Yes, sir.

11  Q.   Special Agent, what is the date range of the information

12  on Government's 46?

13  A.   April 17th to May 20th, 2020.

14  Q.   How many entries are on Government's 46?

15  A.   16.

16  Q.   And when we look at the name, what name is written

17  there?

18  A.   The name in the first row is Chris and the rest of them

19  are Chris Army.

20  Q.   Remind me what Christian Reed did for a living?

21  A.   He was a United States Marine.

22  Q.   Have we seen Chris Army anywhere else in this case?

23  A.   Yes, sir, I have.

24  Q.   Okay.  Now, I want to be very careful here, so I'm going

25  to ask you a very precise question:  Did Christian send the

265

1  defendant a comment of some kind over Snapchat?

2  A.   Yes, sir, he did.

3  Q.   Did the defendant then post that on his own Snapchat as

4  a review of some kind from Christian?

5  A.   Yes, sir, he did.

6  Q.   In doing so, did the defendant name or identify the

7  person who sent him the note?

8  A.   He did.

9  Q.   How did he identify that person?

10  A.   Chris Army.

11  Q.   Okay.  How many blue diamonds, or Ms, were sold to

12  Christian per this chart?

13  A.   57.

14  Q.   How much money did the defendant receive from Christian

15  for these 57 pills?

16  A.   $1,810.

17  Q.   Do you see in the column of payments, there are

18  notations for Venmo?

19  A.   Yes, sir, I do.

20  Q.   Did you highlight those in red?

21  A.   Yes, sir, I highlighted those in red.

22  Q.   Why did you do that?

23  A.   Just to draw my attention to them so I could use those

24  to reference the Venmo transactions.

25  Q.   Okay.  Have you compared the entries for Venmo on

266

1    Government's 46 to the records you got from Venmo?

2    A.    Yes, sir, I did.

3    Q.    And how do they compare?

4    A.    They match.

5    Q.    Okay.  I'd like you to go to the bottom of this chart,

6    please.  What is the date of the final sale?

7    A.    May 20th, 2020.

8    Q.    And what was sold and for how much?

9    A.    12 Perc 30s for $300.

10   Q.    And did Christian pick these up?

11   A.    Yes, sir, he did.

12   Q.    What time did he pick these up?

13   A.    According to the chart, 4:00 p.m.

14   Q.    Okay.  And I should ask, is this copied out of the

15   ledger?

16   A.    Verbatim, yes, sir.

17   Q.    Okay.  What about just before May 20th.  What happened

18   the day before, for instance?

19   A.    Christian conducted two purchases.

20   Q.    Of how much?

21   A.    The first purchase was one Perc 30 for $40.  He picked

22   it up at 2:00 p.m.  And then a second purchase for -- of two

23   Perc 30s for $80.  He also picked those up at approximately

24   5:30 p.m.

25   Q.    And what about the day before that?

267

1    A.    The day before that, he conducted a purchase on the 18th

2    of May at 5:30 for a single Perc 30 for $40.

3    Q.    What about a few days before that, on the 15th?

4    A.    He purchased seven Perc 30s for $200.  Picked them up at

5    approximately 10:50 and also provided $60 through Venmo.

6    Q.    So from the 15th to the 20th, the defendant sold

7    Christian several --

8    A.    23.

9    Q.    23.  How many did he sell between the 15th and the

10   20th?

11   A.    Say again.

12   Q.    How many Percocets or blue M30 pills, or whatever, did

13   the defendant sell Christian between the 15th and 20th of

14   May?

15   A.    23.

16   Q.    Thank you.

17          Let's please take down Government's 46.

18          Special Agent, do you recall earlier in your

19   testimony describing a sort of satellite imaging map that you

20   saw on Christian's phone?

21   A.    Yes, sir, I do.

22   Q.    Have you seen that map anywhere else?

23   A.    Yes, sir, I have.

24   Q.    Where have you seen it?

25   A.    In Nameer Atta's cell phone.

COMPUTER-AIDED TRANSCRIPTION

268

1   Q.   If you can please have a look at Government's 49.

2   A.   49, yes, sir.

3   Q.   Do you recognize it?

4   A.   I do.

5   Q.   What is it?

6   A.   It is a Google Map satellite image pulled from -- that I

7   saw in Nameer Atta's cell phone.

8   Q.   Is this a fair and accurate depiction of the satellite

9   image that you saw on the defendant's phone?

10  A.   Yes, sir, it is.

11       MR. ROTH:  Your Honor, move to admit Government's

12  49.

13       MR. CORTEZ:  Same as before.

14       THE COURT:  49 is received.

15     (Government's Exhibit 49 received in evidence.)

16       MR. ROTH:  Can you please pull it up.

17  Q.   Special Agent, can you walk us through Government's 49.

18  A.   Yes, sir.  So this is a Google Maps GPS satellite image

19  of 9845 Jake Lane, and the building just adjacent to it is

20  9835 Jake Lane.

21       There is a red kind of rounded-edge box in between

22  9845 and 9835.  There is an arrow drawn to it, a red arrow,

23  and above that red arrow is a banner that says "bigger

24  orders/wait."  And then adjacent to 9845 is a white circle,

25  and then an arrow from that, and it says -- the banner above

269

1    the white arrow says "quick spot."

2            There is also a label showing where the pool is.

3    And on 9845 at the bottom of the white circle, is a red drop

4    pin.

5    Q.   Special Agent, earlier you testified that the defendant

6    lives here; right?

7    A.   Yes, sir, that's correct.

8    Q.   What was his address?

9    A.   9845 Jake Lane.

10   Q.   Okay.  And do you see that in the red circle, there is

11   sort of two parallel buildings, one adjacent to the road and

12   one to the left of it?

13   A.   Yes, sir.

14   Q.   Which one is the defendant -- where the defendant

15   lives?

16   A.   The building to the right.

17   Q.   The right of the circle?

18   A.   If you're looking at the two buildings from the top, the

19   building on the right-hand side.

20   Q.   So the one directly below the white circle?

21   A.   Yes, sir, that's correct.

22   Q.   Okay.  Could we please bring up Government's 13.

23            Remind me where Government's 13 was found.

24   A.   Christian Reed's cell phone.

25   Q.   And how does it compare to Government's 49 from the

270

1    defendant's phone?

2    A.   Very similar.

3    Q.   Okay.  Thank you.

4         Special Agent, did you try to find another source of

5    map depicting this place?  Did you go online?

6    A.   I did.

7    Q.   Did you look for a map of the same spot that's depicted

8    in 49 and 13?

9    A.   Yes, sir, I did.

10   Q.   Could you look at Government's 51.

11   A.   Okay.

12   Q.   What is it?

13   A.   It is a Google Maps GPS satellite image.

14   Q.   Did you make this Google Map satellite image?

15   A.   Yes, sir, I did.

16   Q.   Okay.  Is this a fair and accurate copy of what you

17   made?

18   A.   Yes, sir, it is.

19        MR. ROTH:  Your Honor, move to admit Government's

20   51.

21        THE COURT:  Any objection?

22        MR. CORTEZ:  Actually, none to this one.

23        THE COURT:  Okay.  51 is received.

24     (Government's Exhibit 51 received in evidence.)

25        MR. ROTH:  If we can just pull it up.

COMPUTER-AIDED TRANSCRIPTION

271

1    Q.   And simple point.  What is reflected in the map you

2    prepared from Google?

3    A.   A red drop pin on 9845 Jake Lane, San Diego, California

4    92126.

5    Q.   How does this compare -- how does this picture, just as

6    a picture, compare to Government's 13 and Government's 49?

7    A.   Very similar.

8    Q.   Same place?

9    A.   Same place, yes, sir.

10   Q.   Okay.  Good.

11        Special Agent, I'm going to ask you finally to have

12   a look at Government's 50.

13   A.   Okay.

14   Q.   Do you recognize it?

15   A.   Yes, sir, I do.

16   Q.   What is it?

17   A.   It is a contact card from Nameer Atta's cell phone.

18   Q.   Do you know -- how do you know that?

19   A.   Because when I reviewed the cell phone download, I

20   observed this contact card.

21   Q.   Fair and accurate copy of the information you saw on the

22   phone?

23   A.   Yes, sir, it is.

24        MR. ROTH:  Your Honor, we move to admit Government's

25   50.

272

1      MR. CORTEZ:  Same as before.

2      THE COURT:  Okay.  50 is received.

3      (Government's Exhibit 50 received in evidence.)

4      MR. ROTH:  If we can please bring up 50.

5  Q.   Special Agent, whose contact is saved in the defendant's

6  phone here?

7  A.   It is Christian Reed's Venmo contact.

8  Q.   And what is the user name that is saved in association

9  with Christian's Venmo?

10 A.   Christianreed06.

11 Q.   Thank you.  We can take this down.

12      Special Agent, earlier you testified to a CD that

13 you reviewed that had the full contents of the Venmo records

14 that you obtained for Christian and the defendant.

15      Do you remember that testimony?

16 A.   Yes, sir, I do.

17 Q.   Okay.  And with respect to having made that -- given

18 that testimony, could you please have a look at Government's

19 53 and 54.

20 A.   53 and 54?

21 Q.   Please look up when you're ready.

22 A.   Okay.

23 Q.   Do you recognize these items?

24 A.   Yes, sir, I do.

25 Q.   What are 53 and 54?

COMPUTER-AIDED TRANSCRIPTION

273

1   A.   54 is the subscriber information for Nameer Atta's Venmo

2   account, and 53 is transaction history between Nameer Atta

3   and Christian Reed.

4   Q.   Are 53 and 54 fair and accurate copies of the

5   information you directly reviewed from Venmo?

6   A.   Yes, sir, it is.

7            MR. ROTH:   Your Honor, we move to admit 53 and 54.

8            MR. CORTEZ:   Same as before.

9            THE COURT:   Okay.   The objection is overruled.   53

10  and 54 are received.

11    (Government's Exhibits 53 and 54 received in evidence.)

12           MR. ROTH:   Let's bring up 54, please.

13  Q.   Special Agent, what is the account number as depicted in

14  Government's 54?

15  A.   15741155.

16  Q.   And what is the name of the part of the person

17  associated with that account number?

18  A.   Mo David.

19  Q.   If we could please go to Page 2.   Do you see there the

20  same account number?

21  A.   Yes, sir.

22  Q.   And you see a gmail address?

23  A.   Yes, sir.

24  Q.   Okay.   And the account is zimtheonlyg@gmail?

25  A.   That's correct.

274

1    Q.   If we can go to Page 3.

2         Special Agent, do you see a phone number listed with

3    this account?

4    A.   Yes, sir, I do.

5    Q.   What's the phone number for this account?

6    A.   (858) 699-6818.

7    Q.   Whose phone number is that?

8    A.   Nameer Atta's cell phone.

9    Q.   Thank you.  If we could please go to 53.

10        Special Agent, what is in 53?

11   A.   Transaction history between Christian Reed and Nameer

12   Atta.

13   Q.   How does Government's 53 compare with Government's 23,

14   which were the Venmo records that you got from Christian's

15   account?

16   A.   They are the same.

17   Q.   Okay.  Thank you.  We can take that down.

18        Special Agent, you've testified that you searched

19   the defendant's phone and found evidence.  You've testified

20   that you obtained the defendant's Venmo account and found

21   evidence.

22        Did you search anything else in your effort to find

23   evidence that may bear on this case?

24   A.   Yes, sir, I did.

25   Q.   And what else did you search?

COMPUTER-AIDED TRANSCRIPTION

1    A.    Nameer Atta's Snapchat account.

2    Q.    Okay.  Remind me, what is that Snapchat account again?

3    A.    Nameeratta3324.

4    Q.    Okay.  If you could please -- this is going to take you

5    a second.  But have a look at Government's Exhibits 61

6    through 80, some of which are -- 61 through 80, and look up

7    when you've had a chance to review them all.  Some of these

8    are going to be contained on a disc.

9            THE COURT:  Okay.  Mr. Roth, before you get into

10   this line of questioning, we're going to take our 15-minute

11   morning recess at this time.

12           Ladies and gentlemen, I'm going to remind you of the

13   admonition I've given you before.  Please do not discuss the

14   case or form an opinion about the case until it is submitted

15   to you for your deliberations.  Also, please do not do any

16   independent research, whether it's on the Internet or

17   otherwise, regarding any of the facts and circumstances

18   having to do with this case.

19           It is now 25 after.  We will reconvene at 20 till

20   11:00.  Again, you are free to use the jury room behind you,

21   but if you do go in the jury room, you're there for the whole

22   duration of the 15 minutes.

23           Thank you very much for your attention.  We'll be in

24   recess.

25           (Jury absent, 10:27 a.m.)

1     THE COURT:  We are outside the presence of the jury.

2  Counsel is present.  Mr. Atta is present.

3     One of the reasons why I took a break, Mr. Cortez,

4  is I very much appreciate your streamlining your objections

5  and making reference to the in-limine motions.  There were

6  some in-limine motions that were discussed extensively, and I

7  am fully cognizant of the objection that you might have to

8  some of those exhibits, but it's a little unclear to me as to

9  your objection to exhibits that have been received.  So, for

10 example, 23 and 53 were received, and your objection was

11 "same as before."  And I don't believe that those exhibits

12 were discussed during the in-limine process.

13     So with respect to those exhibits, it's unclear to

14 me, and I treated it as though there were no objection to it,

15 because there is nothing in my memory of the record where you

16 specifically lodged an objection to either the foundation,

17 the content or any other basis for those exhibits.

18     So I wanted to give you a full opportunity.  And the

19 reason I broke is because we've got a whole mess of exhibits

20 that we're about to go into.

21     MR. CORTEZ:  Right.

22     THE COURT:  And if you say "same as before" --

23     MR. CORTEZ:  Yes.

24     THE COURT:  -- I don't -- I'm not sure what you're

25 talking about.  And I want to make sure that I give full

277

1    consideration to any objection you might have.

2              MR. CORTEZ:  Thank you for asking.  401 and 403.

3              401, all of this material -- given the indictment

4    and the specific charge in the indictment, all of this

5    material is irrelevant, because it doesn't go to show that on

6    May 20th, 2020, there was a sale of percs to Mr. Reed, No. 1.

7              And also, connected to that, especially going back

8    two years of drug transactions, that has nothing to do with,

9    and that ties into each one of these.  All of these exhibits

10   cannot be just sort of surgically separated from each other,

11   because the jury is going to see them as a group.  So that

12   covers 403.

13             In my in limines, I made an objection to all of this

14   material for both of those reasons.  We had -- you reviewed

15   the transcript of Judge Sammartino's hearing to clear up this

16   issue today.  I have 401 objections for the reasons I just

17   stated and 403, and that's it.

18             THE COURT:  Okay.  I appreciate that.  Because there

19   was some records, the Venmo records I wasn't sure if there

20   was a 902(11) certificate or whether there was a

21   stipulation.

22             MR. CORTEZ:  Right.

23             THE COURT:  So I wanted to make sure that I was

24   cognizant of the basis of your objections so that I rule on

25   it properly.

278

1          MR. CORTEZ:  I got it.  Thank you for asking.

2          THE COURT:  I appreciate that.

3          We'll reconvene at 20 till.

4          MR. CORTEZ:  Thank you.

5          (Recess, 10:30 a.m. to 10:43 a.m.)

6          (Jury present, 10:43 a.m.)

7          THE COURT:  Okay.  We are back on the record.  All

8     of our jurors are present.  All counsel are present.

9     Mr. Atta is present.

10          I will remind you, once again, sir, that you're

11     still under oath.

12          THE WITNESS:  Yes, sir.

13          THE COURT:  Mr. Roth, please continue your

14     examination.

15          MR. ROTH:  Thank you, Your Honor.

16     Q.   Special Agent, before the break, you had examined all of

17     the images that are contained within Government's 61 through

18     80; correct?

19     A.   Yes, sir.

20     Q.   And as to those particular exhibits, which for the

21     record are Government's Exhibit 61, 62, 64, 65, 69, 71, 72,

22     73, 74 and 78, 79 and 80, did you review those in the

23     binder?

24     A.   Yes, sir, I did.

25     Q.   Do you recognize them?

279

1    A.    Yes, sir, I do.

2    Q.    What are they?

3    A.    They are images pulled from the defendant's Snapchat

4    account.

5    Q.    Okay.  How do you know that?

6    A.    Because I reviewed the Snapchat account results from --

7    after the warrant and observed those images.

8    Q.    Are the exhibits that I just read into the record fair

9    and accurate copies of the materials that you saw in

10   defendant's Snapchat account?

11   A.    Yes, sir, they are.

12   Q.    Now, separately, Special Agent, if you could please go

13   to Tab 206.

14   A.    Yes, sir.

15   Q.    What is it, Government's 206?

16   A.    A disc.

17   Q.    And does that disc contain the government's exhibits

18   at -- pardon me, 63, 66, 67, 68, 70, 75, 76 and 77?

19   A.    Yes, sir, they do.

20   Q.    Okay.  Are -- how do you know that the exhibits I just

21   read into the record are contained on the disc at

22   Government's 206?

23   A.    Because I reviewed the disc, saw those exhibits.  Once I

24   was done reviewing the disc, I signed my name to the disc.

25   Q.    And are the contents of the disc that you just described

280

 1    fair and accurate copies of the videos you saw in defendant's

 2    Snapchat account?

 3    A.    Yes, sir, they are.

 4          MR. ROTH:  Your Honor, the United States moves to

 5    admit Government's 61 through 80.

 6          MR. CORTEZ:  Same as before.

 7          THE COURT:  Okay.  Subject to a relevance showing

 8    upon publishing those exhibits, they are conditionally

 9    admitted.

10          MR. ROTH:  Thank you, Your Honor.

11          THE COURT:  And so the record is clear --

12          MR. ROTH:  I understand.

13          THE COURT:  -- I'm going to admit 61, 62, 64, 69,

14    71, 72, 73, 74, 78, 79 and 80, which are the photographs, and

15    on 206, I will conditionally admit 63, 66, 67, 68, 70, 75, 76

16    and 77.

17       (Government's Exhibits 61, 62, 64, 69, 71, 72, 73, 74,

18          78, 79 and 80 received in evidence.)

19          MR. ROTH:  Thank you, Your Honor.

20          THE COURT:  You're welcome.

21          MR. ROTH:  Let's just go through these.  If we could

22    please bring up Government's Exhibit 61.

23    Q.    Special Agent, who is that?  Do you know who that is?

24    A.    Yes, sir, I do.

25    Q.    Who is that?

281

```
1    A.   That is Nameer Atta.

2    Q.   Can you describe the photo.

3    A.   It is a selfie of Nameer Atta.

4    Q.   How do you tell precisely that this is a selfie?

5    A.   Because in the photograph, over Nameer's right shoulder

6    is a mirror, and you can see his reflection where he is

7    holding a phone and taking a photograph.

8         MR. ROTH:  Your Honor, per agreement of the parties,

9    Special Agent Logan has a note just with the date stamps for

10   the exhibits we're discussing, because there is quite a few.

11        With the Court's permission, may he refer to the

12   note purely for refreshing him as to the dates of these

13   exhibits?

14        THE COURT:  Okay.  Without objection, Mr. Cortez?

15        MR. CORTEZ:  No objection.

16        THE COURT:  And those are the dates reflected on the

17   photographs --

18        MR. CORTEZ:  Right.

19        THE COURT:  -- is that correct?

20        MR. ROTH:  Yes, Your Honor.

21        THE COURT:  Okay.  Please, go forward.

22        THE WITNESS:  I don't have a copy of it.

23        MR. ROTH:  I think if you open the binder and go to

24   the front slip, you'll see it.

25        THE WITNESS:  Okay.
```

282

1          MR. ROTH:  Oh, Your Honor.  May I approach?

2          THE COURT:  Yes.

3          MR. ROTH:  Thank you.

4          Special Agent, I have a copy of your note.

5          THE WITNESS:  Thank you.

6          MR. ROTH:  Thank you, Your Honor.

7     Q.    Special Agent, what's the date associated with

8     Government's 61 in the Snapchat account?

9     A.    April 1st, 2020.

10    Q.    Thank you.  And if we can take down 61 and bring up

11    Government's 62.

12          Special Agent, what's this?

13    A.    Also a selfie of Nameer Atta.

14    Q.    And how can you tell precisely that it's a selfie?

15    A.    Because in the picture, I can see him holding his cell

16    phone.

17    Q.    Okay.  What's the date of Government's 62?

18    A.    April 2nd, 2020.

19    Q.    We can take down 62.

20          And, again, 61, 62 were both in the nameeratta3324

21    Snapchat account; is that right?

22    A.    That's correct, yes, sir.

23    Q.    Thank you.

24          Let's please -- forgive me, Your Honor.  Would Your

25    Honor like me to lay a more precise information with each of

COMPUTER-AIDED TRANSCRIPTION

283

1    the videos or just play them?

2         THE COURT:  They have been conditionally admitted.

3    I'm not sure of the contents, so I can't make a Rule 401

4    finding at this point.

5         MR. ROTH:  Okay.

6         THE COURT:  Play them at your peril.  If they do not

7    meet the 401 threshold, then we'll cross that bridge if we

8    come to it.

9         MR. ROTH:  Fair enough.  Could we please bring up

10   Government's 63.

11   Q.   And before we do that, Special Agent, what is the date

12   of Government's 63?

13   A.   April 3rd, 2020.

14        MR. ROTH:  If we can please play Government's 63.

15        (Government's 63 played.)

16   Q.   BY MR. ROTH:  Special Agent, who is in the video?

17   A.   Nameer Atta.

18   Q.   Do you recognize the voice of the person who is

19   speaking?

20   A.   Yes, sir, I do.

21   Q.   Whose voice is that?

22   A.   Nameer Atta's voice.

23   Q.   And what did Nameer Atta say in that video?

24   A.   "You're watching the trap channel."

25        MR. ROTH:  Your Honor, move to admit.

284

1          MR. CORTEZ:  401 and 403.

2          THE COURT:  Okay.  Given the expert testimony

3    elicited as to the term "trap," I find that it meets the 401

4    threshold and it will be admitted.

5          MR. ROTH:  Thank you, Your Honor.

6          Just to make a record, we would also offer it for

7    attribution, just to make a record.

8          MR. CORTEZ:  Same objection.

9          THE COURT:  Okay.  It's admissible on that basis

10   alone.  And I'm not going to go into the 403, but I'm

11   cognizant of 403, and I'm doing that analysis with respect to

12   each and every exhibit offered in this case.

13      (Government's Exhibit 63 received in evidence.)

14          MR. ROTH:  Thank you, Your Honor.  If we can please

15   bring up Government's Exhibit 64.

16   Q.   Special Agent, how does Government's 64 compare to the

17   prior menus that you testified to that you found on the

18   defendant's phone?

19   A.   They are the same.

20   Q.   Okay.  And here, remind us what it says with respect to

21   Perc 30s?

22   A.   It is a blue diamond emoji.  It says Percs, 30 mg, most

23   trusted out.

24   Q.   Thank you.

25          Let's take down 63.

285

1          THE COURT:  Ladies and gentlemen, with respect to

2     Exhibit 63, I give you the same admonition I gave you with

3     respect to Exhibits 42A, B, C and G, in that you are only to

4     consider that exhibit as to the part that was testified about

5     here in court today, and the remainder of that exhibit, it's

6     a copy of another exhibit that I previously gave you the same

7     instruction, is not to be considered for any purpose during

8     your deliberations.

9          Mr. Roth.

10         MR. ROTH:  Thank you.

11    Q.   Special Agent, if we could please bring up 65.

12         Special Agent, what is 65?

13    A.   Another menu.

14    Q.   Okay.  And what does it say there second from bottom?

15    A.   It's a blue circle with a white M emoji.  It says Perc

16    30s, most trusted in SD, handshake emoji.

17    Q.   How does this version of this menu at 65, which you

18    found on the Snapchat account, differ -- compare to the menu

19    that you found in the defendant's phone?

20    A.   They are the same.

21    Q.   Thank you.  We can take down 65.

22         THE COURT:  Before you go on, ladies and gentlemen,

23    with respect to Exhibit 65 as well, the same admonition in

24    terms of the limited purpose for that exhibit applies.

25         So as to the other, quote, unquote, menu items that

COMPUTER-AIDED TRANSCRIPTION

286

1   we've discussed, the only thing that you are to consider is

2   the evidence which has been testified to here in court today,

3   and the remainder of the exhibit should not be considered for

4   any purpose whatsoever.

5          Mr. Roth.

6          MR. ROTH:  Thank you.

7   Q.   Special Agent, before I continue, what date is

8   associated with Government's 63, the first video?

9   A.   It is April 3rd, 2020.

10  Q.   And what are the dates associated with 64 and then with

11  65?

12  A.   64 is May -- is, I'm sorry, April 20th, 2020.  And then

13  65 is May 11th, 2020.

14  Q.   Let's go to Government's 66.

15         What date is associated with Government's 66?

16  A.   I have May 2020.

17  Q.   So it's in May of 2020?

18  A.   Yes, sir.

19         MR. ROTH:  If we can please bring up Government's

20  66.

21         (Government's Exhibit 66 played.)

22  Q.   BY MR. ROTH:  Special Agent, do you recognize the voice

23  on that video?

24  A.   Yes, sir, I do.

25  Q.   What did the voice say?

COMPUTER-AIDED TRANSCRIPTION

287

1    A.    Trap channel booming.  Let's go.

2    Q.    And whose voice is that?

3    A.    Nameer Atta's voice.

4    Q.    Do you recognize the area depicted here in 66?

5    A.    Yes, sir, I do.

6    Q.    What -- where is that?

7    A.    That is the -- that is the area between 9845 Jake Lane

8    and 9835 Jake Lane.

9    Q.    Have we seen that area depicted anywhere else in this

10   case?

11   A.    Yes, sir.

12   Q.    Where have we seen it depicted?

13   A.    It was the red box area on the GPS satellite image.

14   Q.    So there were maps that you found with some writing on

15   them; right?

16   A.    Yes, sir.

17   Q.    And there is a red circle in there?

18   A.    Yes, sir.

19   Q.    And do you recall a notation with the red circle from

20   that exhibit?

21   A.    Yes, sir.

22   Q.    And roughly what did that red circle refer to -- what

23   was the red circle?

24   A.    It was a large order or waiting area.

25   Q.    And this is that red area?

288

1    A.    Yes, sir.

2          MR. ROTH:  Your Honor, we would move to admit 66.

3          MR. CORTEZ:  Same objections.

4          THE COURT:  The objection is overruled.  66 is

5    received.

6       (Government's Exhibit 66 received in evidence.)

7          MR. ROTH:  Thank you.

8    Q.    Special Agent, let's go to 67.

9          Oh, by the way, in 66, forgive me.  I couldn't tell

10   if you said that you heard the defendant say "trap channel

11   booming" or "trap temple booming."

12         MR. CORTEZ:  Objection.  Asked and answered.

13         MR. ROTH:  I couldn't hear him.  So I'm asking to

14   clarify.

15         MR. CORTEZ:  Irrelevant.

16         THE COURT:  Sustained.  The jury -- they heard the

17   answer.  Their recollection will control.

18         MR. ROTH:  Very good.

19   Q.    67, what's the date of 67?

20   A.    May 16th, 2020.

21   Q.    Let's please bring up 67.

22         (Government's Exhibit 67 played.)

23   Q.    BY MR. ROTH:  Special Agent, whose voice was that?

24   A.    The defendant's voice.

25   Q.    What did the defendant say?

COMPUTER-AIDED TRANSCRIPTION

1    A.    The temple is open.

2    Q.    And what area, if you know, is depicted on Government's

3    67?

4    A.    That's the area just outside 9845 Jake Lane.

5    Q.    Have we seen the area outside 9845 Jake Lane that's

6    depicted here anywhere else?

7    A.    Yes, sir, we have.

8    Q.    Please explain.

9    A.    It was the white circle area depicted in the satellite

10   map images.

11   Q.    And, you know, as I say that, let's not be mysterious

12   about this.  Can we please bring up Government's 49.

13         Is Government's 67 that was just played, that white

14   area that is in this, Government's 49?

15   A.    Yes, sir.  That's the area designated as quick spot.

16   Q.    Okay.  And the red area that's designated bigger

17   order/wait, that's the prior exhibit; right?

18   A.    Yes, sir.

19         MR. ROTH:  Thank you.  If we can please go back to

20   67.  Your Honor -- Your Honor, we would move to admit 67.

21         MR. CORTEZ:  401 and cumulative.

22         THE COURT:  Okay.  The objection is overruled.  67

23   is received.

24      (Government's Exhibit 67 received in evidence.)

25   Q.    BY MR. ROTH:  Okay.  Let's go to Government's 69.

290

1    Special Agent, what is Government's 69?

2    A.    It is a photo of the space between 9835 Jake Lane and

3    9845 Jake Lane.

4    Q.    What's the date of it?

5    A.    May 9th, 2020.

6    Q.    Okay.  If we could please bring up Government's 70.  And

7    don't play it yet.  I just want to take a look at it.  I

8    guess we have to play it.

9              (Government's Exhibit 70 played.)

10   Q.    BY MR. ROTH:  Special Agent, what was the date of

11   Government's 70?

12   A.    April 17th, 2020.

13   Q.    What is depicted in Government's 70?

14   A.    30-milligram Percocets.

15   Q.    Special Agent, in the course of your career, have you

16   come across 30-milligram Percocets?

17   A.    Yes, sir, I have.

18   Q.    Is that otherwise known as M30s?

19   A.    Yes, sir.

20   Q.    What do they look like?

21   A.    They are blue.  They have an M imprinted on one side and

22   the number 30 imprinted on the other.

23   Q.    Okay.  Are they circular?

24   A.    Yes, sir.

25   Q.    Is that what is depicted in Government's 70?

1    A.    Yes, sir.

2    Q.    Okay.  How many M30s were depicted in Government's 70?

3    A.    99.

4              MR. ROTH:  Thank you.  Your Honor, move to admit

5    70.

6              MR. CORTEZ:  401.  403.

7              THE COURT:  The objection is overruled.  70 is

8    received.

9         (Government's Exhibit 70 received in evidence.)

10   Q.    BY MR. ROTH:  If we can please bring up 71.

11             Special Agent, what are we looking at here?

12   A.    We're looking at a hand-to-hand transaction.

13   Q.    What's the date of this one?

14   A.    April 17th, 2020.

15   Q.    And do you see what is in the baggy that's being handed

16   over in 71?

17   A.    Yes, sir, I do.

18   Q.    Okay.  Can you tell what is in the baggy?

19   A.    Perc 30s.

20   Q.    Okay.  And do you see any writing on the baggy?

21   A.    Yes, sir.  It's -- the script says Walgreens pill

22   pouch.

23   Q.    Okay.  If we can now please go to Government's 72.

24             What is the date of this picture?

25   A.    May 2nd, 2020.

292

1    Q.   And who is in it?

2    A.   Nameer Atta.

3    Q.   Anything notable about this picture of the defendant?

4    A.   Yes, sir.

5    Q.   What is that?

6    A.   He's holding a Walgreens pill pouch in his hand.

7    Q.   Thank you.

8             Is that consistent with the Walgreens pill pouch

9    that you saw in the exhibit that we just reviewed?

10   A.   Yes, sir.

11   Q.   Special Agent, if we could please go to Government's

12   Exhibit -- if we can please go to Government's 74.

13            What's the date of 74?

14   A.   June 24th, 2020.

15   Q.   Okay.  Who is this of?

16   A.   Nameer Atta.

17   Q.   And is this a selfie?

18   A.   Yes, sir, it is.

19   Q.   Anything notable about this photograph?

20   A.   Large stacks of cash sitting on the floor in front of

21   him.

22   Q.   Thank you.  We can take down.

23            MR. CORTEZ:  Your Honor, just for the record, 401

24   and 403 again.

25            THE COURT:  Okay.  As to 74, the objection is

COMPUTER-AIDED TRANSCRIPTION

293

1    sustained.  74 is not received in evidence.

2          Ladies and gentlemen, you are instructed to

3    disregard the photograph just put on the screen.  That is

4    Government's 74.  You are not to consider that in any way

5    whatsoever during your deliberations in this case.

6          MR. CORTEZ:  Move to strike.

7          THE COURT:  Yes.  74 is stricken.  It is not

8    received in evidence.

9          MR. CORTEZ:  Thank you.

10   Q.   BY MR. ROTH:  Let's turn to 76.  What is the date of

11   Government's Exhibit 76?

12   A.   May 19th, 2020.

13         MR. ROTH:  Okay.  Let's please play 76.

14         (Government's Exhibit 76 played.)

15   Q.   BY MR. ROTH:  Now, Special Agent, what area is depicted

16   here?

17   A.   It is the area right outside 9845 Jake Lane, indicated

18   as the quick spot on the map.

19   Q.   Is that the white circle area?

20   A.   Yes, sir.

21         MR. ROTH:  Your Honor, I know that this is

22   conditionally admitted.  I need to go to one other exhibit to

23   lay a full basis.  It will take one second.

24         THE COURT:  Okay.

25   Q.   BY MR. ROTH:  If you can please flip in the binder to

294

1   Exhibit 90?

2   A.   9-0?

3        MR. ROTH:  And I'm sorry I didn't do this before,

4   Your Honor.

5   Q.   Do you recognize Government's Exhibit 90?

6   A.   Yes, sir, I do.

7   Q.   How does Government's 90 relate, if at all, to

8   Government's 76, the video that we just played?

9   A.   90 is a still image from the video that we just

10  watched.

11  Q.   Okay.  What is contained in the still image at 90?

12  A.   A picture of a dark-blue BMW sedan.

13  Q.   Do you recognize the sedan?

14  A.   Yes, sir, I do.

15  Q.   Whose sedan is it?

16  A.   Christian Reed's sedan.

17       MR. ROTH:  Your Honor, the United States moves to

18  admit 76 and 90.

19       MR. CORTEZ:  401, 403.

20       THE COURT:  Okay.  Okay.  The objection is

21  overruled.  90 and 76 are received.

22    (Government's Exhibits 76 and 90 received in evidence.)

23       MR. ROTH:  Let's play 76 one more time, please.

24       MR. CORTEZ:  Objection.  Cumulative.

25       THE COURT:  Overruled.

295

1          (Government's Exhibit 76 played.)

2     Q.   BY MR. ROTH:  Now, let's please bring up 90.

3          Special Agent, how do you know that that's Christian

4     Reed's BMW?

5     A.   There is damage to the right front bumper.

6     Q.   Can you -- I'm not going to have you draw on the screen

7     because honestly, I struggle to take the notations off.  But

8     if you can just explain where on the car it is.

9     A.   If you -- if you look right at the headlight, I'm going

10    to try real hard not to touch the screen, I promise.  If you

11    look right at the headlight on the passenger side, if you

12    look just below the headlight, you can see a crease in the

13    right front bumper.

14    Q.   How does that compare to the left bumper on the driver's

15    side, just for reference?

16    A.   The left front bumper is undamaged.

17    Q.   So it appears smooth?

18    A.   Yes, sir.

19    Q.   Okay.  Let's go to Government's 77, please.  And by the

20    way, I apologize if I already asked, but what was the date of

21    76?

22    A.   19 May, 2020.

23    Q.   Okay.  So that's -- okay.  Let's go to 77 now.

24          What is the date of 77?

25    A.   May 20th, 2020.

COMPUTER-AIDED TRANSCRIPTION

296

1   Q.   Okay.  Can you remind us what the last two dates were

2   that the defendant sold to Christian?

3   A.   May 19th and May 20th, 2020.

4           MR. ROTH:  Okay.  Let's please play Government's

5   Exhibit 77.

6           (Government's Exhibit 77 played.)

7   Q.   BY MR. ROTH:  Now, having played that, could we please

8   bring up Government's 78, 79 and 80.

9           Special Agent, how, if at all, do 78, 79 and 80

10  relate to the video that's at Government's 77?

11  A.   77 -- 78, 79 and 80 are still images pulled from 77.

12  Q.   Okay.  What is depicted in these four exhibits?

13  A.   Christian Reed driving away from Nameer Atta's house.

14          MR. ROTH:  Your Honor, we move to admit Government's

15  Exhibit 77, which is conditionally admitted, and I believe 78

16  through 80 are in, but just to be safe, we move them in as

17  well.

18          MR. CORTEZ:  401, 403.

19          THE COURT:  The objection is overruled.  77 is

20  admitted as well as 78, 79 and 80.

21     (Government's Exhibits 77 received in evidence.)

22          MR. ROTH:  Thank you, Your Honor.

23  Q.   Special Agent, if we can please go to 77 -- or 78.  I'm

24  sorry.

25          Special Agent, earlier you testified about the dent

297

1    in Christian's BMW.  Do you see that here?

2    A.   Yes, sir, I do.

3    Q.   Where is it?

4         MR. CORTEZ:  Asked and answered.  Objection.

5         THE COURT:  Overruled.

6         THE WITNESS:  It is in the right front bumper, just

7    below the headlight.

8    Q.   BY MR. ROTH:  Okay.  If we can please go to -- if we can

9    go from here actually to Government's Exhibit 10, which is

10   already in evidence.

11        Special Agent, do you recall testifying about

12   Government's Exhibit 10?

13   A.   Yes, sir, I do.

14   Q.   And can you just remind us about the T-shirt here.

15        MR. CORTEZ:  Objection.  Asked and answered, Your

16   Honor.

17        THE COURT:  Sustained.

18   Q.   BY MR. ROTH:  Okay.  Having looked at Government's 10,

19   let's go back now to Government's 79.

20        Special Agent, are you able to see anything about

21   the driver in Government's 79?

22   A.   Yes, sir, I can.

23   Q.   What can you see?

24   A.   He's wearing a gray T-shirt with an orange T on it.

25        MR. ROTH:  Okay.  Your Honor, may I have one moment?

298

1          THE COURT:  Yes.

2          MR. ROTH:  Thank you.

3          Your Honor, can I just confirm that the photo images

4     between 61 and 80, subject to the Court's ruling to strike,

5     are in.

6          THE COURT:  Yes.  All of those are in as previously

7     mentioned, with the exception of 74, which is not in.

8          MR. ROTH:  Okay.

9          THE COURT:  And with respect to the videos, all of

10    the previously conditionally admitted videos are accepted

11    into evidence, with the exception of 68 and 65.

12         MR. ROTH:  Which the government has not offered.

13         THE COURT:  Which the relevance has not been

14    established.

15         MR. ROTH:  Okay.  Your Honor, nothing further at

16    this time.  Thank you.

17         THE COURT:  Okay.  Thank you.  Cross-examination.

18         MR. CORTEZ:  We have a quick motion before we do

19    cross.  What would you like us to do?

20         THE COURT:  I'll take it up at sidebar.

21       (The following proceedings were held at sidebar:)

22         MR. CORTEZ:  Out of an abundance of caution, I must

23    move for a mistrial, especially because in the last

24    cumulative picture, Mr. Atta is sitting there with piles of

25    cash showing him like the prolific drug trafficker that Judge

299

1    Sammartino had a problem with.

2              THE COURT:  Okay.

3              MR. CORTEZ:  I think I have to make that motion.

4              THE COURT:  Response?

5              MR. ROTH:  Your Honor, we would say that the Court

6    struck the image, gave a curative instruction to the jury.

7    We certainly respect the government -- the Court's decision.

8              The government offered the photo in good faith.  It

9    went to proving the defendant's knowledge that he was selling

10   drugs, because drugs are sold for profit, and that was proof

11   of the defendant's profiting.  That's not to ask the Court to

12   reconsider the ruling, but it's just to lay a basis for why

13   we tried to offer it.

14             It was a single photograph.  It was very quickly

15   struck, and I think the Court was quite emphatic in making it

16   clear to the jury that it forms no part of the case.

17             THE COURT:  Okay.  The motion for a mistrial is

18   respectfully denied.  I did instruct the jury that they are

19   to disregard that photograph.  It was only displayed for a

20   very brief period of time, less than five seconds would be my

21   estimation of the time that it was displayed to the jury.

22             It was a photograph that was taken from some

23   distance.  So while there was testimony that there was money,

24   it's not nearly the type of photograph that was otherwise

25   introduced with respect to the GOAT notation that had the

1   $100 bills and the 420 bills; so I would distinguish between

2   that.

3          And I would also note that when I instructed the

4   jurors, and every time I've instructed the jurors for their

5   use of the evidence for a limited purpose, each and every one

6   of the jurors are paying close attention to me as I say those

7   things, and the vast majority of the jurors when I struck the

8   photograph that's in question here, most, if not all -- I

9   will stay with most -- of the jurors nodded up and down in

10  acknowledgement of the fact when I instructed them that they

11  were not to consider that photograph in any manner

12  whatsoever.

13         So I find that it's not an exhibit such that it will

14  unduly prejudice this jury.  I feel that -- I feel confident

15  that they will follow the instruction that they were given

16  and the motion for a mistrial is respectfully denied.

17         MR. CORTEZ:  One last comment, briefly.

18         THE COURT:  Yes.

19         MR. CORTEZ:  My last comment is that appellate

20  courts have held that this is the very type of bell that you

21  cannot unring once you ring it.  So no curative

22  instruction -- even with jury reacting to the Court, we don't

23  know why they were nodding or not; we didn't ask.  And that's

24  it.

25         THE COURT:  Okay.  Thank you.

1              MR. ROTH:  Thank you.

2              MR. CORTEZ:  Thank you.

3         (The following proceedings were held in open court:)

4              THE COURT:  Mr. Cortez, cross-examination.

5              MR. CORTEZ:  Yes, sir.  Thank you.

6              THE COURT:  You're welcome.

7                         CROSS-EXAMINATION

8    BY MR. CORTEZ:

9    Q.   Agent Logan, may I call you Agent Logan?

10   A.   Yes, sir, you can.

11   Q.   Thank you.  I actually have very few questions for you,

12   sir.

13   A.   Okay.

14   Q.   Let me begin with your role in this case, your overall

15   role in this case.  You are the case agent; correct?

16   A.   Yes, sir.

17   Q.   And from the outset of -- the Naval Criminal

18   Investigative Service, that's who you work with; right?

19   A.   Yes, sir.

20   Q.   NCIS are their initials?

21   A.   Yes, sir.

22   Q.   Okay.  Like CSI in the TV shows?

23   A.   Well, the same letters are present, yes, sir.

24   Q.   Only difference?

25   A.   Uh-huh.

302

1    Q.    "Uh-huh," is that a "yes"?

2    A.    Yes, sir.  That's correct.

3    Q.    We're taking a record here.

4    A.    Yes, sir.

5    Q.    She's very diligent.  She keeps us in line.

6    A.    Yes, sir.

7    Q.    So as the case agent, you coordinated other agents;

8    correct?

9    A.    At times, yes, sir.

10   Q.    Yes.  There were several agents assisting in this

11   investigation; correct?

12   A.    Yes, sir.

13   Q.    And as you coordinated other agents, these other agents

14   helped you gather evidence; correct?

15   A.    That's correct.

16   Q.    Helped you interview suspects; correct?

17   A.    Yes, sir.

18   Q.    Helped you tape-record interviews of other suspects;

19   right?

20   A.    Yes, sir.

21   Q.    Helped you secure what would be described as forensic

22   evidence, sir?

23   A.    Yes, sir.

24   Q.    Okay.  Let me take you to -- let me take you to -- if I

25   may have a second.  Before I move to that, I'm going to

303

1     Exhibit 88 in a minute.

2          And I just want to ask you whether one of those

3     agents you coordinated with was Robert Dahlstrom, Robert

4     Dahlstrom?

5     A.   Yes, sir.

6     Q.   Thank you.

7          Now, regarding Exhibit 88, you have that before you,

8     sir?

9     A.   I can go to it, yes, sir.

10         MR. CORTEZ:  Can we pull that up?  It might help us.

11    Thank you.

12         THE WITNESS:  Yes, sir.

13    Q.   BY MR. CORTEZ:  Exhibit 88 depicts on the lower right

14    hand of the photograph, a bottle of what was described as a

15    prescription medication bottle; correct?

16    A.   Yes, sir.

17    Q.   Now, did you seize that bottle, or did another agent

18    seize it?

19    A.   No one seized that bottle.

20    Q.   I'm sorry?

21    A.   No one seized that bottle.

22    Q.   Who found it?

23    A.   I don't know.

24    Q.   Okay.  Was it Agent Dahlstrom?

25         MR. ROTH:  Objection.

1          MR. CORTEZ:  I'm sorry.  He was about to answer.

2          MR. ROTH:  I object.

3          THE COURT:  The basis of your objection?

4          MR. ROTH:  Speculation.  He said he doesn't know.

5          THE COURT:  Okay.  Sustained.  Lack of foundation.

6          MR. CORTEZ:  Perfect.  Thank you.

7          Agent Logan -- may I approach, Your Honor?

8          THE COURT:  Of course.

9     Q.   BY MR. CORTEZ:  Agent Logan, if I may show you

10    Government's 110.  Just look at it to yourself, and I'm going

11    to show you partial.

12    A.   Uh-huh.

13    Q.   This report, sir, that you're looking at, several

14    pages?

15    A.   Yes, sir.

16    Q.   I'm going to -- in the lower left corner, for the

17    record, is the page number series.  And I'm only going to

18    refer you to one of those pages, and that would be Page 8 of

19    12.  See the lower left-hand corner?

20    A.   Yes, sir, I do.

21    Q.   And I'm going to show you the date of that agent who

22    collected that photograph.

23    A.   Yes, sir.

24    Q.   That was Robert Dahlstrom; right?

25          MR. ROTH:  Objection.  He's asking the witness to

1   read from a report.

2           THE COURT:  Sustained.

3           MR. CORTEZ:  I'm asking him now.

4   Q.   That was Agent Dahlstrom; correct?

5           MR. ROTH:  Objection.

6           THE COURT:  Sustained.  Hearsay.

7           MR. CORTEZ:  That's okay.

8   Q.   Now, this bottle, this prescription bottle, you

9   testified on direct examination yesterday that you knew the

10  contents of that bottle; right?

11          MR. ROTH:  Objection.  Misstates the testimony.

12          MR. CORTEZ:  You testified -- sorry.  I need to wait

13  for the Court's ruling.

14          THE COURT:  The objection is overruled.  You may ask

15  your question.

16          MR. CORTEZ:  Thank you, sir.

17  Q.   Do you remember your testimony just from yesterday

18  afternoon?

19  A.   Yes, sir, I do.

20  Q.   You said that the contents of that bottle were all the

21  exact prescription medication that was supposed to be in that

22  bottle; correct?

23  A.   As I understand it, yes, sir.

24  Q.   But that wasn't true, was it?

25  A.   It was my understanding that that was a true and

306

1    accurate statement.

2    Q.   That wasn't my question.  It was not true that that

3    prescription bottle contained only the prescribed medication;

4    right?

5              MR. ROTH:  Objection.  Foundation.

6              MR. CORTEZ:  I'm asking the question.  He can say

7    yes or no.

8              THE COURT:  Overruled.  You may answer the

9    question.

10             THE WITNESS:  Can you ask your question again?  I'm

11   sorry.

12             MR. CORTEZ:  Yes.

13   Q.   The contents of that prescription bottle were not only

14   the prescribed medication that appeared on the label;

15   correct?

16   A.   That is correct.

17   Q.   Thank you.

18             And, in fact, what was in that bottle was -- see if

19   this rings a memory for you -- pills of various different

20   sizes and colors located in the prescription bottle?

21   A.   I would have to reference what you're looking at, sir.

22             MR. CORTEZ:  Sure, sir.  May I approach again?

23             THE COURT:  Yes.

24             MR. CORTEZ:  This is only for your reference.  I

25   just want you to -- sorry.  I shouldn't be commenting.

307

1    Q.   Let me show you -- just for you, sir.  Show you right

2    there (indicating).

3    A.   Okay.

4    Q.   Now, that prescription bottle contained pills of various

5    different sizes and colors; correct?

6              MR. ROTH:  Objection.  Hearsay.

7              THE COURT:  Sustained.

8    Q.   BY MR. CORTEZ:  So you're saying that the contents of

9    that prescription bottle contained only the prescribed

10   medication; is that what you're saying?

11   A.   I'm saying that, as I understand it, in speaking with

12   Special Agent Dahlstrom, the pills contained in that bottle

13   included only pills prescribed to Christian Reed.

14   Q.   Not only the labeled medication; right?

15   A.   Correct.

16   Q.   Correct.  In fact, the labeled medication was

17   Pregabalin, if I pronounced that correctly,

18   P-r-e-g-a-b-a-l-i-n.  That was on the label, but there were

19   other medications in there; right?

20   A.   According to Special Agent Dahlstrom's report, yes.

21   Q.   Thank you.  That's all I wanted to explore.

22            Now, you didn't find that bottle, did you?

23   A.   No, sir, I did not.

24   Q.   No.  In fact, let's tell the jury when you arrived at

25   Christian Reed's barracks.

COMPUTER-AIDED TRANSCRIPTION

1    A.   I was not at Christian Reed's barracks.

2    Q.   Oh.  Ever?

3    A.   I was -- I was there in August of 2020.

4    Q.   So you were not there in May?

5    A.   No, sir, I was not.

6    Q.   You did not examine the scene?

7    A.   No, sir, I did not.

8    Q.   You did not personally secure any evidence?

9    A.   No, sir, I did not.

10   Q.   So you reviewed other people's reports; correct?

11   A.   Yes, sir, that's correct.

12   Q.   And that's how you testified yesterday and today;

13   right?

14   A.   Yes, sir.

15   Q.   Good enough.  Thank you.

16        We just saw a -- we just saw a photograph of a BMW,

17   and you testified that you could see through the window what

18   type of T-shirt the occupant wore; right?

19   A.   Yes, sir.

20   Q.   But we couldn't see the type of T-shirt that you

21   described as being in that photograph.  So do you have

22   independent knowledge as to what type of T-shirt he was

23   wearing?

24        MR. ROTH:  Objection.  This is argument.

25        THE COURT:  Sustained.

309

1          MR. CORTEZ:  I'll withdraw it.

2          THE COURT:  As to what everybody else will see.

3          MR. CORTEZ:  You're right.  I withdraw it.

4    Q.    Now, Agent Logan, I have one last question of you.  As

5    the case agent, gathering evidence, coordinating everybody

6    else working in this case, did you ever found -- did you ever

7    find the 12 Percocet tablets that you testified were sold by

8    Mr. Atta to Mr. Reed on May 20, sir?

9    A.    No, sir, we did not.

10         MR. CORTEZ:  Thank you.  No other questions.

11         THE COURT:  Okay.  Thank you.  Any Redirect?

12         MR. ROTH:  Very brief.

13         THE COURT:  Okay.

14                     REDIRECT EXAMINATION

15   BY MR. ROTH:

16   Q.    Special Agent, if we could just make sure we have a

17   clear understanding of this pill situation.

18   A.    Uh-huh.  Yes, sir.

19   Q.    What was your understanding of the pills found in

20   Christian's barracks room in May of 2020?

21   A.    All the pills found in Christian's barracks room were

22   pills that were prescribed to him by Navy medical officers.

23   Q.    So is it the case that there is a pill bottle with some

24   different pills, but the agents were able to ascertain that

25   all of the pills had been prescribed to him?

310

1          MR. CORTEZ:  That's leading, Your Honor.

2    Objection.

3          THE COURT:  Sustained.

4          MR. CORTEZ:  Although at this point --

5          MR. ROTH:  Fair enough.

6    Q.   Special Agent, you were not personally present on

7    May 21st, 2020 for the response by NCIS; right?

8    A.   Yes, sir, that's correct.

9    Q.   Okay.  Earlier you testified to the phone that was found

10   in Christian's barracks room; correct?

11   A.   Yes, sir.

12   Q.   Okay.  And there was a photograph that counsel has

13   brought up, 88, showing that phone; correct?

14   A.   Yes, sir.

15   Q.   Special Agent, in the course of your work as an agent,

16   do you and fellow agents use something called a chain of

17   custody?

18   A.   Yes, sir, we do.

19   Q.   What is the point of a chain of custody?

20          MR. CORTEZ:  Objection.  Goes beyond the

21   cross-examination, sir.

22          THE COURT:  Overruled.  You may answer.

23          THE WITNESS:  Chain of custody is -- it allows

24   multiple individuals -- it allows for continuation and

25   accountability for the evidence regardless of who handles it

COMPUTER-AIDED TRANSCRIPTION

1    or where it might go within the NCIS system.

2    Q.    BY MR. ROTH:  Is there a chain of custody documented for

3    Christian's phone?

4    A.    Yes, sir.

5    Q.    Is that how you know that the phone that you've

6    introduced today and that you testified over the last two

7    days is the phone that was in Christian's barracks room?

8            MR. CORTEZ:  Your Honor, we'll stipulate to this, if

9    it helps.

10           THE COURT:  Do you accept the stipulation?

11           MR. ROTH:  No.

12           THE COURT:  Okay.  You may ask.

13           THE WITNESS:  Could you ask your question again?

14    I'm sorry.

15    Q.    BY MR. ROTH:  Is there a chain of custody for

16    Christian's phone?

17    A.    Yes, sir, there is.

18    Q.    And is that how you know that's the phone we've been

19    talking about for the last two days?

20    A.    Yes, sir, it is.

21    Q.    Special Agent, why do you think there were no fentanyl

22    pills recovered?

23           MR. CORTEZ:  Objection.  Improper speculation.

24           THE COURT:  Sustained.

25           MR. ROTH:  Nothing further, Your Honor.

312

1          THE COURT:  Thank you.  You may step down, sir.

2          THE WITNESS:  Thank you, sir.

3          THE COURT:  Government's next witness.

4          MR. ROTH:  Your Honor, the United States calls

5     Michael Klinge.

6          THE CLERK:  You can come right up here.  Please

7     raise your right hand.

8       MICHAEL KLINGE, a government witness, having been duly

9         sworn, testified as follows:

10         THE WITNESS:  Yes, ma'am, I do.

11         THE CLERK:  Thank you.

12         Once you're seated, if you can please state your

13    name and spell it for the record.

14         THE WITNESS:  My name is Michael Klinge,

15    M-i-c-h-a-e-l K-l-i-n-g-e.

16         MR. ROTH:  May I proceed, Your Honor?

17         THE COURT:  Yes.  Please.

18         MR. ROTH:  Thank you, Your Honor.

19                         DIRECT EXAMINATION

20    BY MR. ROTH:

21    Q.   Good morning, sir.

22    A.   Good morning.

23    Q.   Mr. Klinge, what do you do for a living?

24    A.   I'm a special agent with the Naval Criminal

25    Investigative Service.

313

1    Q.   Is that NCIS?

2    A.   Yes, it is.

3    Q.   How long have you been a NCIS special agent?

4    A.   Since January of this year.

5    Q.   What did you do for work before you joined NCIS?

6    A.   I was a special agent with the Drug Enforcement

7    Administration.

8    Q.   The DEA?

9    A.   Correct.

10   Q.   How long were you a DEA special agent?

11   A.   About 15 years.

12   Q.   So combined, 16 years of federal law enforcement

13   experience?

14   A.   Correct.

15   Q.   Special Agent, where did you go to school?

16   A.   I have a Bachelor's of Science degree in government from

17   the United States Coast Guard Academy and a Master's of

18   Science degree in Terrorism and Counterterrorism.

19   Q.   Did you serve in the Coast Guard after graduating from

20   the academy?

21   A.   Yes, I did.

22   Q.   How long did you serve in the Coast Guard?

23   A.   About six-and-a-half years.

24   Q.   Okay.  What kind of work did you do in the Coast

25   Guard?

314

1    A.    Predominantly law enforcement.  I spent two years

2    assigned to a ship where we did law enforcement search and

3    rescue predominantly.  I spent two years assigned as the

4    officer in charge of a special operations team.  One year of

5    that was dedicated strictly to counter-drug work and the year

6    after that was 9/11, so we transitioned to counterterrorism

7    operations.

8    Q.    Okay.  And when you left the Coast Guard, is that when

9    you went to the DEA?

10   A.    Yes.

11   Q.    Did you receive any kind of training when you joined the

12   DEA?

13   A.    I did.

14   Q.    What kind of training did you receive?

15   A.    I went through basic agent training at the Marine Base

16   at Quantico, Virginia.

17   Q.    And what kind of topics were you schooled on at basic

18   agent training?

19   A.    Everything needed to be a DEA agent, so undercover

20   operations, working with informants, surveillance, law, drug

21   identification, use of force; the administrative things that

22   go along with federal law enforcement as well.

23   Q.    Did that training include things like working with

24   confidential informants?

25   A.    Yes, it did.

315

1   Q.   Did it include trainings on things like debriefing
2   defendants?
3   A.   Yes.
4   Q.   Did it include things like working with and as an
5   undercover?
6   A.   Yes, it did.
7   Q.   Okay.  When you joined NCIS, did you get a similar
8   training?
9   A.   Yes, I did.
10  Q.   Did that training cover many of the same topics?
11  A.   In some ways, yes.
12  Q.   Why did you choose to switch from the DEA to NCIS?
13  A.   DEA is a single-mission agency focusing mostly on drug
14  trafficking, and I wanted to broaden my investigative horizon
15  and still be able to stay in Southern California.
16  Q.   Okay.  And over the course of your time with NCIS thus
17  far, has any portion of your work been focused on drug
18  trafficking?
19  A.   A majority of it has, yes.
20  Q.   Okay.  Now, you've described some formal trainings
21  you've received.  Have you received any kind of on-the-job
22  training as a DEA agent and now as an NCIS agent?
23  A.   Yes.  Every day seems like an informal training day
24  working with senior NCIS or DEA agents at the time, as well
25  as senior and more experienced local police detectives that

316

1   were federally deputized.

2           And then there were formal trainings as well,

3   in-service trainings in things like financial investigations,

4   telecommunications, exploitation.

5   Q.    Okay.  What are the primary investigative techniques

6   that you have used throughout your career?

7   A.    Predominantly physical surveillance, electronic

8   surveillance, which would be wiretaps, essentially, working

9   with informants, cooperating defendants and undercover

10  operations.

11  Q.    Do you draft and execute search warrants as well?

12  A.    Yes.

13  Q.    Okay.  Special Agent, you've mentioned informant,

14  confidential informant.  What is that?

15  A.    An informant or confidential informant is a non-law

16  enforcement person who has placement and access into criminal

17  organizations and that work on behalf of law enforcement

18  because of their placement and access to -- to basically do

19  criminal activity on our behalf so that we can further our

20  investigations.

21  Q.    So confidential informant is somebody who is not law

22  enforcement?

23  A.    Correct.

24  Q.    That person has a close relationship with some criminal

25  entity or organization or whatever?

317

1    A.    That's correct.

2    Q.    And they have chosen to work with you as law enforcement

3    to help you investigate the group?

4    A.    Correct.

5    Q.    Okay.  Special Agent, you also mentioned undercover.

6    What's that?

7    A.    Undercover is when a law enforcement officer or agent

8    poses as a criminal and/or someone that could facilitate

9    criminal activity in order to basically do the same

10   competence, what we do to further do an investigation.

11   Q.    How many times would you say you've worked with

12   confidential informants?

13   A.    I couldn't put a number on it.  Dozens would be a

14   conservative estimate.  It's a routine part of what we do.

15   Q.    And have you, yourself, ever worked as an undercover?

16   A.    Yes, I have.

17   Q.    And have you worked with other agents posing as

18   undercovers?

19   A.    Yes.

20   Q.    How many times would you say you've worked as an

21   undercover?

22   A.    Maybe a dozen over the course of my career.

23   Q.    And how many times have you worked with other agents

24   assisting with their undercover work?

25   A.    Again, it would be hard to put a number, but dozens is a

1    conservative estimate.

2    Q.    Okay.  Now, you mentioned wiretaps earlier.

3    A.    Yes.

4    Q.    What is a wiretap?

5    A.    A wiretap is the -- in a traditional sense is listening

6    to other people's phone calls pursuant to court

7    authorization.  But it can also extend to text messaging and

8    e-mails, things like that.  But predominantly my experience

9    has been telephonic communication.

10   Q.    So wiretap is a discreet or covert ongoing interception

11   of communications platform between one person and anybody

12   else?

13   A.    That's correct.

14   Q.    Okay.  How many wiretaps have you participated in?

15   A.    Again, hard to quantify.  Well over 25, probably.

16   Q.    Okay.  Have you conducted searches of phones seized from

17   people suspected of participating in drug trafficking?

18   A.    Yes, I have.

19   Q.    Have you searched those phones?

20   A.    Yes.

21   Q.    And have you reviewed texts and other forms of

22   communication found on those phones?

23   A.    Yes, I have.

24   Q.    How many times do you think you've done that?

25   A.    Again, hard to say.  I think it's a very routine part of

1    narcotics investigations, so well over -- dozens at least.

2    Q.   Okay.  Special Agent, in your view, is it an important

3    part of being a drug agent to understand the ways that drug

4    traffickers communicate with each other?

5    A.   Yes, it is.

6    Q.   Can you explain why?

7    A.   It's part and parcel to what we do.  Their communication

8    is what tells the story, and it helps us as law enforcement

9    to be able to be in a position to identify other

10   co-conspirators, to make seizures and to make arrests

11   eventually.

12   Q.   Okay.  Is it important to maintain an ongoing

13   understanding of the modes and methods of communication?

14   A.   Yes, it is.

15   Q.   Okay.  As a drug agent, is it important for you to

16   maintain an ongoing understanding of the nature of the drug

17   market?

18   A.   Yes.

19   Q.   Why is that?

20   A.   Because the drug market is ever changing, and, you know,

21   in order to enforce drug laws or laws that are sort of

22   engaged to drug trafficking, it's important to understand

23   what's going on in the world.

24   Q.   Okay.  Special Agent, have you had any participation as

25   an investigative agent in the matter now before the Court?

320

1    A.   No, I have not.

2         MR. ROTH:   Okay.  Your Honor, the United States

3    offers Special Agent Klinge as an expert in the area of the

4    nature of drug-trafficking communications and the nature of

5    the market pursuant to Rule 702.

6         THE COURT:   Do you wish to voir dire the witness in

7    that regard?

8         MR. CORTEZ:   Not at all.  We'll stipulate.

9         THE COURT:   Okay.

10        MR. CORTEZ:   Subject to 401.

11        THE COURT:   Okay.  You may proceed pursuant to

12   Rule 702.

13        MR. ROTH:   Thank you, Your Honor.

14   Q.   Special Agent, have you been in the courtroom at any

15   point before appearing now during this trial?

16   A.   No, I have not.

17   Q.   Okay.  Special Agent, as part of your work, have you

18   become familiar with the law called the Controlled Substances

19   Act?

20   A.   Yes, I have.

21   Q.   And can you explain how it works.

22   A.   The Controlled Substances Act is a law wherein drugs,

23   controlled substances are -- substances are categorized into

24   one of five categories called schedules, and those schedules,

25   classifications are based on the drugs legitimate accepted

321

1    medical use and propensity for addiction and/or abuse.

2    Q.    And so if the drug is scheduled, that restricts or

3    prohibits its lawful distribution?

4    A.    That's correct.

5    Q.    How are the schedules laid out?  Are they

6    alphabetized?

7    A.    They are numbered I through V.

8    Q.    Okay.  What's on Schedule I?

9    A.    Schedule I is drugs that have a very high propensity for

10   abuse and no legitimately acknowledged medical use in the

11   United States.

12   Q.    Is heroin an example of a Schedule I drug?

13   A.    Yes.

14   Q.    Okay.  And by comparison, Schedule V?

15   A.    Schedule V would be a very widely accepted, legitimate

16   medical use in the United States and a very low propensity

17   for addiction or abuse.

18   Q.    So perhaps some forms of cough syrup might be on V?

19   A.    Possibly, yes.

20   Q.    Okay.  Have you, in the course of your career, come

21   across a drug called oxycodone?

22   A.    Yes.

23   Q.    What is oxycodone?

24   A.    Oxycodone is an opioid that's traditionally prescribed

25   as a painkiller of some kind.

322

1    Q.   Is it scheduled?

2    A.   Yes, it is.

3    Q.   What schedule is it on?

4    A.   Schedule II.

5    Q.   Okay.  Have you come across a drug or pill known as an

6    M30 pill?

7    A.   Yes, I have.

8    Q.   In its legitimate form, what is an M30 pill?

9    A.   An M30 pill is a 30-milligram oxycodone pill.

10   Q.   What do M30 pills look like?

11   A.   They are blue and round, and they have a 30 on one side

12   and an M either square or box on the other side, stamped into

13   the other side.

14   Q.   And because they are produced by a pharmaceutical

15   company, every one has 30 milligrams of oxycodone?

16   A.   The legitimate ones, that's correct.

17   Q.   Okay.  Have you ever heard of Percocet?

18   A.   Yes.

19   Q.   What is Percocet?

20   A.   Percocet is a brand name for oxycodone.

21   Q.   Okay.  Have you ever heard of fentanyl?

22   A.   Yes, I have.

23   Q.   What is fentanyl?

24   A.   Fentanyl is an incredibly strong opioid.

25   Q.   What schedule is it on?

323

1   A.   II.

2   Q.   How does fentanyl compare to heroin?

3   A.   It's exponentially stronger than heroin.

4   Q.   And is fentanyl addictive?

5   A.   Yes.

6   Q.   Correlating to its strength?

7   A.   Correct.

8   Q.   Special Agent, you testified that you keep an ongoing

9   understanding of the nature of the drug market.

10  A.   Yes.

11  Q.   Okay.  And in doing so, do you keep up with the various

12  forms that different drugs take?

13  A.   Yes.

14  Q.   In your experience, do drugs change in their form and in

15  their appearance over time?

16  A.   It's possible, yes.

17  Q.   Okay.  So, for instance, pills can become -- start to

18  come in different colors?

19  A.   Correct.

20  Q.   Substances that are traditionally solid can start to be

21  seen in liquid form?

22  A.   That's correct as well.

23  Q.   Okay.  So let's just have some examples.

24           Special Agent, classically, what does

25  methamphetamine look like?

324

1    A.    Classically, methamphetamine is a crystalline substance.

2    In its pure form, it's very clear; looks like shards of

3    glass.

4    Q.    Okay.  Classically, what does cocaine look like?

5    A.    It's a white powdery substance that in some light can

6    have some sort of a pearly, in a large quantity a pearly

7    visage, I guess.

8    Q.    Heroin?

9    A.    Heroin can either be a dark brown or black tarry

10   substance or a tan sort of sand-like substance.

11   Q.    Okay.  Special Agent, in your experience, does fentanyl,

12   over the last several years, have a sort of classic or

13   expected form?

14   A.    Nowadays, I would say it's almost exclusively seen in

15   pill form.

16   Q.    Okay.

17   A.    Prior to that, it was white powder.

18   Q.    Okay.  What is the nature of the pills?

19   A.    Fentanyl pills that I've seen have traditionally looked

20   like the M30 oxycodone pills.

21   Q.    So the form of fentanyl is fake blue M30 pills?

22   A.    Correct.

23   Q.    Thank you.

24            MR. ROTH:  May I have one second?

25            Special Agent, have you -- couple of questions.  I

325

1    should have asked this a bit earlier.

2    Q.   But in addition to sort of your focus and experience, do

3    you confer with other seasoned drug investigators?

4    A.   Yes, I do.

5    Q.   And does your understanding of the nature of fentanyl

6    reflect a consensus?

7    A.   Yes.

8    Q.   Okay.  Earlier I asked you if all genuine M30 pills were

9    Percocets that come off the line at 30 milligrams of

10   oxycodone.  Can the same thing be said about these

11   counterfeit M30s that have fentanyl in them?

12   A.   No, it cannot be said.

13   Q.   Could you elaborate.

14   A.   A legitimate oxycodone pill made in a lab is made under

15   laboratory conditions and regulated in some way, shape or

16   form.  Counterfeit pills that contain fentanyl are not made

17   in a lab or by a scientist.  They are, you know, put together

18   with fentanyl and various other binding agents to hold --

19   help them hold their pill form.

20   Q.   Okay.  What's --

21   A.   And there is no regulation or rhyme or reason to how

22   much fentanyl is in each pill.

23   Q.   So is it accurate to say that it's kind of a crapshoot

24   when you're -- when it comes to the amount of fentanyl in a

25   counterfeit M30 pill?

326

1    A.   I would say that's correct, yes.

2    Q.   Okay.  Special Agent, I'd like to pivot a little bit.

3         You mentioned that part of your job, sort of to keep

4    your core competence, is to maintain an understanding of the

5    ways that drug traffickers communicate.

6    A.   That's correct.

7    Q.   Do you have any -- in your experience, do drug

8    traffickers use social media?

9    A.   Yes, they do.

10   Q.   Do you have an understanding of why?

11   A.   It's done in an effort to sort of thwart the

12   investigative efforts of law enforcement.  There are ways

13   that they can communicate on social media that are hard or

14   impossible for us to intercept.  And then some social media

15   apps have security measures, for lack of a better word, that

16   allow messages to disappear off the phone.

17   Q.   What are some popular social media applications that

18   drug traffickers like to use?

19   A.   Instagram, Snapchat.  It's -- there is a ton out there,

20   and so it would be hard to say -- classify all of them.

21   Radiate is a path that I would say.  It's not social media,

22   but Snapchat is one I've seen --

23   Q.   Okay.

24   A.   -- often.

25   Q.   Now, in communications over text and social media, et

327

1    cetera, fair to say that you've seen the actual language that

2    is used by drug traffickers?

3    A.    Yes.

4    Q.    Okay.  Do drug traffickers speak in clear,

5    straightforward sentences when they are talking about their

6    activity?

7    A.    No, they don't.

8    Q.    How do they communicate with each other?

9    A.    They use some form of coded language.

10   Q.    Okay.  I'm going to ask you some questions about coded

11   language.

12         First of all, do you tend to see similar terms used

13   over time with respect to various drugs or aspects of

14   trafficking?

15   A.    Yes.

16   Q.    Okay.  Why do traffickers speak in this vague and coded

17   language?

18   A.    Again, it's an effort to thwart detection by law

19   enforcement, parents, military chains of command.

20   Q.    Have you heard or seen this kind of language over those

21   wiretaps that you described?

22   A.    Yes.

23   Q.    Okay.  Special Agent, what is one sort of principal way

24   that you can tell you're looking at coded language for

25   drugs?

COMPUTER-AIDED TRANSCRIPTION

328

1   A.   Obviously, depending on the context.  And then, you

2   know, some of what they say over this coded language doesn't

3   make sense.  So if -- I've seen kilograms of cocaine referred

4   to as shirts or girls, and sometimes someone will order

5   five-and-a-half shirts or five-and-a-half-girls over the

6   wiretap; and it just doesn't make sense.

7   Q.   So let's use that as an example.  So shirts.  That's a

8   coded term you've heard before used for drugs?

9   A.   Correct.

10  Q.   And it's used in the context, you said, that doesn't

11  make sense.

12  A.   Yes.

13  Q.   Okay.  In what sense does it not make sense?

14  A.   It's -- you know, oftentimes the price, you know,

15  $20,000 for a shirt is steep, even in Southern California;

16  nor do you buy half a shirt.

17  Q.   Okay.  So for instance, you've seen something like, I

18  want to get five-and-a-half shirts for 20 G's?

19  A.   Yes.

20  Q.   Okay.  Are there ever coded terms that refer to a

21  physical aspect of the drug?

22  A.   Yes.

23  Q.   So you mentioned that methamphetamine in its classic

24  form is crystalline shards; right?

25  A.   That's correct.

329

1    Q.   What are some common coded terms you've heard for

2    meth?

3    A.   Crystal or glass or windows are three of the more common

4    terms.

5    Q.   Shards?

6    A.   Shards as well.

7    Q.   Okay.  What about cocaine?

8    A.   Cocaine is white powder, so powder, snow, because snow

9    is white powder, things like that.  Blow is just an old term

10   that they used.  Coke.

11   Q.   Heroin?

12   A.   Heroin would be H, because heroin starts with an H.

13   Horse is an old name.  Hype, because it's injected with a

14   hypodermic needle.  Smack is another one as well.

15   Q.   What about fentanyl?

16   A.   Fentanyl is -- fent is popular.  Sometimes they call it

17   white as well, because in its powder form, it's a white

18   powder.

19   Q.   What about those pills you described earlier?

20   A.   Those would usually -- even though they are not

21   called -- even though they may not contain OxyContin, they

22   are still called oxys, even though they don't contain

23   oxycodone.  Or 30s, or sometimes just pills; or blues,

24   because they are oftentimes blue in color.

25   Q.   Have you heard -- have you ever heard Percocet or any

330

1    derivative of Percocet used in this context?

2    A.    Yes.

3    Q.    Okay.  What have you heard?

4    A.    Traditionally just percs is usually what I've seen.

5    Q.    Okay.  Now, younger generation, social media is big

6    these days.  Do drug traffickers use only the written word

7    when engaged in this coding language?

8    A.    No, they don't.

9    Q.    What is another means that they use to communicate?

10   A.    They use emojis.

11   Q.    Okay.  And what is an emoji?

12   A.    An emoji is a picture that is sort of pre-programmed or

13   obtained on your phone that can be used as shorthand

14   basically for a word or phrase.

15   Q.    Can you give an example of an emoji you use in your own

16   life?

17   A.    So my daughter said she had a biology test tomorrow, and

18   I sent a four-leaf clover emoji to wish her good luck.

19   Q.    Okay.  How do drug traffickers use emojis when

20   communicating?

21   A.    It's just another form of coded language.

22   Q.    Have you seen emojis used to reflect different drugs in

23   the same way that coded terms do?

24   A.    Yes, I have.

25   Q.    So what is an example you've seen of an emoji for

331

1    cocaine?

2    A.    Snowflake.

3    Q.    Okay.  What about for heroin?

4    A.    Either needle or a horse, as I said before.  Horse is

5    for heroin.

6    Q.    Have you seen personally any emojis referring to M30

7    pills?

8    A.    Just usually there is a pill emoji, either a tablet or a

9    capsule, or with the number 30.

10            MR. ROTH:  One moment, Your Honor.

11            THE COURT:  Yes.

12            MR. ROTH:  Thank you.

13            MR. ROTH:  Nothing further, Your Honor.  Thank

14   you.

15            THE COURT:  Okay.  Thank you.

16            Cross-examination?

17            MR. CORTEZ:  Surprisingly, Agent, I have absolutely

18   no questions for you.  Thank you.

19            THE WITNESS:  Thank you.

20            THE COURT:  Okay.  Thank you.  You may step down,

21   sir.

22            THE WITNESS:  Thank you.

23            MR. ROTH:  The United States rests.

24            THE COURT:  Okay.  Ladies and gentlemen, that

25   concludes the presentation of the government's case-in-chief,

332

1    so the evidence that the government intends to present for

2    your consideration has come to a close.

3          As I mentioned earlier, the defense has an

4    opportunity to present any evidence, if they choose to do so.

5    At no time does the defense have to present any evidence.  So

6    they will make that decision, but they will make that

7    decision during our lunch break.

8          So we are going to take our one-hour lunch break at

9    this time.  And it is quarter till 12:00.  I ask that you be

10   back at quarter to 1:00 for the resume -- at which time we

11   will resume the presentation of evidence, if the defense

12   chooses to do so.

13         I would remind you of the admonition not to discuss

14   the case or form an opinion about the case and not to do any

15   independent research about anything having to do with the

16   case, whether it be on the Internet, consulting written

17   materials or anything of that nature.

18         So I wish you all a very good lunch break.  We'll

19   see you back in one hour's time.  Again, you can leave your

20   notebook on your chair.  No one will have access to them.  If

21   you do go into the jury room, if you brought your lunch and

22   you used the refrigerator, you will have to remain in the

23   jury room during the entire one-hour time period.

24         If not, please enjoy your lunch and the facilities

25   outside the courthouse, and we'll see you back.  Thank you.

333

1          (Jury absent, 11:46 a.m.)

2          THE COURT:  We are still on the record.

3          We are outside the presence of the jury.  All

4     counsel are present.  Mr. Atta is present.

5          A couple of housekeeping matters.  I provided the

6     parties with a written copy of the verdict form.  A copy has

7     also been e-mailed to you is my understanding.

8          Also, with respect to the jury instructions, I

9     believe a copy has also been e-mailed to you, and the final

10    version of the instructions has also been filed on the ECF

11    system.

12         So with those housekeeping matters, is there

13    anything else that we need to address before we break for

14    lunch?

15         MR. CORTEZ:  Yes.  I'll renew my motion for

16    mistrial, and I'll make my Rule 29.

17         THE COURT:  Okay.  Is the mistrial motion any

18    different from what has already been discussed at sidebar?

19         MR. CORTEZ:  It adds the over two years of drug

20    ledgers that have nothing to do with this, and they relate to

21    the warning about getting into the prolific drug-trafficker

22    characterization.

23         THE COURT:  Okay.

24         MR. CORTEZ:  That's -- and everything else.

25         THE COURT:  Okay.  With respect to --

334

1          MR. CORTEZ:  It's a general -- I'm sorry.  It's a

2     general Rule 29.

3          THE COURT:  Okay.  I understand the general

4     Rule 29, but the specific that you raised, that is, the drug

5     ledger, that was marked for identification as Government's

6     Exhibit No. 45.  It was not received into evidence.  What was

7     received into evidence was the 1006 summary as it pertains to

8     Mr. Atta.

9          Have I correctly characterized the exhibit that was

10    received?

11         MR. ROTH:  Yes.

12         MR. CORTEZ:  Yes.  But the jury was told the number

13    of those things, so that's for my mistrial motion.

14         THE COURT:  Okay.

15         MR. CORTEZ:  I don't want to blend rule -- I want to

16    keep Rule 29 over here.  General Rule 29.

17         THE COURT:  Let's address the mistrial motion.

18         With respect to the testimony, I believe it was

19    testimony that it was approximately 200 pages long.  And with

20    regard to that, I find that it is relevant, in that it

21    reflects that Mr. Atta kept very detailed records as to his

22    activities selling items.

23         And in that respect, I believe it sheds light on his

24    knowledge and intent to sell specific controlled substances.

25    And I believe that's also reflected in the exhibit that was

335

1    received -- and refresh my recollection as to the exhibit,

2    the 1006.

3              MR. ROTH:  46, your Honor.

4              THE COURT:  -- in 46.

5              And it reflects the quantity of the controlled

6    substance, the type of controlled substance, and it marries

7    it up with the exhibits that were received; that is, the menu

8    items that were received.  So it ties together those.  And I

9    think it substantiates the Rule 401 analysis as to why those

10   menus were properly received into evidence with the

11   appropriate limiting instruction that I gave.

12             MR. CORTEZ:  And with the Court's comments and

13   explanation, my comment for the record would be those

14   combinations, the interrelationship, all of that evidence,

15   exacerbates the 403 prejudicial effect.

16             THE COURT:  Okay.  Your objection is noted for the

17   record.  I stand on the rulings that have been made so far.

18   I believe that they are appropriate under the circumstances.

19             And, again, without getting into the specific

20   details, with regard to any exhibit that has been offered,

21   not only am I doing the Rule 401 and any other required

22   analysis as to the foundation, I am also very cognizant of

23   Rule 403 and have performed that analysis with respect to any

24   exhibit that's been received into evidence so far in this

25   trial.

336

1           MR. CORTEZ:  Thank you.

2           THE COURT:  As to the general Rule 29, does the

3    government wish to be heard?

4           MR. ROTH:  Yes, Your Honor.  Thank you.  If I may,

5    Your Honor, just to make a brief record.

6           The United States showed the summary chart to

7    counsel in an e-mail before trial, didn't receive

8    confirmation that it could come in; so we had to lay

9    foundation to put it in.  So I would add that we needed to

10   show it was a voluminous record to justify a summary chart.

11          THE COURT:  Okay.  I believe that's also

12   appropriate.

13          Mr. Cortez, do you have any comment in that regard?

14          MR. CORTEZ:  No more comment.  I've said enough.

15          THE COURT:  Okay.

16          MR. ROTH:  Thank you, Your Honor.

17          As to Rule 29, the government has offered

18   overwhelming evidence of guilt, certainly sufficient guilt --

19   certainly sufficient evidence to put this case to the jury.

20   Our burden is to show a knowing distribution of fentanyl.  We

21   have done that overwhelmingly, including through the exhibit

22   at 46 that Your Honor referenced.

23          We have to show that the defendant understood it was

24   fentanyl or some other controlled substance.  Again, we have

25   made that showing in fairly overwhelming fashion, I believe.

337

1   And we have to prove that the distribution of the fentanyl

2   was the but-for cause of Christian Reed's death.

3         Among other things, this Court took testimony from

4   Dr. Bryan Platt, the medical examiner, who testified

5   unequivocally, and I think comprehensively, that it was a

6   fentanyl overdose that killed Christian Reed.

7         Thank you.

8         THE COURT:  Viewing the evidence in the light most

9   favorable to the government, which I'm required to do so at

10  this stage of the proceeding, I find that there is sufficient

11  evidence in the record to find that a reasonable jury could

12  find that the government has met its burden with respect to

13  the three elements as to the offense charged, and the motion

14  is respectfully denied.

15        MR. CORTEZ:  Thank you, sir.

16        And I will notify -- I will know for sure about a

17  case we may or may not have before 1:30.

18        THE COURT:  Okay.  If --

19        MR. CORTEZ:  Actually, what time are we back here?

20        THE COURT:  Quarter to 1:00, so 12:45.

21        MR. CORTEZ:  Okay.  I will know -- I'll let you all

22  know by then.

23        THE COURT:  Okay.  Mr. Cortez, what I would ask that

24  you do -- if you choose not to present any evidence, I would

25  ask you to rest in front of the jury so that it's clear to

COMPUTER-AIDED TRANSCRIPTION

338

1    them that you have made that decision with respect to the

2    presentation of evidence.  And we'll go right into jury

3    instructions if you choose not to present any evidence.

4              MR. CORTEZ:  And then closings?

5              THE COURT:  And then closing.

6              MR. CORTEZ:  Very good.  Thank you.

7              THE COURT:  Thank you all very much.

8              (Recess, 11:53 a.m. to 12:50 p.m.)

9              (Jury present, 12:52 p.m.)

10             THE COURT:  Okay.  Good afternoon.  Welcome back.

11   All of our jurors are present.  All counsel are present,

12   Mr. Atta is present.

13             Mr. Cortez, do you wish to call any witnesses?

14             MR. CORTEZ:  Oh, sorry, Your Honor.  No, we do not.

15   We rest.

16             THE COURT:  Okay.  Ladies and gentlemen, that

17   concludes the presentation of evidence in this case, and the

18   case will now be submitted to you for your consideration.

19             But before we do that, I have to read you the jury

20   instructions that will govern your deliberations in this

21   case.  Again, I remind you that you have a written copy of

22   all of these instructions, so I notice that some of you have

23   been diligently taking notes during the course of the

24   testimony.  You need not take any notes during the jury

25   instruction portion of this, because you will have a written

1    version of these very same instructions.

2         Following the instructions, the attorneys will have

3    an opportunity to give their closing arguments to you.  The

4    government will go first.  The defense will go next, and the

5    government will have an opportunity to offer a rebuttal

6    argument.  And following the argument, I have a few closing

7    instructions as to the logistics of how you should conduct

8    your deliberations.  So that's our schedule for this

9    afternoon.

10        And, again, ladies and gentlemen, I ask for your

11   indulgence.  Again, I'm reading these instructions to you, so

12   I apologize for not maintaining eye contact with you as we go

13   through these instructions.

14        Members of the jury, now that you have heard all the

15   evidence, it is my duty to instruct you on the law that

16   applies to this case.  A copy of these instructions will be

17   available in the jury room for you to consult.  It is your

18   duty to weigh and to evaluate all the evidence received in

19   the case, and if you can do so, to decide the facts.  It is

20   also your duty to apply the law as I give it to you to the

21   facts as you find them, whether you agree with the law or

22   not.

23        You must decide the case solely on the evidence and

24   the law.  You will recall that you took an oath promising to

25   do so at the beginning of the case.  You should also not be

340

influenced by any person's race, color, religious beliefs,
national ancestry, sexual orientation, gender identity,
gender or economic circumstances.

      Also, do not allow yourself to be influenced by
personal likes or dislikes, sympathy, prejudice, fear, public
opinion or biases, including unconscious biases.  Unconscious
biases are stereotypes, attitudes or preferences that people
may consciously reject but may be expressed without
conscientious awareness, control or intention.

      You must follow all of these instructions and not
single out some and ignore others.  They are all important.
Please do not read into these instructions or into anything I
may have said or done as any suggestion as to what your
verdict should be.  That is a matter entirely up to you.

      The indictment is not evidence.  The defendant has
pleaded not guilty to the charge.  The defendant is presumed
to be innocent, unless and until the government proves the
defendant guilty beyond a reasonable doubt.  In addition, the
defendant does not have to testify or present any evidence.
The defendant does not have to prove innocence.  The
government has the burden of proving every element of the
charge beyond a reasonable doubt.

      A defendant in a criminal case has a constitutional
right not to testify.  In arriving at your verdict, the law
prohibits you from considering in any manner that the

341

1    defendant did not testify.

2          Proof beyond a reasonable doubt is proof that leaves

3    you firmly convinced the defendant is guilty.  It is not

4    required that the government prove guilt beyond all possible

5    doubt.  A reasonable doubt is a doubt based upon reason and

6    common sense and is not based purely on speculation.  It may

7    arise from a careful and impartial consideration of all the

8    evidence, or from lack of evidence.

9          If, after a careful and impartial consideration of

10   all the evidence, you are not convinced beyond a reasonable

11   doubt that the defendant is guilty, it is your duty to find

12   the defendant not guilty.  On the other hand, if, after a

13   careful and impartial consideration of all the evidence, you

14   are convinced beyond a reasonable doubt that the defendant is

15   guilty, it is your duty to find the defendant guilty.

16         The evidence you are to consider in deciding what

17   the facts are consists of:  First, the sworn testimony of any

18   witness.  Second, the exhibits received in evidence.  And,

19   third, any facts to which the parties have agreed.

20         In reaching your verdict, you may consider only the

21   evidence and testimony received into evidence.  The following

22   things are not evidence, and you may not consider them in

23   deciding what the facts are:

24         Questions, statements, objections and arguments by

25   the lawyers are not evidence.  The lawyers are not witnesses.

COMPUTER-AIDED TRANSCRIPTION

342

1    Although you must consider a lawyer's questions to understand

2    the answers of a witness, the lawyers' questions are not

3    evidence.

4            Similarly, what the lawyers have said in their

5    opening statements, will say in their closing arguments, and

6    have said at other times is intended to help you interpret

7    the evidence, but it is not evidence.  If the facts as you

8    remember them differ from the way the lawyers state them,

9    your memory of them controls.

10           Any testimony that I have excluded, stricken or

11   instructed you to disregard is not evidence.  In addition,

12   some evidence was received only for a limited purpose.  When

13   I have instructed you to consider certain evidence in a

14   limited way, you must do so.

15           Anything you may have seen or heard when the court

16   was not in session is not evidence.  You are to decide the

17   case solely on the evidence received at the trial.

18           Evidence may be direct or circumstantial.  Direct

19   evidence is direct proof of a fact, such as testimony by a

20   witness about what that witness personally saw or heard or

21   did.  Circumstantial evidence is indirect evidence, that is,

22   it is proof of one or more facts from which you can find

23   another fact.

24           You are to consider both direct and circumstantial

25   evidence.  Either can be used to prove any fact.  The law

1   makes no distinction between the weight to be given to either

2   direct or circumstantial evidence.  It is for you to decide

3   how much weight to give any evidence.

4          In deciding the facts in this case, you may have to

5   decide which testimony to believe and which testimony not to

6   believe.  You may believe everything a witness says, or part

7   of it or none of it.

8          In considering the testimony of any witness, you may

9   take into account the following:  First, the opportunity and

10  ability of the witness to see or hear or know the things

11  testified to; second, the witness' memory; third, the

12  witness' manner while testifying; fourth, the witness'

13  interest in the outcome of the case, if any; fifth, the

14  witness' bias or prejudice, if any; sixth, whether other

15  evidence contradicted the witness' testimony; seventh, the

16  reasonableness of the witness' testimony, in light of all the

17  evidence; and, eight, any other factors that bear on

18  believability.

19         Sometimes a witness may say something that is not

20  consistent with something else he or she said.  Sometimes

21  different witnesses will give different versions of what

22  happened.  People often forget things or make mistakes in

23  what they remember.

24         Also, two people may see the same event but remember

25  it differently.  You may consider these differences, but do

344

1    not decide the testimony is untrue just because it differs

2    from other testimony.  However, if you decide that a witness

3    has deliberately testified untruthfully about something

4    important, you may choose not to believe anything that

5    witness said.

6         On the other hand, if you think the witness

7    testified untruthfully about some things but told the truth

8    about others, you may accept the part you think is true and

9    ignore the rest.

10        The weight of the evidence as to a fact does not

11   necessarily depend on the number of witnesses who testify.

12   What is important is how believable the witnesses were and

13   how much weight you think their testimony deserves.

14        You are here only to determine whether the defendant

15   is guilty or not guilty of the charge in the indictment.  The

16   defendant is not on trial for any conduct or offense not

17   charged in the indictment.

18        The defendant is charged in the indictment with

19   distribution of fentanyl resulting in the death of another,

20   that is, C.M.R., in violation of Sections 841(a)(1) and

21   (b)(1)(C) of Title 21 of the United States Code.

22        In order for the defendant to be found guilty of

23   that charge, the government must prove each of the following

24   elements beyond a reasonable doubt:

25        First, the defendant knowingly distributed fentanyl.

345

1   Second, the defendant knew that it was fentanyl or some other

2   federally controlled substance.  And, third, the use of the

3   fentanyl distributed by the defendant resulted in the death

4   of C.M.R.

5        The word "distributed" means delivering or

6   transferring possession of the fentanyl to another person

7   with or without any financial interest in that transaction.

8   The government is not required to prove the amount or

9   quantity of fentanyl distributed.  It need only prove beyond

10  a reasonable doubt that there was a measurable or detectable

11  amount of fentanyl.

12       The phrase "resulted in death" means that C.M.R.'s

13  use of the fentanyl distributed by the defendant was the

14  cause of his death.  In that regard, the government must

15  prove beyond a reasonable doubt that but for C.M.R.'s use of

16  the distributed fentanyl, he would not have died.  The

17  government need not prove that C.M.R.'s death was a

18  foreseeable result of the fentanyl distribution or that the

19  defendant knew or should have known that the distributed

20  fentanyl would cause his death.

21       Additionally, the level of care administered to

22  C.M.R. by the first responders, whether it was medically

23  appropriate or whether it fell below an ordinary standard of

24  care, is not a relevant consideration as to whether the

25  fentanyl distributed by the defendant was the cause, in fact,

1    of C.M.R.'s death.

2          The crime of distribution of fentanyl resulting in

3    death includes the lesser crime of distribution of fentanyl.

4    If, one, all of you are not convinced beyond a reasonable

5    doubt that the defendant is guilty of distribution of

6    fentanyl resulting in death, and, two, all of you are

7    convinced beyond a reasonable doubt that the defendant is

8    guilty of the lesser crime of distribution of fentanyl, you

9    may find the defendant guilty of distribution of fentanyl.

10         For the defendant to be found guilty of the lesser

11   crime of distribution of fentanyl, the government must prove

12   each of the following elements beyond a reasonable doubt:

13         First, the defendant knowingly distributed fentanyl.

14   And second, the defendant knew that it was fentanyl or some

15   other federally controlled substance.

16         "Distributing" means delivering or transferring

17   possession of fentanyl or some other federally controlled

18   substance to another person with or without financial

19   interest in that transaction.

20         The government is not required to prove the amount

21   or quantity of fentanyl or other federally controlled

22   substance.  It need only prove beyond a reasonable doubt that

23   there was a measurable or detectable amount of the substance.

24         The indictment charges that the offense alleged was

25   committed on or about a certain date.  Although it is

347

1   necessary for the government to prove beyond a reasonable

2   doubt that the offense was committed on a date reasonably

3   near the date alleged in the indictment, it is not necessary

4   for the government to prove that the offense was committed

5   precisely on the date charged.

6         Ladies and gentlemen, that concludes the preliminary

7   set of jury instructions that will govern your deliberations.

8   Again, I have some final instructions that concern the

9   logistics of your deliberations following the closing

10  arguments of the attorneys in the case.

11        Is the government prepared to go forward with your

12  closing argument?

13        MR. ROTH:  We are, Your Honor.  If we may just have

14  a moment to set up?

15        THE COURT:  Yes.

16        MR. ROTH:  Thank you.

17        Can you all hear me?  Okay.

18        Your Honor.

19        THE COURT:  Please, go ahead.

20        MR. ROTH:  Thank you.  Good afternoon, ladies and

21  gentlemen.

22        Christian Reed died the day after his 26th birthday.

23  He died on the floor of his barracks room at Miramar.  He

24  died from drugs sold to him by his dealer, the defendant.

25        You have now seen all of the evidence in this case,

348

1   and it all fits together in a neatly, overlapping,

2   collaborative, corroborative way, showing to you in an

3   overwhelming fashion that this man (indicating) sold drugs to

4   Christian Reed, controlled substances, that resulted in

5   Christian's death.  He is guilty of the charge in the

6   indictment.

7          And, of course, my clicker stops working.

8          The charge in this case, as Judge Robinson explained

9   to you, breaks down into elements.  There are three, and they

10  are straightforward.  Our obligation is to prove them to you

11  beyond a reasonable doubt.  We're just going to go through

12  them together, and then we're going to walk through this

13  evidence in a calm, objective, methodical fashion.

14         The first element is that the defendant knowingly

15  distributed fentanyl.  The second is that he knew -- this is

16  important -- that it was fentanyl or some other controlled

17  substance.  And, third, that the distribution of fentanyl by

18  the defendant was the cause of Christian's death.

19         Let's talk about this element.  What does it mean

20  for us to prove that the defendant knowingly distributed

21  fentanyl?  Straightforward.  It wasn't an accident.  It

22  wasn't a scenario in which the defendant generally believed

23  he was giving something else to Christian and it turned out

24  to be drugs.  It's that he was making a purposeful

25  distribution to Christian.

349

1          Second, that he knew it was fentanyl or some other

2     controlled substance, which is a fancy way of saying he knew

3     it's a controlled substance.  What does it mean?  It means

4     that he knows it's a drug, and, separately, that the drug is

5     on the controlled substances schedules that you heard about.

6          Every iteration of the drugs at issue in this case

7     is a controlled substance.  Fentanyl is a controlled

8     substance.  Oxycodone is a controlled substance.  Percocet is

9     just a brand name for oxycodone.  M30 pills are oxycodone,

10    and in the counterfeit form, fentanyl.

11         We have proven to you -- and we're going to go

12    through this -- that he knew it was fentanyl, but even if one

13    of you thinks that maybe he thought it was really Percocet,

14    it does not matter.  It's a controlled substance.  And the

15    element is he knew it was a controlled substance.

16         And third, that the use of the fentanyl was the but

17    for cause of death.  Now, "but for" sounds like legal

18    terminology.  It's pretty simple.  It's our burden to show

19    that it was the fentanyl that did it, that there were no

20    other contributing factors to the death, that it was fentanyl

21    plus something else.  It was the drugs.  That's what this

22    third element is about.

23         You heard some testimony in cross-examination about

24    Narcan, constricted pupils, things like that.  Irrelevant.

25    Does not matter.  How the first responders responded -- and I

350

1   submit to you there is evidence that they responded

2   competently, professionally, admirably, but the nature of

3   their attempt to intervene in the emergency initiated by this

4   man's drugs does not matter.  So all of that is a red

5   herring.  You should ignore it.

6           Let's start with that first element, knowing

7   distribution.  How do you know that the defendant

8   purposefully gave drugs to Christian?

9           Let's start with Christian himself.  Here he is.  He

10  was a Marine.  Got these photos of him in his dress blues and

11  his fatigues.  And important and remember this photo, ladies

12  and gentlemen, here he is in his Tennessee Volunteer T-shirt.

13  It's from the day on or before his death.

14          Here is the photo from his phone of his distinctive

15  BMW, which he damaged the front right fender.  Remember the

16  testimony of his friend, Austin Ritter, which was stipulated

17  to, and you can credit that.  He knew Christian; Christian

18  was his friend.  He knew Christian drove a dark BMW sedan

19  with damage to the front fender.  This is Christian's car.

20          Here is Christian's phone that you heard so much

21  about.  There is the first set of messages between Christian

22  and the defendant over Snapchat.  And what does he say to

23  him?  To begin the relationship, the selling relationship,

24  verify yourself.

25          Why would a person need Christian to verify himself?

1    Because he's dealing Christian drugs.  Drug dealers don't

2    want to get caught.  Drug dealers don't want to sell drugs to

3    undercover agents.  Drug dealers don't want to sell to

4    confidential informants.  Drug dealers don't want to sell to

5    people who are going to get them in trouble.

6           So what's the first thing you do?  Tell me who

7    referred you.  Are you cool?  Are you trustworthy?  Can I

8    sell to you and it's going to be okay?  Verify yourself.

9    From the beginning.  That's how this whole thing starts.

10   Asks him for the area where am I going to deliver.  And what

11   does Christian respond, by the way?  Miramar.

12          And by the way, who's nameeratta3324, communicating

13   with Christian over those Snaps that we saw over Christian's

14   phone?

15          Ms. Douglas, if you would.

16          (Video played.)

17          MR. ROTH:  The purveyor of the trap channel,

18   verifying that this is his account.  Here are photos again

19   that you saw in the defendant's own Snapchat account.

20          And here, again, are the 43 communications between

21   Christian and the defendant in April and May of 2020 offering

22   percs for sale, prices, meeting locations, amounts,

23   confirmations.  Sale after sale after sale after sale.

24   Fifteen of them.

25          Summarized for you in the summary chart that's

1   admitted into evidence for you as Exhibit 46.  Pay close

2   attention to this chart.  Blue diamonds.  You saw for

3   yourself what those are.  Perc 30s, fentanyl.  Sale after

4   sale after sale.

5          The defendant sold Christian 57 pills, 57 fentanyl

6   pills over six weeks.  He made $1800 off of him.  And as you

7   heard, every single one of those pills, who knows what's in

8   them.  You're playing Russian roulette when you take a

9   fentanyl pill, ladies and gentlemen.  Special Agent Klinge

10  told you, there is no way to know what is actually in them,

11  how much fentanyl is in them.

12         The Venmo transactions that you saw corroborating

13  the transactions in the ledger and in those communications.

14  You see right there, four notations for partial payments by

15  Christian over Venmo.  You have the Venmo records yourselves.

16  Go ahead and study them.  It all matches.

17         The defendant sold Christian OC, oxycodone.

18  Christian referred to him as his plug, his G.  He's his

19  dealer.  That's what this relationship is.  That's what it

20  is.  He's his dealer.  He sold him fentanyl pills and

21  Christian got unlucky at the end, died from one of them.

22  That's all this case is.

23         You saw this map in Christian's phone, further

24  corroboration that he is the one who sold him these pills.

25  Here is the map.  We know that that's the defendant's home

1    because Special Agent Logan explained to you he did

2    surveillance there, he executed a search there.

3          Here is the same map from the defendant's side of

4    the line.  It's annotated.  You see that red circle and that

5    white circle that we're going to come back to.  This is the

6    spot.  This is the trap.  This is the temple, the trap

7    temple.  It's all the same thing.  This is where you go to

8    get sold fentanyl pills by the defendant.

9          If you would please play the video on the left and

10   then on the right.

11         (Video played.)

12         MR. ROTH:  That's the red area on the map.

13         (Video played.)

14         MR. ROTH:  That's the white area on the map.  The

15   temple is open.  Come get your fentanyl.

16         And, of course, the final sales, the sales that all

17   but certainly are of the specific pills that killed

18   Christian.  May 19th, two different sales of three different

19   pills.  May 20th, the day before death, 12 pills for 300

20   bucks.  Documented for you right there uncontroverted.  In

21   Snapchat on Christian's phone.  By video, by summary ledger,

22   by Venmo transaction, by map, by video.

23         Here is May 19th.  You saw Exhibit 90.  There is the

24   BMW with the distinctive dent.  There is Christian getting

25   sold drugs.

354

1          Let's play this, please.

2          (Video played.)

3          MR. ROTH:  That's the white area on that map.

4          May 20th, the final sales.  This is a little bit

5   hard to see, but I encourage you to take some time with these

6   images.  You see on the right Christian in his Tennessee

7   Volunteers T-shirt.

8          You see on the left, this is a still shot from

9   May 20th, the video that this defendant posted to his Snap

10  account.  And if you look carefully, look beneath the

11  windshield, and you can see just the thin outline, it's

12  bisected by the seat belt.  You can see the orange T.  You

13  see it coming across both sides of the seat belt and a piece

14  of it poking out underneath the belt.  It's right there.

15  That's Christian.  Of course, again, the BMW with the dent.

16  And there it is from Christian's phone.

17          Please play this.

18          (Video played.)

19          MR. ROTH:  May 20th, the final sale.  That video,

20  Christian driving away to die with pills that man sold him.

21          Christian had no other Snaps to set up any other

22  deals.  Christian had no other payments for drugs to any

23  other person.  Christian had no other locations notated to go

24  get drugs.  Christian had no other need.  He's got a plug.

25  There is no other dealer.

1          This defendant had Christian verify himself, used

2     Snapchat to set up the transactions, over 43 exchanges for 15

3     deals, provided the location for Christian to come get the

4     pills, sold him 57 Perc 30s over six weeks, profited $1800,

5     accepted online payments and sold to Christian at the booming

6     temple, filming and posting to Snapchat for all to see the

7     final sales.  That man sold the pills to Christian that

8     killed him, him and only him.

9          Let's go now to the death part.  This was an

10    overdose, period.  Aaron Balderson explained to you how he

11    ran to assist, even though he was not on duty as an EMT or

12    even working as one.  But he had training, a Marine was in

13    distress.  He ran to help him, and he immediately started

14    resuscitations.

15         Keith Naylor, the paramedic you heard from.  He

16    testified about his 20 years of experience and his training

17    and his expertise administering aid as a paramedic.  He

18    talked about how they pushed epinephrine to try to get a

19    heartbeat, how they asked the hospital to use Narcan.  Not

20    the hospital directing them to use Narcan.  They thought that

21    they should use it.  They requested it.

22         And he had no pulse, no breath.  Keeping in mind,

23    folks, there was a lot of questions of these two gentlemen

24    and some insinuations that somehow this was on them.  They

25    don't care why Christian Reed is not breathing.  They want

356

1    him to start breathing.  They don't care why his heart

2    stopped.  They want his heart to start.

3          That makes perfect sense.  If any of you have had

4    a -- in your own common, life experience or just from common

5    sense, because you're in the medical field, if the heart is

6    not beating, there is no point to worry about anything else.

7    That's their focus.

8          And here they are doing their best to resuscitate

9    Christian.  Christian, who is not breathing when they find

10   him.  Christian, who has turned purple.  Christian, who has

11   no pulse.  Christian, who is gurgling.  These guys did their

12   best.  But I submit to you, ladies and gentlemen, there is

13   evidence for you to find that Christian was gone by the time

14   they got there.  There was nothing anybody was going to be

15   able to do that day.

16         Now, you also heard from Dr. Platt.  And I want to

17   pause here, because the government's evidence on this point

18   is testimony.  We don't have a lot of -- we don't have

19   documents that we put in front of you on this point.  We

20   offered you the testimony of Balderson, Naylor and Dr. Platt.

21         So let's talk about how you evaluate witness

22   credibility.  It's common sense.  It's how you judge people

23   in your daily lives.  It's how you decide whether the person

24   that is in front of you is honest, credible, trustworthy,

25   worthy of your time and respect.

357

1          How did they appear on the stand?  I submit to you

2     Dr. Platt and Naylor and Balderson were honest.  They were

3     the same person on cross-examination and direct.  All three

4     of them sought to just give information without bias or

5     prejudice.  Their tone was the same.  The content of their

6     answers was the same.  Their flow was the same.  Their clear

7     efforts to provide responsive information to both sides was

8     the same.  Their interest in the outcome.  They're medical

9     professionals; right.

10          You could consider whether Special Agent Logan has

11    an interest in the outcome, he's the case agent, obviously.

12    But these three, they don't have that.  They are just there

13    to tell you the story of what happened, and in the case of

14    Dr. Platt, to offer you learned testimony explaining to you

15    the nature of the death.

16          Now, additionally with Dr. Platt, he testified to

17    you pretty directly on the basis of his experience and his

18    expertise as a doctor.  So consider in evaluating his

19    credibility and the weight you accord his testimony, whether

20    or not he's a credible guy, he knows what he's talking about.

21          He works in the Armed Forces Medical Examiner

22    system.  He has a BS in chemistry.  He has an MD from Temple

23    University.  He had an internship in family practice.  He did

24    a clinical pathology residency at Walter Reed.  He entered a

25    forensic pathology fellowship with the office of the chief

358

1    medical examiner for the military.

2            This is an experienced person.  He's been doing this

3    for years.  He holds I think deputy director of the office

4    that he works in.  He's done, I think he said, 135 autopsies

5    with the Armed Forces and before that, 201.  He's done over

6    300 of these.  This is a trained, experienced professional,

7    who gave unbiased, objective testimony, just explaining what

8    happened to Christian.

9            He conducted -- and he did a good job.  He did the

10   autopsy.  He examined Christian's entire body and his brain.

11   He had toxicology work done on the fluids in the body.  He

12   reviewed Christian's medical records looking for clues to

13   explain what happened to this 26-year-old Marine.  And he

14   completed -- importantly, he completed the review after he

15   got the toxicology report.  I submit to you that's a big

16   deal.

17           He have could have gotten the tox report, seen all

18   that fentanyl, and said, okay, that's it.  But he knew there

19   were issues that a review of the brain would either

20   complicate matters or confirm them.  So he completed the work

21   even after he had the clear evidence from the tox screen that

22   this was an overdose.

23           What's his opinion?  Christian died of an overdose.

24   That's what acute fentanyl intoxication is.  That's what he

25   said.  He found no evidence of any other material issue.

1          There was a thought that Christian had had a stroke,

2     called this from the prior month, April of '20.  But as

3     Dr. Platt explained, if there had been a stroke, you'd see

4     evidence of it in the brain.  You'd see soft matter, or

5     blood.  None.  There was no stroke.  It's a red herring.  If

6     you hear about it in closing, go to, that's irrelevant.

7     There was no stroke.

8          No evidence of lingering vasculitis, if vasculitis

9     had ever occurred.  Vasculitis, which he explained to you, is

10    the inflammation of the vessels in the brain.  The brain was

11    healthy.

12         No evidence of -- he talks about rhabdomyolysis, the

13    weakness in the arm.  No evidence of that.  No injury in the

14    body, no injury to the organs, to the muscles.  Christian was

15    a healthy, 26-year-old man.  What caused the death?

16    Fentanyl.

17         He saw evidence in the body, separate from the tox

18    screen, consistent with an overdose.  He explained to you

19    that when a person overdoses, their lungs fill with fluid and

20    you can usually tell they are about twice as heavy.  That's

21    where Christian's lungs were.  He reviewed the toxicology

22    report, and he explained to you that there was a fentanyl

23    concentration in the blood consistent with acceptable ranges

24    in overdose death cases.

25         He noted for you that there were metabolites,

360

1    norfentanyl and 4-ANPP.  Metabolites, evidence that the body

2    is breaking down and metabolizing fentanyl at the time of

3    death.  Ladies and gentlemen, where did that fentanyl come

4    from?  The defendant sold these pills to Christian on

5    April 17th and 30th, on May 1st, 3rd, 6th, 7th, 10th, 11th

6    twice, 13th, 15th twice, 18th, 19th and 20th.  Twelve pills

7    on the twentieth.

8            He's metabolizing fentanyl because this guy has sold

9    him the pills with the fentanyl in them and he's taking them.

10   Metabolites are evidence of the pills that that man sold

11   Christian.  Nothing less.  Nothing more.

12           And, of course, the presence of cutting agents,

13   confirming there is no legitimate fentanyl in Christian's

14   body.  This was not administered by a hospital.  The cutting

15   agents are the bread and eggs holding together the fentanyl

16   in the pill.  Cutting agents are proof that it's a pill, an

17   M30 pill.

18           And you heard those cutting agents, he knew they

19   were cutting agents.  He had a logical explanation.  You use

20   it in animals, and you haven't been able to get it in the

21   U.S. for the last 50 years.  So that's not a legitimate

22   medical product that was in Christian's body together with

23   the fentanyl.

24           He also was aware and considered the other medicines

25   that Christian had been prescribed, and, consistent with

361

1    prescriptions, were in Christian's body.  There was a pill

2    bottle in Christian's room with some pills in it.  There were

3    prescriptions for Christian.  The prescriptions were in the

4    tox screen.  He considered those and he explained to you that

5    didn't have anything to do with it.

6         Importantly, you didn't hear any evidence to the

7    contrary; right.  On cross-examination, there was some

8    skeptical questions, well, what about these pills?  But you

9    didn't hear from any defense expert to rebut the proof that

10   these other drugs were relevant.  No documents to suggest

11   otherwise.  No witness that can conceive a way to suggest

12   otherwise.  The only evidence in the record for you to

13   consider is Dr. Platt's undisputed testimony that the other

14   drugs were irrelevant.

15        Fentanyl and the cutting agents, the amount of

16   fentanyl in the accepted range.  No other cause.  And, of

17   course, it's consistent with the overall factors that you

18   saw.  Christian was nonresponsive when he was found.

19   Christian had no heartbeat.  Christian wasn't breathing.

20   Christian had no other injuries.  Christian had no stroke, no

21   vasculitis, no other injury to the body.  A recognized level

22   of fentanyl, which, by the way, as you heard, the way

23   fentanyl kills you is it stops your heart and then you stop

24   breathing.  Presence of cutting agents and no other

25   contributors, no other drugs.

1          Now, before I move on -- and, by the way, when we
2    talk about -- we talked about those metabolites, and I read
3    off those dates to you.  Just to make a point.  Go back to
4    the chart of the sales.  This matches Dr. Platt's testimony.
5    This is the fentanyl and the metabolites at work.
6          Now, I want to be clear for the record and for your
7    benefit.  The burden of proof in this case starts with us,
8    stays with us and ends with us.  I said to you just now,
9    Dr. Platt's testimony is not rebutted.  There is no
10   obligation by the defense to do a thing.  They don't have to
11   put on evidence, they don't have to put on witnesses.  It is
12   our burden, and we embrace that.
13         But the point is, you didn't receive any evidence to
14   rebut the proof that we have offered to you.  Had you
15   received it, you might consider it and decide whether we have
16   met our burden.  But the record before you is the evidence
17   provided by Dr. Platt that the other drugs had nothing to do
18   with the death.  That's the record.
19         Finally, we have to show you that the defendant knew
20   he distributed a controlled substance.  He knows it's a drug
21   and the drug is controlled.  We don't have to prove that he
22   knows it's on the substances schedule.  That's not our
23   burden.  He knows it's a drug and separately that drug is on
24   the schedule.
25         Every drug that you've heard about is on the

363

1    schedules.  We talked about this.  Fentanyl is a Schedule II
2    substance.  You heard about that from Special Agent Klinge
3    and from Special Agent Logan.  Oxycodone, controlled
4    substance.  Percocet is just a brand name for oxycodone, a
5    nickname among drug traffickers, but it's the same thing.
6    M30 pills can only be one of two things, fentanyl or
7    oxycodone/Percocet.  They are all controlled.
8            We have proven to you that he knew he was selling
9    fentanyl, but even if some of you think maybe it was real
10   Percocet, does not matter.  Does not matter.  And if you hear
11   otherwise from my colleague, that's not correct.  It's a
12   controlled substance.  Period.  All of it.
13           We have shown you with both direct and
14   circumstantial evidence that the defendant knew he was
15   selling fentanyl.  And as Judge Robinson has explained, and
16   as we talked about in voir dire, they are both relevant.  You
17   consider both equally.  You decide how much weight to assign
18   to them, but they are -- they are both proper forms of
19   evidence.  As we said, they are all scheduled.
20           How did he know he was selling fentanyl?  First of
21   all, you heard testimony that in February of 2019, an article
22   was published.  There was a screenshot of it.  And as
23   relevant here, that article put him on notice that M30 pills
24   exist, that they are counterfeit and that they contain
25   fentanyl.  In his phone.  He saw that.

364

1          Special Agent Klinge testified to you, based on his

2    16 years of experience with the DEA and with NCIS, based on

3    his wiretaps, his searches, his CIs, his UC work, it is the

4    common, accepted, understood form of fentanyl, that it's

5    counterfeit blue M30 pill.  Meth is shards.  Heroin is brown

6    tar.  Cocaine is pearly white powder.  Fentanyl is M30s.

7          Please play this.

8          (Video played.)

9          MR. ROTH:  There they are on his Snapchat two weeks,

10   a month before Christian dies.  99 fentanyl M30 pills.  Now,

11   in fairness, we never tested these pills, but I'm arguing to

12   you that you can infer that these are M30 pills.

13         There he is dealing them with the distinctive

14   Walgreens baggy that you can see him holding.  That's his

15   hand handing two pills to somebody in the car.  There he is

16   in his account -- or pardon me, corroborating this is him in

17   his Snapchat account.

18         And let's talk about these, these are on his phone.

19   That's important, because let's go look at the communications

20   on his phone sent to and from Nameer Atta on the phone with

21   those photos on it, let's talk about what they say.

22         November 2019, Johnny Gym says, Can you hook me up?

23   I need some percs.  I'm going to go get a tattoo this

24   weekend.  It's going to hurt.

25         The defendant says, Yeah.  My homie has got some

script percs.  Differentiating script, prescription percs from Perc 30s.  How many milligrams are they, Johnny asks him?  And the response, the only prescription ones are the 10s.  Everything else is fake.  He knows 30-milligram pills are fake.  He knows it.  They are not script.  They are fentanyl.

Here we go again.  May of 2020, within days of Christian dying, Alyssa asks him, How much would seven percs be?  He gives her a price, and what does he say?  Trust me, the most trusted and most potent in Orange County and San Diego right now.

Ladies and gentlemen, an oxycodone pill made by the manufacturer has 30 milligrams of oxycodone in it, every single one.  Why is it necessary to say to a buyer, my pills are both the most trusted and the most potent?  Because he knows it's not 30 milligrams of oxycodone regularly, predictably.  His fentanyl pills are powerful, they will get you high, but they are trusted.  You're not going to die.  Not from my pills.  Trust me.  I'm the most trusted and the most potent pills.  I got you.  It only makes sense because he knows he's talking about fake pills.

And, of course, you saw his communications with Salim from March of 2020.  And Salim says to you, Your plug sucks.  I've got one who has got M30s that are prescription.  No fentanyl.  Says it to him.  I've got a source of these

1   M30s.  These are real.  They have no fentanyl.

2          What is his response?  You're retarded.  Shut the F

3   up.  Not percs, LOL.  2000 percent.  They don't make real

4   M30s with oxycodone.

5          From the phone, beyond the communications, he's

6   marketing this stuff.  And how is he marketing it?  Blue

7   diamond is a Perc 30.  Pay attention to that, because once

8   again, most trusted.  Only relevant because he wants people

9   not to be scared of buying them.  You're not going to die

10  from my percs, not from my fentanyl.

11         Updating his menu.  He's in business.  He sold out.

12  He's going to re-up, though.  Don't worry.  He's got more for

13  you.

14         Here, another menu.  Note, these aren't Perc 30s.

15  They are just percs.  Not most trusted.  Perc 30s are the

16  ones that have to be trusted.

17         And, of course, another one from the phone.  Once

18  again, the blue M, so the diamond and the blue M, Perc 30s.

19  And what does he say again?  Most trusted in SD.  If it's a

20  Perc 30, he wants you to know you can trust it and you're not

21  going to die.  Because he knows nobody knows how much

22  fentanyl is in any pill, so you got to persuade people that

23  yours are going to be safe.

24         You see these same menus on the Snapchat account.

25  This one is from April 20th.  Christian would have seen that

367

1   one.  They were Snapchat friends by then.  Second one is from

2   May 11th.  Yet again, Perc 30s, most trusted, most trusted

3   out, most trusted in SD.  That's his tag line for his Perc

4   30s.

5          And, of course, don't forget what this is all about.

6   Why sell drugs?  Nobody is doing it out of the goodness of

7   their heart.  This is about money.  This is what drug dealing

8   is about.

9          Here are his messages with Ryyan, hitting up his own

10  plug.  We got the percs.  Let's go get the percs.  I've got

11  bands for percs.  There they are.  I got money.  I got cash.

12  I'm the greatest of all time.  I'm the GOAT.  I'm the best

13  dealer out there.  I got the cash.  That's what this is

14  about.  This is about stacks of money, nothing else.  That's

15  what Christian's life was about.

16         Christian, by the way, who saw this banner on his

17  phone -- this is the defendant.  Same font, same style,

18  everything.  Christian was a customer.

19         If we can please play this.

20         (Video played.)

21         MR. ROTH:  Trap temple is booming.  Money is coming

22  in.

23         Drugs are a commodity.  They're an illegal

24  commodity.  They're a dangerous commodity.  You can infer all

25  of that from your common sense.  That's what he's trying to

368

1    do, make some money.  So he knows what he's selling.  He

2    knows it's profitable, and he's selling it to get paid.

3            Here he is, just off Christian, just over five, six

4    weeks, 1800 bucks.  Easy money.

5            (Video played.)

6            MR. ROTH:  Here again -- can we play these.  I'm

7    sorry.

8            (Video played.)

9            MR. ROTH:  On the left.  There goes Christian on the

10   19th.

11           Actually, can you play the one on the right.

12           (Video played.)

13           MR. ROTH:  Where he goes off to his death, having

14   been sold the final 12.

15           How did he know that these M30s were laced with

16   fentanyl?  He had notice.  He knew that only 10-milligram

17   Percocets were prescription.  He said and believed there was

18   no such thing as 30-milligram prescription oxycodone,

19   Percocet, whatever.

20           He repeatedly advertised his pills as the most

21   trusted and the most safest and you can trust me and you can

22   buy my pills and everything is going to be fine, on Snapchat.

23   He referred to them as most trusted and most potent.  He made

24   money, the GOAT made money off of this.  He had sales to

25   Christian of 57 pills, making 1800 bucks in a short period of

COMPUTER-AIDED TRANSCRIPTION

369

1  time.  It's a drug, he knows what drug it is, and he knows

2  it's fentanyl.

3       But, of course, even if you think that that chart

4  that you saw, blue diamonds and Ms, is legitimate Percocet,

5  real, 30-milligram oxycodones, he's guilty.  He's guilty.  It

6  was fentanyl.  He knew it was fentanyl.  But even if he

7  thought it might be Percocet, does not change the outcome.

8       Now, you're going to receive a verdict form at the

9  end of this from Judge Robinson.  This is what it looks like.

10  You heard instructions on how to fill -- on how this works.

11  The first thing we're going to ask you to do, find the

12  defendant guilty of distribution of controlled substances.

13  That's the first question before you.

14       Once you make that conclusion, go to the second

15  question:  Did the fentanyl cause Christian's death?  And we

16  would like for you to write that it did.  That would be

17  finding the defendant guilty as charged.

18       He was 26.  His birthday had been the day prior.  He

19  died from drugs that man sold him.  That man knew what he was

20  doing, who cared about making money, whose pills resulted in

21  death.  He is guilty.

22       Thank you.

23       THE COURT:  Thank you, Mr. Roth.

24       Mr. Cortez, do you wish to make a closing argument?

25       MR. CORTEZ:  Absolutely.  Thank you.

1          THE COURT:  You're welcome.

2          MR. CORTEZ:  You know, when I sat there listening to

3     his closing argument, and it was an argument, and their nice

4     PowerPoint, and all the editorial comment and additions to

5     facts that you did not hear or see, I kind of forget the

6     evidence for a second.

7          But then he said something, actually, he said a lot

8     of things that brought me back to reality.  And I'm going to

9     try to go through them with you so that the same effect

10    doesn't happen to you.  I may forget a few things, and I will

11    not address all the stuff that he got up here and told you

12    about, so convincingly pointing at Mr. Atta.  So think about

13    what we would say.

14         But let me begin with an interesting comment.  It

15    has to do with His Honor's burden of proof.  You will see the

16    instructions; I will go through them with you.

17         He showed you a sensationalist video.  Why -- they

18    are going to ask you to use your common sense, because after

19    I finish talking, he's going to come up and has another

20    chance to address everything I told you, to undo what I've

21    told you.

22         So think about your life experience and ask

23    yourself, why would this advocate for me?  Why would he do

24    these things?  And I'll tell you what woke me up.  It

25    reminded me about the burden of proof that he said in

371

1    passing, the burden is always on us.  He never has any burden

2    to show anything.  Although, in that very context, he said,

3    He hasn't offered any evidence to rebut what we said.

4         Well, that violates the very oath that you took in

5    His Honor's instruction.  We don't have to offer any evidence

6    to contradict what they said in closing argument.  Now, with

7    that as an instruction, to wake us up to what's really

8    happening here in motivation, here is the key to his closing

9    argument, and he admitted it.  You don't have to take it from

10   me, the defense attorney.

11        He showed you that sensationalist video with nice

12   music in the background about the temple and all that stuff,

13   and my client's picture.  Why does he show you that?  Why

14   does he have any need to show you that graphic stuff?  It

15   doesn't address May 20th.  But most importantly, I will show

16   you something that it doesn't address.

17        But he says, who knew what's in those pills?  Who

18   knew what's in those pills?  Here is the problem, ladies and

19   gentlemen of the jury.  He's supposed to know.  And not only

20   that, he has an obligation to know.  And even more than that,

21   even further than that, he has an obligation to prove it to

22   you to an extremely high level.  We gave it a name, beyond a

23   reasonable doubt.

24        We use that in law.  We try to explain to juries

25   what it really means, and I don't think we ever succeed.

1    What it really means, it's not -- think about clear and

2    convincing.  Clear and convincing, think about that, because

3    that level is lower than reasonable doubt.  Clear and

4    convincing is precisely what those two words mean.  It is

5    very clear for a person of reason and intellect using common

6    sense, and it's convincing.  There is no lingering reasonable

7    doubt.

8            Under that standard, they are supposed to prove to

9    you what is in those pills.  And they are also supposed to

10   use something else that my colleague characterized, and I'll

11   use another phrase that he used throughout, twice actually in

12   his closing.  It's very interesting.

13           He's talking about the first responders.  We're not

14   talking about first responders not having provided

15   reasonable, medical, professional care.  That's not the

16   issue.  The issue -- the issue is how has the government's

17   evidence come to you and what does it say?  Okay.

18           He used the phrase twice, dismissively, red

19   herrings.  Let's talk about red herrings, since he brought it

20   up.

21           Thank God we have some real proof here for you to

22   see.  Their own proof.

23           When you go into the deliberating room, in that

24   room, after Judge Robinson gives you the binding law, and one

25   of those pieces of law is Jury Instruction No. 9.  I won't

373

1    put it up on the PowerPoint.  I'll read it to you.  And you

2    will have it in there to read.

3              And the second sentence of this jury instruction,

4    it's enlightening about their motive.  Why did they show that

5    video?  Why do they show the photographs of Mr. Atta, several

6    photographs of Mr. Atta?

7              The defendant is not on trial for any conduct or

8    offense not charged in the indictment.  Think about that for

9    a while.  Not charged in the indictment.

10             So let's look at -- to help us, because we're trying

11   to go through the evidence here and the law.  What is in the

12   indictment, you might ask.  I asked myself, what's in the

13   indictment?

14             His Honor told you at the beginning.  Let's do it

15   again and see what happened here, how far we strayed from the

16   actual evidence and the facts.  Remember in our voir dire,

17   remember in our opening, I asked you to hold out, don't make

18   up your minds, don't decide on emotions.  That's what those

19   photographs and the videos and all that stuff, all the sales,

20   all the prices, the summaries by the agents.  Oh, you see,

21   that's the metabolites.

22             They can't even prove that any of those 57 pills,

23   not one of those 57 pills they summarized in a nice chart

24   with little graphics, and they explained what a GIF is and a

25   little this and there is a diamond, there is a bag of cash,

374

 1    there is all this; how graphic.  Ask yourselves, Why?  Why

 2    are they doing that?

 3            Well, let's see if it helps us with the charge in

 4    the indictment.  And he'll come up here after I sit down and

 5    try to weave some more.

 6            Here is what it really says.  On or about May 20,

 7    2020, that's the day before, remember, when those 12 Percocet

 8    tablets they say were sold by Mr. Atta to Mr. Reed, 12

 9    Percocet tablets.  And as I keep reading -- before I keep

10    going, remember what the good case agent admitted.

11            My last question on cross-examination of him was, my

12    cross-examination was not that lengthy at all.  Agent Logan,

13    you were not able to find any of those 12 Percocet tablets,

14    were you, sir?  No, we weren't.  No, we weren't.  No, we

15    weren't.

16            Is that important, or is that a red herring by a

17    defense attorney that may be too polished?  Well, I'll bring

18    you back to his own phrase.  Well, who knew what's in them?

19    Who knew what's in those 12 Percocet tablets?

20            Well, now, who knows what happened to them.  Whether

21    someone knows what happened to them was not proved to you.  I

22    didn't hear any evidence as to it.  That's why I asked the

23    question, Well, sir, you testified for over an hour about all

24    this nice stuff.

25            Let's see, again, what the indictment really

1 | continues to say.  Within the Southern District of

2 | California, the defendant, Nameer Atta, did knowingly and

3 | intentionally -- knowingly and intentionally distribute a

4 | mixture and substance containing a detectable amount of --

5 | and then there is a fancy chemical word you heard before from

6 | Dr. Platt and others -- and with metabolites, propanamide.  I

7 | can't pronounce it properly.  I'm sorry.  That's why I asked

8 | Dr. Platt to help us -- commonly known as fentanyl, a

9 | Schedule II controlled substance, and then it says which

10 | resulted in the death of another person, to wit, C.M.R.,

11 | Mr. Reed.

12 | So the indictment specifically charges that on

13 | May 20, Mr. Atta sold Mr. Reed fentanyl.  Without putting

14 | some nice language and explanations and red herrings,

15 | fentanyl.  And why is that important?

16 | I want to show you.  I'm not going to tell you or

17 | argue.  He also -- the government also tried to tell you, and

18 | they told you that Dr. Platt was credible.  Look at all his

19 | education.  We never questioned his education.  He was

20 | credible.  I completely agree.  I couldn't agree more.

21 | Remember my opening statement, members of the jury.

22 | Remember who mentioned metabolites first.  They said drugs.

23 | We said metabolites.  Why is that important now?  Well, there

24 | is a piece of evidence, it's evidence that you will go into

25 | that room and take.

376

1          I ask you, I beg you, based on your oath, and I

2    approach you because you have to look at it.  I want you to

3    look at this exhibit.  And I'm asking you, begging you to

4    read it very closely, very, very closely.

5          This is Dr. Platt's autopsy report.  And what is

6    important about Dr. Platt's autopsy report, look at the

7    sticker.  This blue sticker in the lower right corner is not

8    yellow.  It doesn't say "Government Exhibit."  It does not

9    say "Government Exhibit."  It says "Defendant's Exhibit D-1."

10   The only one we introduced.

11         So I ask you, in determining red herrings, in

12   determining motives, why does the defense have to introduce

13   the autopsy report?  Well, it's very obvious to you, you're

14   not naive.  You don't have to have a law degree.  They didn't

15   introduce it.  Really?

16         The indictment requires them to prove that this poor

17   man died of the very -- let's say object -- I can't find my

18   pen.  There it is.  See if I can -- this is how it makes

19   sense to me.  The indictment in the last part says, pretty

20   much, the thing itself, the thing itself that Mr. Atta sold

21   to Mr. Reed on May 20, 2020, that thing itself, whatever it

22   was -- because they don't know -- killed him.  Remember, that

23   simple thing, that thing that was sold on May 20th killed

24   Mr. Reed tragically.

25         So do we know what that thing was?  Because they

1    have a burden to show beyond a reasonable doubt, they have to

2    prove to you what that thing was.  They can't argue it away.

3    They can't ask you to then look at the defense as red

4    herrings, characterizing every little point we bring up as a

5    red herring.

6            Like, for instance, do you remember how it was

7    awkward when I started cross-examining the case agent?  Let

8    me set the scene, and I show you this photograph.  It's in

9    evidence.  You saw it.  Okay.

10            Before I went to this question, I was careful.

11    Officer, you're the case agent; right?  Yes.

12            You were coordinating everyone?  Yes.

13            Everyone was gathering evidence?  Yes.

14            Interviewing witnesses?  Yes.

15            And you were coordinating everyone; right?  Oh, yes.

16            And they introduced this picture, not me.  That has

17    Government's 88.  Why is that important?  Is that another red

18    herring?  Oh, and they also showed you a picture of the

19    bottle and the contents, or some bottle.  Some bottle.  Why

20    is this important?  Is this a red herring by a defense

21    attorney that is grasping for straws?

22            Well, it's important because it has to do with the

23    accuracy of the gathering of evidence.  But it's also

24    important to motives.  Remember how I struggled on

25    cross-examination.  Objection.  Hearsay.  Well, I had to do

378

1    it two or three times, and it became a little awkward.  It

2    became almost a little confusing.  What is he trying to do?

3            And finally, finally after two or three questions,

4    after it was awkward and objections, oh, okay, there were

5    other pills in there, but they were all medication.  Other

6    pills, various other pills.  Remember.  I read it.

7            Why is that important?  It has to do with how they

8    are taking evidence and they are trying to stretch it.  On

9    direct examination, the agent didn't say there were various

10   other medications in that bottle.  He said there was only one

11   type, the one prescribed, the one on the prescription label.

12   But that wasn't true.  Okay.

13           So why am I doing that?  To sidetrack you here, to

14   not look at the real facts?  No.  It has to do with

15   everything they are showing you, and it has to do with who

16   put in the autopsy, and it has to do with how credible is

17   Dr. Platt?  He's extremely credible.

18           And it has to do with the questions I asked him.

19   And, Dr. Platt, what are metabolites?  That's the first time

20   anyone went into the concept of metabolites.  And why is it

21   important?  It is evidence.  These are facts.  Metabolites

22   are something that the body processes.  And when you take

23   fentanyl, a legal amount, it breaks down, because it doesn't

24   kill you.  Your body is metabolizing.  You're still alive.

25   Okay.

379

1          But either way, if you take oxycodone, Percocets,

2     you're going to have it in the system.  Dr. Platt, remember,

3     we read off, we read off together the series of

4     medications they found as a result of the autopsy and the

5     toxicology report.  Remember that?  It's not minor.  It's not

6     irrelevant.  It's critical.  It goes to the very heart of the

7     case.  What killed Mr. Reed?  What was that substance that

8     killed Mr. Reed?  It was fentanyl, undoubtedly.

9          Okay.  And I ask, Well, is there any oxycodone that

10    you found?  No.  Percocet is the brand name, one of the brand

11    names for oxycodone.  Oxycodone is an opiate.  We heard that

12    from all the agents.  Why would that be important?  Is that

13    some other controlled substance, that it's a loophole that we

14    try to find it?  Again, they argued it just before me.  No,

15    members of the jury.

16         Here is the real legal issue.  Look at the Judge's

17    Jury Instruction No. 10.  They spent a great deal of time on

18    the first and second element.  Though on the first, they

19    admitted, it has to be knowingly distributed.  And then they

20    argue, but you see, he's saying these are the safest and this

21    is the temple and all this stuff.  These are trustworthy.

22    That proves he knew that they had fentanyl.

23         It does not prove anything.  It does not prove

24    anything.  It's an argument.  But more importantly, those 12

25    Percocet tablets they say contained fentanyl, they never

380

1    found them, so we don't know what was in them; just like the

2    ones in the video.  But that's critical, because it goes to

3    the very substance that was found in Mr. Reed's body that

4    caused his death.  It goes to the very heart of the case.

5          And you know what part of Jury Instruction No. 10

6    will tell you that?  Not me.  Not the prosecutor.  Look at

7    the third element.  I beg you to look at the third element.

8    I'm not going to bother to read it to you.  Read it in there

9    and notice what it requires the government to prove, not only

10   1 or 2, but No. 3 is critical because it's not some other

11   controlled substances.

12         And why is that central?  Because Element No. 3 goes

13   with the autopsy report.  Only what's in this autopsy report

14   and the toxicology report is what was found in Mr. Read's

15   body.  No oxycodone at all.  What would that mean?  We don't

16   know.  That's another question.  We don't have to prove what

17   happened.  They have to prove what happened.  And they didn't

18   prove that.  And they admitted it.

19         We don't know -- who knows what was in those pills.

20   Well, in this proceeding, we're supposed to know.  We don't

21   just guess or argue it away.  So are all these things that

22   I'm saying red herrings?  Am I trying to distract you from

23   the real evidence?

24         Well, the real evidence, as I said in my opening

25   statement, it's certainly, certainly not Government

1     Exhibit 73.  I wanted to see a government exhibit on the

2     autopsy report, but sadly, we don't have that.  It's our

3     exhibit.  Our sole, humble little exhibit.

4            But we have this.  You will have this in the

5     deliberating room.  Look at it.

6            MR. ROTH:  I don't mean to interrupt counsel.  It's

7     not of record, but we did play that in our closing.

8            MR. CORTEZ:  I got it.  You see this is two

9     photographs, two separate photographs.  Why would they show

10    you these photographs?

11           Because look at how Mr. Atta looks.  If one of us

12    has had too many drinks and they take a picture of us, that's

13    how we're going to look.  And if we take a selfie of us, and

14    we've have too many drinks, that how we're going to look.  Or

15    if someone is going to be taking other things, that's what

16    we're going to look like.  And then the one on the left,

17    there is a baggy.  Very convenient.  The agent told you

18    that's a Wal-Mart -- you can read it.

19           Why are they showing you this and they are arguing

20    this hand holding that is Mr. Atta.  Did they prove that, or

21    did they argue it?

22           Those are the things that you're here to decide.

23    Because there is another jury instruction that the Judge,

24    Judge Robinson will tell you.  It is not conjecture.  And

25    Instruction No. 1 is one of the keys.  They are all key

382

1   instructions, but they are all helpful.

2            Instruction No. 1, second paragraph, you read it,

3   please, when you get in the deliberation room.  It is your

4   duty to weigh and evaluate all evidence -- evidence; not

5   argument -- in the case, and in the process, decide the

6   facts.  This is about facts.  This is about evidence.  This

7   is about science.

8            In our opening statement, we shared with you how

9   those were going to be the central focus of this whole trial.

10  You have evidence before you right now that tells you what

11  did not -- did not cause Mr. Reed's tragic death.  Judge

12  Robinson told you, you use the evidence or the lack of

13  evidence.  Remember that.  He just told you.

14           The lack of evidence, what does the lack of evidence

15  in this autopsy report show?  No proof that either those 12

16  alleged Percocet tablets, now argued always contained

17  fentanyl, well, neither the DEA agent nor the case agent,

18  Agent Logan, said anything about that.

19           You have fentanyl in a variety of substances, but

20  there is a lot of Percocets out there.  And look how many he

21  sold.  Well, if he sold him 57 in a period of a month and a

22  half.  I ask you a simple, commonsense question:  If they are

23  so lethal, why did he take them for almost a month and a

24  half?  Because that's the argument they are making.

25           But even more to the point in this trial, do we

383

1    know, is there evidence, facts, do we know that those 12

2    tablets, whatever was in them, because we don't know what is

3    in these things, who knows, do we know that those were taken

4    by Mr. Reed or whether he did something else with them?  We

5    don't know that.

6          Those are reasonable questions that any person

7    should have, and those are questions that the government's

8    proof must, must prove.  Prove, not argue.  And if we,

9    indeed, don't have a burden here, then why am I with a burden

10   to show the autopsy, the actual source of the actual facts,

11   the actual evidence, the actual chemicals found by Dr. Platt?

12         Dr. Platt is an absolutely credible witness.  They

13   could have easily asked him a bunch of questions.  Dr. Platt,

14   did you find -- in your facts that you reviewed, did you find

15   any evidence at all, any evidence at all -- listen to me,

16   because this is a huge gap in their case.  Did you find any

17   evidence at all in determining cause of death, any actual

18   fentanyl?  Besides in the body you mean?  Yeah.  No.

19         Did Agent Logan prove to you that he found actual

20   fentanyl in Mr. Atta's possession?  No.  All the graphs they

21   show, the Snapchat, the summaries, the little icons and

22   everything, did they say, Hey, I have some Percocet tablets

23   laced with fentanyl.  Very dangerous, so you must be careful

24   not to take too much of it?

25         No.  There is no evidence from the government that

384

1   Mr. Atta at any point in time was distributing fentanyl or a

2   controlled substance that he knew, that he knew, they never

3   proved that, was contained in that substance.

4          Like, I love that analogy by Agent Logan, the

5   analogy of the meatloaf.  That the binders, you know, the

6   eggs and the bread crumbs.  Yes, if you have oxycodone and

7   you have other binding agents, you're going to find oxycodone

8   and the other agents, which no one found here.

9          If there is some tablet, something associated with

10  Mr. Atta before May 20 that has fentanyl, no matter how much

11  or how little, we've got to prove to the jury that he is

12  definitely associated with fentanyl.  There is nothing.

13         One of the lists says no fentanyl.  Well, why does

14  that say that?  He argues that it's a warning.  Hey, these

15  are the safest.  They won't kill you.  That doesn't say that.

16  It does not say that.

17         So without taking too much more of your time, it has

18  been a long two days for me.  I will not have another chance

19  to talk with you.  And this case began about facts.  This

20  case began with an indictment that was read by the Court.

21  This case began with an indictment that charges a specific

22  crime and a specific criminal offense with a specific

23  relationship.

24         That relationship, that relationship in this

25  indictment, is that the object that they say Mr. Atta sold

385

1    Mr. Reed on May 20, Mr. Reed took into his body -- we don't

2    have any proof of that -- and that after taking that

3    object -- or in this case, 12 tablets, not one -- that he

4    took that object, those 12 tablets, he ingested them and then

5    he died.  That's what this requires them to prove.  And

6    Dr. Platt told you that never happened.  That's why we had to

7    introduce the autopsy report.

8         When the prosecutor is finished saying all the

9    things he's going to say, please remember, members of the

10   jury how you began this case, how you started.  You started

11   with a presumption of innocence.  Well, what does that mean?

12   What is a daily-life application?  How are we non-legally

13   trained people supposed to apply that?  How do I apply the

14   presumption of innocence?

15        It's actually very easy.  I'm going to try to share

16   what I think it says.  When you began this trial, when you

17   were sworn in and the evidence began to come in, you were not

18   sitting there (indicating).  I'm going to ask you to get

19   inside your mind and your imagination and put yourself right

20   here.  Because you begun, and still right now, before you go

21   into that room, you're right here.  You have to presume him

22   innocent.  You have to presume him innocent.

23        And the word is until and unless.  Until and unless

24   they prove beyond a reasonable doubt facts, chain of custody,

25   leading facts to the next in an orderly fashion, not having

COMPUTER-AIDED TRANSCRIPTION

386

1    gaps and no explanations, no arguments.

2           I ask you to remember that because you have my

3    client's life in your hands.

4           Thank you.

5           THE COURT:  Thank you, Mr. Cortez.

6           Government's rebuttal.

7           MR. ROTH:  Thank you, Your Honor.

8           I like Mr. Cortez.  He's a colleague and a friend,

9    but his indignation about how the evidence came in is

10   pointless and immaterial.

11          We all have a role to play in this room.  You, the

12   jury, are the judges of the facts.  Ms. Forrest and I are

13   advocates on behalf of the United States.  Mr. Cortez is here

14   to advocate for his client.  And the judge is the arbiter of

15   the law.

16          All you have to know is that the evidence came in as

17   allowed by the judge who administers the law, and you

18   received it.  In some instances, you didn't receive it.  In

19   many instances, you did.  But you saw the process by which

20   foundation was laid, relevance was shown, authenticity was

21   shown and you received the exhibits.  That's it.

22          So Mr. Cortez can wave the indictment around all he

23   wants.  It doesn't mean anything.  If he were the prosecutor

24   and wanted to prove the case by limiting himself to evidence

25   on what happened on one day, in one year two and a half years

387

1    ago, that's his choice.  We put on the case that we have to

2    prove, and we gave you the evidence that we were allowed by

3    law, which is embodied by His Honor, and that's what is in

4    front of you.

5            MR. CORTEZ:  Objection.  That misstates the law.

6            THE COURT:  Overruled.  The evidence that was

7    allowed in was evidence that was permissible under the rules

8    of evidence.

9            Please continue.

10           MR. ROTH:  And your duty is to decide what the value

11   of the evidence is, to afford it the weight that you believe

12   it deserves to draw inferences that in your collective

13   judgment are appropriate to draw.  That's it.  That's it.

14           To that end, ladies and gentlemen, we precisely and

15   powerfully, I submit to you, showed you how it all links up.

16   The fact of the ledger, it goes to the fact that the

17   defendant didn't distribute M30 fentanyl by accident.  He

18   wanted to.  It was profitable.  We showed you that he knew

19   what was in those pills because he had notice of it because

20   he had conversations about it over time.

21           Because he had repeated transactions and he kept

22   making money off of it, and how do you know what you're

23   selling is good?  Because people keep coming back for it;

24   right.  That's the power of the evidence, and it's for you to

25   weigh.

388

1          Mr. Cortez also made much of the notion that the

2     defense had to introduce the autopsy report.  That's

3     nonsense.  We have our burden.  It stays with us.  We're the

4     only party in the room that has to prove anything to you.

5     But he could admit the autopsy report or not.  That's his

6     decision.  That's a strategy call by a lawyer.  Nothing more.

7          Why didn't we show it to you?  We put the doctor on

8     the stand, gave you his testimony.  Take it or leave it.

9     It's your call.  Credit it as much credit as you believe it

10    deserves and make whatever findings you believe are proper

11    based on his testimony.

12         Mr. Cortez wants you to see the report to assess his

13    testimony.  You can do that.  There is nothing wrong with

14    that.  But this idea that we forced him in a corner and we

15    shifted the burden to somehow require him to put in an

16    exhibit, that's ridiculous.  He chose to put in the exhibit.

17    That's it.

18         And by the way, since it's in front of you and he

19    urges you to read it, why don't you start with Page 1 where

20    the opinion is a death by acute fentanyl intoxication.  And

21    then go to the next page, where it talks about how the victim

22    is a healthy, 26-year-old male with no issues in the body.

23         The autopsy report, which supported the doctor's

24    opinion that this was a fentanyl overdose, somehow became

25    evidence contradicting the government's case.  I don't

389

1    understand that, but you're the jury, you'll weigh the

2    evidence.

3            There was also this complaint that the fentanyl

4    pills were never recovered.  Why do you think that is?  This

5    is a case in which the evidence has proven to you that the

6    fentanyl pills were sold to Christian, that Christian died

7    from taking them.

8            Why weren't they recovered?  What was Special Agent

9    Logan supposed to do, suck out his stomach acid and

10   reconstitute a fentanyl pill to show it at trial?

11           MR. CORTEZ:  Objection.  That misstates the actual

12   evidence.

13           THE COURT:  Overruled.

14           MR. CORTEZ:  Okay.

15           MR. ROTH:  Where were the fentanyl pills?  Draw the

16   obvious inference, ladies and gentlemen.  He died from them.

17           Finally, I want to close with showing you the

18   reasonable doubt instruction, which I think is on the screen

19   in front of you.  It's doubt based on reason and common

20   sense.

21           It's not doubt based on theatrics.  It's not doubt

22   based on innuendo.  It's not doubt based on misleading, where

23   were the pills and Dr. Platt and his report.  There is

24   something wrong with the evidence, and we can put it in a

25   sentence.  That's doubt based on reason and common sense.

1          And here there is none.  You have overwhelming

2     evidence that can't be disputed.  You barely heard them put

3     up a fight about it.  Christian's phone.  Christian's

4     Snapchat.  Christian's Venmo.  The defendant's phone.  The

5     defendant's Snapchat.  The defendant's Venmo.  It all syncs

6     up.  It's one inescapable conclusion.  He's a drug dealer,

7     who sells fentanyl and sold it to Christian and Christian

8     died from it.  That's it.  He's guilty.

9          Thank you.

10         THE COURT:  Thank you, Mr. Roth.

11         Ladies and gentlemen, a few concluding instructions,

12    and, again, you'll have copies of these instructions along

13    with the ones that I read to you earlier.

14         When you begin your deliberations, elect one member

15    of the jury as your foreperson who will preside over the

16    deliberations and speak for you here in court.  You will then

17    discuss the case with your fellow jurors to reach agreement,

18    if you can do so.  Your verdict, whether guilty or not

19    guilty, must be unanimous.

20         Each of you must decide the case for yourself.  But

21    you should do so only after you have considered all the

22    evidence, discussed it fully with the other jurors and

23    listened to the views of your fellow jurors.

24         Do not be afraid to change your opinion if the

25    discussion persuades you that you should, but do not come to

391

1     a decision simply because other jurors think it is right.  It

2     is important that you attempt to reach a unanimous verdict,

3     but, of course, only if each of you can do so after having

4     made your own conscientious decision.  Do not change an

5     honest belief about the weight and effect of the evidence

6     simply to reach a verdict.

7              Perform these duties fairly and impartially.  You

8     should also not be influenced by any person's race, color,

9     religious beliefs, national ancestry, sexual orientation,

10    gender identity, gender or economic circumstances.

11             Also, do not allow yourself to be influenced by

12    personal likes or dislikes, sympathy, prejudice, fear, public

13    opinion or biases, including unconscious biases.  Unconscious

14    biases are stereotypes, attitudes or preferences that people

15    may consciously reject, but may be expressed without

16    conscious awareness, control or intention.

17             It is your duty as jurors to consult with one

18    another and to deliberate with one another with a view toward

19    reaching an agreement, if you can do so.  During your

20    deliberations, you should not hesitate to reexamine your own

21    views and change your opinion if you become persuaded that it

22    is wrong.

23             Because you must base your verdict only on the

24    evidence received in the case and on these instructions, I

25    remind you that you must not be exposed to any other

392

1    information about the case or to the issues it involves.

2          Except for discussing the case with your fellow

3    jurors during your deliberations, do not communicate with

4    anyone in any way and do not let anyone else communicate with

5    you in any way about the merits of the case or anything to do

6    with it.

7          This restriction includes discussing the case in

8    person, in writing, by phone, tablet, computer or any other

9    means, via e-mail, text messaging or any Internet chat room,

10   blog, website, or any other forms of social media.  This

11   restriction applies to communicating with your family

12   members, your employer, the media or press, and the people

13   involved in the trial.

14         If you are asked or approached in any way about your

15   jury service or anything about this case, you must respond

16   that you have been ordered not to discuss the matter and to

17   report the contact to the Court.

18         Do not read, watch or listen to any news or media

19   accounts or commentary about the case or anything to do with

20   it.  Do not do any research, such as consulting dictionaries,

21   searching the Internet or using other reference materials,

22   and do not make any investigation or in any other way try to

23   learn about the case on your own.

24         The law requires these restrictions to ensure the

25   parties have a fair trial based on the same evidence that

393

1    each party has had an opportunity to address.  A juror who

2    violates these restrictions jeopardizes the fairness of these

3    proceedings and a mistrial could result that would require

4    the entire trial process to start over.  If any juror is

5    exposed to any outside information, please notify the Court

6    immediately.

7         Some of you have taken notes during the trial.

8    Whether or not you took notes, you should rely on your own

9    memory of what was said.  Notes are only to assist your

10   memory.  You should not be overly influenced by your notes or

11   those of your fellow jurors.

12        The punishment provided by law for this crime is for

13   the Court to decide.  You may not consider punishment in

14   deciding whether the government has proved its case against

15   the defendant beyond a reasonable doubt.

16        A verdict form has been prepared for you.  After you

17   have reached a unanimous agreement on a verdict, your

18   foreperson should complete the verdict form according to your

19   deliberations, sign and date it and advise the bailiff that

20   you are ready to return to the courtroom.

21        If it becomes necessary during your deliberations to

22   communicate with me, you may send a note through the bailiff,

23   signed by any one or more of you.  No member of the jury

24   should ever attempt to communicate with me except by a signed

25   writing, and I will respond to the jury concerning the case

394

1    only in writing or here in open court.

2            If you send out a question, I will consult with the

3    lawyers before answering it, which may take some time.  You

4    may continue your deliberations while waiting for the answer

5    to any question.

6            Remember that you are not to tell anyone, including

7    me, how the jury stands numerically or otherwise on any

8    question submitted to you, including the question of the

9    guilt of the defendant until after you have reached a

10   unanimous verdict or have been discharged.

11           Ladies and gentlemen, that concludes the

12   instructions that will govern your deliberations.  The last

13   two instructions made reference to a bailiff.  I actually

14   have two bailiffs to assist you in this case.  And at this

15   time, I will ask Ms. Ortiz to swear our two bailiffs.

16           THE CLERK:  Please stand.

17           (Bailiffs sworn, 2:30 p.m.)

18           THE COURT:  Okay.  Ladies and gentlemen, the case

19   has now been officially submitted to you for your

20   deliberations.  I would ask you at this time to retire to the

21   jury room to begin your deliberations.

22           The bailiffs will escort you into the room and show

23   you around and get you oriented and provide you with any

24   additional materials, pens, paper, whatever you need during

25   the course of your deliberations.

395

1          So thank you for your time and attention, and please

2     follow the bailiffs into the jury deliberation room.

3          (Jury deliberations, 2:31 p.m.)

4          THE COURT:  Okay.  We are outside the presence of

5     the jury.  All counsel are present.  Mr. Atta is present.

6          I would ask the parties to confirm with Ms. Ortiz

7     what exhibits have been received into evidence and ensure

8     that only those exhibits that have been received are

9     submitted to the jury for their consideration.

10          There was only one defense exhibit.  Is that going

11     back in paper form, or has that been added to the thumb drive

12     that's going back?

13          MR. CORTEZ:  It was going to be added to the thumb

14     drive.

15          MS. DOUGLAS:  It has.

16          THE COURT:  Okay.  So we're still in the pandemic

17     protocol where the physical exhibits are not going back.

18          MR. CORTEZ:  Right.

19          THE COURT:  But they have access to the thumb drive.

20     There is a screen where they can go through the exhibits in

21     the jury room during their deliberations.

22          Mr. Cortez, did you confirm that only those exhibits

23     admitted into evidence are on the thumb drive?

24          MR. CORTEZ:  No.  It's being finalized as we

25     speak.

COMPUTER-AIDED TRANSCRIPTION

396

1          THE COURT:  Okay.  I would ask you to do so to

2    ensure that only those exhibits that are in evidence are on

3    the thumb drive.

4          MR. ROTH:  Your Honor, we will not be including the

5    stipulation which was filed and included because the only

6    portion of it was the testimony of Austin Ritter that would

7    have been offered, which per the parties we simply read into

8    the record.

9          THE COURT:  Okay.  Mr. Cortez, do you agree that the

10   stipulation should not go back to the jury for their

11   deliberations, because the only part that was read to the

12   jury is in the record in the form of oral recitation?

13         MR. CORTEZ:  I agree.

14         THE COURT:  Okay.

15         MR. CORTEZ:  I have one last thing.

16         THE COURT:  Yes.

17         MR. CORTEZ:  I want to make another motion for

18   mistrial.  Because in the middle of the government's closing

19   argument, the first one, he actually -- and I referred to

20   this in my closing.  He actually said to the jury that we

21   have not offered any evidence to rebut, when he said it, our

22   evidence.  Okay.

23         Clearly, he said that.  I really believe that's a

24   shifting of the burden, and it affects the entire process.

25   And I renew my motion for mistrial.

397

1          THE COURT:  Okay.  I took that comment in the

2     context of arguing that the government's evidence was

3     uncontested.  I believe it may have been an inartful way of

4     phrasing that particular argument, but I do note that

5     Mr. Roth came back and clarified that he was not shifting the

6     burden, that the burden remained with the government, and

7     then recycled that argument in a proper format to argue that

8     the testimony was uncontested and that there was no burden on

9     the part of the defense.

10          So I would respectfully deny the motion for a

11     mistrial.

12          MR. CORTEZ:  I understand.

13          THE COURT:  Okay.

14          MR. CORTEZ:  Your clerk has my cell number.

15          THE COURT:  Okay.  I would ask that all the parties

16     be within a ten-minute call --

17          MR. CORTEZ:  Okay.

18          THE COURT:  -- of the courthouse during the jury

19     deliberations.

20          Do the parties waive their presence -- if the jury

21     decide that they are going to retire for the evening and come

22     back tomorrow, do you waive your presence at the end of the

23     day and the beginning of the day tomorrow?

24          MR. CORTEZ:  Yes, we do.

25          MR. ROTH:  Yes, Your Honor.

COMPUTER-AIDED TRANSCRIPTION

398

1          THE COURT:  Okay.  I'd like to conclude today's

2     session, before you have an opportunity to consult about the

3     exhibits, with a comment on the performance of both sides in

4     this case.

5          I appreciate the professionalism by both sides.  I

6     think this case was very well presented.  It's a difficult

7     case.  There are some serious consequences to the matters

8     that are under the jury's consideration.  But I do appreciate

9     the professionalism on both sides, so thank you.

10          MR. CORTEZ:  Thank you.

11          MR. ROTH:  Thank you, Your Honor.

12          MS. FORREST:  Thank you.

13          THE COURT:  Okay.  We are in recess.

14          (Recess, 2:35 p.m. to 4:28 p.m.)

15          THE COURT:  Okay.  We are back on the record.  We

16     are outside the presence of the jury.  All counsel are

17     present.  Mr. Atta is present.

18          You should have on your table two different jury

19     notes that were submitted.  The first one is the jury

20     question:  The verdict form does not contain the word

21     "knowingly" while Instruction 10 and 11 include it.  Please

22     clarify.  Which takes precedence?

23          The other one is, Can the verdict form be reworded

24     or is it set?

25          You have one of my proposed answers.  I was working

399

1   on the other one, and then all counsel arrived.

2          So the option that I give the parties -- and I'm

3   more than happy to hear your thoughts on this as well -- is

4   that the verdict form is not intended to reflect the elements

5   of the crime charged; rather, it is merely intended to

6   document the jury's decision after your full consideration of

7   the jury instructions and the facts of the case.

8          MR. CORTEZ:  I agree with that.

9          THE COURT:  Okay.  Government's position?

10          MR. ROTH:  I agree with it, Your Honor.  Or if Your

11   Honor has an alternative that the Court would like to

12   propose.

13          THE COURT:  The other alternative, and it was merely

14   a word manipulation issue for me, because I had the

15   "guilty"/"not guilty," "did" or "did not" under the line, is

16   to amend the verdict form to track the specific language of

17   the indictment.  That seems to be their concern.

18          MR. CORTEZ:  Yeah, no.  Because I think that they

19   are going to get a little more confused.  Jury -- Jury

20   Instructions 10 and 11 cover it, and they should rely upon

21   it.  And it follows my part of the argument in closing,

22   especially Instruction 10.

23          MR. ROTH:  I think a whole new verdict form may lead

24   to more confusion than less.

25          THE COURT:  Very well.  I was so inclined.  And I

400

1    appreciate that.  What I would propose to do is just submit

2    this in written format to the jurors with a time on it, and

3    make that part of the record.

4              Is that okay with the defense?

5              MR. CORTEZ:  When you say "this," are you talking --

6              THE COURT:  It's the sheet that you have without

7    anything, other than my -- I'll probably use my stamp.

8              MR. CORTEZ:  We agree with that as well.

9              THE COURT:  Okay.  Could I have one of your

10   versions.  Mine has 9.5.

11             Okay.  The time is 4:30.  And I will ask the

12   bailiffs to submit that response.  And the response will be

13   made part of the record as well.

14             MR. CORTEZ:  Thank you.

15             THE COURT:  Okay.

16             MR. ROTH:  Your Honor, if we don't hear from the

17   Court by 5:05, should we just assume, or will the Court

18   contact us?  I just don't want to leave.

19             THE COURT:  So when they leave for the day,

20   Ms. Ortiz will let the parties know that they have recessed

21   for the day.  I am going to let them decide when they want to

22   come back, unless it's unreasonable.  If they want to come

23   back at noon, I'm going to suggest something earlier in the

24   day.  But I will let the parties know.

25             MR. CORTEZ:  Thank you.

401

1          MR. ROTH:  Thank you, Judge.

2          THE COURT:  You're welcome.

3          (Recess, 4:31 p.m. to 5:06 p.m.)

4          (Jury present, 5:06 p.m.)

5          THE COURT:  Okay.  We are back on the record.  All

6     of our jurors are present.  All counsel are present.

7     Mr. Atta is present.

8          Ladies and gentlemen, I'm informed that you have

9     reached a verdict; is that correct?

10          THE FOREPERSON:  Yes, Your Honor.

11          THE COURT:  And could the foreperson please hand the

12     verdict form to the bailiff.

13          Okay.  Mr. Atta, could you please stand for the

14     reading of the verdict.

15          MR. CORTEZ:  May I stand, too?

16          THE COURT:  Yes.

17          THE CLERK:  United States District Court,

18     Southern District of California, United States of America,

19     Plaintiff, versus Nameer Mohammad Atta, Defendant, Case No.

20     21-cr-1289-TWR.

21          Verdict:  We, the jury, find the defendant guilty of

22     distribution of fentanyl or some other federally controlled

23     substance, as charged in the indictment.

24          If you found guilty above, distribution did result

25     in the death of C.M.R., another person.

COMPUTER-AIDED TRANSCRIPTION

402

1          Dated September 27th, 2022, signed by the

2     foreperson, Austin Mroczek.

3          THE COURT:  Okay.  Mr. Cortez, do you wish to have

4     the jury polled?

5          MR. CORTEZ:  Yes, please.

6          THE COURT:  Ms. Ortiz, would you please poll the

7     jury.

8          THE CLERK:  Sean Kaufman, is this your verdict as

9     presented and read?

10          JUROR NO. 1:  Yes.

11          THE CLERK:  Elaine Wilson, is your verdict as

12     presented and read?

13          JUROR NO. 2:  Yes.

14          THE CLERK:  Jordan Black, is this your verdict as

15     presented and read?

16          JUROR NO. 3:  Yes.

17          THE CLERK:  Melanie Ramos, is this your verdict as

18     presented and read?

19          JUROR NO. 4:  Yes.

20          THE CLERK:  Austin Mroczek, is this your verdict as

21     presented and read?

22          THE FOREPERSON:  Yes.

23          THE CLERK:  Richard Massey, is this your verdict as

24     presented and read?

25          JUROR NO. 6:  Yes.

COMPUTER-AIDED TRANSCRIPTION

1    THE CLERK:  Madisyn Berg, is this your verdict as

2    presented and read?

3    JUROR NO. 7:  Yes.

4    THE CLERK:  Noe Vizcarra, is this your verdict as

5    presented and read?

6    JUROR NO. 8:  Yes.

7    THE CLERK:  Jesse Watford, is this your verdict as

8    presented and read?

9    JUROR NO. 9:  Yes.

10    THE CLERK:  Amy Messenger Alexander, is this your

11    verdict as presented and read?

12    JUROR NO. 10:  Yes.

13    THE CLERK:  Jessica Occhialini, is your verdict as

14    presented and read?

15    JUROR NO. 11:  Yes.

16    THE CLERK:  Tarang Patel, is this your verdict as

17    presented and read?

18    JUROR NO. 12:  Yes.

19    THE CLERK:  Thank you.

20    THE COURT:  Okay.  The jury has been polled.  The

21    verdict will be made part of the record in this case.

22    You may have seat.  Thank you.

23    MR. CORTEZ:  Thank you.

24    THE COURT:  Ladies and gentlemen, I'm going to make

25    my remarks brief, but I wanted to finish where we started

404

1   yesterday, and that is thanking each and every one of you for

2   your willingness to participate in this very important civic

3   duty.

4           As I hope you now understand, randomly selecting

5   people from the community to stand as judges of the facts in

6   a criminal case, such as this one, is a very important task,

7   and our judicial system is envied by many, many countries in

8   the world because we have citizens, such as yourself, who are

9   willing to serve in the capacity as jurors.

10          So on behalf of my court staff, on behalf of all of

11  the federal judges here in this Southern District of

12  California, I want to sincerely thank you for your time and

13  attention.

14          I paid very close attention to you during the course

15  of the presentation of the evidence, and each and every one

16  of you gave it your full attention, as it deserved in this

17  case.  So thank you once again.  I wish you all a very good

18  evening.

19          You may leave your notebooks here in the courtroom.

20  Ms. Ortiz will take your notes out and will shred them.  No

21  one will review them.  And make sure that you remove any

22  personal effects from the jury room prior to departing today.

23          As I told the other jurors who were not selected, if

24  you would kindly place your juror badges in the receptacle as

25  you go through security, we will recycle those.

405

1          The final thing that I would like to tell you,

2     ladies and gentlemen, is oftentimes, staff or the attorneys

3     or other individuals with an interest in the case may seek to

4     speak with you outside the courtroom after you're dismissed.

5     Whether or not you speak with those individuals is a matter

6     entirely up to you.

7          I would give you one cautionary thought, though.  If

8     you do choose to speak with anyone, please be very candid and

9     very truthful in any response you give, because interviews

10    with jurors sometimes circle their way back and wind up on my

11    desk in the form of an affidavit.  So please be mindful of

12    that possible fact if you choose to speak with any of the

13    participants after you're discharged from your duties.

14         And, officially, you are now discharged from your

15    duties.  You may discuss the case with anyone, to include the

16    parties, your spouse, your family members, your coworkers.

17    The admonition I've been giving you is now lifted.

18         So thank you once again, and good evening.

19         (Jury discharged, 5:12 p.m.)

20         THE COURT:  Okay.  We are outside the presence of

21    the jury, which has been dismissed now, so it's really no

22    consequence at this juncture.

23         But, Ms. Ortiz, may we have a sentencing date,

24    please.

25         THE CLERK:  That will be January 13th, at 9:30 a.m.

COMPUTER-AIDED TRANSCRIPTION

1            THE COURT:  Yes.  With a PSR.  I will order that a

2    presentence report be prepared in this matter.

3            Does January the 13th work for you, Mr. Cortez?

4            MR. CORTEZ:  Yes.

5            THE COURT:  Does January the 13th work for the

6    United States?

7            MR. ROTH:  It does, Your Honor.

8            THE COURT:  Okay.  Is there any other matter that we

9    need to address?

10            MR. CORTEZ:  Yes.  Would you extend the time for

11    post-verdict motions to the time of sentencing?

12            THE COURT:  Yes.  Until two weeks before sentencing.

13    So when your sentencing paperwork would ordinarily be due, a

14    week in advance of that, so that the government has a week to

15    respond to it.

16            MR. CORTEZ:  Okay.

17            THE COURT:  Okay.

18            MR. CORTEZ:  One last question.  We're -- I know

19    we're swimming upstream.  We're going to bring a

20    Constitutional attack on the sentencing part of this statute.

21            When would you like to see that?  At sentencing?

22            THE COURT:  Okay.  I'm looking at the date a little

23    bit more closely.  Given the briefing that I anticipate --

24            MR. CORTEZ:  It's going to be extensive.

25            THE COURT:  And we're right in the middle of the

1    holiday season for all the briefings, because two weeks out

2    would be right around the New Year and right after.

3            MR. CORTEZ:  Can we have a little more, because I

4    can tell you, there is extensive briefing going to happen.

5            THE COURT:  Okay.  Let's push the sentencing to

6    February.

7            MR. CORTEZ:  Beginning.

8            THE CLERK:  February 10th.

9            MR. CORTEZ:  That's good.

10           THE COURT:  Okay.

11           THE CLERK:  9:30 a.m.

12           THE COURT:  Okay.  Does February the 10th work for

13   the United States?

14           MR. ROTH:  Certainly, Your Honor.

15           THE COURT:  Okay.  Any briefing from the defense

16   will be due four weeks before the sentencing date, which will

17   be the 13th of January.  The government will have two weeks

18   to respond.  And your response will be due by January the

19   27th.  And then all of the sentencing-related documents will

20   be filed in the ordinary course.

21           MR. CORTEZ:  Thank you.

22           THE COURT:  Okay.

23           MR. ROTH:  Yes, Your Honor.

24           THE COURT:  All right.  Thank you very much.

25           We are in recess.

COMPUTER-AIDED TRANSCRIPTION

408

1          MR. ROTH:  Thank you, Judge.

2          MS. FORREST:  Thank you, Your Honor.

3          MR. CORTEZ:  Your Honor, one unusual request.

4          THE COURT:  Yes.

5          MR. CORTEZ:  May my client hug his mom?

6          THE COURT:  That's entirely up to the marshals.

7     Mr. Cortez, he's in their custody.

8          (Proceedings concluded at 5:15 p.m.)

9                    --oOo--

10               C E R T I F I C A T I O N

11          I hereby certify that I am a duly appointed,
      qualified and acting official court reporter for the United
12    States District Court; that the foregoing is a true and
      correct transcript of the proceedings had in the
13    aforementioned cause; that said transcript is a true and
      correct transcription of my stenographic notes; and that the
14    format used herein complies with the rules and requirements
      of the United States Judicial Conference.
15          DATED:  October 25, 2022, at San Diego, California.

16                              S/CAMERON P. KIRCHER
                                CAMERON P. KIRCHER
17

18

19

20

21

22

23

24

25

COMPUTER-AIDED TRANSCRIPTION